UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SHAWN SULLIVAN, *et al*., on behalf of themselves and all others similarly situated, | : | Civil Action Index Nos. |
|  | : |  |
|  | : | 04-CV-02819 (SRC) |
| Plaintiffs, | : |  |
|  | : |  |
| - against - | : |  |
|  | : |  |
| DB INVESTMENTS, INC., *et al*., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
| ANCO INDUSTRIAL DIAMOND CORP., on behalf of itself and all others similarly situated, | : | 01-CV-04463 (SRC) |
|  | : |  |
|  | : |  |
| Plaintiff | : |  |
|  | : |  |
| - against - | : |  |
|  | : |  |
| DB INVESTMENTS, INC., *et al*., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
| BRITISH DIAMOND IMPORT COMPANY, on behalf of itself and all others similarly situated, | : | 04-CV-04098 (SRC) |
|  | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| - against - | : |  |
|  | : |  |
| CENTRAL HOLDINGS LTD., *et al*., | : |  |
|  | : |  |
| Defendants. | : |  |

**INDIRECT AND DIRECT PURCHASER PLAINTIFFS' JOINT SUBMISSION ON ALLOCATION OF THE SETTLEMENT FUND, NATIONAL PLAN OF FUND DISTRIBUTION, AND CONTENT AND DISSEMINATION OF NOTICE**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................. 1

II.    LEGAL STANDARDS FOR ALLOCATING SETTLEMENT FUNDS TO MEMBERS OF THE INDIRECT PURCHASER SUBCLASSES................ 4

    A.    Proving Damages In An Indirect Purchaser Case ....................................... 4

    B.    Legal Standard For Allocation ................................................... 5

    C.    Litigation Risks Informed the Indirect Purchasers' Decision to Settle ........................................................................ 8

    D.    The Allocation Should Account for Litigation Risks ................................. 9

III.   A NATIONWIDE, *PRO RATA* DISTRIBUTION OF THE SETTLEMENT PROCEEDS TO ALL MEMBERS OF THE RESELLER AND CONSUMER SUBCLASSES IS FAIR, REASONABLE, AND ADEQUATE ..................................................................... 9

    A.    Courts Within The Third Circuit Consistently Approve Settlement Fund Distribution Plans Where Class Members' State Law Claims Differ ........................................................................ 10

    B.    The Indirect Class Settlement Proceeds Are Proper For A Nationwide Distribution Method. ............................................ 13

    C.    *De Minimis* Recoveries and Residual Funds ........................................... 14

IV.   THE INDIRECT PURCHASER CLASS NOTICE AND NOTICE PLAN SATISFY THE REQUIREMENTS OF RULE 23 AND DUE PROCESS ........ 15

    A.    Legal Standard for Notice ...................................................... 16

    B.    The Plan To Disseminate Notice Satisfies The Requirements Of Rule 23 And Due Process ..................................................... 17

         1.    The Indirect Purchaser Notice Plan Provides The Best Notice Practicable, Is Plain And Simple, and Meets The Due Process Requirements Of Rule 23 ..................................... 18

                a.    Published Notice Will Reach Almost Every Member Of The Consumer Subclass And A Large Portion Of The Reseller Subclass ................................... 18

                b.    The Internet Will Also Provide Notice To The Indirect Purchaser Class Members .................................. 20

                c.    Earned Media And Third-Party Notice Will Increase Awareness ......................................................... 21

         2.    The Notice Will Reach Consumer Subclass Members ................ 22

**TABLE OF CONTENTS**
**(continued)**

                                                                                          Page

        3.    The Notice Will Reach Reseller Subclass Members By
                 Direct Mail And Publication ........................................................ 25

    C.    The Content Of The Notice Complies With Rule 23 And Due
         Process ................................................................................................. 26

V.    THE DIRECT PURCHASER CLASS NOTICE AND NOTICE PLAN
       SATISFY THE REQUIREMENTS OF RULE 23 AND DUE PROCESS ......... 28

VI.    CONCLUSION ................................................................................................. 30

VII.   ATTACHED EXHIBITS

    A.  *Angela Tese-Milner as Chapter 7 Trustee of the*
       *Estate of W.B. David & Co., Inc.*
       Case No. 04-Civ-5203 (KMW) (S.D.N.Y.)
       (March 27, 2007 Order).
    B.  Long Form Notice
    C.  Publication Notice
    D.  Reseller Subclass Claim Form
    E.  Consumer Subclass Claim Form
    F.  Direct Purchaser Class Supplemental Notice
    G.  Direct Purchaser Class Claim Form

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................................... 16

*Angela Tese-Milner as Chapter 7 Trustee of the Estate of W.B. David & Co., Inc.*
*v. De Beers Centenary A.G., et al.*,
Case No. 04-Civ-5203 (KMW) (S.D.N.Y.) ............................................................... 9

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
191 Cal. App. 3d 1341 (1987) ...................................................................................... 5

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989)........................................................................................................ 4

*Carlough v. Amchem Prods., Inc.*,
158 F.R.D. 314 (E.D. Pa. 1993) ................................................................................. 16

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974).............................................................................................. 16, 17

*Gordon v. Microsoft Corp.*,
No. MC 00-5994, 2003 WL 23105550 (D. Minn. Dec. 15, 2003) ......................... 5

*Henry v. Sears Roebuck & Co.*,
No. 98-CV-4110, 1999 WL 33496080 (N.D. Ill. July 23, 1999).......................... 17

*Hopkins v. De Beers Centenary AG, et al.*,
No. CGC-04-432954, 2005 WL 1020868 (Cal. Sup. Ct. April 15, 2005)............. 5

*Illinois Brick v. Illinois*,
431 U.S. 720 (1977)....................................................................................................... 4

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
MDL No. 1500, -02 Civ. 5575, 2006 U.S. Dist. LEXIS 17588, at *58
(S.D.N.Y. Apr. 6, 2006)................................................................................................ 6

*In re Cardizem CD Antitrust Litigation*,
218 F.R.D. 508 (E.D. Mich. 2003) ............................................................................. 6

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
216 F.R.D. 197 (D. Me. 2003)......................................................................... 6, 25, 28

*In re Computron Software, Inc.*,
6 F. Supp. 2d 313 (D.N.J. 1998) ................................................................................. 6

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*,
410 F. Supp. 722 (D. Minn. 1975)............................................................................... 7

*In re Corel Corp. Inc. Sec. Litig.*,
293 F. Supp. 2d 484 (E.D. Pa. 2003) ........................................................................ 5

*In re Domestic Air Transp. Antitrust Litig.*,
141 F.R.D. 534 (N.D. Ga. 1982)............................................................................... 16

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Lease Oil Antitrust Litig. (No. II)*,
   186 F.R.D. 403 (S.D. Tex. 1999) ................................................................................ 7, 9

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   205 F.R.D. 369 (D.D.C. 2002) .................................................................................. 10

*In re Lucent Tech. Sec. Litig.*,
   307 F. Supp. 2d 633 (D.N.J. 2004) ............................................................................ 5

*In re Michael Milken and Assocs. Sec. Litig.*,
   150 F.R.D. 57 (S.D.N.Y. 1993) ................................................................................ 17

*In re Microstrategy Sec. Litig.*,
   148 F. Supp. 2d 654 (E.D. Va. 2001) ................................................................... 9, 17

*In re Nissan Motor Corp. Antitrust Litig.*,
   552 F.2d 1088, 1105 (5th Cir. 1977) ........................................................................ 16

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997) ......................................................... 16, 19, 26, 27

*In re Relafen Antitrust Litig.*,
   231 F.R.D. 52, 74-75 (D. Mass. 2005) ...................................................................... 7

*In re Remeron Direct Purchaser Antitrust Litig.*,
   No. Civ. 03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ..................................... 5, 6

*In re Remeron End-Payor Antitrust Litig. (Remeron II)*,
   Nos. Civ. 02-2007, Civ. 04-5126, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) .............. 10, 13

*In re Telectronics Pacing Sys., Inc.*,
   137 F. Supp. 2d 985 (S.D. Ohio 2001) ...................................................................... 7

*In re The Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)...................................................................................... 27

*In re Warfarin Sodium Antitrust Litigation*,
   212 F.R.D. 231 (D. Del. 2002) .......................................................................... passim

*Lake v. First Nationwide Bank*,
   156 F.R.D. 615 (E.D. Pa. 1994)................................................................................ 17

*Lenahan v. Sears, Roebuick and Co.*,
   No. Civ. 02-0045, 2006 WL 2085282 (D.N.J. July 24, 2006)........................................... 27

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) .................................................................................... 7

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. 2001) ................................................................................ 17

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)................................................................................................ 17

*Nichols v. Smithkline Beecham Corp.*,
   No. Civ. A. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) .................................. 7, 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Schwartz v. TXU Corp.*,
  No. 3:02-CV-2243-k, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ...................................... 6

*White v. Nat'l Football League*,
  822 F. Supp. 1389 (D. Minn. 1993), aff'd, 41 F.3d 402 (8th Cir. 1994)............................... 17

**RULES**

Fed. R. Civ. P. 23 ...................................................................................................... passim

**TREATISES**

*Manual for Complex Litigation* (Fourth) § 21.312 ...................................................... 27

*Newberg on Class Actions* (4th ed. 2002)................................................................. 6, 8, 26, 27

## I.       **INTRODUCTION**

The Amended Settlement Agreement ("Agreement")[1] resolves seven lawsuits[2] brought by indirect and direct purchasers of diamonds against certain De Beers entities[3] (for violations of federal antitrust and state antitrust, consumer protection, and common laws. Plaintiffs in these cases allege that De Beers monopolized and controlled the supply of rough and polished diamonds and, as a result, caused the prices of rough and polished diamonds to be higher than they otherwise would have been.  Plaintiffs, and the absent class members they represent, purchased rough diamonds, polished diamonds, and diamond jewelry at allegedly inflated prices resulting from De Beers' acts and sued to recover their damages.[4]

---

[1] On November 29, 2006, the Honorable Stanley R. Chesler, United States District Judge for the District of New Jersey, preliminarily approved a settlement among plaintiffs and De Beers S.A. that resolves *Sullivan v. D.B. Investments*, an action brought by a putative class of indirect purchasers of diamonds, as well as three other indirect purchaser class actions.  This agreement was later amended to settle three additional class actions, including actions brought by both direct and indirect purchasers.  The amended agreement was preliminarily approved on March 31, 2006.

[2] (1) *Sullivan, et al. v. DB Investments, Inc., et al.*, D.N.J. Index No. 04-cv-02819 (SRC) ("*Sullivan*"); (2) *Hopkins v. De Beers Centenary A.G., et al.,* San Francisco Co., Case No. CGC-04-432954 ("*Hopkins*"); (3) *Cornwell v. DB Investments, Inc., et al.*, Maricopa Co. Case No. CV2005-2968 ("*Cornwell*"); (4) *Null, et al. v. DB Investments, Inc., et al.,* Madison Co. Case No. 05-L-209 ("*Null*"); (5) *Leider, et al. v. Ralfe, et al.*, D.N.J Index No. 06-cv-00908 (SRC) ("*Leider*"); (6) *Anco Industrial Diamond Corp. v. DB Investments, Inc., et al.*, D.N.J. Index No. 01-cv-04463 (SRC) ("*Anco*"); and (7) *British Diamond Import Company v. Central Holdings Ltd., et al.*, D.N.J. Index No. 04-cv-04098  (SRC) ("*British Diamond*").

[3] De Beers S.A., DB Investments, Inc., De Beers Consolidated Mines, Ltd., De Beers A.G., Diamond Trading Company, Ltd., CSO Valuations A.G., Central Selling Organization, Central Holdings Ltd., and De Beers Centenary A.G. (hereinafter collectively, "De Beers").

[4] Submitted herewith is the Indirect Purchaser Plaintiffs' Stipulated Industry Facts ("Stipulated Facts") containing 59 paragraphs of uncontested background information pertinent to the subject matter at issue in this case.  Specifically, the Stipulated Facts address the following areas:  (1) a procedural history of the litigation including a brief description of the cases where the parties reached a settlement and a summary of the Amended Settlement Agreement (Stipulated Facts at ¶¶ 1-13); (2) background information on the diamond mining industry (Stipulated Facts at ¶¶ 14-18); (3) De Beers' rough diamond market share and distribution method (Stipulated Facts at ¶¶ 19-28); (4) a description of the "diamond pipeline" (Stipulated Facts at  ¶¶ 29-47); (5) background information about the Reseller Subclass members' purchases (Stipulated Facts at ¶¶ 48-54); (6) background information about the Consumer Subclass members' purchases

The Agreement establishes two subclasses of indirect purchasers and a class of direct purchasers, each represented by separate counsel:  (1) an Indirect Purchaser Reseller Subclass ("Resellers") whose members purchased rough diamonds, loose polished diamonds, and diamond jewelry at wholesale; (2) an Indirect Purchaser Consumer Subclass ("Consumers") whose members purchased diamond jewelry and loose polished diamonds at retail; and (3) a Direct Purchaser class whose members purchased rough and polished diamonds from De Beers and De Beers' competitors.  Importantly, the settlement requires both that De Beers abide by the terms of an injunction and to pay total cash consideration of $295 million, of which $272.5 million has been allocated to the Indirect Purchaser Class and $22.5 million to the Direct Purchaser Class (and up to $7 million for Indirect Purchaser Class notice costs).  In exchange, class members agree to release all claims included in the complaints, as well as claims that could have been brought against De Beers that arise out of or are related to the facts alleged in the complaints.  These include claims for damages and injunctive and other equitable relief under the Sherman and Clayton Acts and state antitrust, consumer protection, and common laws covering all fifty states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.  Certain De Beers sightholder claims are excluded from the settlement and release.[5]

The Agreement further provides for the appointment of a Special Master to resolve issues concerning, *inter alia*, allocation of settlement funds to members of the Indirect Purchaser Subclasses, the claims process, and notice.  Resellers and Consumers previously briefed and argued to the Special Master the issue of allocating settlement funds between the two

---

(Stipulated Facts at ¶¶ 55-62); and (7) prices of diamond products (Stipulated Facts at ¶¶ 63-68). The Indirect Purchaser Plaintiffs suggest the Special Master consider the Stipulated Facts in his deliberations and in the drafting of his Report and Recommendation.

[5] "De Beers sightholders" are entities selected by De Beers that have the right to buy rough diamonds sold periodically by DeBeers at sales known as "sights."

subclasses.  At that time, the Resellers and Consumers each argued that the weight of the economic and industry evidence supported a decision granting a larger share of the settlement funds to their respective Subclass.  Counsel for each subclass presented expert opinions and economic analyses.  The Special Master stated his intent to recommend an allocation of 50.3% to the Resellers and 49.7% to the Consumers.  (*See* April 12, 2006 Submission of the Honorable Alfred M. Wolin Special Master.)

The Indirect Purchaser Subclasses and the Direct Purchaser class now submit this joint briefing on three sets of common legal issues:  (1) the standards for allocating funds between subclass members; (2) proposed claim and fund distribution processes for each subclass and for the Direct Purchaser Class; (3) a proposed nationwide plan of notice to the Indirect Purchaser Class members; and (4) a proposed plan of notice to Direct Purchaser Class members.  As discussed below in Section II, the allocation plan for indirect purchasers should be based on the damages that could be recovered in an indirect purchaser action under state antitrust, consumer protection, or common laws while also reflecting the legal risks faced by subclass members.  Section III summarizes the federal authority authorizing nationwide settlement classes for claims brought under the law of all 50 states and also explains why a *pro rata* distribution is appropriate here.  Section IV describes the due process standards that govern the design of a proper plan of notification and how the Indirect Purchaser Class notification plan complies.  The Reseller and Consumer subclasses agree upon the legal standards that guide the Special Master's decisions on these issues.  Finally, Section V describes the proposed notice plan for the Direct Purchaser Class.

Resellers and Consumers disagree how the legal standard governing allocation should apply to the facts of this case and, therefore, present their arguments concerning specific

legal risks in their separate briefs submitted herewith.  As explained in those submissions, the subclasses particularly disagree over their respective risks associated with proving damages.  *See* Consumer Brief at II(B); Reseller Brief at III.  The claims proposals developed by each subclass are described in section III of the Consumer Brief and section IV of the Reseller Brief.

## II.    LEGAL STANDARDS FOR ALLOCATING SETTLEMENT FUNDS TO MEMBERS OF THE INDIRECT PURCHASER SUBCLASSES

This section reviews the law relevant to the allocation of settlement funds to the Indirect Purchaser Class members.  It first analyses the measure of damages in an indirect purchaser case, then turns to the fairness standard that guides the allocation process, and finally discusses the key role of legal risk analysis in a plan of allocation.

### A.    Proving Damages In An Indirect Purchaser Case

The *Sullivan* settlement resolves claims of a nationwide class of indirect purchasers.[6]  In state law indirect purchaser cases, plaintiffs contend "they [are] the true victims of overcharges passed on to them by one or more middlemen."  ABA Section of Antitrust Law, *Antitrust Law Developments* 852 (5th ed. 2002).  To prove damages in an indirect purchaser case, plaintiffs must establish the amount of the illegal overcharge they absorbed.  As a Minnesota court explained in a case concerning consumer purchases through a variety of channels of Microsoft's Windows operating system, the "question then is how much did this alleged increase in cost to direct purchasers result in an increased price to class members, *i.e.*, how much of the monopoly overcharge was passed through to them."  *Gordon v. Microsoft*

---

[6] *Illinois Brick v. Illinois*, 431 U.S. 720, 727 (1977), held that only the first purchaser in the chain of distribution, the direct purchaser, may bring a suit under the federal antitrust laws.  However, several states enacted so-called "*Illinois Brick* repealer statutes" to allow recovery under their antitrust statutes by indirect purchasers.  *California v. ARC Am. Corp.,* 490 U.S. 93, 105-06 (1989) (federal antitrust laws do not preempt state antitrust laws).  Other states continue to allow business tort recoveries under their consumer protection laws or their unjust enrichment common laws.

*Corp.,* No. MC 00-5994, 2003 WL 23105550, at *1 (D. Minn. Dec. 15, 2003) (noting that "a product can follow a large number of different pathways from Microsoft to a consumer"); *see also B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1351 (1987) ("Plaintiff and the class can demonstrate they were damaged by the alleged conspiracy only if they can establish that the independent distributors increased prices for glass containers to compensate [them] for Defendants' overcharges."); *Hopkins v. De Beers Centenary AG, et al.*, No. CGC-04-432954, 2005 WL 1020868 (Cal. Sup. Ct. April 15, 2005) (certifying class of California indirect diamond purchasers).

As in *Gordon* and *Hopkins*, the Indirect Purchaser Class members here would prove damages at trial by determining the amount of the illegal overcharge, estimating the value of the diamonds in the products they purchased, and then calculating how much of that value was a result of the portion of the rough diamond overcharge passed through to them.  Consistent with this authority concerning indirect purchaser damage calculations, the Indirect Purchaser Class's proposed allocation plan seeks to compensate claimants in relation to the amount of overcharge Resellers and Consumers absorbed.

    **B.**    **<u>Legal Standard For Allocation</u>**

A plan to allocate the settlement fund must, like the settlement itself, be fair, adequate, and reasonable.  *In re Lucent Tech. Sec. Litig.,* 307 F. Supp. 2d 633, 649 (D.N.J. 2004). "A plan . . . that reimburse[s] class members based on the type and extent of their injuries [is generally] reasonable."  *In re Corel Corp. Inc. Sec. Litig.,* 293 F. Supp. 2d 484, 493 (E.D. Pa. 2003) (quoting *Aetna Inc. Sec. Litig.,* MDL No. 12191, 2001 WL 209281 at *12 (E.D. Pa. Jan. 4, 2001)).  This flexible standard permits courts to approve plans fitting the exigencies of each case. *See In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 FSH, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) (describing the broad and discretionary supervisory powers of

courts allocating settlement proceeds among class members) ("*Remeron I*").  For example, in *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003), consumers were allocated a per capita recovery from the settlement fund based upon a proof of purchase of an audio CD.  The court held that this practical method of calculating claim awards was superior to one based on the actual number of CDs purchased during the class period because of the burden of documenting numerous separate purchases.  *Id.* at 209-10, 213.

Allocation plans are reasonable when they are based on objective, analytic methodologies often used by expert economists.  *Accord*, 3 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 10:7, at 489 (4th ed. 2002) ("[c]lass proof of damages . . . by application of mechanical formulae or statistical methods . . . has received approval in several antitrust cases").  The "allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL No. 1500, -02 Civ. 5575, 2006 U.S. Dist. LEXIS 17588, at *58 (S.D.N.Y. Apr. 6, 2006).  For example, the court in *In re Cardizem CD Antitrust Litigation,* 218 F.R.D. 508, 531 (E.D. Mich. 2003), approved a plan of allocation "based on each class member's actual purchases of [Cardizem] CD, in conformance with Plaintiffs' experts' damage calculation methodology."  *See also In re Computron Software, Inc.,* 6 F. Supp. 2d 313, 321 (D.N.J. 1998) (approving allocation plan based on an analysis of the timing and inflation of stock purchases); *Schwartz v. TXU Corp.,* No. 3:02-CV-2243-k, 2005 WL 3148350, at *23-24 (N.D. Tex. Nov. 8, 2005) (approving allocation plan designed by class counsel and their experts based on objective methodology for calculating damages).  In antitrust cases, allocations of settlement funds to claimants in proportion to the overcharge they incurred are inherently reasonable.  *See Remeron I*¸ 2005 WL 3008808, at *11; *see also In re Coordinated Pretrial*

*Proceedings in Antibiotic Antitrust Actions,* 410 F. Supp. 722, 726-29 (D. Minn. 1975) (approving allocation plan that accounted for different measures of damages for purchases of different products).

Courts also routinely approve allocation plans that are the result of negotiations between separate counsel representing class members with divergent interests. For instance, in antitrust cases involving purchases of prescription drugs, courts appoint separate counsel to advocate for the interests of consumers and third party payors ("TPPs") during allocation, but do not subdivide the class nor replace the lead counsel who negotiated the settlement on behalf of all class members. *See Nichols v. Smithkline Beecham Corp.*, No. Civ. A. 00-6222, 2005 WL 950616, at *18 (E.D. Pa. Apr. 22, 2005). *In re Warfarin Sodium Antitrust Litigation,* 212 F.R.D. 231, 260 (D. Del. 2002) ("*Warfarin I*"), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ("*Warfarin II*"), held that a plan of allocation was fair because it was agreed to by attorneys separately representing consumers and TPPs after extensive, arm's-length negotiations. *See also In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 74-75 (D. Mass. 2005) (holding that structural protection was present in allocation proceeding where separate counsel was appointed for both consumer and TPP subgroups, notwithstanding fact that some counsel on allocation committee represented all end-payors); *In re Lease Oil Antitrust Litig. (No. II),* 186 F.R.D. 403, 424-26 (S.D. Tex. 1999) (adequate representation found where assignment of separate law firms and independent experts to represent each group in allocation negotiations provided safeguards for all class members); *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1004 (S.D. Ohio 2001) (counsel for absent class members added a structural protection supporting the settlement allocation plan); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (class benefits from informal participation by counsel who was knowledgeable of case).

Consistent with this authority, separate Reseller and Consumer counsel presented to the Special Master background industry information, testimony from two expert economists, econometric pricing analyses, and other evidence and arguments concerning the pricing of diamond products purchased, respectively, by Resellers and Consumers.

C.   **Litigation Risks Informed the Indirect Purchasers' Decision to Settle**

Counsel for the Indirect Purchaser Class appropriately considered litigation risks when entering the settlement agreement.  Before settling, Indirect Purchaser Plaintiffs and their counsel evaluated the totality of the risks concerning the litigation and determined that this settlement was a superior option for all Class members.  *Newberg*, *supra*, § 11.50, at 155 (appropriateness of the settlement fund measured by "the likely expenses of continuing the litigation and its prospects for relief for the class").

Although defaults had been entered in all of the settled cases, there were no monetized judgments and, therefore, De Beers had several options available.  First, De Beers could decide not to appear and, according to De Beers, any monetized judgment would not be enforced by courts in the foreign jurisdictions where it holds assets.  Second, one or more De Beers entities could have appeared and moved to vacate the defaults.  In the event that a court granted such a motion, De Beers would have litigated a host of issues including service, personal jurisdiction, application of statutes of limitation, class certification, liability, and damages.  Third, even if the defaults were not vacated,  De Beers could have appeared to contest damages, which it maintains indirect purchasers would have had difficulty establishing.  Faced with these uncertainties, the Indirect Purchaser Plaintiffs believed that the benefits of a settlement assuring them a significant financial and equitable recovery substantially outweighed the risks and expense of further litigation.  The real risk to Plaintiffs that De Beers would succeed in lifting the defaults is demonstrated by the Honorable Kimba Wood's recent decision in *Angela Tese-Milner*

*as Chapter 7 Trustee of the Estate of W.B. David & Co., Inc. v. De Beers Centenary A.G., et al.*,

Case No. 04-Civ-5203 (KMW) (S.D.N.Y.), another case alleging anti-competitive conduct by De

Beers.[7]   After lengthy briefing and argument, the Court vacated the defaults and permitted

De Beers to respond to the complaint.

> ### D.      The Allocation Should Account for Litigation Risks

Settlements and settlement allocations should account for litigation risk,

particularly with respect to proving the amount of damages.  An allocation plan should reflect the

relative strengths of class members' claims.  *See In re Microstrategy Sec. Litig.*, 148 F. Supp. 2d

654, 668-69 (E.D. Va. 2001) (approving an allocation plan that "sensibly makes interclass

distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members'

individual claims"); *cf. Warfarin I,* 212 F.R.D. at 255-56 (analyzing the risks faced by plaintiffs

in establishing liability and damages in approving a settlement).  *Lease Oil Antitrust Litigation*,

*supra*, is instructive.  Representatives of two subgroups, first tier claimants who had lease and

antitrust claims and second tier claimants who only had antitrust claims, negotiated a plan of

allocation.  *Id.* at 425.  Over objectors' protests, the court held that the allocation between the

two subgroups was fair because "different counsel represented different interests, negotiated on

behalf of those interests and agreed to an allocation responsive to the relative strength of those

interests."  *Id.*   The application of this standard to the facts of this case is a matter of sharp

disagreement, which is separately briefed.

### III.      A NATIONWIDE, *PRO RATA* DISTRIBUTION OF THE SETTLEMENT PROCEEDS TO ALL MEMBERS OF THE RESELLER AND CONSUMER SUBCLASSES IS FAIR, REASONABLE, AND ADEQUATE

Although the subclasses disagree on the amount to be allocated to each subclass

---

[7] Attached hereto as Exhibit A is a true and correct copy of the March 27, 2007 Order in which Judge Wood vacated the defaults entered against the De Beers defendants.

fund, they do agree that separate nationwide, *pro rata* distributions among subclass claimants is fair, reasonable, and adequate.   Both subclasses developed plans of distribution whereby the amount each claimant receives will be determined by calculating a "Recognized Diamond Claim" for each Purchase.  Each claimant's total Recognized Diamond Claim will be divided by the total of all Recognized Diamond Claims for that claimant's subclass in order to determine the claimant's *pro rata* share of the subclass settlement fund.  Full explanations of the respective subclass distribution plans are contained in the Consumers' and Resellers' briefs.

A.     **Courts Within The Third Circuit Consistently Approve Settlement Fund Distribution Plans Where Class Members' State Law Claims Differ.**

The standard for approving a plan of allocation in a settlement class action "is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable, and adequate."  *Computron Software*, 6 F. Supp. 2d at 321 (*quoting In re Oracle Sec. Litig.*, [1994-1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,355 at 90,466 (N.D. Cal. June 18, 1994)); *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 381 (D.D.C. 2002) ("[a]s with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate").  Courts in the Third Circuit have consistently approved *pro rata* distribution plans similar to the one proposed here. *See, e.g., Warfarin I,* 212 F.R.D. at 258-60 (approving a plan of allocation that did not take into account differences of claims under various states' laws); *In re Remeron End-Payor Antitrust Litig.*, Nos. Civ. 02-2007, Civ. 04-5126, 2005 WL 2230314, at *21 (D.N.J. Sept. 13, 2005) ("*Remeron II*") (variations in state law did not make the settlement unfair where it allowed defendants to achieve global peace, plaintiffs were compensated for the common law claims of unjust enrichment, and the settlement fund likely would have been much smaller if some class members had been excluded); *Nichols*, 2005 WL 950616, at *16-20 (nationwide settlement class

allocated net settlement fund proceeds to consumers and TPPs in all 50 states without regard to variations in state laws).  In fact, there is no reported decision in which a Third Circuit Court disallowed a distribution that ignored distinctions in the strength of settlement class members' different state laws claims.

In *Warfarin*, the seminal case on the issue, which concerned the sale of the drug Coumadin, the plaintiffs brought: (1) injunctive relief claims under § 16 of the Clayton Act; (2) damage claims under § 4 of the Clayton Act on behalf of TPPs; (3) state law damage claims for violations of consumer fraud and deceptive trade practice acts of all 50 states and the District of Columbia; (4) indirect purchaser damage claims under the antitrust statutes of those states that allow such claims; and (5) claims for tortious interference and unjust enrichment under the laws of all 50 states and the District of Columbia.  *See Warfarin I*, 212 F.R.D. at 240-41.  The case settled and the parties sought approval of a national settlement class with a proposed plan of distribution that made no distinction between residents of *Illinois Brick* repealer and non-repealer states.  Included in the settlement was a release of "any legal, equitable, or administrative claims against defendant 'that relate to the marketing, promotion or sale of Coumadin during the Class Period that were or could have been asserted' in the instant Coumadin litigation."  *Id.* at 243.

The plan of allocation provided for the net fund to be divided between consumers and TPPs.  *Id.*  The "recognized loss" for each class member was computed identically as the "total payments made for Coumadin (less the amounts received for reimbursements, discounts, or rebates) multiplied by 15%."  *Id.*  Eighteen percent of the $44.5 million fund was set aside to pay consumers first.  *Id.*

A number of objectors argued that the allocation plan should have taken into account differences between class members.  Several objectors criticized the allocation plan for

treating claimants from all states equally given the differences among the states' antitrust and consumer protection statutes.  One objector asserted that the TPPs should have received a smaller share of the settlement because they lacked standing under the antitrust laws.  Finally, several objectors complained that fixed co-pay consumers should not have been included in the settlement because they would have paid the same price regardless of the defendant's conduct, and thus suffered no damages.

Despite the acknowledged differences among class members, the court approved the plan of allocation.  First, the court found that it would have been "purely speculative" to anticipate that claimants from indirect purchaser states could have obtained a greater recovery than other claimants, where damages were also sought through state consumer protection statutes.  It made no difference that these statutes provided for different types of recovery – some provided for actual damages, others for punitive or treble damages, and others for full consideration (*i.e.*, the purchase price and not just the overcharge).  *Id.* at 260.  The court also found that even if some class members did not have strong claims for damages, they still had claims for injunctive or other equitable relief and that it was appropriate to compensate them for releasing those claims.  *Id.* at 259.  Second, the court understood the defendant's need for global peace and acknowledged that a settlement that did not include all groups with potential claims would have likely been much smaller, as it would have left the defendant subject to future suits.  *Id.* at 258-59.  Finally, the court noted that both consumer and TPP class representatives, after extensive, arm's-length negotiations, agreed to the allocation plan, further demonstrating its fairness.  *Id.* at 260.

The Third Circuit affirmed, 391 F.3d 516 (2004), citing the same reasons for approval as the District Court.  In addition, the Court observed that many of the arguments raised

against the parties' plan of allocation "overlap substantially with those made with respect to class certification . . . ." *Id.* at 539.  As the Court noted, its ruling that the national settlement class satisfied Rule 23's commonality and predominance requirements addressed *sub silentio* any objection to distributing the settlement proceeds without distinguishing state laws.  *See id.* at 528-531.

> **B.**     **The Indirect Class Settlement Proceeds Are Proper For A Nationwide Distribution Method.**

Here, both Indirect Purchaser Subclass funds contemplate a *pro rata* distribution method indistinguishable from those approved in the cases discussed above.  As in *Warfarin*, it would be "purely speculative" to craft a plan of allocation that distinguishes between class members based on variations in state antitrust and consumer protection laws.  212 F.R.D. at 257. Moreover, all class members have brought and will be releasing claims for injunctive relief and for unjust enrichment.  It is entirely appropriate that they receive consideration for these claims. *See Warfarin II*, 391 F.3d at 539.  The nationwide release is also necessary for De Beers to obtain the global peace for which it negotiated and paid.  If the settlement class is not as broad as the one proposed here, De Beers would remain vulnerable to claims by excluded class members and in all likelihood the settlement fund would be significantly smaller.  *See id.*; *Remeron II*, 2005 WL 2230314, at *21.  In fact, if De Beers had not been able to achieve global peace, it may have continued its practice of avoiding U.S. courts and not settled at all.

The Court should also consider that the allocation plan was developed by competent and experienced counsel, including counsel in the *Hopkins* case, which only involved claims of indirect purchasers in California (an *Illinois Brick* repealer state) and counsel in the *Null* case, which only involved claims of indirect purchasers in Illinois (a non-repealer state). Both sets of counsel had the best interests of their classes in mind when agreeing to the proposed

plan of allocation.

The fact that the *Sullivan* plaintiffs initially sought to certify Consumer and Reseller damage subclasses from fewer than all 50 states and the District of Columbia does not warrant an allocation that gives preference to certain states. This position merely reflected *Sullivan* counsels' assessment of the class claims they could support and manage in litigation. The settlement covers a broader set of claims brought in seven class actions, including the *Null* suit brought on behalf of Illinois purchasers (whose claims were not included in the *Sullivan* class certification motion), and the release of all claims that could have been brought based on the same facts and circumstances alleged in these cases. It would be purely speculative to assume that residents of some states have stronger claims than residents of other states simply because the plaintiffs in one case chose not to certify a nationwide damages class.[8] In addition, the *Sullivan* motion included certification of a nationwide injunctive class and, as the Third Circuit has made clear, the existence of such claims justifies equal treatment of all settlement class members.

## C.    *De Minimis* **Recoveries and Residual Funds**

Both of the proposed Subclass distribution plans provide that those claims that result in a recovery below a minimum amount (a "*de minimis*" claim) will not be paid. Some recoveries will be too small to be cost-effective to distribute. At the end of the distribution process there is likely to be a residual amount of money consisting of uncashed checks, interest earned after the distribution amounts were calculated, and unspent money previously reserved for distribution costs.

The parties have discussed options for the recommended disposition of these

---

[8] Even though *Sullivan* counsel chose not to include Illinois purchasers in their damages subclasses, counsel for *Null* were able to prosecute their case effectively prior to settlement, including obtaining class certification.

remaining funds, including redistribution to claimants and/or a *cy pres* distribution.  Counsel have concluded that the best course at this time is to defer any decision about the disposition of either the *de minimis* or residual monies until the appropriate points in the claims administration process, at which times the available funds can be quantified.  At those times, Subclass Counsel will submit recommendations to the Special Master as to the appropriate disposition of these monies for his consideration, determination, and recommendation to the Court.

IV.     **THE INDIRECT PURCHASER CLASS NOTICE AND NOTICE PLAN SATISFY THE REQUIREMENTS OF RULE 23 AND DUE PROCESS**

The Consumers and Resellers propose to notify all Indirect Purchaser Class members of the settlement through a Notice Plan that uses a combination of direct mail, newspaper and magazine publication, Internet advertising, a case-specific website, an earned media campaign, and a toll-free telephone number.[9]  Both subclasses will use the same long- and short-form notices to inform class members of all required information about the litigation and the terms of the proposed settlement.

To assist in the design, development, and implementation of the Notice Plan, Plaintiffs retained the team of Rust Consulting, Inc. ("Rust"), Kinsella-Novak Communications, Ltd. ("Kinsella-Novak"), and Complete Claims Solutions ("CCS"), nationally recognized class action claims administration and notice specialists. Kinsella-Novak has particular expertise in designing media-based class action notice plans.  *See* the accompanying Declaration of Andrew Novak in Support of Notice Program, ¶¶ 4-6.  Based on Kinsella-Novak's analysis of class member demographics, plaintiffs believe the Notice Plan described below is the most effective way to reach both the Reseller and Consumer subclass members.

---

[9] Attached hereto are the long-form notice (Exhibit B) and the summary notice (Exhibit C).

A.       <u>Legal Standard for Notice</u>

The purpose of notice is to inform class members of the litigation and to provide them with the information necessary to make an informed and intelligent decision whether to remain in the class and receive the benefit of a settlement or whether to object to or opt-out of the proposed settlement.  *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 526 (D.N.J. 1997) (Wolin, J.), *aff'd in relevant part*, 148 F.3d 283 (3d Cir. 1998).  In evaluating the notice plan, "[t]he Court must consider both the notice's mode of dissemination and its content to assess whether the notice was sufficient."  *Prudential*, 962 F.Supp. at 527.  In the case of a class action settlement where the class has not previously been certified, the notice must meet the requirements of both Fed. R. Civ. P. 23(c)(2) and 23(e).  *Id.*; *see also Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause).

Rule 23(c)(2) requires that, in the case of a Rule 23(b)(3) class, notice to the class be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (citing Rule 23); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (same).  Rule 23(e) requires "notice in a reasonable manner to all class members who would be bound by a proposed settlement . . . ."  Rule 23(e)(1)(B).  However, no law nor rule requires every possible class member to receive actual notice.  *See Prudential*, 962 F. Supp. at 527 n.52 (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950)); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 551 (N.D. Ga. 1982).

**B.** **The Plan To Disseminate Notice Satisfies The Requirements Of Rule 23 And Due Process**

Notice plans must be reasonably calculated to reach potential class members. *Eisen*, 417 U.S. at 174. In evaluating plans to disseminate notice, courts routinely approve plans that provide for notice to the class be sent via first class mail, for publication in national papers and magazines, and for website publication. *See, e.g., Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950) ("This Court has not hesitated to approve . . . publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning."); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 669-70 (E.D. Va. 2001) (approving publication of summary notice in nationwide newspapers and posting full notice on websites maintained by co-lead counsel); *Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) (the Court approved class notice mailed to the last known address of all class members identified through reasonable effort by defendant, a summary notice published on three separate days in a nationally published newspaper, *USA Today*, and the class notice and other pertinent information published on the Internet); *Henry v. Sears Roebuck & Co.*, No. 98-CV-4110, 1999 WL 33496080 (N.D. Ill. July 23, 1999) (the Court directed the class action settlement notice be sent by first class mail to all identified class members, and the summary notice be published twice in the national edition of *USA Today*); *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628 (E.D. Pa. 1994) (approving as reasonable notice third class mail sent to identified class members and publication twice in the national edition of *USA Today*); *White v. Nat'l Football League*, 822 F. Supp. 1389, 1400 (D. Minn. 1993) (notice by mail to identified class members and publication once in *USA Today* "clearly satisfy both Rule 23 and due process requirements"), *aff'd*, 41 F.3d 402 (8th Cir. 1994); *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (notice by mail to identified class members and publication

in *USA Today*).

1.      **The Indirect Purchaser Notice Plan Provides The Best Notice Practicable, Is Plain And Simple, and Meets The Due Process Requirements Of Rule 23**

Plaintiffs' proposed Notice Plan provides the best notice practicable and is reasonably calculated to reach the majority of Indirect Purchaser Class members.  Based on Kinsella-Novak's research and analysis, the Notice will reach approximately 87.1% of adults age 18 and over with average household incomes over $50,000, with an estimated frequency of 3.9 times, delivering 383,496,000 gross impressions.[10]  Notice Plan at 34.

The Notice Plan has two main parts:  (1) publication of the summary notice to all members of both subclasses and (2) direct mail of the long-form notice to approximately 50,000 potential Reseller Subclass members.  The summary notice will be published in newspapers, Sunday newspaper supplements, trade magazines, consumer magazines, on the Internet, and on a user-friendly website, all containing the Claims Administrator's case-specific toll-free phone number.  Similar to notice plans used in other nationwide class actions, this notice plan will reach members of both large and widely dispersed subclasses.

Each publication of the Notice will prominently feature the toll-free number, the website address, and the Claims Administrator's mailing address for class members to use to obtain the long-form notice, a claim form, and other information.

a.      **Published Notice Will Reach Almost Every Member Of The Consumer Subclass And A Large Portion Of The Reseller Subclass**

Kinsella-Novak (with input from the parties to the settlement) developed the paid media plan described below that is measurable and quantifiable against the Consumer Subclass member demographic.  Although direct mail is the primary form of notice to the Reseller

---

[10] Gross impressions are the total number of times class members see the notice.

Subclass, publication targeted to the Consumer Subclass will also reach the Reseller Subclass.

The Notice will be published in the following:

- **<u>Newspapers</u>**

The short-form notice will be published twice in the national editions of *The New York Times* (once on Sunday and once in a weekday edition), *The Wall Street Journal,* and *USA Today.  See Prudential*, 962 F. Supp. at 495.

To provide notice in Puerto Rico and the Virgin Islands, the notice will be translated and placed in the following local newspapers:  *El Nuevo Dia, El Vocero, San Juan Star, St. Croix Avis, St. John Trade Winds, and St. Thomas News.*

- **<u>Newspaper Supplements</u>**

*Parade* and *USA Weekend* are newspaper supplements inserted into weekend or Sunday editions of 985 newspapers (eight newspapers carry both) reaching every media market in the country.  The Notice will appear twice in *Parade*, which has an estimated circulation of 32,400,000 readers and once in *USA Weekend*, which has an estimated circulation of 23,400,000.

- **<u>Consumer Magazines</u>**

Media research shows that most adults read one or more magazines during an average month and nearly three out of five adults read or look at a magazine daily.  The following consumer magazines are included in this Notice Plan because they are the highest ranking in readership by the target audience, providing subject content that appeals to class members:  *Better Homes and Gardens, Ebony, ESPN The Magazine, JET, National Geographic, Newsweek, Parents, People Magazine, Reader's Digest, Sports Illustrated,* and *U.S. News & World Report*.  To reach young, including teenage, class members, in addition to appearing in

-19-

*ESPN The Magazine, People,* and *Sports Illustrated*, the Notice will appear in *CosmoGirl!* and *Seventeen*.  To reach Hispanic class members, in addition to the other publications, the Notice will appear in *People En Español, Selecciones, TV y Novelas,* and *Vista*.  To reach class members in Puerto Rico, the notice will appear in *Buena Vida*, *Imagen,* and *VEA*.

Finally, the Notice will also appear in *Bridal Guide* and *Modern Bride*, the top-ranking topic-specific magazines read by diamond buyers.

- **Trade Publications**

To reach members of the Reseller Subclass and Direct Purchaser Class, an important supplement to the notice plan is advertising in trade publications, including:  *AJM Magazine, Colored Stone, JCK, JQ Magazine, Lustre, Mid-America Jewelry News, Modern Jeweler, National Jeweler*, *Professional Jeweler*, *Southern Jewelry News, Rapaport Diamond Report*, the *International Diamond Exchange* website, and *JCK's eMonday email*.

### b.      The Internet Will Also Provide Notice To The Indirect Purchaser Class Members

- **Internet Search Engines**

Internet search-engine sponsored-link advertising through key word searches will also be used to disseminate the Notice to class members.  Indirect Purchasers are heavy Internet users.  Notice Plan at 40.  Plaintiffs will use eighteen different search engines, including Google, Yahoo, NBC, and other nationally known resources.  Each time an Internet user types in a search term with the word *diamond*, the search engine will generate an advertisement notifying them of the proposed settlement and directing them to the case website described below.

- **Case Website**

Rust created a user-friendly website, www.diamondsclassaction.com. Through the

website, class members can obtain additional information about the settlement, including: (1) an information homepage; (2) frequently asked questions and answers; (3) links to downloadable and printer-friendly versions of the settlement documents, including the long-form Notice, Settlement Agreement, and all three claim forms; (4) the option for Consumer Subclass members to enter data into an online claim form; and (5) the ability to email questions to the Claims Administrator and request mailing of a Notice and claim form.

<div align="center">

**c.**      **Earned Media And Third-Party Notice Will Increase Awareness**

</div>

In addition to paying for notice to reach class members, Kinsella-Novak developed a program of free media dissemination called "earned media." *See* Notice Plan at 37-38. Kinsella-Novak will issue a press release announcing the settlement and explaining how to obtain further information. Any media outlets that write or publish stories regarding the settlement will supplement the paid Notice gross impressions. Kinsella-Novak will also contact media in New York, Miami, Phoenix, and Los Angeles where diamond resellers and traders are concentrated.

Kinsella-Novak will also work with the Jewelers of America and its forty affiliated state associations to provide outreach to the Reseller Subclass members. The Jewelers of America trade association represents more than 11,000 jewelry stores nationally and will provide an additional means to notify a substantial number of Reseller Subclass members (most of whom are also Consumer Subclass members).[11]

Additionally, Kinsella-Novak will send the press release to three trade publications that do not accept paid advertising, *Gems & Gemology, The Diamond Registry*

---

[11] Similar coordinating efforts will be made with other well-recognized diamond trade organizations such as the Diamond Dealers Club of NYC, other regional diamond bourses, the International and National Diamond Manufacturers Associations, and similar organizations.

*Bulletin*, and *The Jewelry Appraiser*. *Id.* at 39.  Finally, Kinsella-Novak will produce short radio and television segments that news organizations may use to report the settlement.  *Id.* at 37-38.

<div align="center">

**2.**     **The Notice Will Reach Consumer Subclass Members**

</div>

As explained in the accompanying Novak declaration, the above-described notice program was designed by Kinsella-Novak, the country's premier class action notice consultant. Novak Decl., ¶¶ 3-6.   To construct an appropriate notice plan for a case of this size, Kinsella-Novak, following state-of-the-art procedure, analyzed data available from the MediaMark Research, Inc. *2006 Doublebase Survey*.   MediaMark, also known as "MRI," surveys over 26,000 people per year, ages 18 and older.   MRI collects consumer information about 500 product/service categories, 6,000 brands, and various lifestyle activities.  Notice Plan at 11 n.1. Over 450 advertising agencies pay to receive MRI's survey results.

MRI provides data on individuals who purchase diamonds.  *Id.* at 11.  Based on its survey results, MRI provides information that newspapers, magazines, and other forms of media diamond purchasers read and watch.  Having analyzed the MRI research, Kinsella-Novak determined that "the demographic profile of diamond purchasers through the Class Period is fairly consistent with the demographic profile of diamond purchasers in the past 12 months."  *Id.* at 11 n.2.  Accordingly, although there is a 12-year class period, the demographic of diamond purchasers has not demonstrably changed.

The MRI research showed the following demographics for diamond consumers who purchased diamonds (for comparison purposes, the demographics of the total population of Adults 18 years of age and older ("Adults 18+") are also provided):

| DEMOGRAPHICS | DIAMOND CONSUMERS | ADULTS 18+ |
|---|---|---|
| **Gender** | | |
| Male | 48.2% | 48.1% |
| Female | 51.8% | 51.9% |

<div align="center">

-22-

</div>

| DEMOGRAPHICS | DIAMOND CONSUMERS | ADULTS 18+ |
|---|---|---|
| **Age** | | |
| 18-34 | 37.4% | 31.2% |
| 35-44 | 21.9% | 20.3% |
| 45-54 | 21.6% | 19.1% |
| 55+ | 19.2% | 29.4% |
| **Education** | | |
| Graduated/Attended College | 56.9% | 52.3% |
| Graduated High School | 30.2% | 31.8% |
| **Household Income** | | |
| Under $29,999 | 18.4% | 27.5% |
| $30,000 - $49,999 | 18.0% | 20.4% |
| $50,000 - $74,999 | 21.3% | 20.0% |
| $75,000 - $99,999 | 16.3% | 13.1% |
| $100,000+ | 26.2% | 19.0% |
| **Ethnicity** | | |
| Caucasian | 74.8% | 77.7% |
| African- American | 16.3% | 11.5% |
| Hispanic | 9.5% | 12.5% |
| Asian | 2.9% | 2.9% |
| Other | 6.1% | 8.1% |
| **Location**[12] | | |
| A & B Counties | 72.0% | 71.2% |
| C & D Counties | 28.1% | 28.8% |

Notice Plan at p. 13.

Based on this demographic profile, Kinsella-Novak developed a paid media program designed to reach Consumer Subclass members. Kinsella-Novak's research and analysis revealed that Diamond Consumers are heavy consumers of magazines and radio, above-average newspaper and Internet consumers, and below-average television viewers. Notice Plan at 16. Kinsella-Novak selected print media (magazines and newspapers) as the primary form of

---

[12] "A" Counties, as defined by A.C. Nielsen Company, are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the MSA (Metropolitan Statistical Area) and include the largest cities and consolidated areas in the United States. "B" Counties are all counties not included under A that are either over 150,000 population or in a metro area over 150,000 population according to the latest census. "C" Counties are all counties not included under A or B that either have over 40,000 population or are in a metropolitan area of over 40,000 population according to the latest census. "D" Counties are, essentially, rural counties in the Nielsen classification system of A, B, C, D counties.

paid media for disseminating notice to the Consumer Subclass because of its wide use by the target audience, its ability to reach the target audience in a cost-effective manner, and its value as a credible and tangible information source that allows for extended text. *Id.* at 17. In addition, due to the above-average Internet consumption by Diamond Consumers, the settlement website will be promoted through search-engine sponsorships. *Id.* Television was not selected for the paid media program because of its below-average use by the target audience and high cost. Although Diamond Consumers are heavy radio consumers, this media was also not selected for the paid media program because it is more cost-effective when used locally, not nationally. *Id.*

In determining which paid media placements would be best for reaching the Consumer Subclass, Kinsella-Novak reviewed all available consumer publications for coverage and composition of their target audience, as well as the compatibility of their editorial and creative message. The selected publications summarized in the previous section and discussed in detail in the Notice Plan represent the most widely read publications by Diamond consumers.

To evaluate the strength and efficiency of the publication plan, Kinsella-Novak measured the paid media program outlined above[13] against the demographic target of the Consumer Subclass: individuals who purchased diamonds in the 12 months preceding the *2006 Doublebase Survey* ("Diamond Consumers"). Kinsella-Novak estimates that 87% of Diamond Consumers will be reached with an average estimated frequency of 3.9 times, delivering 58,837,000 gross impressions.[14] Novak Decl., ¶ 30. MRI data show that Diamond Consumers are more likely than the average adult to have a household income above $75,000. Thus, in

---

[13] MRI does not measure *People En Español, Selecciones, TV y Novelas, Vista*, magazines and newspapers in Puerto Rico and the U.S. Virgin Islands, and the selected trade publications. Therefore, the reported reach does not include coverage in these publications.

[14] Gross impressions are the total number of times a media vehicle containing the Publication Notice is seen. This is a duplicated figure, as some viewers (readers) will see several media vehicles (publications) containing the Publication Notice.

order to demonstrate the reach of the paid media program against a broader audience, Kinsella-Novak also calculated delivery estimates for Adults 18 years of age and older with a household income above $50,000. When measured against this audience, the paid media program has an 87.1% estimated reach with an average estimated frequency of 3.9 times, delivering 383,496,000 gross impressions. *Id.* These data show that the notice program is more than adequate to meet the requirements of Rule 23. If the class size is as high as 117 million persons, *see* Potter Declaration at ¶ 10, the Notice will have a reach of over 80%. *See In re Compact Disc*, 216 F.R.D. at 203 (notice reaching 85% of the music-consuming public with an average estimated frequency of over four times sufficient to reach class of CD consumers).

### 3.     The Notice Will Reach Reseller Subclass Members By Direct Mail And Publication

The Reseller Subclass is substantially smaller than the Consumer subclass and the identities of the class members are reasonably ascertainable from mailing lists and records of various industry trade associations. Direct mail will be the primary means to notify these subclass members.

At present, Plaintiffs have obtained lists of approximately 50,000 entities who are likely Reseller Subclass members from trade associations and other industry sources. Declaration of Thomas R. Glenn, ¶ 7. Plaintiffs propose that the Notice be sent by first class mail to each of these Reseller Subclass members and to all persons who call or email the Claims Administrator and request the Notice.[15] The direct mail package will include the long-form Notice and a claim form.

Nonetheless, "to ensure extensive coverage of these entities and individuals, direct mail notice will be supplemented by publication notice . . . ." Notice Plan at 12. This will

---

[15] Industry sources for mailing lists include The Jewelers Board of Trade, The New York Diamond Buyer's Guide, and InfoUSA.com. Glenn Decl., ¶ 7.

be done primarily through advertising in trade publications that are read by individuals who work in the precious gem or jewelry industry and deal in diamonds. *Id.* at 28-30.

### C.   The Content Of The Notice Complies With Rule 23 And Due Process

As stated above, the content of the notice must meet the requirements of both Fed. R. Civ. P. 23(c)(2) and 23(e).   The proposed Notices meet the requirements of both Rules by concisely and clearly stating in plain English:  (1) the nature of the actions; (2) the definitions of the Classes; (3) the Classes' claims and Defendants' defenses; (4) a description of the settlement, including how to file a claim; (5) the names of counsel for the Class;[16] (6) the maximum amount of attorneys' fees they will request; (7) the fairness hearing date; (8) a description of Class members' opportunity to appear at the hearing through counsel or on their own; (9) a statement of the procedure and deadline for filing objections to the settlement; (10) a statement of the procedure and deadline for filing requests for exclusion; (11) a statement of the consequences of exclusion; (12) a statement of the consequences of remaining in the Class, including the binding effect of a class judgment on class members; (13) contact information Class members may use to obtain further information; and (14) information on how to obtain the complete record from the court's files.[17] *Prudential*, 962 F. Supp. at 527 (citing *Newberg*, *supra*, § 8.32 at 8-103); *see also*

---

[16] The Notices do not include counsels' telephone numbers but instead direct class members to contact the Claims Administrator.  With the Consumer Subclass numbering in the tens of millions, if 1% of class members telephone, this will overwhelm Class Counsels' telephone systems.  However, Rust Consulting, the Consumer Claims Administrator, can handle such a large volume of telephone calls, and will promptly inform Class Counsel of any class member who needs information the Claims Administrator cannot provide or who wishes to speak with Class Counsel.

[17] While all the cases being settled are not formally consolidated with the *Sullivan* case, the Notice will direct class members to the records for all these cases.  When looking at the combined record, a substantial number of issues have been briefed and considered by the various courts.  Most notably, of all the cases, the *Hopkins* and *Null* courts certified classes.  The *Leider* court produced two reports and recommendations by Magistrate Maas and two opinions by Judge Baer.  The briefings and opinions in *Leider* addressed a variety of issues, including antitrust standing, plaintiffs' methodology for calculating damages, the appropriateness of class

-26-

*In re The Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 327 (3d Cir. 1998); *Lenahan v. Sears, Roebuck and Co.*, No. Civ. 02-0045, 2006 WL 2085282, at *6 (D.N.J. July 24, 2006) (Chesler, J.).  Finally, the Notices contain a detailed description of how each claimant's *pro rata* share of the settlement fund will be determined.  This includes a summary description of the methodology for calculating payments in the main text of the long-form Notice.

A Rule 23(e) notice is designed to be only a summary of the litigation and the settlement.  It is crucial to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.  The notice need not be unduly specific nor indicate the arguments in favor of and against the proposed settlement.  It need only be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections. *Prudential*, 962 F. Supp. at 527 (citations omitted).

Finally, settlement notices should contain "a formula for distribution of the settlement fund;" however, it is unnecessary for the formula "to specify precisely the amount that each individual class member may expect to recover."  *Newberg*, *supra*, § 8:32; *see also Manual for Complex Litigation* (Fourth) § 21.312 (2004) (settlement notices should "explain the procedures for allocating and distributing settlement funds . . . [and] provide information that will enable class members to calculate or at least estimate their individual recoveries . . . .").  When a settlement provides for a *pro rata* distribution of the settlement funds, however, the notice does not have to "include details such as how much each class member might receive from the settlement" nor "the estimated number of class members and total damages they might

---

certification, the validity of plaintiffs' false advertising and deceptive trade practices claims under New York law, and the enforceability of a default judgment.

claim." *Warfarin I*, 212 F.R.D. at 246.

The proposed Notices here meet all of these requirements.[18]  The proposed Notices are clear, precise, informative and in plain English.  Plaintiffs drafted the Notices using concise, clear language so that the terms of the settlement and the options available to the Class members are easily understood.  *See Compact Disc*, 216 F.R.D. at 203; Fed. R. Civ. P. 23(c)(2)(B).

## V.    THE DIRECT PURCHASER CLASS NOTICE AND NOTICE PLAN SATISFY THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Direct Purchaser Class is the result of the negotiated settlement of two cases: the *Anco* case on behalf of rough diamond purchasers and the *British Diamond* case on behalf of polished diamond purchasers.  In *Anco,* the Court certified a class and notice was given to that class by mail and publication (in print and Internet form) from June to August 2004.  In *British Diamond,* a class certification motion was pending when the case settled.  The cases claim damages under the Sherman Act on behalf of purchasers of rough and polished diamonds directly from De Beers, as well as purchasers from sightholders.  These cases were settled for $45 million.

Half of the settlement amount, $22.5 million, is allocated to the "Direct Purchaser Class."  These are purchasers of rough and polished diamonds directly from De Beers or from De Beers' competitors.  The other half of the settlement amount was added to the Indirect Purchaser Class settlement amount and the Indirect Purchaser Class definition was modified to

---

[18] The publication Notice does not include the full text of the release, which no authority requires, for three reasons.  First, the release itself is well over a page long.  Second, the release is not written in the plain English language style that governs class action notices.  Finally, the Notice refers Class members to the case website and to the Claims Administrator if they wish to read the full text of the release.  The publication Notice summarizes the release simply and completely, thereby informing Class members clearly what claims they are releasing.  The release is attached as an Appendix to the long-form Notice.

include purchasers of rough diamonds from a sightholder. The *Anco* and *British Diamond* complaints alleged that purchases from sightholders were direct purchases. Under the Settlement Agreement such purchases are treated as indirect purchases. (Purchasers of polished diamonds from a sightholder were already included in the definition of the Indirect Purchaser Class under the original Settlement Agreement.) Thus, any purchases from sightholders of rough and of polished diamonds are treated as indirect purchases and claims for such purchases will be made against the Reseller Subclass settlement fund.

The certified class in *Anco,* and putative class in *British Diamond*, will be notified of the proposed settlements and the procedures involved. A supplemental notice has been prepared to do this (*see* Supplemental Notice, Exh. F). In addition, the Direct Purchaser Class Members will be provided with a claim form tailored to purchases which qualify for a distribution from the settlement for that Class (*see* Direct Purchaser Claim Form, Exh. G).

The Supplemental Notice (1) explains how the settlement of the *Anco* and *British Diamond* cases fits into the overall settlement, (2) describes how each claimant's *pro rata* share of the settlement will be determined, and (3) and directs readers to the overall Settlement Notice and to the website at which additional information can be obtained. The website will allow anyone to download and print the Supplemental Notice and Direct Purchaser Claim Form. The website will provide certain additional information, including the names of the De Beers' competitors known to Class Counsel, purchases from whom qualify the buyers as members of the Direct Purchaser Class.

The Notice Plan is straightforward. The number of *Anco* and *British Diamond* Class Members is modest compared to the number of Indirect Purchasers. De Beers will provide the names and addresses of direct purchasers from its own records. Supplemental notices will be

mailed to those direct purchasers, as well as to members of the Diamond Manufacturers Industry Association.

Publication notice will also be given in the same way that class notice was approved and given in *Anco* in 2004, that is:

1.      A full-page print advertisement of a short-form settlement notice in the next available issue of the Rapaport Diamond Report.  The Rapaport Diamond Report is recognized by the trade as the authority on diamond prices and has a trade circulation of approximately 8,000.

2.      A web advertisement on International Diamond Exchange ("IDEX"), www.idexonline.com, that will run for 30 days.  The advertisement will be linked to the website maintained by plaintiffs, www.diamondsclassaction.com, containing the full settlement notice. Idexonline.com provides news and price information to the diamond industry, and has approximately 40,000 visitors each month.

3.      An advertisement in the weekly "eMonday" email of Jeweler's Circular Keystone ("JCK"), also linked to the full settlement notice at www.diamondsclassaction.com.  JCK's eMonday email, which includes news and price information, is distributed weekly to approximately 9,000 subscribers in the diamond industry.

4.      Additionally, notice by publication targeted to the Consumer Subclass and to the Reseller Subclass will also reach the Direct Purchaser Class.

## VI.      **CONCLUSION**

The Indirect Purchaser Class respectfully asks the Special Master to make final the tentative allocation between the Reseller and Consumer subclasses by taking into account legal risks in addition to the economic evidence already presented.  The Indirect Purchaser Class also asks the Special Master to approve the proposed nationwide, *pro rata* claims process, the

Notice Plan, the long- and short-form Notices, and the two Claim Forms.  The Notice Plan is comprehensive and will reach most Class members several times through various media (newspapers, magazines, the Internet, and direct mail for Reseller subclass members).  The Notices themselves contain all the required information to inform Class members about the settlement.

The Direct Purchaser Class also respectfully requests the Special Master approve its Notice Plan and Claim Form.


Dated:  April 16, 2007                    Respectfully submitted,

                                          Josef D. Cooper
                                          Tracy R. Kirkham
                                          COOPER & KIRKHAM, P.C.
                                          655 Montgomery Street, l7th Floor
                                          San Francisco, CA  94111
                                          (415) 788-3030

                                          Craig C. Corbitt
                                          ZELLE HOFMANN VOELBEL MASON
                                          & GETTE, LLP
                                          44 Montgomery Street, Suite 3400
                                          San Francisco, CA  94104
                                          (415) 693-0700

                                          William Bernstein
                                          Eric B. Fastiff
                                          LIEFF CABRASER HEIMANN
                                          & BERNSTEIN, LLP
                                          275 Battery Street, 30th Floor
                                          San Francisco, CA  94111
                                          (415) 956-1000

                                          By:    /s/ Eric B. Fastiff

-31-

Stephen Katz
Howard B. Becker
KOREIN TILLERY
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO  63101
(314) 241-4844

**Counsel for the Indirect Purchaser Consumer Plaintiffs**


Joseph J. Tabacco, Jr.
Todd A. Seaver
Matthew D. Pearson
BERMAN DeVALERIO PEASE TABACCO
BURT & PUCILLO
425 California Street, Suite 2100
San Francisco, CA  94104
(415) 433-3200


By:    /s/ Joseph J. Tabacco, Jr.

John A. Maher (JM-6121)
LAW OFFICES OF JOHN A. MAHER
450 Springfield Avenue
Summit, NJ  07901-3626
(908) 277-2444

Susan G. Kupfer
GLANCY BINKOW & GOLDBERG LLP
455 Market Street, Suite 1810
San Francisco, CA  94105
(415) 972-8160

**Counsel for the Indirect Purchaser Reseller Subclass**

Jared Stamell
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, New York 10006
(212) 566-4047


By:    /s/ Jared Stamell

Robert A. Skirnick
Maria A. Skirnick
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
One Liberty Plaza, 35th Floor
New York, New York 10006
(212) 240-0020

Edward W. Harris, III
SOMMER BARNARD PC
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
(317) 713-3500

**Counsel for the Direct Purchaser Plaintiffs**

569585.8

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/27/07_

ANGELA TESE-MILNER as CHAPTER 7
TRUSTEE OF THE ESTATE OF W.B.
DAVID & CO., INC.,

        Plaintiff,               04 Civ. 5203 (KMW) (KNF)

  -against-                         ORDER

DE BEERS CENTENARY A.G., ET AL.,

        Defendants.

-------------------------------------X
WOOD, U.S.D.J.:

## I. Overview

By motion dated December 2, 2005, defendants De Beers
Centenary A.G., De Beers Consolidated Mines Ltd., The Diamond
Trading Company, and The Diamond Development Company
(Proprietary) Ltd. (together "Defendants") move to vacate the
Court's October 21, 2005 entry of default.  For the reasons
stated below, Defendants' motion is GRANTED.


## II. Background

On July 1, 2004, W.B. David & Co., Inc. ("Plaintiff") filed
suit against over 100 defendants, claiming $200 million in
damages in connection with Defendants' termination of Plaintiff
as one of its preferred distributors, and the alleged theft of a
company trade secret.  On September 2, 2005, the Court granted

Plaintiff leave to file an amended complaint. By letter dated
September 29, 2005, Plaintiff informed the Court that it no
longer planned to file an amended complaint, but instead would
dismiss its lawsuit against any defendants that had already
appeared, and pursue default remedies against the De Beers entity
defendants. By order dated October 21, 2005, the Court entered a
default against Defendants and referred the case to Magistrate
Judge Kevin Fox for an inquest into damages. Defendants then
moved to vacate the entry of default on the ground that there is
"good cause" under Federal Rule of Civil Procedure 55(c).[1]
Alternatively, Defendants argue that the Court should vacate the
entry of default because the Court lacks personal jurisdiction
over Defendants.

## III. Discussion

Pursuant to Federal Rule of Civil Procedure 55(c), the Court
may set aside an entry of default for "good cause shown." Fed.
R. Civ. P. 55(c). A court, in deciding whether to vacate an
entry of default, must "consider the willfulness of the default,
the existence of a meritorious defense, and the level of

---

[1]Following the completion of briefing on Defendants' motion
to vacate default, the Court stayed the proceedings in this
action to enable Trustee for Plaintiff to obtain counsel and
respond to Defendants' motion. Trustee did not inform the Court
until September 7, 2006 that it did not intend to file additional
motion papers.

2

prejudice that the non-defaulting party may suffer should relief
be granted." Pecarsky v. Galaziworld.com Ltd., 249 F.3d 167, 171
(2d Cir. 2001). "It is well established that default judgments
are disfavored. A clear preference exists for cases to be
adjudicated on the merits." Id. at 174. "[W]hen doubt exists as
to whether a default should be granted or vacated, the doubt
should be resolved in favor of the defaulting party." Enron Oil
Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993); see also Kumar
v. Ford, 111 F.R.D. 34, 39 (S.D.N.Y. 1986) ("[I]n close cases,
courts favor disposition of a case on the merits.").

For the reasons discussed below, the Court holds that there
is "good cause" to vacate the October 21, 2005 entry of default
against Defendants.

A.   Prejudice

First, Plaintiff will not suffer prejudice if the Court
vacates the entry of default. Plaintiff argues that as a result
of Defendants' failure to appear, it can no longer afford to
prosecute its case. According to Plaintiff, if Defendants had
"made a timely appearance over a year ago when they were required
to and we were still in business, we would have made arrangements
to fund this litigation, including establishing a reserve."
Walter & Sheldon David Aff. ¶ 4. Plaintiff's argument is belied
by the fact that it waited almost fifteen months after filing the
Complaint to seek an entry of default. See Enron, 10 F.3d at 98

3

("The fact that plaintiff waited over a year before seeking such relief strongly suggests that some further delay will not unduly prejudice it."). Accordingly, the Court concludes that vacating the entry of default will not prejudice Defendants.

### B. Meritorious Defense

"The test of [a meritorious] defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense." Pecarsky, 249 F.3d at 173 (quoting Enron, 10 F.3d at 98; see also Grant v. City of N.Y., 145 F.R.D. 325, 326 (S.D.N.Y. 1992) ("[Defendant] must merely raise a serious question concerning [plaintiff's] allegations.") (internal quotations omitted). The defense need only meet a "low threshold of adequacy." Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981).

Defendants argue that Plaintiff's antitrust and state law claims are meritless, because, inter alia, there is still significant competition in the relevant diamond markets, Plaintiff cannot demonstrate monopoly power, and the Leading Jewelers of the World proprietary marketing program is not a trade secret. Plaintiff concedes that several of these issues raise relevant questions of fact. See Pl.'s Opp'n at 22 ("[W]hether monopoly power actually exists is a question of

4

fact."); <u>id.</u> at 23 ("Discovery may well show that De Beers began stealing the LJW plans, and began planning Diamond Masters of Japan, well before Las Vegas happened."); <u>id.</u> at 24 n.9 ("The evaluation of the relevant trade secret factors, which weigh in Plaintiff's favor, is a question of fact.").  The Court, therefore, concludes that Defendants present a meritorious defense.

    C.   <u>Willfulness</u>

    "[W]illlfulness, in the context of a default, [is] conduct that is more than merely negligent or careless." <u>SEC v. McNulty</u>, 137 F.3d 732, 738 (2d Cir. 1998).  It is sufficient, however, for a defendant to default deliberately; the defendant's conduct does not need to amount to bad faith. <u>Gucci Am., Inc. v. Gold Ctr. Jewelry</u>, 158 F.3d 631, 635 (2d Cir. 1998).

    Defendants argue that their default was not deliberate because they have "good faith reasons to believe that this Court lacks jurisdiction over them." Defs.' Mem. at 15–16.[2] Defendants direct the Court to two fairly old district court decisions in which courts stated that an erroneous view of the law on jurisdiction negates willfulness.  In each of these instances, however, the defendant filed a motion to dismiss for

---

[2] Defendants also contend that service of process was defective. The Court, however, does not consider this argument because Defendants raise it for the first time in their reply memorandum. <u>See</u> <u>Harris v. Albany County Office</u>, 464 F.3d 263, 268 (2d Cir. 2006) ("We generally do not consider issues raised in a reply brief for the first time.").

lack of personal jurisdiction before the court entered default,
albeit after the deadline for filing such a motion had expired.
See Bartels v. Int'l Commodities Corp., 435 F. Supp. 865, 866 (D.
Conn. 1977); Latini v. R. M. Dubin Corp., 90 F. Supp. 212, 213
(N.D. Ill. 1950). Defendants did not file such a motion here.
The only evidence of their supposed good faith belief is a 2001
Offering Circular in which Defendants state, with regard to a
prior indictment and two past lawsuits, "De Beers believes . . .
that the US courts lack jurisdiction over the company." Sunshine
Aff. Exh. 1. As a result, it is questionable whether Defendants'
default was or was not "willful."

Because, however, Defendants have presented meritorious
defenses and demonstrated a lack of prejudice to Plaintiff, the
Court finds that Defendants have shown "good cause" to vacate the
entry of default.[3] See Akhtar v. Martin, No. 89 Civ. 5569, 1990
U.S. Dist. LEXIS 4369, at *3-6 (S.D.N.Y. Apr. 18, 1990) (granting
motion to vacate default despite defendant's willful conduct,
because defendant presented meritorious defenses and there would

---

[2] Because the Court finds good cause under Rule 55(c), and
Defendants seek only to vacate the entry of default and not to
dismiss the case, the Court does not reach Defendants' arguments
regarding personal jurisdiction. See Defs.' Mem. at 3
("Defendants respectfully request that the Court vacate the
default entered on October 21, 2005, so that they may appear and
defend this action."); id. at 17 ("The default should . . . be
lifted to permit Defendants to contest Plaintiff's Complaint on
its merits."); id. at 24 ("Defendants respectfully request that
this Court grant Defendants' motion to vacate default and issue a
schedule setting forth the date by which Defendants need to file
an answer or move to dismiss Plaintiff's Complaint.").

be no apparent prejudice to plaintiff); <u>Grant</u>, 145 F.R.D. at 326-27 ("[T]he 'good cause' test warrants that entry of default be vacated.  Although the first factor, willfulness of default, advises against the defendant, the other considerations support her."); <u>McNulty</u>, 137 F.3d at 738 ("[T]he district court . . . has discretion to deny the motion to vacate if it is persuaded that the default was willful <u>and</u> is unpersuaded that the defaulting party has a meritorious defense.") (emphasis added).

## IV. Conclusion

In accordance with the above, the Court grants Defendants' motion to vacate the entry of default (D.E. 97).  Defendants shall answer or otherwise move with respect to the Complaint no later than April 20, 2007.

SO ORDERED.

DATED:    New York, New York
          March 27, 2007

_____
KIMBA M. WOOD
United States District Judge

7

# EXHIBIT B

# NOTICE OF CLASS ACTION SETTLEMENT

**If you purchased a Diamond or Diamond Jewelry Between January 1, 1994 and March 31, 2006, You May Have a Claim to Receive Benefits From a Proposed Class Action Settlement**

**READ THIS ENTIRE NOTICE CAREFULLY.  IT MAY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO SHARE IN A $295 MILLION PROPOSED SETTLEMENT.**

A group of class action lawsuits claim that the De Beers group of companies conspired to fix, raise and control the price of gem diamonds, monopolized the rough gem diamond market, and issued false and misleading advertising. The lawsuits claim that this violated federal and state antitrust and unfair competition laws, and state consumer protection and deceptive advertising laws.  They also claim that as a result, diamond purchasers paid more for diamonds and diamond jewelry.  De Beers denies these allegations and believes that it has valid defenses to the lawsuits. De Beers has decided to settle the lawsuits to avoid the uncertainty and expense of further litigation.

The Settlement will create a $295 million Settlement Fund.  If you purchased diamonds between January 1, 1994 and March 31, 2006, you may be able to make a claim to be paid from the Settlement Fund.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | | |
|---|---|---|
| SUBMIT A CLAIM FORM | The only way to get a payment. You may submit a Claim Form even if you object to the Settlement. | Form must be postmarked no later than _____ |
| EXCLUDE YOURSELF | Get no payment.  This is the only option that allows you to bring your own lawsuit against DeBeers based on the legal claims in the class action lawsuits. | Exclusion request must be postmarked no later than _____ |
| OBJECT | Write to the Court about why you don't like the proposed settlement. | Written objection must be postmarked no later than _____ |
| GO TO A HEARING | Ask to speak in Court about the proposed settlement. | Notice of Intention to Appear must be postmarked no later than_____ |
| DO NOTHING | Get no payment.  Give up rights to be part of any other lawsuit against DeBeers based on the legal claims in the class action lawsuits. | Not Applicable |

**THESE RIGHTS AND OPTIONS—AND THE DEADLINES TO EXERCISE THEM—ARE EXPLAINED IN THIS NOTICE.**

565923.3

**This Notice answers the following questions:**

1.  **Why should I read this Notice?**
2.  **What are the Lawsuits about?**
3.  **What is a class action?**
4.  **What are the specific Lawsuits being settled?**
5.  **Who are the members of the Settlement Classes?**
6.  **What are the terms of the Proposed Settlement?**
7.  **What are the reasons for the Proposed Settlement?**
8.  **How much will my payment be?**
9.  **How can I get a payment?**
10. **When will I get my payment?**
11. **Who represents the Classes and what are the associated costs and expenses?**
12. **What are the Release and Covenant Not to Sue?**
13. **If I exclude myself, can I get money from the Proposed Settlement?**
14. **If I don't exclude myself, can I sue later?**
15. **How can I exclude myself from the Proposed Settlement and release?**
16. **What if I do not want to exclude myself, but I do not like the Proposed Settlement?**
17. **What's the difference between objecting and excluding?**
18. **When and where will the Court decide whether to approve the Proposed Settlement?**
19. **Do I have to come to the hearing?**
20. **What happens if I do nothing at all?**
21. **Where can I get additional information or obtain a Claim Form?**

1.      <u>**WHY SHOULD I READ THIS NOTICE?**</u>

Your rights may be affected by the proposed settlement of class action lawsuits currently pending in the United States District Court for the District of New Jersey ("the Court"). People and business entities in the United States who purchased gem diamonds directly from De Beers and other diamond mining companies between September 20, 1997 and March 31, 2006, or who purchased loose gem diamonds, diamond jewelry or other products containing a gem diamond from a seller other than a mining company between January 1, 1994 and March 31, 2006 are included in Settlement Classes that have been preliminarily approved by the Court. This Notice describes the choices that are available to those people and businesses and tells them what they need to do to protect their rights.

2.      **WHAT ARE THE LAWSUITS ABOUT?**

Beginning in 2001, lawsuits were filed in state and federal courts against De Beers and entities associated with De Beers ("the Lawsuits").  De Beers and these entities are sometimes referred to in this Notice as "Defendants" and sometimes as "De Beers."  The Defendants are De Beers S.A., DB Investments, Inc., De Beers Consolidated Mines, Ltd., De Beers A.G., Diamond Trading Company, Ltd., CSO Valuations A.G., Central Selling Organization, Central Holdings, Ltd. and De Beers Centenary A.G.  Defendants are the largest supplier of rough diamonds in the world.

The Lawsuits claim that the Defendants unlawfully monopolized the supply of Rough Gem Diamonds, sponsored false and misleading advertising and unlawfully raised the prices of Gem Diamonds higher than they should have been, all of which violated certain federal and state antitrust, consumer protection and unfair competition laws.  Defendants deny all of these claims.

**THE COURT HAS NOT RULED ON ANY OF THE CLAIMS OR DEFENSES IN THE LAWSUITS AND THIS NOTICE IS NOT AN EXPRESSION OF ANY OPINION BY THE COURT ABOUT THE MERITS OF ANY CLAIM OR DEFENSE.**

3.      **WHAT ARE THE SPECIFIC LAWSUITS BEING SETTLED?**

The following are the Lawsuits being settled by the Proposed Settlement:

*Sullivan, et al. v. DB Investments, Inc., et al.*, D.N.J. Index No. 04-cv-02819 (SRC)

*Hopkins v. De Beers Centenary A.G., et al.,* San Francisco County No. CGC-04-432954

*Cornwell v. DB Investments, Inc., et al.*, Maricopa Co. No. CV2005-2968

*Null, et al. v. DB Investments, Inc., et al.,* Madison Co. No. 05-L-209

*Leider, et al. v. Ralfe, et al.*, Docket No. 01-CV-3137 (HB)

*Anco Industrial Diamond Corp. v. DB Investments, Inc., et al.*, D.N.J. Index No. 01-cv-04463 (SRC)

*British Diamond Import Company v. Central Holdings Ltd., et al.*, D.N.J. Index No. 04-cv-04098  (SRC)

4.      **WHAT IS A CLASS ACTION?**

In a class action, one or more people, called Class Representatives, sue on behalf of people who have similar claims.  All these people are a "Class" or individually they are "Class

Members." In a class action, one court resolves the claims of all Class Members, except for those who elect to exclude themselves from the Class.

### 5.      WHO ARE THE MEMBERS OF THE SETTLEMENT CLASSES?

The Court has decided that there are two Classes, or groups, of gem diamond buyers, whose claims against De Beers are being settled by the Class Representatives.  One of these two Classes is further divided into two Subclasses.  The two Classes are the Direct Purchaser Class and the Indirect Purchaser Class.  The Indirect Purchaser Class is divided into the Reseller Subclass and the Consumer Subclass.  It is possible for a single person or business to be in more than one of these Classes or Subclasses.  The Court has defined these Classes and Subclasses as follows:

**A.  Direct Purchaser Class ("Direct Purchasers"):**

All natural persons and legal entities located in the United States who purchased any Gem Diamond directly from a Defendant or Defendants' Competitors (including any entity controlled by or affiliated with any such party) from September 20, 1997 to March 31, 2006.  The Class excludes any person or entity which is or was a Sightholder for the time period(s) during which such person or entity had Sightholder status.

**B.  Indirect Purchaser Class ("Indirect Purchasers"):**

All natural persons and legal entities located in the United States who purchased any Diamond Product between January 1, 1994 to March 31, 2006, from a person or business entity other than a Defendant (including any entity in which any Defendant has a controlling interest and any affiliate of any Defendant) and other than one of Defendants' diamond mining Competitors (including any entity controlled by or affiliated with any such party).

1. **Indirect Purchaser Reseller Subclass ("Resellers"):**  All persons and entities in the Indirect Purchaser Class who purchased any Diamond Product for resale.  For example, Resellers include diamond jewelry manufacturers and retailers, among others.

2. **Indirect Purchaser Consumer Subclass ("Consumers"):**  All persons in the Indirect Purchaser Class who purchased any Diamond Product for use and not for resale.  For example, Consumers include people who purchase diamond jewelry to wear or to give as a gift.

Both of the classes exclude Defendants and their affiliates, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, Defendants' diamond mining Competitors, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff.

- 3 -

Note that the time period for the Direct Purchaser Class begins September 20, 1997, while the beginning date for the Indirect Purchaser Class is January 1, 1994.  The ending date for both classes is March 31, 2006.

The following additional definitions may be helpful to you in understanding the class definitions:

**Located in the United States:**  (i)  For the Direct Purchaser Class, it means resided in or purchased in the United States during the Direct Purchaser Class Period; (ii) For the Indirect Purchaser Class, it means purchased in the United States during the Indirect Purchaser Class Period and resided in the United States on _____, 2007; and (iii) For both Settlement Classes, "reside in" means: for a natural person means maintained a place of residence; and for an entity means was organized and existed under the laws of any state or territory in the United States or maintained a place of business in the United States.  The United States in defined to include the District of Columbia, Puerto Rico and the U.S. Virgin Islands in addition to the 50 states.

**Purchased in the United States:**  You are considered to have purchased in the United States if your purchase was delivered to a location within the United States, regardless of whether the seller was located in the United States or abroad.

**Gem Diamond**:  This is a diamond of such color, clarity and quality that it has been or could be used in Diamond Jewelry.  Some other diamonds are used for industrial purposes, such as cutting materials or for use in lasers.  The Lawsuits and the Proposed Settlement are not about industrial diamonds.

**Diamond Product**:  A Diamond Product is any Rough Diamond, Polished Diamond, Diamond Jewelry, or any other product consisting of or containing one or more Gem Diamonds.  It does not include products containing man-made or industrial diamonds.

**Diamond Jewelry**:  Diamond Jewelry is any decorative or functional adornment typically made of metals and containing one or more Gem Diamond.  This includes, among other jewelry, diamond rings, earrings, necklaces, bracelets, watches and cufflinks.

**Rough Diamond**:  This is a Gem Diamond that is uncut and unpolished.

**Polished Diamond**:  This is a Gem Diamond that has been cut and polished.

**Defendants' Diamond Mining Competitors**:  A list of Defendants' competitors and their affiliates is attached as Appendix A, and include Alrosa, Rio Tinto, BHP Billiton and Argyle.

**Sightholder**:  This is a customer entitled to purchase rough diamonds from the Diamond Trading Company at its regularly scheduled Sights.

- 4 -

## 6.   WHAT ARE THE TERMS OF THE PROPOSED SETTLEMENT?

**THIS IS ONLY A SUMMARY OF THE SETTLEMENT TERMS.  THE COMPLETE SETTLEMENT IS AVAILABLE ONLINE AT:  www.diamondsclassaction.com.**

The Proposed Settlement benefits the Classes in two ways:

First, the Proposed Settlement prohibits the Defendants from engaging in certain conduct that violates state and federal antitrust laws, and requires the Defendants to submit themselves to the jurisdiction of the Court for purposes of enforcing these and other provisions of the Proposed Settlement.  This agreement is contained in an order of the Court called an "Injunction."  Specifically, the Injunction prohibits the Defendants from entering into certain agreements with Sightholders and entities engaged in the mining or production of rough gem diamonds to fix prices or restrict supply.  The Injunction also prohibits the Defendants from making certain open market purchases in the United States

You can read all of the terms of the Injunction online at www.diamondsclassaction.com.  You can also request a copy to be sent to you by writing the Claims Administrator, P.O. Box 1859, Faribault, Minnesota 55021-1859, or calling 1-800-760-5431.

Second, Defendants agree to pay a total of $295 million to the Classes.  They will also pay up to $7 million to provide Notice of the Proposed Settlement to the Indirect Purchaser Class.  Of the $295 million, $22.5 million has been allocated to the Direct Purchaser Class and $272.5 million has been allocated to the Indirect Purchaser Class.

A Special Master, retired United States District Judge Alfred E. Wolin, was appointed by the Court to recommend how the $272.5 million in the Indirect Purchaser Class Fund will be divided between the Reseller and Consumer Subclasses.  Judge Wolin's recommendation to the Court is that the Reseller Subclass Settlement Fund be $137,067,500 (50.3% of the total) and the Consumer Subclass Settlement Fund be $135,432,500 (49.7% of the total).  The Defendants' payment has been received and invested and the interest earned will be divided according to the division of the Settlement principal.  As explained further in answer to Question 11, Class Counsel intend to apply to the Court for an award of attorneys' fees of up to 25% of the overall Settlement Fund.  They will also ask the Court to reimburse their out-of-pocket expenses and for incentive awards to the Class Representatives..  All awards and reimbursements authorized by the Court will be deducted from the Settlement Funds prior to distribution to the Class and Subclass members.

In exchange for the Defendants' agreement to obey the Injunction and their payment of $295 million, all persons who do not exclude themselves from the Settlement Classes (see Questions 12-15) will release the Defendants from any and all past, present and future claims that arise out of or are related to the claims in the Lawsuits.  This means that if you stay in the Classes, you can never sue the Defendants again for these claims.

### 7.      WHAT ARE THE REASONS FOR PROPOSED SETTLEMENT?

Class Counsel researched and conducted discovery into the claims of the members of the Classes and the defenses to those claims that might be asserted by Defendants.  This discovery included:

- review of Defendants' documents and diamond jewelry industry data and information,
- interviews of Defendants' employees, and
- consultations with economic experts, who studied Defendants and the diamond industry, and with members of the diamond industry.

Based on this research, Class Counsel and the Class Representatives believe that the Proposed Settlement is fair, reasonable and adequate and in the best interests of the Classes.  Class Counsel also considered the risks and expense of continuing the Lawsuits.  These include the risk that even if the Classes would win at trial, there are particularly high obstacles to collecting a judgment because the Defendants all operate outside of the United States.

Defendants have denied and continue to deny each of the claims made in the Lawsuits and that they have done anything wrong.  Defendants have asserted and continue to assert many defenses, including that the United States Courts do not have jurisdiction over them and that many of the claims in the Lawsuits are time-barred.  Defendants decided to settle the Lawsuits to avoid the time and expense of litigation.  Defendants have taken into account the uncertainty and risk of the outcome of any litigation, especially in complex cases such as this one.


### 8.      HOW MUCH WILL MY PAYMENT BE?

It is not possible to determine what your payment will be at this time.  Your share of the Proposed Settlement will be paid on a *pro rata* basis from the money available in the specific Class or Subclass Settlement Fund to which you have made a claim.  This means that your recovery will be based on several criteria, including the quantity, purchase price and type of the diamond(s) and/or diamond jewelry you bought and how many Class Members file valid claims.

The rules for dividing the settlement funds among the Members of the Classes and Subclasses differ from group to group.  You can read more about these rules and how the payment amounts will be calculated in Appendix C to this Notice.

To receive any payment, you must file a claim form.  There are separate claim forms for use by the members of the Direct Purchaser Class, the Indirect Purchaser Reseller Subclass and the Indirect Purchaser Consumer Subclass.   See Questions 9 and 21 of this Notice for instructions on how to obtain the claim form.

### 9.        HOW CAN I GET A PAYMENT?

**TO RECEIVE A PAYMENT, YOU MUST COMPLETE AND SUBMIT A CLAIM FORM FOR EACH CLASS OR SUBCLASS IN WHICH YOU ARE A MEMBER.**  Claim Forms can be downloaded at www.diamondsclassaction.com or obtained by:

> For the Direct Purchaser Class:  By calling 1-800-XXX-XXXX, or by writing to
> [TO BE INSERTED]

> For the Indirect Purchaser Class:  By calling 1-800-760-5431, or by writing to
> Diamonds Claims Administrator
> P.O. Box 1859
> Faribault, Minnesota  55021-1859

**THE DEADLINE TO SUBMIT YOUR CLAIM FORM IS _____, 2007.  IF YOU SUBMIT YOUR CLAIM FORM BY MAIL, IT MUST BE POSTMARKED NO LATER THAN _____, 2007.**

**Important Information for Consumers** --  If you are a member of the Consumer Subclass, you are strongly encouraged to submit your claim electronically.  To do this, please visit www.diamondsclassaction.com and click on the Consumer Claim Form link.

### 10.       WHEN WILL I GET MY PAYMENT?

Payments will be mailed to Class Members after all of the claims are processed, and after the Court grants final approval of the Proposed Settlement and any appeal is resolved.  **The Court is scheduled to consider final approval of the Settlement at a hearing on _____, 2007.**

Status reports will be posted on the Settlement Website, www.diamondsclassaction.com, to keep you advised of developments and the anticipated distribution schedule.  It is likely that distribution of the Settlement proceeds will not occur before the latter half of 2008 or the first half of 2009.  This is because all claims must be verified and processed and all discrepancies and other issues must be resolved in order to compute the total amount of approved payment dollars. This number will then be used to calculate your individual *pro rata* share of the Settlement Fund.

### 11.       WHO REPRESENTS THE CLASSES AND WHAT ARE THE ASSOCIATED COSTS AND EXPENSES?

The Court has appointed the following law firms to represent the Class members: Berman DeValerio Pease Tabacco Burt & Pucillo; Cooper & Kirkham, PC; Glancy Binkow & Goldberg, LLP; Korein Tillery, LLC; Lieff Cabraser Heimann & Bernstein, LLP; Law Offices of John A. Maher; Meredith Cohen Greenfogel & Skirnick, PC; Stamell & SChager, LLP, Sommer Barnard Attorneys PC and Zelle Hofmann Voelbel Mason & Gette, LLP..  These lawyers are called Class Counsel, and with the assistance of other lawyers in the Lawsuits, have been handling the

- 7 -

Lawsuits, in some instances, from as far back as 2001, without being paid any fees.  They have also advanced the costs and expenses of the Lawsuits.

You do not have to pay Class Counsel.  They will ask the Court to pay them a fee for their services and to reimburse them for the out-of-pocket costs and expenses that they advanced. Class Counsel have agreed that they will not ask the Court for an award of attorneys' fees that is more than 25% of the Settlement Fund  They will also ask the Court to pay them back their actual out-of-pocket costs and expenses, which they do not anticipate will exceed $5 million. Further, Class Counsel will ask for a payment not to exceed _____ for each of the Class Representatives.  All such fees, payments and reimbursements that are awarded by the Court will be paid out of the Settlement Funds.  They will not be collected from Class Members.

You can also hire your own lawyer to represent you in the Lawsuits if you want, but you will have to pay that lawyer yourself.

## 12.    <u>WHAT ARE THE RELEASE AND COVENANT NOT TO SUE?</u>

Every Class Member will agree to the Release and Covenant Not to Sue contained in Section V of the Settlement Agreement.  In general, Class Members are agreeing not to sue any Defendant ever again about any past, present or future claims based on or related to the conduct covered by the Lawsuits.  This includes any type of cause of action, demand, right,  suit and request for equitable, legal and administrative relief of any kind or nature whatsoever arising from or relating to the facts alleged in the Lawsuits.  **It includes all conduct up to [date of settlement class certification] by DeBeers concerning the exploration, mining, processing, treatment, sorting, distribution, marketing, advertising, sale or pricing of diamonds.**  This includes claims based on:

- existing or past agreements with other diamond suppliers, such as Alrosa, Alexkor, Argyle, Ashton Mining, BHP Billiton, Debswana, Namdeb, and Rio Tinto;
- De Beers' joint ventures and other interests in businesses engaged in the marketing, advertising, sale or pricing of diamonds;
- the Supplier of Choice program and other methods of selling or distributing diamonds; and
- marketing, advertising, and sales programs.

**You can read the full text of the Release and Covenant Not To Sue in Appendix B to this Notice.**

The Release and Covenant Not to Sue will bind you if you do not exclude yourself from the Classes, even if you fail to file a Claim Form.  To be eligible to receive a payment from the Proposed Settlement, you must file a Claim Form.

**13.   IF I EXCLUDE MYSELF, CAN I GET MONEY FROM THE PROPOSED SETTLEMENT?**

No.  Excluding yourself tells the Court that you don't want to be a Class Member and you don't want to settle your claims against the Defendants.  Therefore, if you exclude yourself, you **CANNOT** get money from the settlement of the Lawsuits.  If you ask to be excluded, your rights will no longer be affected by the Lawsuits, and you should not file a Claim Form or object to the Proposed Settlement. You would, however, be able to sue or be part of a different lawsuit against Defendants in the future based on the same claims that are in the Lawsuits here, at your own expense.

**14.   IF I DO NOT EXCLUDE MYSELF, CAN I SUE LATER?**

No.  Unless you exclude yourself, you give up the right to sue Defendants for the claims asserted in the Lawsuits and resolved by the Proposed Settlement.  You must exclude yourself from the Classes to start your own lawsuit.

**15.   HOW CAN I EXCLUDE MYSELF FROM THE SETTLEMENT AND RELEASE?**

**If you want to exclude yourself from the Class, you must do so by sending a written statement labeled "Request for Exclusion" by first class mail POSTMARKED NO LATER THAN_____, 2007 to the following address:**

<div align="center">

**Diamonds Claims Administrator**
**P.O. Box 1859**
**Faribault, Minnesota 55021-1859**

</div>

**The Request for Exclusion must be in writing and clearly state your name and address, as well as all trade names or business names and addresses you have used, whether you want to be excluded from the Direct or Indirect Purchaser Class (or both).   All Requests for Exclusion must be submitted only on your behalf and  must be signed by you or an officer of an entity seeking exclusion.**

**If you do not request to be excluded from the class you will be bound by any judgment that may be entered in the Lawsuits whether or not you file a claim for a payment from the Settlement Fund.**

**16.   WHAT IF I DO NOT WANT TO EXCLUDE MYSELF BUT I DO NOT LIKE THE SETTLEMENT?**

You can object to the Proposed Settlement.  **In order to have your objection considered by the Court, you MUST submit a written "Objection" postmarked no later**

than _____, 2007 and sent to the address set out in the answer to Question 15, above. You Objection **must** include: (1) your complete name and full residence or business address (giving the address of your lawyer, if you are represented by counsel, is not sufficient); (2) a statement, signed by you under penalty of perjury, that you purchased Diamond Products in the United States during the Class Period; and (3) a statement of the reasons for your objection and any supporting papers you want the District Court to consider. A mere statement that you object to the Settlement is not sufficient.

If you object, you may attend the Fairness Hearing, but that is not necessary for your views to be considered by the Court. You may ask to speak at the Fairness Hearing. **If you wish to speak, you should clearly write your "Intention to Appear" on your written "Objection."**

## 17.    WHAT IS THE DIFFERENCE BETWEEN OBJECTING AND EXCLUDING?

Objecting is simply telling the Court that you do not like something about the Proposed Settlement. But you still agree to be bound by any decision that the Court may make to approve the Settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you do not want to be part of the Class. If you exclude yourself, you cannot object to the Proposed Settlement because the Lawsuits and the Proposed Settlement no longer affect your rights.

## 18.    WHEN AND WHERE WILL THE DISTRICT COURT CONSIDER WHETHER TO APPROVE THE PROPOSED SETTLEMENT?

**The Fairness Hearing will be held at XX:XX a.m. on Month OO, 2007, in Courtroom XX, on the XXth Floor of the Martin Luther King, Jr. Federal Building and United States Courthouse, 50 Walnut Street, Newark, New Jersey 07102.** At this hearing the Court will consider whether the Proposed Settlement, including the allocation between the Indirect Purchaser Subclasses, is fair, reasonable and adequate and should be given final approval. The Court will also consider Class Counsels' motion for attorneys' fees, expenses and incentive awards to the Class Representatives. **The hearing may be moved to a different date without additional formal notice to the Classes, so it is a good idea to check www.diamondsclassaction.com regularly for updated information.**

## 19.    DO I HAVE TO COME TO THE HEARING?

No, you do not have to attend the Fairness Hearing. Class Counsel will answer any questions the District Court may have. But, you are welcome to come at your own expense. You may also pay your own lawyer to attend. If you send an Objection to the Proposed

- 10 -

Settlement, you may indicate your Intention to Appear and come and talk about your Objection, but you do not have to come to Court to talk about it.  As long as you submit your written Objection on time, the District Court will consider it.

### 20.    WHAT HAPPENS IF I DO NOTHING AT ALL?

If you do nothing, you will be a part of the Classes, and bound by the Release and all decisions made by the Court regarding the Proposed Settlement.  However, unless you file a Claim Form online or postmarked by the deadline, you will not be eligible for a payment from the Settlement Fund.

### 21.    WHERE CAN I GET ADDITIONAL INFORMATION OR OBTAIN A CLAIM FORM?

You can read the Settlement Agreement and the Injunction, as well as get more detailed information about the claims procedure by visiting the Settlement website at www.diamondsclassaction.com.  You can also request paper copies of the Settlement Agreement, the Injunction and other information by calling 1-800-760-5431 or by writing to the Diamonds Claims Administrator at P.O. Box 1859, Faribault, Minnesota 55021-1859.

**Consumer Subclass Members can review the instructions for filing and file a Claim Form online at www.diamondsclassaction.com.  All members of the Consumer Subclass who have internet access are strongly urged to submit their claims online.**  You can also receive written instructions and a paper Claim Form by calling 1-800-760-5431 or by writing to the Diamonds Claims Administrator at P.O. Box 1859, Faribault, Minnesota 55021-1859.

**ALL QUESTIONS CONCERNING THIS NOTICE AND THE SETTLEMENT AGREEMENT SHOULD BE DIRECTED TO THE CLAIMS ADMINISTRATOR BY EMAIL AT claimsadministrator@diamondsclassaction.com, BY CALLING 1-800-760-5431, OR BY WRITING TO THE FOLLOWING ADDRESS:**

<div align="center">

**Diamonds Claims Administrator**
**P.O. Box 1859**
**Faribault, Minnesota 55021-1859**

</div>

There are files concerning the various cases in the Lawsuits.  For more detailed information about these cases, you are referred to the pleadings, orders and other court documents filed in the Lawsuits, which may be inspected at the following locations during regular business hours:

> For *Sullivan*, *British Diamond*, *Anco*, [*Leider*, and *Null*]: Office of the Clerk of the United States District Court for the District of New Jersey, Room 4015, Martin Luther King, Jr. Federal Building and United States Courthouse, 50 Walnut Street, Newark, New Jersey 07102.

For *Hopkins*: [Plaintiffs to provide.]

For *Cornwell*: [Plaintiffs to provide.]

Please note that the court clerk's offices **DO NOT** have any information about the Proposed Settlement or the claims process.  That information must be obtained from the Diamonds Claims Administrator, as noted above.

**QUESTIONS OR COMMENTS <u>SHOULD NOT</u> BE DIRECTED TO THE COURT OR COUNSEL FOR DEFENDANTS.**

Dated:  Month 00, 2007

BY ORDER OF THE COURT:
William T. Walsh, Clerk
United States District Court
District of New Jersey

- 12 -

**APPENDIX A**

[LIST OF DEFENDANTS' COMPETITIORS TO BE ADDED]

# APPENDIX B

## RELEASE AND COVENANT NOT TO SUE

Section V of the proposed Settlement provides for the following Release and Covenant Not to Sue:

(A)    <u>Releases</u>.  Upon the Effective Date, the Released Parties shall be released and forever discharged from any and all claims, causes of action, demands, rights, actions, suits and requests for equitable, legal and administrative relief of any kind or nature whatsoever arising from or relating to facts alleged in any of the Class Actions (whether such claims are based on antitrust, unfair competition, consumer protection or fraud or deception, unfair practices, price discrimination, trade regulation, trade practices, unjust enrichment and/or other federal or state law, regulation or common law similar or analogous to any of the above, including without limitation the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*), whether known or unknown, asserted or unasserted, that any member of the Settlement Classes who has not timely excluded himself, herself or itself from the action, ever had, could have had, now has, or can, shall or may have in the future (the "Claims"), on the basis of or arising from conduct from the beginning of time until the date of settlement class certification, by any of the Released Parties concerning the exploration, mining, processing, treatment, sorting, distribution, marketing, advertising, sale or pricing of any Diamond Product, including but not limited to:  (i) existing or past agreements, contracts or transactions with other diamond mining companies, suppliers, producers, sellers or distributors, including but not limited to agreements with ALROSA, Alexkor, Argyle, Ashton Mining, BHP Billiton, Debswana, Namdeb, Rio Tinto and any Joint Ventures; (ii) existing or past acquisitions of interests in, joint ventures relating to, or other participation in diamond mines, diamond mining companies, suppliers, producers, sellers or distributors or other businesses engaged in the marketing, advertising, sale or pricing of any Diamond Product; (iii) methods of distribution or distribution programs of any Diamond Product (including but not limited to the Supplier of Choice program), including all means of selling or distributing any Diamond Product to any direct or indirect purchasers; (iv) marketing and sales programs relating to any Diamond Product; and (v) advertising programs relating to any Diamond Product.  The parties expressly agree that the release applies to Claims arising from certain business practices or conduct in existence on the date of settlement class certification but continuing after such date, namely: (i) the Supplier of Choice Program, so long as there is no material change in the European Commission's approval, no material change in the Supplier of Choice Program or no material change to the United States federal antitrust laws that are applicable to the Supplier of Choice Program; (ii) the ALROSA Agreement, so long as there is no material change in the European Commission's position, no material change in the ALROSA Agreement or no material change to the United States federal antitrust laws that are applicable to the ALROSA Agreement; and (iii) any advertising programs substantially similar to those used during the two years prior to the date of settlement class certification.  Nothing in this Settlement shall be interpreted to release unrelated claims, including, but not limited to, for example, a personal injury, product defect or breach of contract claim.  Nothing in this Settlement is intended to release any direct purchaser claim of any Sightholder.

- 14 -

(B)   <u>Covenant Not to Sue</u>.   Upon the Effective Date, each member of the Settlement Classes covenants and agrees that it shall not hereafter seek to establish liability or assert claims, on behalf of itself or any other person, entity or class, against any of the Released Parties, in whole or in part, for any of the claims described in Paragraph A herein.  The Parties agree that this Covenant may be pled as a full and complete defense to any action, suit or other proceeding that may be instituted, prosecuted or attempted with respect to any of the claims described in Paragraph A herein.

(C)   <u>Waiver of Release Limitations</u>.   To the extent permitted by law, each member of the Settlement Classes shall also be deemed to have expressly waived, released and forever discharged any and all defenses, provisions, rights and benefits that may be available under:

(i)   Section 1542 of the California Civil Code, which provides:

A general release does not extend to claims in which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor;

and/or,

(ii)   Any law of any state or the District of Columbia, or principle of common law, which is similar, comparable or equivalent to Section 1542 of the California Civil Code (each a "Comparable Law").

With respect to released claims, each member of the Settlement Classes hereby:  (i) assumes all risks for claims heretofore and hereafter arising, whether known or unknown, suspected or unsuspected, contingent or noncontingent; (ii) releases and forever discharges such claims as part of the Released Claims; and (iii) expressly and irrevocably waives any rights he, she, or it may have under Section 1542 and any Comparable Law.

<u>Effect of Releases</u>.  This Settlement Agreement may be pleaded as a full and complete defense to any action, suit or other proceeding that may be instituted, prosecuted or attempted with respect to any of the Released Claims.  The Parties further agree that this Settlement Agreement may be pleaded as necessary for the purpose of enforcing this Settlement Agreement.

## APPENDIX C

## CLAIMS PROCESSING PROCEDURES

**A.  Direct Purchaser Class**

The settlement agreement provides that $22.5 million (plus interest earned) will be allocated to the claims of the Direct Purchaser Class before the deduction of taxes, attorneys' fees and expenses, costs of administration and any other amounts the Court approves.

After deductions authorized by the Court from the $22.5 million (plus interest earned) allocated to the Direct Purchaser Class, the net amount will be distributed *pro rata* to Direct Purchaser Class members based upon their rough and polished diamond purchases from De Beers owned Diamdels, De Beers Polished Diamond Division and De Beers' Competitors.  To make a claim, Direct Purchaser Class members must submit a Direct Purchaser Class Claim Form reporting their purchases from defendants and defendants' competitors that were delivered to the United States.  (The Direct Purchaser Class Claim Form can be obtained from the Claims Administrator and at www.diamondsclassaction.com.) The claims will be reviewed by the Claims Administrator and claimants may be required to provide appropriate documentation.  The Claims Administrator may also revise purchase amounts submitted by claimants after comparing those purchase amounts to sales data provided by defendants.

As approved by the Claims Administrator, the rough and polished diamond purchases will be adjusted by multiplying rough diamond purchases by 1.22.  Direct Purchaser Class members will be paid a dollar amount calculated by multiplying the net fund by a fraction in which the particular class member's adjusted purchases is the numerator and the total of all adjusted purchases is the denominator.  The following represents this formula:

| Direct Class Member's Payment | = | Net Settlement Fund ($22.5 Million + Interest - Fees - Incentive Awards - Expenses) | x | Adjusted Purchases for Each Direct Purchaser Class Member's Approved Claims |
|---|---|---|---|---|
| | | | | Aggregate Adjusted Purchases for All Approved Direct Purchaser Class Claims |

**B.  Indirect Purchaser Reseller Subclass**

The Reseller Subclass Fund will be distributed *pro rata* to Subclass members filing valid timely Claim Forms ("Claimants") based on their purchases of Rough Diamonds, Polished Diamonds and/or Diamond Jewelry.  To determine each Reseller Subclass Claimant's *pro rata* share of the Reseller Subclass Fund, Claimants will be asked to submit information for the two years (either fiscal or calendar) of the Class Period in which they had the most purchases.  The Claims Administrator will then convert purchases of Rough Diamonds, Polished Diamonds and

- 16 -

various types of Diamond Jewelry to a uniform measure based on wholesale values of polished diamonds prevailing during the Class Period.

To derive this value, the Claims Administrator will apply a formula to the information provided by each Claimant about their aggregate dollar purchases of each type of Diamond Product purchased during the Class Period. Since increases in rough diamond prices were not reflected equally in the prices of each Diamond Product, the Claims Administrator will also apply weights to Resellers' purchases to reflect differences in the absorption of an increase in rough diamond prices. The resulting number will be the Claimant's "Recognized Claim Amount" for that Diamond Product. The Claims Administrator will then total the Recognized Claim Amount for each Diamond Product to calculate a Total Recognized Claim Amount for each Claimant. The Total Recognized Claim Amount of Claimants who were not in business during the entire Class Period will be pro-rated to reflect the shorter time during which they were making purchases.

Each Reseller Claimant will receive a *pro rata* payment from the Reseller Settlement Fund based on the ratio of the Claimant's Total Recognized Claim Amount to the sum of all Reseller Claimants' Total Recognized Claim Amounts.

The Claims Administrator will apply the following formulas to calculate a Reseller Claimant's Recognized Claim Amounts:

**Rough Gem Diamonds**

The total dollar amount of a Claimant's purchases of Rough Gem Diamonds, as verified, will be multiplied by 1.22 to calculate a polished wholesale equivalent. This amount will then be multiplied by 0.338, representing the approximate portion of any price increase absorbed by Rough Gem Diamond purchasers. The amount was derived from the Reseller Subclass's economic expert's statistical analysis of absorption weights of Rough Gem Diamond price changes. The adjusted purchase dollar amount will be each Claimant's Recognized Claim Amount for Rough Gem Diamond purchases.

**Polished Gem Diamonds**

The total dollar amount of a Claimant's purchases of Polished (loose) Gem Diamonds, as verified, will be multiplied by 0.287, representing the approximate portion of any price increase absorbed by Polished Gem Diamond purchasers in the Reseller Subclass. This amount was similarly calculated by the Resellers' economic expert. The adjusted purchase dollar amount will be each Claimant's Recognized Claim Amount for Polished Gem Diamond purchases.

**Diamond Jewelry**

The Claims Administrator will multiply the total dollar amount of a Claimant's purchases of various categories of Diamond Jewelry, as verified, by the Recognized Claim Percentages shown in the chart below in order to estimate the polished wholesale value of

- 17 -

the diamonds contained in each piece of Diamond Jewelry. This chart applies to all types of Diamond Jewelry except diamond watches, pens and other diamond-accented accessories. Jewelry is organized into categories of jewelry containing only diamonds or jewelry with diamonds and other gemstones ("Mixed Stone Jewelry"). Depending on the type and wholesale price point, a percentage of the wholesale price shall be applied by the Claims Administrator to the total annual wholesale dollar prices paid by each claimant for each category.

The purchase prices adjusted by the Recognized Claim Percentages will then be multiplied by 0.375, representing the approximate portion of any price increase absorbed by Diamond Jewelry purchasers in the Reseller Subclass, as calculated by the Resellers' economic expert. This amount will be each Reseller Claimant's Recognized claim Amount for Diamond Jewelry.

The percentages to be applied are as follows:

### RESELLER DIAMOND JEWELRY TABLE

| Items Purchased | Purchase Price | Recognized Claim Percentage |
|---|---|---|
| Mixed Stone Jewelry | Less than $100 | 13.8% of wholesale price |
| Mixed Stone Jewelry | $100 and above | 30% of wholesale price |
| Diamond Only Jewelry | Less than $100 | 24.7% of wholesale price |
| Diamond Only Jewelry | $100 up to $499 | 57.6% of wholesale price |
| Diamond Only Jewelry | $500 up to $4,999 | 66.1% of wholesale price |
| Diamond Only Jewelry | $5,000 and up | 90% of wholesale price |

**Diamond-Faced Watches and**

Purchases of diamond-faced, non-pavé watches may be claimed by each Claimant providing information showing the wholesale price of the watch and either the number of diamonds contained on the face of the watch or the total carat weight of the diamonds on the watch. A Recognized Claim Amount for the watch will then be calculated. To calculate the Recognized Claim Amount for watches above the wholesale price of $1,500, the Claims Administrator will first either multiply the total carat weight of the diamonds on the watch by $522.50, or multiply the number of diamonds on the watch by $6.57. The resulting number will be multiplied by 0.375, which represents the

- 18 -

approximate portion of any price increase absorbed by non-pavé diamond watch purchasers in the Reseller Subclass.  This calculation will be the Recognized Claim Amount.  For watches with a wholesale purchase price of less than $1,500, the Recognized Claim Amount will be calculated by (1) multiplying the total carats by $361.00, or (2) the number of diamonds by $2.01, and then multiplying the result by 0.375.

Claims for pavé watches will be handled in a similar manner.  Pavé watches may be claimed by having the Claimant provide the total carat weight of the diamonds on the watch or the number of diamonds on the watch.  The Claims Administrator will calculate the Recognized Claim Amount for each watch by either (1) multiplying the total carats by $484.50, or (2) multiplying the total number of diamonds by $3.62, and multiplying the result by 0.375.

**Other Diamond-Accented Products**

For non-jewelry pieces, such as diamond accented pens, a Claimant may supply the wholesale price paid for such piece and the total carat weight of the diamonds in each piece, along with a description including the 4 C's of the diamond(s). A Recognized Claim Amount will be calculated from this information that will reflect the estimated wholesale value of the diamonds as well as an estimate of the  approximate portion of any price increase absorbed by the Claimant.

There was a large dollar volume of Rough Gem Diamonds, Polished Gem Diamonds and Diamond Jewelry purchased indirectly in the United States by the diamond trade during the twelve-year class period. Because the distribution to eligible claimants, once their verified claim amounts have been calculated, will be *pro rata*, each individual payment amount will be computed in proportion to the totality of all of the claims being paid.  In the event that a substantial number of Reseller subclass members (by number or dollar purchase volume) file claims, the actual payout of settlement proceeds to any eligible claimant will be a small fraction of the dollar volume of the claimant's total purchases.  The settlement focuses on alleged illegal activities by Defendants and the resulting overcharge (the difference between the price actually paid and what would have been paid in a competitive market); the overcharge itself is only a small portion of the purchase price paid by resellers.  Claimants may receive a check in a very modest amount, i.e. $30-$50, even though their purchases during the class period may have been thousands of dollars.

It is possible that some claims will result in payments that are too small to process, because the administrative cost of calculating claims and distributing checks exceeds the check amount.  Those Claimants whose total payment would be $25 or less will not receive any payment.  Class Counsel cannot predict at this stage how many eligible Subclass Members will file claims or the total amount of the purchases in the claims filed. Because each Claimant's amount will be based on a proportion of all claims filed and verified,  there is no way to inform Reseller Subclass members the portion of the net settlement proceeds they will receive.  All Reseller Subclass members are encouraged to submit claims against the Settlement Fund.

- 19 -

## C.  Indirect Consumer Subclass

The Consumer Subclass Fund will be distributed *pro rata* to Subclass members filing valid timely Claim Forms ("Claimants") based on the Claimants' purchases of Diamond Jewelry and/or Polished Diamonds.  The Claims Administrator will calculate a Recognized Claim Amount for Polished Diamonds and various types of Diamond Jewelry purchased by the Claimant during the Class Period by applying a Recognized Claim Percentage to the purchase price paid by the Claimant.  This is being done so that the claims of all Consumer Subclass members will be paid based on the wholesale value of the polished diamonds in the jewelry and not on the value of the setting (gold, platinum and precious or semi-precious stones) or the retailer's mark-up.

The following table will be used by the Claims Administrator for all loose diamonds and diamond jewelry other than watches and diamond accented non-jewelry items:

### CONSUMER DIAMOND PRODUCT TABLE

| Item | Purchase Price | Recognized Claim Percentage |
|---|---|---|
| Mixed Stones Jewelry | Less than $200 | 6% of the retail price |
| Mixed Stones Jewelry | $200 or more | 14.5% of the retail price |
| Diamonds Only Jewelry | Less than $200 | 10.5% of the retail price |
| Diamonds Only Jewelry | $200-$999 | 27.5% of the retail price |
| Diamonds Only Jewelry | $1,000-$5,499 | 32% of the retail price |
| Diamonds Only Jewelry | $5,500 to $9,999 | 38.5% of the retail price |
| Diamonds Only Jewelry | $10,000 or more | 45% of the retail price |
| Loose Diamonds | Any and all | 59% of the retail price |

Purchases of diamond-faced, non-pavé watches may be claimed by each Claimant providing information showing the purchase price of the watch and either the number of diamonds contained on the face of the watch or the total carat weight of the diamonds on the watch..  A Recognized Claim Amount for the watch will then be calculated.  To calculate the Recognized Claim Amount for watches priced at $2,600 or above, the Claims Administrator will either (1) multiply the total carat weight of the diamonds on the watch by $544.52, or (2) multiply the number of diamonds on the watch by $6.57.  For watches priced less than $2,600, the Recognized Claim Amount will be calculated by (1) multiplying the total carats by $417.73, or (2) the number of diamonds by $2.01.  This calculation will be the Recognized Claim Amount for the watch.

- 20 -

Claims for pavé watches will be handled in a similar manner.  Pavé watches may be claimed by having the Claimant provide the total carat weight of the diamonds on the watch or the number of diamonds on the watch.  The Claims Administrator will calculate the Recognized Claim Amount for each watch by either (1) multiplying the total carats by $548.99, or (2) multiplying the total number of diamonds by $3.62.

The total of the Recognized Claim Amounts for all approved purchases on a Claim Form will be divided by the total Recognized Claim Amounts for all Consumer Subclass Claimants to determine each individual Claimant's *pro rata* share of the Consumer Subclass Settlement Fund. If the number of persons filing approved claims is so high that an individual claimant's total share of settlement fund computes to less than $10, a check will not be issued for that amount. Instead, recommendations as to the disposition of this amount, along with similar amounts attributable to other claims, will be made by Class Counsel to the Court.  As a general guideline, if a Claimant's only purchases consist of Mixed-Stones Jewelry with total purchase prices of $165 or less, or Diamonds Only Jewelry with total purchase prices of $95 or less, their claims cannot result in a payment amount of $10.00, regardless of how few Consumer Subclass members submit claims.

Conversely, if the number of persons filing approved claims is so low that the computation of a Claimant's *pro rata* share of the Settlement Fund would exceed the total Recognized Claim of Amounts for all eligible purchases, the Claimant will be limited to the total Recognized Claim Amount of their purchases.  For example, if a Consumer Subclass Member claims for one engagement ring that costs $2,000, for which the Recognized Claim Amount is 32% of the purchase price, that claimant will not receive more than $640.  Recommendations as to the disposition of any money remaining after all Claimants are paid for the Recognized Claim Amounts of their approved purchases will be made by Class Counsel to the Court after the total amount of such monies is determined.

- 21 -

# EXHIBIT C

Legal Notice

# If You Purchased a Gem Diamond or Diamond Jewelry
## Between January 1, 1994 and March 31, 2006

### You May Have a Claim to Receive Benefits in a Proposed Class Action Settlement

You may be eligible to obtain a cash benefit from a Proposed Class Action Settlement in three Class Actions pending in the United States District Court for the District of New Jersey.  These lawsuits are about gem diamond pricing, and the Proposed Settlement is with DeBeers, a miner and seller of rough gem diamonds.

**This is just a summary of your rights. To get complete information about the Class Actions and your rights, and to see if you qualify to receive a cash payment you should  visit: www.diamondsclassaction.com or call:  1-800-760-5431**

**What Are These Lawsuits About?**
The lawsuits allege that the De Beers group of companies ("Defendants") conspired to fix, raise and control the price of gem diamonds.  They also claim that DeBeers monopolized the rough gem diamond market and issued false and misleading advertising.  The lawsuits claim that Class Members therefore were forced to pay more for gem diamonds and diamond products.

The Defendants deny these allegations and have decided to settle, without admitting any liability or wrongdoing, to avoid the expense and burden of litigation.

**Who is Involved?**
There are two groups of people whose rights are affected by the Proposed Class Action Settlement.  These two groups are the "Direct Purchaser Class" and the "Indirect Purchaser Class."

You are a member of the "Direct Purchaser Class" if:
- You are a person or business resident in the United States, excluding De Beers sightholders, and
- Between September 20, 1997 and March 31, 2006, you purchased any gem diamond directly from DeBeers or one of De Beers's diamond mining competitors (e.g., Alrosa, Rio Tinto, BHP Billiton or Argyle) for delivery in the United States.

The "Indirect Purchaser Class" has two subclasses: the Reseller Subclass and the Consumer Subclass.

You are a member of "The Reseller Subclass" if:
- You are a person or business resident in the United States on _____, 2007,
- You purchased gem diamonds or diamond jewelry from someone other than De Beers or one of its competitors in the United States or for delivery in the United States, between January 1, 1994  and March 31, 2006, and
- You purchased the gem diamonds or diamond jewelry for resale.

For example, Reseller Subclass members include diamond jewelry manufacturers and retail jewelry stores.

You are a member of "The Consumer Subclass" if:
- You are a person or business resident in the United States on _____, 2007,
- You purchased gem diamonds or diamond jewelry from someone other than De Beers or one of its competitors, in the United States or for delivery in the United States, between January 1, 1994  and March 31, 2006, and

- You purchased the diamonds or diamond jewelry for your own use or as a gift, but not for resale.

**What Does The Proposed Settlement Provide?**

De Beers has agreed to pay $295 Million to settle the class actions ("the Settlement Fund"). The Settlement Fund will be divided as follows:

- The Direct Purchaser Class will receive $22.5 Million
- The Reseller Subclass will receive about $137 Million.
- The Consumer Subclass will receive about $135 Million.

The Settlement Fund is earning interest. The Settlement Fund is also subject to charges, such as attorneys' fees, out-of -pocket expenses of the lawsuits, and costs of administering the claims process, that will be made by the Court.

The amount you will get depends on the total number of claims that are made. Because of the cost to administer checks, if you are a Consumer whose payment amount is less than $10 or a Reseller whose payment amount is less than $25, you will not get a payment check.

The Proposed Settlement also provides for an Injunction that prohibits DeBeers from engaging in certain conduct that violates federal and state antitrust laws.

**Who Represents You?**

The Court has appointed attorneys to represent the Classes. You do not need to pay them. Class Counsel will ask the Court to award them a fair and reasonable fee not to exceed 25% of the total recovery. They will also request reimbursement of their costs and payments for the Class Representatives. The awards that the Court makes will be deducted from the Settlement Fund before it is divided among the Class members.

You may also hire your own attorney, if you wish. However, you will be personally responsible for that attorney's fees and expenses.

**What are Your Legal Rights?**

You have a choice whether or not to stay in the Classes.

- If you do not want to be part of the Proposed Settlement, you must exclude yourself, in writing, postmarked by **Month Date, 2007.** Excluding yourself will allow you to bring your own claims against the Defendants.

- If you stay in the Classes, you will not be able to sue DeBeers for any of the claims in this lawsuit in the future. However, you can file a claim to get a payment from the Settlement Fund. Your claim must be postmarked by **Month Date, 2007.**

If you stay in the Classes, you may object to or comment on any part of the Proposed Settlement. Your objection/comment must be written and postmarked by **Month Date, 2007**. You may also request in writing to speak at the Final Approval Hearing, which will be held on **Month Day, 2007**, at [time] in the United States Courthouse, 50 Walnut Street, Newark, NJ  07102. At that time, the Court will decide whether to approve the Settlement as fair, reasonable, and adequate, and what to award Plaintiffs' Counsel as reasonable fees and reimbursements.

**For More Information on your Legal Rights and Filing a Claim:**
**Visit: www.diamondsclassaction.com        Call: 1-800-000-0000**

**Or Write: Diamonds Claims Administrator, P.O. Box 1859, Faribault, MN 55021-1859**

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAWN SULLIVAN ET AL V. DB INVESTMENTS, INC. ET AL. | File No. 04-2819-SRC |
| This document relates to: INDIRECT PURCHASER RESELLER SUBCLASS | PROOF OF CLAIM AND RELEASE |

### TO: INDIRECT PURCHASERS WHO RESIDE OR HAVE A PLACE OF BUSINESS IN THE UNITED STATES AND WHO BOUGHT ANY DIAMOND PRODUCT FOR DELIVERY TO THE UNITED STATES FOR RESALE

**PLEASE READ THIS ENTIRE CLAIM FORM CAREFULLY; THE COMPLETED CLAIM FORM MUST BE POSTMARKED ON OR BEFORE _____ TO BE ELIGIBLE TO SHARE IN THE SETTLEMENT PROCEEDS.**

### I. GENERAL INSTRUCTIONS

To receive any money from the settlement proceeds obtained in *Sullivan v. DB Investments, Inc. et al.,* No. 04-2819 (D.NJ.) (SRC), members of the indirect purchaser reseller subclass must complete this Proof of Claim, **and sign it under penalty of perjury and mail it so it is postmarked on or before xxxxxxxxx xx, 2007.** The claims of class members who fail to file a timely, properly addressed Proof of Claim may be rejected and the class member may be precluded from any recovery. The Proof of Claim and Release, postmarked on or before xxxxxxxxx xx, 2007 should be sent to: Claims Administrator, c/o Complete Claims Solutions, LLC, P.O. Box xxxx, West Palm Beach, FL 33416.

All inquiries regarding the allocation of settlement proceeds should be made in writing to the Claims Administrator. Inquiries may be received by mail at the address above, by fax (561-651-7788), or by email (xxxxxxxxxxx@CompleteClaimSolutions.com). All class members who did not previously seek exclusion from the class are bound by the terms of the judgment entered in this action regardless of whether they submit a Proof of Claim and Release. If you submitted or intend to submit a Request for Exclusion from the class, do not submit a Proof of Claim and Release.

### II. DEFINITIONS

"**Class Actions**" refer to *Anco Industrial Corp. v. D.B. Investments, Inc., et. al.,* D.N.J. Index No.01-cv-04463 (SRC), *British Diamond Import Company v. Central Holdings Ltd., et.al.,* D.N.J. Index. No. 04-cv-04098(SRC); *Cornwell v. D.B. Investments, Inc., et. al.,* Maricopa Co. No. CV2005-2968, *Hopkins v. De Beers Centenary A.G., et. al.,* San Francisco County No. CGC-04-432954, *Leider, et. al, v. Ralfe, et. al.,* D.N.J. Index No. 06-cv-00908 (SRC); *Null v. D.B. Investments, Inc. et. al.,* D.N.J. Index No. 05-cv-04849 (SRC), and *Sullivan v. D.B. Investments Inc., et. al.,* D.N.J. Index No. 04-cv-02819 (SRC).

"**Class Period**" refers to January 1, 1994 through March 31, 2006.

"**Court**" refers to the United States District Court for the District of New Jersey.

"**De Beers**" refers to De Beers S.A. and its directors, officers, employees, agents and representatives, predecessors, successors, and assigns.

"**Defendants**" refers to DB Investments, Inc., De Beers S.A., De Beers Consolidated Mines, Ltd., De Beers A.G., Diamond Trading Company ("DTC"), Ltd., CSO Valuations A.G., Central Selling Organization, Central Holdings, Ltd., and De Beers Centenary A.G.

"**Defendants' Competitors**" refers to all other diamond mining companies or rough diamond producers, including but not limited to ALROSA, Rio Tinto, and BHP Billiton or their affiliates.  An affiliate is defined as a company related by a shareholding interest directly or indirectly of 25% or more.

"**Diamond Jewelry**" refers to any decorative or functional adornment typically made of metals and set with one or more Gem Diamond.

"**Diamond Product**" refers to any Rough Diamond, Polished Diamond, Diamond Jewelry or any other product consisting of or containing one or more Gem Diamond, excluding synthetic and industrial diamonds.

"**Gem Diamond**" refers to a diamond of such color, clarity and quality that it has been or could be used in Diamond Jewelry, as distinguished from a diamond used for industrial purposes.

"**Indirect Purchaser Class**" refers to all natural persons and legal entities located in the United States who purchased any Diamond Product between January 1, 1994 and March 31, 2006, provided that any purchases of any Gem Diamond made directly from a Defendant (including any entity in which any Defendant has a controlling interest and any affiliate of any Defendant) or Defendants' Competitors (including any entity controlled by or affiliated with any such party) shall be excluded.  The class shall also exclude Defendants, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, any federal, state or local government entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff.

"**Indirect Purchaser Reseller Subclass**" refers to all persons and entities in the indirect Purchaser Class who purchased any Diamond Product for the purpose of resale in the United States.

"**Located in the United States**" refers to those Class Members who purchased  Diamond Products for for delivery to the United States during the Indirect Purchaser Class Period AND who reside in the United States on the date the Notice of Settlement is approved by the Court.  For a natural person, "Resides" means maintained a place of residence.  For a non-natural person or entity, "Resides" means organized and existed under the laws of any state of territory in the United States or maintained a place of business in the United States.

"**Purchase**" refers to a transaction which can be proven by business records, if required, and where the Class Member paid for and obtained title to the rough or polished diamonds or diamond jewelry. Purchases made on consignment or as a broker, where title does not pass to the buyer, do not qualify for claims under the Settlement.

"**Released Claims**" refers to those claims described in Section V of the Amended Settlement Agreement.  Those claims refer refer to all claims, arising from conduct from the beginning of time until the date of settlement class certification, by any of the Released Parties concerning the exploration, mining, processing, treatment, sorting, distribution, marketing, advertising, sale or pricing of any Diamond Product. Please see the full text of the release in the long form notice or Amended Settlement Agreement at www.diamondsclassactions.com.

"**Released Parties**" refers to the Defendants and their past, present, and future directors, officers, employees, shareholders, affiliates, divisions, predecessors, parents (including Central Holdings, Limited., Anglo American PLC, Debswana Diamond Company (Proprietary) Limited and the Government of Botswana, and their subsidiaries), subsidiaries, other organizational units of any kind, general or limited partners, successors and assigns, and the past, present, and future agents, representatives, attorneys, heirs, executors, administrators and other persons acting on behalf of any of them.

"**Settlement**" refers to the settlement contemplated by the Settlement Agreement.

"**Settlement Agreement**" refers to the Amended Settlement Agreement, made and entered into as of March 24, 2006, by and between the Plaintiffs and De Beers, which was preliminarily approved by the Court on March 31, 2006.

"**Sightholder**"  refers to those customers (including any controlled affiliates, divisions, or subsidiaries of any such customer) entitled to purchase Rough Diamonds from the CSO or DTC at regularly scheduled Sight or Sights. Any such customer is only a Sightholder for the periods of time when it was or is entitled to purchase Rough Diamonds from the CSO or DTC at a regularly scheduled Sight or Sights. Sightholder status terminates when the right to purchase Rough Diamonds from the CSO or DTC at a regularly scheduled Sight or Sights terminates. Sightholders may claim under this settlement for their INDIRECT purchases, e.g., those not made directly from De Beers or its competitors or their affiliates.

## III.  CLAIM FORM AND INSTRUCTIONS

**Please type or neatly print all requested information.  File only one claim for all of your affiliated companies. A company is affiliated if it is owned in whole or in part by the same entity, is part of the same corporate structure, or reports consolidated income for tax reporting purposes.**

By signing this claim form, you are verifying that you have business records to support your claim  and agree to provide additional information to Plaintiffs' counsel, the Claims Administrator, or the Court to support your claim. Consequently, you are **required** to keep copies of purchase orders, invoices, checks or other documentation of your purchases in case further verification of your claim is necessary.  Failure to supply requested information to the Claims Administrator may result in the rejection of all or part of your claim.

By signing the claim form you are also verifying that you have not submitted any other claim for the same purchases of Diamond Products during the Class Period, have not authorized any other person or entity to do so, and know of no other person or entity having done so on your behalf.

## PART 1:  CLAIMANT IDENTIFICATION

Claimant's Name: _____
(If purchases were made in a name other than the Claimant's Name, please attach documentation of your right to assert a claim with respect to those purchases.)

Mailing Address: _____

_____

| | | |
|---|---|---|
| City | State | Zip Code |

If the address above is not a U.S. address, does the claimant have a U.S. office?     Yes ☐     No ☐

If yes, please list the address of a U.S. office below:

Mailing Address: _____

| | | |
|---|---|---|
| City | State | Zip Code |

Social Security Number <u>or</u> Federal Employer Tax Identification Number (FEIN): _____
(If you fail to include this tax information, your claim may not be paid).

Phone Numbers: Day: (____) _____          Evening: (____) _____

Email Address, if available: _____

Person to contact if there are questions regarding this claim: _____

Please identify any and all entities affiliated with your business whose purchases of Diamond Products are included in this claim: _____

Other names and FEINS under which you have done business during the Class Period: _____

_____

3

## PART 2:  SCHEDULE OF QUALIFYING PURCHASES

- Choose any two years during the class period from January 1, 1994 through March 31, 2006 to list your aggregate dollar purchases of Rough Diamonds, Polished Diamonds or Diamond Jewelry at the price you actually paid. You may select either a calendar year or fiscal year as ordinarily maintained on your books and records, provided that the fiscal year ends before March 31, 2006. The two years selected need not be consecutive. However, all purchases listed must be from the two selected years. Failure to report all purchases of diamonds for the years you have selected will reduce the amount of your claim.

- The Diamond Products must be delivered into the United States for the purpose of resale in the United States. For example, even if you meet the definition of resident of the United States, if you purchased diamonds in Antwerp and sent them to Mumbai for production of jewelry, those purchases are not included in the Settlement. However, if the jewelry is imported or delivered into the United States, the jewelry purchases may be claimed under the Settlement.

- Enter total amounts by category according to the type of product and cost. For example, if you bought $100,000 worth of diamond jewelry in one year, some of which contained diamonds mixed with other gemstones that were purchased for more than $500 at wholesale and other pieces that only contain diamonds that were purchased for more than $5,000 wholesale, enter the aggregate amounts of these purchases for each category in the appropriate boxes listed in the chart below. DO NOT INCLUDE PURCHASES MADE ON MEMO OR ON CONSIGNMENT.   YOU MUST HAVE TAKEN TITLE TO THE DIAMOND PRODUCT FOR WHICH YOU ARE SEEKING TO CLAIM.

- Attach summary documentation to support your claim (such as a worksheet summary of purchases prepared by you listing purchases by vendor or a computer printout of purchases.) As explained above, you should retain all original documentation supporting your claim (for example invoices, purchase orders, cancelled checks). Such information must be provided to the claims administrator upon request. In the event that you fail to provide such information upon request of the claims administrator, your claim may not be paid.

- You may only claim once for any diamond product; subsequent internal transfers to other business units or affiliates are excluded.

In listing claims on the chart below, please use the following guidelines:

**Rough diamond** claims include uncut rough diamonds and diamonds that are cut, but not polished.

**Polished diamond** claims include diamonds that are cut and polished and sold as loose, unset stones.

**Diamond Jewelry** claims should be set forth according to the price categories listed on the chart. Enter the total amount of purchases for each type and cost category of jewelry for the two years you choose between 1994 and 2006. All finished or partially finished jewelry pieces can be claimed in these categories. **Diamond Jewelry** claims must be identified according to the wholesale cost of each piece.

      **Diamonds Only:** means jewelry pieces containing set polished diamonds only, with no other types of gem stones

      **Mixed**: means jewelry pieces containing polished diamonds and other gem stones

**Diamond-Faced Watches** must contain polished diamonds on the face of watch, surrounding the face of watch on bezel, or on the watch band.

**Other Diamond Products** include diamond-accented products, such as pens or accessories.

**Wholesale Cost** is the price you actually paid for the diamond products <u>net of any returns, credits, discounts, or rebates.</u>

4

# YEAR 1

## YEAR: _____

**Enter Aggregate Dollar Amount of Diamond Purchases at Wholesale Cost Paid**

| *Rough Diamonds* | |
|---|---|
| | |

| *Polished Diamonds* | |
|---|---|
| | |

## DIAMOND JEWELRY

| *Mixed Diamonds and Gemstones* | *Aggregate Wholesale Cost* |
|---|---|
| Below $100 Wholesale Cost Per Piece | |
| $100 or more Wholesale Cost Each Piece | |

| *Jewelry Containing Diamonds Only* | *Aggregate Wholesale Cost* |
|---|---|
| Below $100 Wholesale Cost Per Piece | |
| $100 or more but less than $500 Wholesale Cost Per Piece | |
| $500 or more but less than $5,000 Wholesale Cost Per Piece | |
| $5,000 or more Wholesale Cost Per Piece | |

**YEAR 1 (continued)**

## DIAMOND DECORATED WATCHES

**Please provide the brand, model, number of watches purchased, and the total number of diamonds on each watch OR the total carat weight of the diamonds during the two years of your choosing.   Use separate sheets if necessary.**

| *Pave Watches* | | | | | | |
|---|---|---|---|---|---|---|
| Brand | Model | Wholesale Price | Number of Watches | Number of Diamonds | **OR** | Total Carat Weight |
| | | | | | | |

| *Non-Pave Watches*<br>Less than $1,500 Wholesale Cost Each Watch | | | | | | |
|---|---|---|---|---|---|---|
| Brand | Model | Wholesale Price | Number of Watches | Number of Diamonds | **OR** | Total Carat Weight |
| | | | | | | |

| *Non-Pave Watches*<br>More than $1,500 Wholesale Cost Each Watch | | | | | | |
|---|---|---|---|---|---|---|
| Brand | Model | Wholesale Price | Number of Watches | Number of Diamonds | **OR** | Total Carat Weight |
| | | | | | | |

## OTHER DIAMOND DECORATED PRODUCTS

**Please enter the product description (pen, doll, accessory), brand name (MontBlanc, Chanel, etc.), the quantity of the product purchased, the wholesale price, and the "4 Cs" of the diamonds within the product. Please use separate sheets if necessary.**

| Product Description | Brand Name | Wholesale Price | Quantity of Product | Cut | Color | Clarity | Carat Weight |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## YEAR 2

## YEAR: _____

**Enter Aggregate Dollar Amount of Diamond Purchases at Wholesale Cost Paid**

| *Rough Diamonds* | |
|---|---|
| | |

| *Polished Diamonds* | |
|---|---|
| | |

## DIAMOND JEWELRY

| *Mixed Diamonds and Gemstones* | *Aggregate Wholesale Cost* |
|---|---|
| Below $100 Wholesale Cost Per Piece | |
| $100 or more Wholesale Cost Each Piece | |

| *Jewelry Containing Diamonds Only* | *Aggregate Wholesale Cost* |
|---|---|
| Below $100 Wholesale Cost Per Piece | |
| $100 or more but less than $500 Wholesale Cost Per Piece | |
| $500 or more but less than $5,000 Wholesale Cost Per Piece | |
| $5,000 or more Wholesale Cost Per Piece | |

7

**YEAR 2 (continued)**

## DIAMOND DECORATED WATCHES

**Please provide the brand, model, number of watches purchased, and the total number of diamonds on each watch OR the total carat weight of the diamonds during the two years of your choosing. Use separate sheets if necessary.**

| *Pave Watches* | | | | | | |
|---|---|---|---|---|---|---|
| Brand | Model | Wholesale Price | Number of Watches | Number of Diamonds | OR | Total Carat Weight |
|  |  |  |  |  |  |  |

| *Non-Pave Watches* Less than $1,500 Wholesale Cost Each Watch | | | | | | |
|---|---|---|---|---|---|---|
| Brand | Model | Wholesale Price | Number of Watches | Number of Diamonds | OR | Total Carat Weight |
|  |  |  |  |  |  |  |

| *Non-Pave Watches* More than $1,500 Wholesale Cost Each Watch | | | | | | |
|---|---|---|---|---|---|---|
| Brand | Model | Wholesale Price | Number of Watches | Number of Diamonds | OR | Total Carat Weight |
|  |  |  |  |  |  |  |

## OTHER DIAMOND DECORATED PRODUCTS

**Please enter the product description (pen, doll, accessory), brand name (MontBlanc, Chanel, etc.), the quantity of the product purchased, the wholesale price, and the "4 Cs" of the diamonds within the product. Please use separate sheets if necessary.**

| Product Description | Brand Name | Wholesale Price | Quantity of Product | Cut | Color | Clarity | Carat Weight |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

NOTE: Your claim will be adjusted to reflect the years during the Class Period in which you were in business and were an indirect purchaser of diamond products for resale. For example, if you were in the business of selling diamond products for resale for only 5 years of the 12 year class period, your claim would be reduced proportionately.

_____ If you have been in the business of reselling diamond products and purchased diamonds indirectly from De Beers or its competitors for every year of the Class Period (January 1994 through March 2006) in some quantity, check this box.

If you did not purchase diamond products each year of the Class Period, please list the years you did purchase diamond products indirectly from De Beers or its competitors -in the space below:*

_____

* If you were a sightholder of DeBeers at any time during the Class Period, you may only submit a claim for indirect purchases (e.g. purchases not made directly from DeBeers or its competitors). Review the Direct Purchaser Notice to see if you qualify to submit a claim against the Direct Purchaser Settlement Fund.

If you need more space for any part of this claim form, attach separate sheets providing the required information. You may download additional pages at the website _____. Be sure to sign and print or type your name on each additional sheet.

## PART 3:  JURISDICTION OF THE COURT

By signing below, you hereby swear and affirm under the penalty of perjury that: (1) you have authority to submit this Claim Form either directly on behalf of the subclass Member or as its Authorized Agent, and, in turn, have been given the authority to submit this Claim Form by each subclass Member identified in this Claim Form and in any attachments to it, and to receive on behalf of each such subclass Member any and all amounts that may be allocated from the Indirect Purchaser Settlement Fund; (2) the information contained in this Claim Form and any attachments is true and accurate, based on records maintained by or otherwise available to you and that you will supplement this Proof of Claim by furnishing documentary support upon request of the Claims Administrator, Counsel or the Court; (3) you, the Authorized Agent (if any), and the subclass member on whose behalf this Claim Form is submitted, hereby submit to the jurisdiction of the United States District Court for the District of New Jersey (the "Court") for all purposes associated with this Claim Form and the Settlement, including resolution of disputes relating to this Claim Form; (4) in the event that amounts from the Indirect Purchaser Settlement Fund are distributed to an agent of a Class Member, and the Class Member later claims that the agent did not have the authority to claim and receive such amounts on its behalf, you will hold the Class, counsel for the Class, Defendants, Counsel for Defendants, and the Settlement Administrator harmless with respect to any claims made by the Class Member.

## PART 4:  RELEASE

All Class Members who did not opt out from the class are releasing all claims, known and unknown that were or could have been asserted against the defendants in the class action lawsuit being settled (De Beers, S.A., De Beers Consolidated Mines, Ltd., De Beers A.G., DB Investments, Inc., Diamond Trading Company, Ltd., CSO Valuations A.G., Central Selling Organization, Central Holdings, Ltd., and De Beers Centenary A.G. and various related parties) arising from or relating to the facts alleged in that action, and waiving all rights that you may have under California Civil Code 1542 and any similar statutes. Please refer to the Notice Of Class Action Settlement or the Settlement Agreement for a more complete description of the scope of the released claims. A copy of the Notice and the Settlement Agreement may be obtained at www.diamondsclassaction.com.

## PART 5: CERTIFICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing information regarding this claim is true and correct and that this Proof of Claim and Release form was executed this _____ day of _____, 2007 in _____

<div align="center">(city / state / country)</div>

_____
(Sign your name here)

_____
(Type your name here)

_____
(Type your Company name here)

_____
(Capacity of person signing, e.g. President, Partner)

## ACCURATE PROCESSING OF CLAIMS MAY TAKE SIGNIFICANT TIME.
## THANK YOU, IN ADVANCE, FOR YOUR PATIENCE.

**Important Note:**

**The distribution to all eligible claimants, once all claim amounts have been verified, will be _pro rata_, that is, each claimant's payment amount will be computed in proportion to the totality of all of the claims being paid. In the event that a substantial number (by number or purchase volume) of Reseller subclass members file claims, the actual payout of settlement proceeds to any eligible claimant will be a small fracton of the dollar volume of the claimant's total purchases. There is also the possibility that some claims will result in payments of under $25.00 which are too small to process because of the administrative cost of distributing checks. Those claimants will not receive any payment. In advance of the completion of the claims processing, there is no way to inform subclass members how much, if any, of the settlement proceeds they will receive.**

## CHECKLIST

Before submitting your claim, please make sure you have:

1. Signed the Certification
2. If you are sending documents supporting your claim, sent only copies. Retain your original documents supporting your claim.
3. Kept a copy of the completed Proof of Claim for your records.
4. Sent your Proof of Claim by Certified Mail (return receipt requested) if you want proof that your claim was received.
5. Submitted your claim AND release **postmarked on or before** _____

If you have any questions concerning the plan or the claim form, or if you change your address, please contact:

<div align="center">

Claims Administrator
Complete Claims Solutions, LLC
P.O. Box xxxxx
West Palm Beach, FL  33416
Phone: (xxx) xxx-xxxx        Website: www.

</div>

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

SULLIVAN, *et al*. v. DB INVESTMENTS, INC., *et al*.
Case No. 04-2819-SRC

# CONSUMER CLAIM FORM

**TO:  CONSUMERS LIVING IN THE UNITED STATES WHO BOUGHT**
**DIAMONDS OR DIAMOND JEWELRY**
**FOR THEMSELVES OR FOR GIFTS, BUT NOT FOR RESALE**

**PLEASE READ THIS ENTIRE CLAIM FORM CAREFULLY**

**TO BE ELIGIBLE TO SHARE IN THE SETTLEMENT PROCEEDS**
**YOUR COMPLETED CLAIM FORM MUST BE POSTMARKED ON OR BEFORE**
**_____, 2007**
**OR**
**YOU MUST SUBMIT YOUR CLAIM ONLINE AT  *www.diamondsclassaction.com***
**ON OR BEFORE _____, 2007**

This Claim Form may only submitted by persons who were residents of the United States on _____, 2007, who purchased a gem diamond, diamond jewelry, a diamond accented watch or other diamond accented item in the United States or for delivery to the United States between January 1, 1994 and March 31, 2006 for their own use or for a gift.  If you purchased diamonds directly from De Beers or De Beers' mining company or if you purchased for resale, you must obtain a different claim form from the Claims Administrator.

To be eligible to receive any money from the settlement obtained in this class action lawsuit you **must either:** (1) complete this Claim Form and mail it postmarked on or before _____, 2007 to: Claims Administrator, P.O. Box 1861, Faribault, Minnesota 55021-1861; or (2) submit your claim on-line at:  www.diamondsclassaction.com, on or before _____, 2007. The claims of Class Members who fail to submit their Claim Forms on time by U.S. Mail (properly addressed) or fail to fill out an on-line Claim Form by the deadline may be rejected and the class member may be precluded from any recovery.

If you have questions regarding the settlement, contact the Claims Administrator. Questions may be sent by email to administrator@diamondsclassaction.com, by mail addressed to Claims Administrator, P.O. Box 1861, Faribault, Minnesota 55021-1861, or you may call 1-800-760-5431.

All persons who qualify for Consumer Subclass membership and who did not seek exclusion from the class are bound by the terms of the judgment entered in this action and release their claims against the defendants whether or not they submit a Claim Form.  However, if you requested to be excluded from the Class, **do not** submit a Claim Form.

Questions?  Email the Claims Administrator at administrator@diamondsclassaction.com, or
call 1-800-760-5431.

Page 1
564239.6

| Part I – Eligibility and Instructions |
|---|

**IT IS IMPORTANT TO FOLLOW THESE INSTRUCTIONS CAREFULLY OR THERE MAY BE A DELAY IN PROCESSING YOUR CLAIM.**

1.      You are eligible to make a claim for a payment from the Consumer Subclass Settlement Fund if you were a resident of the United States on _____, 2007, and you purchased in the United States or for delivery to the United States, one or more gem diamonds or one or more pieces of jewelry or other item containing a gem diamond, for yourself or for a gift for someone else, and not for resale, between January 1, 1994 and March 31, 2006.

2.      Your diamond or diamond jewelry purchase qualifies if you purchased it from any person or business other than De Beers, any of De Beers's mining competitors (such as Alrosa, Rio Tinto, or BHP Billiton) or one of their affiliates (defined as a company related by shareholder interest of 25% or more).  Purchases from any other entity made in the United States or for delivery to the United States, such as a purchase made from a jewelry store or an internet retailer, makes you eligible to participate in the Consumer Subclass Settlement Fund.  The United States includes Puerto Rico, the U.S. Virgin Islands, and the District of Columbia in addition to the 50 states.

3.      If you purchased a diamond or diamond jewelry directly from a mining company or for resale, please consult the website, www.diamondsclassaction.com, or call the Claims Administrator at 1-800-760-5431, or email administrator@diamondsclassaction.com. to obtain the correct claim form.

4.      If you need any help to determine whether you are eligible to submit a consumer claim, please contact the Claims Administrator at 1-800-760-5431 or email administrator@diamondsclassaction.com.

5.      If your purchases fit the above criteria, complete the attached Claim Form, or fill in the Consumer Claim Form on-line.  You do not need to submit proof of your purchase(s) with your Claim Form.  However, you may need to send documents to the Claims Administrator to prove your purchase(s), if the Claims Administrator requests them.  Therefore, keep any documents you have that show proof of your purchase(s), such as a receipt, invoice, credit card statement, insurance statement, appraisal, certificate or any other documents showing the diamond's or the diamond jewelry's cut, clarity, color, number of carats, authenticity or the person or business from whom the diamond or diamond jewelry was bought.

Questions?  Email the Claims Administrator at administrator@diamondsclassaction.com, or call 1-800-760-5431.

Page 2
564239.6

## Part II – Computation of Your Claim

The Consumer Subclass Settlement Fund of $135,432,500 (plus interest, less court-approved attorneys' fees, litigation cost reimbursements, any awards to the named plaintiffs and administrative expenses) will be divided *pro-rata* among the Consumer Subclass members whose claims have been approved for payment.  That means that the amount paid to any individual Subclass member will depend on the total approved claims submitted by Subclass members.  The more approved claims that there are, the smaller the individual payments will be. All claims will be paid based upon the "Consumer Recognized Claim Amount" for the items shown on the Claim Form.  The Consumer Recognized Claim Amount is designed to reflect the polished wholesale value of the diamond(s) contained in each piece of jewelry or loose polished diamond(s) sold at retail.  It is designed so that a Recognized Claim Amount will not be based on the value of the other components of the piece of jewelry, such as the setting for the diamond, including gold, platinum or  other precious or semi-precious stones, or on retailers' mark-up. The Claims Administrator will calculate the Consumer Recognized Claim Amount for every approved purchase of a diamond or diamond jewelry.  The Consumer Recognized Claim Amount for all approved purchases on a Claim Form will be totaled and then that sum will be divided by the total Consumer Recognized Claim Amounts for all approved claims submitted by Consumer Subclass Members to calculate each claimants' *pro rata* share of the Consumer Subclass Settlement Fund.  More information about how claims will be processed and payments will be calculated can be obtained by reviewing the Notice of Class Action Settlement available on-line at www.diamondsclassaction.com or by calling the Claims Administrator at 1-800-760-5431.

Please be advised that if your *pro rata* share of the Settlement Fund  is a payment of less than $10.00, no check will be sent to you as a result of prohibitive administrative costs.  As a general guideline, if your total purchases consist of Mixed-Stones Jewelry with combined purchase prices of $165 or less, or Diamonds Only Jewelry with combined purchase prices of $95 or less, your claim will not reach the payment minimum amount of $10.00.

On the other hand, if your *pro rata* share of the Settlement Fund would exceed the total Recognized Claim Amount for all of your eligible purchases, your payment will be limited to the total Recognized Claim Amount.  For example, if your claim is for one engagement ring that cost $2,000, your Recognized Claim Amount is $640, which is the maximum payment that you would receive.

Questions?  Email the Claims Administrator at administrator@diamondsclassaction.com, or call 1-800-760-5431.

Page 3
564239.6

| Part III – Claim Form |
|---|

## WE STRONGLY RECOMMEND THAT YOU SUBMIT YOUR CLAIM ONLINE AT
### *www.diamondsclassaction.com*
## IF YOU DO SO, YOU DO NOT HAVE TO FILL OUT OR MAIL THIS CLAIM FORM TO THE CLAIMS ADMINISTRATOR

**Claimant Information:**

Name: _____

Address: _____
Street Address

_____    _____    _____
City                                                            State                    Zip Code

Telephone No.:  (__ __ __) __ __ __-__ __ __        (__ __ __) __ __ __ - __ __ __
Daytime                                                  Evening

Email Address: _____

If you are submitting this Claim Form on behalf of someone else who is a Consumer Subclass Member, please explain why you have the right to do so and attach a copy of any Power of Attorney, evidence of guardianship or other documents that you may have.

_____

_____

**Purchase Information:**

Please provide the information requested below for **each** item that you purchased during the class period (January 1, 1994 to March 31, 2006). If you purchased more than one item in any category, it will be easier if you submit your claim form online. If you do not have web access, please attach a piece of paper separately listing the description by category and purchase price for each item.

The following definitions will assist you in properly filling out your Claim Form.

"Diamonds Only"    Means a piece of jewelry that contains one or more diamonds and no other gemstones.

"Mixed Stones"    Means a piece of jewelry that contains one or more diamonds as well as one or more other gemstones, such as sapphires, emeralds, rubies, amethysts or pearls.

"Loose Diamonds"    Means one or more polished gem-quality diamond(s) not set in a piece of jewelry.

Questions? Email the Claims Administrator at administrator@diamondsclassaction.com, or call 1-800-760-5431.

| | |
|---|---|
| Pavé Watch | A watch face or bezel that is fully or partially "paved" with diamonds. The stones used in a Pavé Watch are generally small and set very close together. |
| Non- Pavé Watch | All other watches set with one or more diamonds on the face, bezel or watch band. |
| Carat Weight | A measure of weight of diamonds and gem stones.  A carat is equal to 200 milligrams or $1/5^{th}$ of a gram. |

| Item | Purchase Price |
|---|---|
| Loose Diamonds | $ |
| Engagement Ring | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Bride's Wedding Ring/Band | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Groom's Wedding Ring/Band | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Anniversary or Eternity/Guard Ring/Band | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Other Type of Ring | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Necklace/Chain/Pendant | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Pin/Brooch | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Diamond Stud Earrings | $ |
| Other Type of Earrings | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Tennis Bracelet | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |
| Other Type of Bracelet | |
|     Diamonds Only | $ |
|     Mixed Stones | $ |

Questions?  Email the Claims Administrator at administrator@diamondsclassaction.com, or call 1-800-760-5431.

| Pavé Watch | $ |
|---|---|
|     Number or Carat Weight of Diamonds on the Watch | |
| Non- Pavé Watch | $ |
|     Number or Carat Weight of Diamonds on the Watch | |
| Other (cufflinks, pen, etc.) [Specify Item] | |
|     Item: | $ |
|     Number or Carat Weight of Diamonds on the Item | |

IF YOU PURCHASED MORE THAN ONE ITEM IN A CATEGORY, PLEASE ATTACH AN ADDITIONAL PAGE(S) SPECIFYING THE ITEM AND PURCHASE PRICE.

**Certification:**

> The Settlement Administrator may audit any and all claims.  Persons making false claims may be subject to civil or criminal penalties.  Fraudulent submission of multiple requests could result in federal prosecution under the U.S. Mail Fraud laws (18 U.S.C. §§ 1341 and 1342).

By signing below, you verify under penalty of perjury that that the information provided in this Claim Form is true, accurate, and complete, and that you did not purchase any of the items listed above for the purpose of reselling them.

Signing under penalty of perjury means that the information you have provided is the truth.  It is a crime to submit a false claim form and sign the penalty of perjury statement.

I declare under penalty of perjury under the laws of the United States of America that the information provided in the Claim Form by the undersigned is true and correct and that this Claim Form was executed on _____ _____, _____ in
                                      (month)           (day)       (year)
_____.
               (city/state/country)


_____       _____
(Sign your name here)               (Write or type your name here)


**ACCURATE PROCESSING OF CLAIMS MAY TAKE A SIGNIFICANT AMOUNT OF TIME.  THANK YOU, IN ADVANCE, FOR YOUR PATIENCE.**


Questions?  Email the Claims Administrator at administrator@diamondsclassaction.com, or call 1-800-760-5431.

**Release:**

All Class Members who did not exclude themselves are releasing all claims, known and unknown that were or could have been asserted against the defendants in the class action lawsuit being settled (De Beers, S.A., De Beers Consolidated Mines, Ltd., De Beers A.G., DB Investments, Inc., Diamond Trading Company, Ltd., CSO Valuations A.G., Central Selling Organization, Central Holdings, Ltd., and De Beers Centenary A.G. and various related parties) arising from or relating to the facts alleged in that action, and waiving all rights that you may have under California Civil Code 1542 and any similar statutes.  Please refer to the Notice Of Class Action Settlement for a more complete description of the released claims.  A copy of the Notice may be obtained at www.diamondsclassaction.com.

**CHECKLIST:**

Please make sure you have:

    1.      Signed the Verification above.

    2.      Kept any documents evidencing your purchase(s).

    3.      Kept a copy of the completed Claim Form for your records.

    4.      E-filed or mailed your claim **on or before _____.**

    5.      Sent your Claim Form by Certified Mail (return receipt requested) if you want proof that your claim was received.

Mail Claim Form to:

<div align="center">

Diamonds Claims Administrator
P.O. Box 1861
Faribault, MN 55021-1861

</div>

Questions?  Email the Claims Administrator at administrator@diamondsclassaction.com, or call 1-800-760-5431.

Page 7
564239.6

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------------x
Settlement of:                                          :
                                                        :
*Sullivan, et al. v. DB Investments, Inc., et al.,*     :
04 CV 2819,                                             :
-------------------------------------------------------------x
                                                        :
This document relates to:                               :
                                                        :
*Anco Industrial Diamond Corp.,*                        :
*v. DB Investments, Inc., et al,*, 01 CV 4463           :
                                                        :
*British Diamond Import Company v.*                     :
*Central Holdings, Ltd., et al.*, 04 CV 4098            :
                                                        :
Direct Purchaser Class                                  :
                                                        :
-------------------------------------------------------------x

<u>**SUPPLEMENTAL NOTICE OF PROPOSED SETTLEMENT**</u>

To:    PURCHASERS OF ROUGH OR POLISHED DIAMONDS

       DELIVERED TO THE UNITED STATES:


       YOU MAY HAVE A CLAIM FOR MONEY FROM THE SETTLEMENT OF CLASS

       ACTION LAWSUITS AGAINST DE BEERS AND SOME OF ITS AFFILIATED

       COMPANIES.  IF YOU ARE A MEMBER OF ANY CLASS OR SUBCLASS IN THE

       LAWSUITS, THE SETTLEMENT MAY AFFECT YOUR LEGAL RIGHTS.


1.     <u>The Purpose of This Notice</u>

       The purpose of this notice is to inform you of (a) a proposed settlement of the class

actions listed above as part of an agreement that settles seven class action lawsuits for $295

million, (b) a hearing scheduled on the proposed settlement, (c) how to claim money under the

1

settlement for certain diamond purchases from De Beers or its competitors, (d) the opportunity to make a claim for diamond purchases separate from, and in addition to, the purchases covered by this notice, (e) your right to comment on the proposed settlement, and (f) how to exclude yourself from the settlement, if you wish.

Judge Stanley R. Chesler of the United States District Court for the District of New Jersey will hold a hearing on _____, 2007 at _____ a.m. (which the Court may adjourn from time to time without further notice) in the Federal Courthouse, 50 Walnut Street, Newark, New Jersey 07102, to decide whether the settlement of seven class action lawsuits against De Beers and its affiliates is fair, reasonable and adequate and should be approved by the Court, whether final judgment should be entered dismissing the lawsuits with prejudice, and whether the Court should approve plaintiffs' application for attorneys' fees, incentive awards to plaintiffs and reimbursement of expenses.  Class or Subclass members do not have to appear at the hearing, but they may do so if they wish by timely notifying the Claims Administrator in the required manner.  (See Section 14 below.)

The public file in the Clerk's Office in Room 4015 of the Federal Courthouse, 50 Walnut Street, Newark, New Jersey 07102, contains the settlement agreement and other documents relating to the settlement.  The settlement agreement, this notice and other notices about the settlement, as well as forms on which to claim money, are available online at www.diamondsclassaction.com or from the Claims Administrator as set forth in Section 16 below.

2.      What the Lawsuits Are About

Between 2001 and 2004, seven class action lawsuits were started against De Beers, the world's largest supplier of rough diamonds.  De Beers engages in its business outside the United States through various companies.  The defendants in the class actions are some of those companies.

The lawsuits allege, among other allegations,  that defendants unlawfully conspired and monopolized the supply of rough diamonds, thereby raising diamond prices,.  The lawsuits allege that defendants' actions violated federal and state antitrust and unfair competition laws and consumer protection, deceptive advertising and other state laws.  Defendants deny each and all of plaintiffs' allegations and that they violated the law.

Damages and an injunction for violation of federal antitrust laws were sought on behalf of rough diamond purchasers in *ANCO Industrial Diamond Corp. v. DB Investments, Inc.,* D.N.J. Index No. 01-CV-4463 (SRC)) *("Anco"),* and on behalf of polished diamond purchasers in *British Diamond Import Co. v. Central Holdings Ltd.,* D.N.J. Index No. 04-cv-4098 (SRC)) (*"British Diamond").*  Other lawsuits were brought for violations of federal antitrust laws and state antitrust and consumer protection laws on behalf of consumers and resellers of diamond products, such as jewelry stores and jewelry manufacturers, including *Sullivan v. DB Investments, Inc.,* (D.N.J. Index No. 3:04-CV-2819 (SRC)).  The classes of purchasers in the different lawsuits overlap.

In September 2003, the Court in *Anco* certified a class of rough diamond purchasers, including all purchasers of rough diamonds (excluding De Beers' alleged co-conspirators) from De Beers or from a sightholder.  Notice of class certification was sent to class members and published in print and internet media.  In *British Diamond,* a motion was pending at the time the settlement agreement was signed for certification of a class of polished diamond purchasers,

including all purchasers of polished diamonds (excluding sightholders) from De Beers or from a sightholder.  Until De Beers S.A. appeared in court to settle the cases, defendants failed to appear in court in both *Anco* and *British Diamond* and the Court entered defaults in both cases.

3.     You May Be Entitled to Claim Money If You Bought Diamonds from a
        <u>Diamdel, De Beers Polished Diamond Division or a De Beers Competitor</u>

        This notice concerns purchases of rough or polished diamonds (excluding industrial diamonds) directly from a De Beers-owned Diamdel ("Diamdel"), the De Beers Polished Diamond Division ("De Beers Polished"), or De Beers′ competitors, such as Aber, Alrosa, Argyle, BHP Billiton or Rio Tinto, and their affiliates ("De Beers Competitors"), from September 20, 1997 to March 31, 2006 (excluding all purchases made while you were a sightholder or a controlled affiliate of a sightholder).  An affiliate is any entity related directly or indirectly by an ownership interest of 25% or more.  A controlled affiliate is a company related by a direct or indirect shareholding interest of more than 50%.  Under the settlement agreement, such a purchaser is called a "Direct Purchaser" and the entire group of such purchasers is called the "Direct Purchaser Class."  The complete definition of the Direct Purchaser Class is set out in Section 9 below and in the settlement agreement that is available online at [www.diamondsclassaction.com](www.diamondsclassaction.com) from the Claims Administrator or in the Court Clerk′s Office.

4.     <u>You Also May Have a Claim for Money for Other Diamond Purchases</u>

        **The settlement agreement also covers purchases of diamonds <u>not</u> made from Diamdels, De Beers Polished or De Beers Competitors.  These purchases are described briefly in this Section 4.  Information on how to claim money for these other purchases (and to receive a separate notice and claim form for these other purchases) is available**

4

**online at www.diamondsclassaction.com or from the Claims Administrator.  (See Section 16 below.)**

A purchaser of diamonds and products incorporating diamonds may be entitled to make a claim for money separate from, and in addition to, the purchases from Diamdels, De Beers Polished and De Beers Competitors.  Under the settlement agreement, these other purchases are in the Indirect Purchaser Class, which includes two subclasses:

(A)     Indirect Purchaser Reseller Subclass ("Resellers"):  All persons and entities in the Indirect Purchaser Class who purchased any Diamond Product for resale.  For example, Resellers include diamond jewelry manufacturers and retailers, among others.

(B)     Indirect Purchaser Consumer Subclass ("Consumers"):  All persons in the Indirect Purchaser Class who purchased any Diamond Product for use and not for resale.  For example, Consumers include people who purchased diamond jewelry to wear or to give as a gift.

The beginning date for purchases by the Indirect Purchaser Class is January 1, 1994.  The beginning date for purchases made by the Direct Purchaser Class is September 20, 1997.  The ending date for purchases by both Classes is March 31, 2006.

You may be a member of the Direct Purchaser Class covered by this notice and also be a member of either or both of the two subclasses in the Indirect Purchaser Class if you made purchases that are covered by either or both of these subclasses.  You may submit a claim for money in each class or subclass of which you are a member .

5

5.      No One Can Claim Money Unless and Until the Court Approves the Settlement

The settlement will not go into effect unless the Court approves the settlement as fair, reasonable and adequate.  Defendants have deposited $295 million into an interest-bearing escrow account to settle the lawsuits.  If the Court approves the settlement, that money will be used to pay the claims of class and subclass members after the deduction of taxes, attorneys' fees and expenses, costs of administration and any other amounts the Court approves.

6.      Here Are Your Options

You have the option to remain a member of a class (and subclasses, if applicable) or to exclude yourself.

You do not need to do anything to remain a class or subclass member.  You may exclude yourself from membership in the classes and subclasses by timely notifying the Court as specified in Section 11 below.

If you do not exclude yourself, and you remain a class or subclass member, and if the settlement is approved, you may make a claim for money.  A claim for money must be made timely and on the required form.  You may also comment on the settlement as explained in Section 12 below.

To claim money as a member of the Direct Purchaser Class, you must submit a claim in the form attached to this notice as Exhibit A, postmarked no later than December 31, 2007.  (See Section 13 below.)  To claim money as a member of the Indirect Purchaser Class, you must

6

submit a claim form for your indirect purchases that is attached to the separate notice for the

Indirect Purchaser Class.  All notices and claim forms are available online at

www.diamondsclassaction.com or from the Claims Administrator.


If you are a member of the Direct Purchaser Class or Indirect Purchaser Class, you will

be bound by the Court's approval of the settlement – regardless of whether you submit a claim –

unless you exclude yourself in writing.  The approval will release antitrust and consumer claims,

as well as any other related claims, that you may have against defendants, affiliated companies

and their representatives for claims involving the exploring, mining, processing, treatment,

sorting, distributing, marketing, sale or pricing of diamonds.


If you exclude yourself, you will not be able to make a claim in the settlement, you will

not be able to comment on the settlement, you will not be bound by the settlement, and you may

bring your own legal claim separately against one or more of the defendants at your own

expense.


7.      <u>Who Represents the Direct Purchaser Class</u>


For purposes of settlement only, the Court appointed as counsel for the Direct Purchaser

Class:

        Jared B. Stamell
        Stamell & Schager, LLP
        One Liberty Plaza, 35th Floor
        New York, NY  10006
        Telephone:     (212) 566-4047
        Facsimile:     (212) 566-4061

        Robert A. Skirnick
        Meredith Cohen Greenfogel & Skirnick, PC
        One Liberty Plaza, 35th Floor

7

New York, NY  10006
Telephone:     (212) 240-0020
Facsimile:      (212) 240-0021

and

Edward W. Harris, III
Sommer Barnard Attorneys PC
One Indiana Square, Suite 3500
Indianapolis, IN  46204
Telephone:     (317) 713-3500
Facsimile:      (317) 713-3699

If you wish, at your own expense, you may have counsel of your choosing enter an appearance on your behalf in this litigation.

8.       <u>Settlement Negotiations</u>

Beginning in May 2005, the plaintiffs in *Anco* and *British Diamond* and the lawyers in all the lawsuits met with the defendants to discuss settlement.  To facilitate settlement, the parties hired experienced mediators who worked with them:  law school professor Eric D. Green and retired Federal Judge Hon. Nicholas H. Politan.  Negotiations proceeded until November 2005 when a settlement was reached resolving *Sullivan* and three additional lawsuits alleging violations of state antitrust and consumer protection laws.  A settlement agreement was signed under which defendants agreed to pay $250 million and agreed to an injunction prohibiting them from engaging in certain conduct that violates the federal and state antitrust laws.

On November 30, 2005, after the settlement agreement was signed, Judge Chesler appointed retired Federal Judge Hon. Alfred E. Wolin as Special Master to make recommendations about allocation of the settlement funds and other open issues.

8

On February 7, 2006, another lawsuit, *Leider v. Ralfe,* S.D.N.Y. Index No. 01-CV-3137 (HB) ("*Leider"),* was settled and later transferred to the federal district court in New Jersey.

Negotiations proceeded on the remaining two lawsuits, *Anco* and *British Diamond,* until March 2006, when a settlement for an additional $45 million was reached.  The existing settlement agreement for $250 million was amended to include the additional $45 million, making the total settlement of all lawsuits $295 million.  The Direct Purchaser Class was established and procedures to administer the settlement that were put in place for the original settlement were modified to incorporate the *Anco* and *British Diamond* settlement.

Plaintiffs' counsel believe that the settlement is fair, reasonable and adequate, and in the best interests of the Class because of the benefits it provides and the uncertainty and risks of continued litigation, including the risk that a judgment against the defendants, which are foreign corporations, may be difficult to enforce.

9.    Summary of Settlement Terms

The following is only a summary of the settlement terms.  The complete settlement agreement containing (a) the definition of the Class and Subclasses and other terms, (b) the separate notices for the Direct Purchaser and Indirect Purchaser Classes, (c) the separate claim forms for the Direct Purchaser Class, the Indirect Purchaser Reseller Subclass and Indirect Purchaser Consumer Subclass, (d) the Release and Covenant Not to Sue and (e) the Injunction is available online at www.diamondsclassaction.com, from the Claims Administrator or in the Court Clerk's Office.  (See Section 16 below.)

9

a.      Class Definition

For settlement purposes, the classes in *Anco* and *British Diamond* were modified by separating the class members in those two cases into (a) purchasers from Diamdels, De Beers Polished and De Beers Competitors, who are now members of the Direct Purchaser Class and (b) purchasers from sightholders, who are now members of the Indirect Purchaser Class.  The settlement also enlarges the time periods covered by the Direct Purchaser Class and Indirect Purchaser Class and, as a result, purchases from September 20, 1997 through March 31, 2006 are included in the Direct Purchaser Class, and purchases from January 1, 1994 through March 31, 2006 are included in the Indirect Purchaser Class.

The Direct Purchaser Class is defined in the settlement agreement as follows:

All natural persons and legal entities located in the United States who purchased any Gem Diamond directly from a Defendant or Defendants' Competitiors (including any entity controlled by or affiliated with any such party) from September 20, 1997 to March 31, 2006, the date of settlement class certification. The class shall exclude Defendants, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, Defendants' Competitors, any person or entity which is or was a Sightholder for the time period(s) during which such person or entity had Sightholder status, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff.

10

The term "Gem Diamond" is defined in the settlement agreement as a loose diamond usable in jewelry as follows:

> Gem Diamond means a diamond of such color, clarity and quality that it has been or could be used in Diamond Jewelry, as distinguished from a diamond used for industrial purposes.

The phrase "located in the United States," as used in the settlement agreement with regard to the Direct Purchaser Class, means a purchaser who resided in or purchased in the United States (i.e., purchased for delivery to the United States) during the Direct Purchaser Class Period (September 20, 1997 through March 31, 2006).

The phrase "reside in" means a person who maintained a place of residence in the United States or a business or other entity that either (I) is organized or existing under the laws of a U.S. state or territory, or (ii) maintains a place of business in the United States.

b.    <u>Monies Allocated To the Direct Purchaser Class</u>

The settlement agreement provides that $22.5 million (plus interest earned) will be allocated to the claims of the Direct Purchaser Class before the deduction of taxes, attorneys' fees and expenses, costs of administration and any other amounts the Court approves.  The net amount will be distributed as described in Section 10 below.  The Indirect Purchaser Class, composed of the Reseller and the Consumer Subclasses, will divide the remaining settlement money ($272.5 million plus interest earned before the same deductions listed above) as determined by the Special Master and subject to Court approval, as described in the separate notice relating to the Indirect Purchaser Class.

11

c.      The Injunction

As part of the settlement, defendants agree to entry of an injunction.  In the injunction, defendants, who are foreign companies, agree to submit themselves to the jurisdiction of the Court for purposes of enforcing the settlement and not to engage in conduct that violates the antitrust laws of the United States and each state that has antitrust laws.  The injunction also prohibits defendants from entering into certain kinds of agreements with their competitors and customers unless they are approved by a governmental competition authority, such as the European Commission.  Although the injunction will not be formally issued by the Court until a final judgment is issued approving the settlement, defendants have agreed to comply with the terms of the injunction until that time.

d.      The Release and Covenant Not To Sue

If the Court issues a final judgment approving the settlement, defendants will be released from liability to all class members who have not timely excluded themselves in any future lawsuit based on the claims made in the settled lawsuits and related claims.  However, claims for purchases by a sightholder from De Beers and De Beers Competitors are excluded from the release.  The release also contains an agreement not to sue defendants, for the same claims that are settled, that will be enforceable against all class members who have not timely excluded themselves.  The release is attached to this notice as Exhibit B and is in the settlement agreement.

10.     Calculation and Payment of Claims

12

After deductions authorized by the Court from the $22.5 million (plus interest earned) allocated to the Direct Purchaser Class, the net amount will be distributed to Direct Purchaser Class members based upon their rough and polished diamond purchases from Diamdels, De Beers Polished and De Beers' Competitors.  To make a claim, Direct Purchaser Class members must submit a claim (on the claim form attached to this notice) reporting their purchases from defendants and defendants' competitors that were delivered to the United States.  A list of defendants' competitors compiled from public information is is available online at www.diamondsclassaction.com.  The claims will be reviewed by the Claims Administrator and claimants may be required to provide appropriate documentation.

As approved by the Claims Administrator, the rough and polished diamond purchases will be adjusted by multiplying rough diamond purchases by 1.22.  Direct Purchaser Class members will be paid a dollar amount calculated by multiplying the net fund (see Section 9.b. above) by a fraction in which the particular class member's adjusted purchases is the numerator and the total of all adjusted purchases is the denominator.  The following represents this formula:

| Direct Class Member's Payment | = | Net Settlement Fund ($22.5 Million + Interest - Fees - Incentive Awards - Expenses) | X | Adjusted Purchases for Each Direct Purchaser Class Member's Approved Claims |
|---|---|---|---|---|
| | | | | Aggregate Adjusted Purchases for All Approved Direct Purchaser Class Claims |

11.     How To Exclude Yourself From the Settlement

If your purchases of rough or polished diamonds or diamond products qualify you for membership in the Direct Purchaser Class or the Indirect Purchaser Class, and you do not want to participate in the class actions or in their settlement, you must submit a written request for

exclusion by first-class mail postmarked no later than September ___, 2007 to the following

address:

<div style="margin-left:2em">

Diamonds Claims Administrator
P.O. Box ___
_____, FL _____

</div>

The request for exclusion must state the name and address of the person or entity to be excluded

from the class and subclasses, as well as all trade names or business names and addresses used

by the person or entity, and must be signed by that person or entity.  You may <u>not</u> exclude

yourself by telephone or email.  If you exclude yourself, you will not share in the proceeds of the

proposed settlement or any judgment, you will not be able to make a claim for money from the

proposed settlement, you will not be bound by any judgment or release issued by the Court and

you will have the right to pursue claims against defendants on your own at your own expense.


      If you do not exclude yourself as described above, you will be bound by all judgments

entered by the Court and by the settlement if it is approved, whether or not you file a claim.


12.  <u>How To Object To The Settlement</u>


      Any class member who wants to object to the settlement must submit the objection in

writing and send it by first-class mail postmarked no later than September ___, 2007 to the

following addresses:

<div style="margin-left:2em">

Diamonds Claims Administrator
P.O. Box _____
_____, FL _____

   and

Jared B. Stamell
Stamell & Schager, LLP
One Liberty Plaza, 35th Floor

</div>

New York, NY  10006

The written objection must include (a) the objector's name and address, as well as all trade names or business names and addresses used by the objector, (b) a statement signed under penalty of perjury that the objector purchased rough or polished diamonds or diamond products during the class or subclass periods, and (c) the reasons for the objection and any supporting papers that you want the Court to consider.  Unless otherwise ordered by the Court, any class member who does not make its timely objection in the manner provided in this notice waives all objections to the settlement and to the application by plaintiffs and their attorneys for the award of attorneys' fees, incentive awards and reimbursement of expenses.  If you send an objection, you do not have to appear at the hearing to talk about it.  As long as you submit your written objection on time and in the manner specified, the Court will consider it.

13.     How To Submit a Claim

To submit a claim in the Direct Purchaser Class, complete the form attached to this notice, providing all required information, including your name, address and list of purchases of rough and polished diamonds during the class period.  The completed claim form must be postmarked no later than December 31, 2007 and sent by first class mail to the following address:

> Diamonds Claims Administrator
> P.O. Box _____
> _____, FL _____

To submit a claim for the Indirect Purchaser Class, see the separate notice and claim forms available online at www.diamondsclassaction.com or from the Claims Administrator.

14.     Appearance at the Hearing

15

Any class member may secure a right to appear and be heard at the hearing described in Section 1 above by submitting a Notice of Intention to Appear.  In order to be effective, a Notice of Intention to Appear must be in writing, must include your name, address, telephone number and email address, a statement that you wish to appear and be heard at the hearing, and a brief summary of what you want to say at the hearing about the settlement.

Your Notice of Intention to Appear must be sent by first-class mail, postmarked no later than _____, 2007, to the following address:

Diamonds Claims Administrator
P.O. Box _____
_____, FL _____

15.   Attorneys' Fees, Incentive Awards and Reimbursement of Expenses

Class Counsel in *Anco* and *British Diamond* intend to apply to the Court, in a joint application with the class counsel in the other lawsuits covered by the settlement agreement, for attorneys' fees in an amount not to exceed 25% of the total recovery and reimbursement of costs and expenses incurred in prosecuting the cases.  In addition, plaintiffs in *Anco* and *British Diamond* intend to apply for an award for serving as plaintiffs based upon the work they performed, including participation in settlement negotiations.

16.   For More Information

This notice is a summary of the proposed settlement.  The pleadings, orders of the court and other court documents and the settlement agreement may be inspected in the Clerk's Office. The settlement agreement, notices, claim forms and other documents related to the settlement are

16

available at www.diamondsclassaction.com or from the Claims Administrator.


   All questions about the notice and the settlement should be directed to
      Diamonds Claims Administrator
      P.O. Box _____
      _____, FL _____


or by email at administrator@diamondsclassaction.com or by calling [toll-free telephone].


Dated:  April ___, 2007         Clerk of the Court
                 United States District Court
                 District of New Jersey


**DO NOT TELEPHONE OR WRITE TO THE COURT OR THE CLERK OF THE COURT ABOUT THIS NOTICE OR THE SETTLEMENT.**

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------x
Settlement of:                                          :
                                                        :
*Sullivan, et al. v. DB Investments, Inc., et al.,*     :
04 CV 2819,                                             :
---------------------------------------------------------------x
                                                        :
This document relates to:                               :
                                                        :
*Anco Industrial Diamond Corp.,*                        :
*v. DB Investments, Inc., et al,*, 01 CV 4463           :
                                                        :
*British Diamond Import Company v.*                     :
*Central Holdings, Ltd., et al.*, 04 CV 4098            :
                                                        :
Direct Purchaser Class                                  :
                                                        :
---------------------------------------------------------------x

## DIRECT PURCHASER CLASS
## CLAIM FORM

### This Claim Form Must Be Notarized or Affirmed Under Penalty of Perjury

Use this form to make a claim for a payment as a member of the Direct Purchaser Class. The purchases you may include are those you made from a De Beers owned Diamdel, De Beers Polished Diamond Division or De Beers' competitors, such as Aber, Alrosa, Argyle, BNP Billiton and Rio Tinto, or affiliates of De Beers' competitors, during the period September 20, 1997 through March 31, 2006. For purposes of this settlement, an affiliate is a company related by a shareholding interest directly or indirectly of 25% or more. A DTC Sightholder and its controlled affiliates are not eligible to make a claim for purchases made during the period they had Sightholder status. A controlled affiliate is a company related by a direct or indirect shareholding interest of more than 50%.

This claim form should be read together with the attached Notice of Settlement. For additional information, including copies of the Notice of Settlement and this claim form, the settlement agreement and a list of De Beers' competitors, visit www.diamondsclassaction.com.

If you have questions about the settlement, contact the Claims Administrator by mail addressed to:

Diamonds Claims Administrator

1

P.O. Box _____

_____, FL _____

or by e-mail to:administrator@diamondclassaction.com

or by telephone at:1-800-xxx-xxxx

All class members are bound by the judgment entered in this action, and release their claims against the defendants, whether or not they submit a claim form unless they ask to be excluded from the classes as provided in the Notice of Settlement, Section ___.  If you have excluded yourself, or intend to exclude yourself, from the Direct Purchaser Class, do not submit this claim form.

***This claim form must be completed, signed, notarized or affirmed, and mailed to the address below, postmarked no later than _____, 200__.  If you do not submit a timely, properly completed and addressed claim form, your claim may be rejected and you may not receive any recovery.***

The Claims Administrator may request additional documentation of your purchases, and may, in its discretion, revise your purchase amounts after comparing your purchase amounts to sales data provided by defendants.

I.      General Information:

      A.      Provide the following information requested:

           1.      Correspondence about your claim will be sent to the street address you provide below.  (If your mailing address changes, notify the Settlement Administrator in writing or you will not receive correspondence.)

Name of Claimant:_____

Street Address:_____

City:_____ State:_____ Zip Code:_____

Telephone: _____ Facsimile: _____

E-Mail Address:_____

Social Security No. or Taxpayer Identification

No.:_____

Name and Title of Person Signing Claim:_____

_____

Name and Title of Claimant's Contact Person:_____

_____

2

B.     If your mailing address is not in the United States, do you have an office in the United States?     Yes _____       No _____

If yes, state the United States address below:

Street Address:_____

City:_____ State:_____ Zip Code:_____

C.     State the person to contact about your claim and, below that, information we will use to contact him or her.

Name: _____

Street Address:_____

City:_____ State:_____ Zip Code:_____

Telephone: _____ Facsimile: _____

E-Mail Address:_____

D.     If at the time of any purchase claimed below you used a business or trade name, or were located at an address other than the name and address provided above, indicate each such name and/or address below.

| Business or Trade Name(s) | Location(s) | Year(s) |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

D.     Has the claimant been a DTC Sightholder or a controlled affiliate of a DTC Sightholder at any time during the time starting September 20, 1997 and ending March 31, 2006?      Yes _____     No _____

If yes, please indicate the start date and end date of the period(s) during which the claimant or its controlled affiliate had Sightholder status.  For the purposes of a claim, a Sightholder's "controlled affiliate" is a company related to it by a direct or indirect shareholding interest of more than 50%.

Start date: _____       End date: _____

II.      Claimant's Purchases of Rough and Polished Gem Diamonds

On the forms below (and add additional sheets, as necessary), list the rough and polished gem diamonds, respectively, purchased for delivery to the United States during the period starting September 20, 1997 and ending March 31, 2006 in the claims categories listed below.

Rough Gem Diamonds

| Year | Total Amount Paid | Total Carats Purchased | Supplier |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Polished Gem Diamonds

| Year | Total Amount Paid | Total Carats Purchased | Supplier |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

If necessary, continue the list on separate sheets.  Attached is a sheet that you can copy for this purpose.

III.     Proof of Purchases

Describe the documents that establish the purchases listed, such as invoices, bank statements

4

and/or bookkeeping records.  You may be required to produce these records to substantiate your claim.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

IV.   Jurisdiction of the Court

Claimant hereby submits to the jurisdiction of the United States District Court for the District of New Jersey for all purposes associated with this claim, and agrees to be bound by and subject to the terms of any orders entered by that Court in connection with the settlement in the above captioned class action, and to furnish such additional proof or documentation with respect to this claim as the Court or the Claims Administrator may request.

V.   Release

All Class Members who do not opt out of the class are releasing all claims, known and unknown that were or could have been asserted against the defendants in the class action lawsuits being settled (De Beers, S.A., De Beers Consolidated Mines, Ltd., De Beers A.G., DB Investments, Inc., Diamond Trading Company, Ltd., CSO Valuations A.G., Central Selling Organization, Central Holdings, Ltd., and De Beers Centenary A.G. and various related parties) arising from or relating to the facts alleged in that action, and waiving all rights that they may have under California Civil Code 1542 and any similar statutes. Please refer to the Notice Of Class Action Settlement or the Settlement Agreement for a more complete description of the released claims. A copy of the Notice and the Settlement Agreement may be obtained at www.diamondsclassaction.com.

<div align="center">Certification</div>

I certify that the foregoing statements made by me are accurate, and that I have not previously submitted a claim form under the settlement agreement for the same purchases listed in this claim form.  I am aware that if any of the foregoing statements made by me are willfully false, I

<div align="center">5</div>

am subject to punishment.

_____     _____
                Signature                                                      Date

Print Name and Title: _____

### One of the Following Must Be Completed:

Sworn to before me this _____ day of _____, 2007

                                                    _____
                                                                          Notary Public

### [or]

Affirmed this _____ day of _____, 2007

                                                    _____
                                                                          Signature
                                              (same signature as person signing claim
form)

                              Print Name: _____
                                                                (same as above)

6

## **Filing Deadline and Address**

**Mail Postmarked No later than _____, 200\_\_\_\_ to:**

    **Diamonds Claims Administrator**

    _____

    _____

    _____

    _____

**Additional Purchases**

**Rough Gem Diamonds**

| Year | Total Amount Paid | Total Carats Purchased | Supplier |
|------|-------------------|------------------------|----------|
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |
|      |                   |                        |          |

**Additional Purchases**

**Polished Gem Diamonds**

| Year | Total Amount Paid | Total Carats Purchased | Supplier |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |