HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHAWN SULLIVAN, ARRIGOTTI FINE JEWELRY and JAMES WALNUM, on behalf of themselves and all others similarly situated, | : : : : | Civil Action Index No. 04-02819 (SRC) |
| Plaintiffs, | : : | Hon. Alfred M. Wolin (Ret.) Special Master |
| vs. | : : | |
| DB INVESTMENTS, INC., DE BEERS S.A., DE BEERS CONSOLIDATED MINES, LTD., DE BEERS A.G., DIAMOND TRADING COMPANY, CSO VALUATIONS A.G., CENTRAL SELLING ORGANIZATION, and DE BEERS CENTENARY A.G., | : : : : : : : | |
| Defendants. | : : | |

## CONSUMER PLAINTIFFS' MEMORANDUM CONCERNING THE ALLOCATION OF THE INDIRECT PURCHASER SETTLEMENT FUND AND THE PROPOSED PLAN OF DISTRIBUTION TO THE CONSUMER SUBCLASS

TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II. ALLOCATION OF THE INDIRECT PURCHASER FUND BETWEEN CONSUMERS
    AND RESELLERS ...................................................................................................... 2

    A. At Least 49.7% Of Rough Diamond Price Increases Were Passed Through As
       Polished Diamond Price Increases To Consumers. ............................................... 3

       1.  Retailer Margins On Diamond Jewelry Remained Constant, Indicating That
           They Did Not Absorb Price Increases. ........................................................... 3

       2.  The Consumers Presented A More Persuasive Economic Analysis Than The
           Resellers. ....................................................................................................... 3

       3.  The Resellers' Anecdotal Evidence Is Unpersuasive ...................................... 4

       4.  There Is No Persuasive Evidence Of A "Reseller Profit Squeeze." ............... 4

       5.  The Resellers' Contention That Consumer Demand Is Elastic Is Unpersuasive. ......... 5

       6.  Much Of The Commerce Within The Diamond Pipeline Is Foreign, And
           Therefore Is Not Within The Reseller Subclass. ............................................ 5

    B. The Resellers Faced Greater Litigation Risks Than The Consumers. ................... 6

       1.  Standing Under State Laws Is Broader For Consumers. .................................. 6

       2.  The Resellers Faced A Greater Risk On Class Certification. ........................... 7

III. THE PLAN OF DISTRIBUTION OF THE CONSUMER FUND. ............................. 8

    A. The Relevant Legal Standard. .............................................................................. 8

    B. Pro Rata Distribution Among All Consumer Claimants Is Reasonable. ............. 10

    C. Summary Of The Proposed Claims Process. ...................................................... 11

    D. Feasibility Of The Proposed Claims Process. ..................................................... 13

    E. Claims Based On Purchases Of Diamond Jewelry. ............................................ 15

       1.  Overview. ...................................................................................................... 15

       2.  High-End Diamond Jewelry. .......................................................................... 17

       3.  Applying The Estimates To All Years Of The Class Period ......................... 17

       4.  Intermediate Category Recommended By Counsel ....................................... 17

       5.  Treatment Of De Minimis Claims. ................................................................ 19

       6.  Treatment Of Claims In The Event Of A Low Claims Rate. ......................... 20

i

F.  Claims Based On Purchases Of Diamond Watches. ....................................................... 20

G.  Claims Based On Purchases Of Loose Diamonds ......................................................... 22

H.  Claims Auditing ................................................................................................................ 22

I.  Claims Administration And Sufficiency of The Claim Form........................................... 22

IV. CONCLUSION................................................................................................................................. 22

TABLE OF AUTHORITIES

**Cases**

*Deutschman v. Beneficial Corp.,*
    841 F.2d 502 (3d Cir. 1988) ....................................................................................... 9

*In re Aetna Inc., Fed. Sec. L. Rep.,*
    (CCH) P 91322, 2001 WL 20928 (E.D. Pa. 2001) ................................................... 8

*In re Agent Orange Product Liability Litigation,*
    818 F.2d 179 (2d Cir. 1987) ...................................................................................... 9

*In re American Bank Note Holographics, Inc.,*
    127 F. Supp. 2d 418 (S.D. N.Y. 2001) ..................................................................... 8

*In re Ann Taylor Stores Securities Litigation,*
    1993 WL 183732, at *4 (S.D. N.Y. 1993) ................................................................ 9

*In re AremisSoft Corp. Securities Litigation,*
    210 F.R.D. 109 (D.N.J. 2002) .................................................................................... 8

*In re Cardizem CD Antitrust Litigation,*
    218 F.R.D. 508 (E.D. Mich. 2003), *appeal dismissed,* 391 F.3d 812 (6th Cir. 2004), *cert.
    denied,* 544 U.S. 1049 (2005) ................................................................................... 8

*In re Cendant Corp. Sec. Litig.,*
    109 F. Supp.2d 235 (D.N.J. 2000). ........................................................................... 8

*In re Chicken Antitrust Litigation American Poultry,*
    669 F.2d 228 (5th Cir. 1982) ...................................................................................... 8

*In re Citric Acid Antitrust Litigation,*
    145 F. Supp. 2d 1152 (N.D. Cal. 2001) .................................................................... 8

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
    216 F.R.D. 197 (D. Me. 2003) ................................................................................. 14

*In re Holocaust Victim Assets Litigation,*
    413 F.3d 183 (2d Cir. 2005) ...................................................................................... 8

*In re Ikon Office Solutions, Inc., Securities Litigation,*
    194 F.R.D. 166 (E.D. Pa. 2000) ............................................................................ 8, 9

*In re Lucent Tech. Inc. Sec. Litig.,*
    307 F.Supp.2d 633 (D.N.J. 2004) ............................................................................. 8

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
    235 F.R.D. 137 (D. Me. 2006) ................................................................................... 7

*In re PaineWebber Ltd. Partnerships Litigation,*
    171 F.R.D. 104 (S.D. N.Y. 1997), *aff'd,* 117 F.3d 721 (2d Cir. 1997) ..................... 8

iii

*In re Relafen Antitrust Litig.,*
   221 F.R.D. 260 (D. Mass. 2004)...........................................................................7

*In Re Remeron Direct Purchaser Antitrust Litig.,*
   2005 U.S. Dist. Lexis 27013 (D.N.J. November 9, 2005) ....................................10

*In re Terazosin Hydrochloride Antitrust Litig.,*
   220 F.R.D. 672 (S.D. Fla. 2002).........................................................................7

*In re Visa Check/Mastermoney Antitrust Litigation,*
   297 F. Supp. 2d 503 (E.D. N.Y. 2003), *aff'd,* 396 F.3d 96 (2d Cir. 2005), *cert. denied,*
   544 U.S. 1044 (2005)...........................................................................................8

*In Re Warfarin Sodium Antitrust Litig.,*
   391 F.2d 516 (3d Cir. 2003) ...............................................................................10

*In re Warfarin Sodium Antitrust Litig.,*
   212 F.R.D. 231 (D.Del. 2002), *aff'd* 391 F.3d 516 (3d Cir. 2004).......................11

*In re WorldCom, Inc. Securities Litigation,*
   388 F. Supp. 2d 319 (S.D. N.Y. 2005).................................................................8

*In re Worldcom, Inc. Securities Litigation,*
   2005 WL 2319118, at *12 (S.D. N.Y. 2005).........................................................8

*Johnson v. Montgomery County Sheriff Dept.,*
   604 F.Supp. 1346 (D.Ala. 1985).........................................................................10

*Kentucky Steel Elec. Inc. v. Mitsubishi Corp.,*
   2003-2 Trade Cas. (CCH) P 74199, 2003 WL 22358491 (E.D. Pa. 2003)..............8

*Krangel v. Golden Rule Resources, Ltd.,*
   194 F.R.D. 501 (E.D. Pa. 2000)..........................................................................9

*Law v. National Collegiate Athletic Ass'n,*
   108 F. Supp. 2d 1193 (D. Kan. 2000) .................................................................9

*Leider v. Ralfe,*
   387 F.Supp.2d 283 (S.D.N.Y. 2005)....................................................................7

*Microsoft I-V Cases,*
   J.C.C.P. No. 4106, 2000-2 Trade Cas. (CCH) ¶73,013 (Cal. Super Ct. San Francisco
   County Aug. 29, 2000).........................................................................................7

*Rozack v. Volvo of Amer. Corp.,*
   131 Cal. App. 3d 750 (Cal. Ct. App. 1982)..........................................................7

*Walsh v. Great Atlantic & Pacific Tea Co., Inc.,*
   726 F.2d. 956, 38 Fed. R. Serv. 2d 39 (3d Cir. 1983)...........................................8

## I.    INTRODUCTION

The Indirect Purchaser Consumer Subclass respectfully submits this memorandum to address two related issues.   First, we summarize the reasons why the Special Master's recommended allocation of 49.7% of the Indirect Purchaser Settlement Fund ("Fund") to the Consumer Subclass is not only reasonable but is the minimum amount that should be allocated. Second, on the assumption that this allocation will be confirmed by the Court, we propose a plan of distribution for the Consumer portion of the Fund.

The Special Master gave careful consideration to the competing arguments and evidence in arriving at the recommended division, and the Consumers do not seek reconsideration of that determination.   Any lesser percentage to the Consumers would be unwarranted.   In addition to summarizing below the arguments and the evidence we previously set forth,[1] we discuss below the significantly greater litigation risk that the Resellers would have faced had the case not settled.   There is much less precedent for certifying reseller classes than there is for consumer classes, a risk that would have been compounded by the multiple levels of resellers in this case.

Consumer Subclass Counsel propose a plan of distribution for the Consumer portion of the Fund that will fairly and efficiently distribute the settlement proceeds.   We recommend that the members of the Consumer Subclass be required to submit claim forms concerning their purchases of diamonds and diamond-containing products.   Payments would then be made on a *pro rata* basis, based upon reasonable approximations of the diamond content value of their purchases.   The Consumers' expert economist explains the basis of those approximations in the "Fourth Supplemental Affidavit of John Pisarkiewicz, Ph.D.," submitted herewith and summarized below.

---

[1] *See* (1) "Consumer Plaintiffs' Memorandum Regarding Allocation of Settlement Fund," filed February 14, 2006; (2) "Report of John Pisarkiewicz, Ph.D. On The Allocation Of A Proposed Settlement Between the Indirect Purchaser Consumer Subclass and the Reseller Subclass," filed February 14, 2006; (3) "Correction to Report of John Pisarkiewicz, Ph.D.," filed February 23, 2006; (4) "Supplemental Affidavit of John Pisarkiewicz, Ph.D.," dated February 24, 2006;(5) "Consumer Plaintiffs' Post-Hearing Memorandum Regarding Allocation of the Settlement Fund," filed March 22, 2006; (6) "Second Supplemental Affidavit of John Pisarkiewicz, Ph.D.," filed March 22, 2006; (7) "Consumer Plaintiffs' Memorandum In Response To The Declaration of the Bates-White Economists," filed April 6, 2006;" (8) "Third Supplemental Affidavit of John Pisarkiewicz., Ph.D.," filed April 6, 2006.

The Consumers' proposed plan of distribution is also supported by the accompanying "Declaration of Matthew B. Potter on the Distribution of Settlement Funds to the Consumer Subclass Members." Mr. Potter explains why the plan of distribution is reasonable, based upon the estimated class size and claims rate, and describes how Rust Consulting will process the claims. Plaintiffs contemplate that there will be a joint Notice, which is described in the accompanying "Direct and Indirect Purchaser Plaintiffs Joint Submission Regarding Dissemination and Content of Notice to the Indirect and Direct Purchaser Classes," the "Affidavit of Andrew Novak in Support of Notice Program," and the proposed long and short forms of notice to all class members.[2] Certain facts stated herein are also supported by the accompanying "Indirect Purchaser Plaintiffs' Stipulated Industry Facts" ("Stipulated Facts").

## II.    ALLOCATION OF THE INDIRECT PURCHASER FUND BETWEEN CONSUMERS AND RESELLERS

We do not intend to reargue the evidence previously submitted, but briefly summarize it here for the Special Master's and the Court's convenience. The allocation of the settlement fund between the consumer and reseller subclasses should be informed not only by the relevant economic evidence bearing upon each subclass' claim to the funds, but also by the relative litigation risks each subclass would have faced had the case not settled. The Consumers presented more persuasive economic evidence than the Resellers, and faced significantly fewer litigation risks than the Resellers. There is no basis to decrease the recommended 49.7% allocation.

---

[2] Mr. Potter is a Principal Consultant for Rust Consulting, Inc. ("Rust"), the proposed administrator of the Settlement Fund. Mr. Novak is Vice President of Kinsella/Novak Communications, Ltd., which has designed and would implement the proposed notice program.

**A.    At Least 49.7% Of Rough Diamond Price Increases Were Passed Through As Polished Diamond Price Increases To Consumers.**

    **1.    Retailer Margins On Diamond Jewelry Remained Constant, Indicating That They Did Not Absorb Price Increases.**

Dr. Pisarkiewicz demonstrated that retailers' margins have remained essentially constant over the relevant period, which is inconsistent with their claim that they have absorbed rough diamond price increases. The data used by Dr. Pisarkiewicz was reliable. Among the margin analyses that he conducted was an analysis of jeweler's margins on sales of diamond jewelry in the Cost of Doing Business survey, a well-recognized study published by the Jewelers of America, the largest organization of jewelers in America.[3] According to Dr. Pisarkiewicz's analysis of the data, the gross margins on diamond jewelry were similar to gross margins on all sales, and storewide gross margins are thus a reasonable proxy for diamond jewelry margins. Dr. Pisarkiewicz's analysis of retailer gross margins is consistent with his econometric analysis, which also indicates that most of the rough diamond price increases were passed through to the consumer level, and it is also consistent with De Beers' documents.[4]

    **2.    The Consumers Presented A More Persuasive Economic Analysis Than The Resellers.**

Dr. Pisarkiewicz's econometric analysis demonstrated that rough diamond price increases were passed through to consumers. De Beers provided an illustrative model developed by one of its consultants, which was meant to be an example of how industry data could be analyzed.[5] Dr. Pisarkiewicz therefore made several appropriate adjustments to the model. First, the regressions in the model relied on a small number of observations, so Dr. Pisarkiewicz supplemented the observations. Second, the illustrative model relied on per capita GDP, which is published on a quarterly basis. Dr. Pisarkiewicz used personal disposable income, which is a monthly series

---

[3]  Report of John Pisarkiewicz ¶¶ 76-82; *see* Fourth Supp. Aff. of Pisarkiewicz, fn. 20 and Ex. 38.

[4]  Second Supp. Aff. of Pisarkiewicz ¶¶ 27-35, 47-51: Third Supp. Aff. Of Pisarkiewicz, ¶¶ 37-42.

[5]  "De Beers S.A.'s Reply Memorandum to the Consumer and Reseller Subclass' Memoranda Regarding the Allocation of the Settlement Fund," dated February 24, 2006, at pp, 6-8.

published by the U.S. Department of Commerce, and is therefore more precise. Third, the illustrative model did not address the high degree of multicollinearity between rough prices and carat size, and between rough per capita demand and gold prices.[6] Dr. Pisarkiewicz adjusted for this as well. His analysis strongly suggested that rough diamond price increases over the class period were largely passed through the diamond pipeline all the way down to the consumers.

### 3.    The Resellers' Anecdotal Evidence Is Unpersuasive.

The anecdotal evidence submitted by the resellers was not persuasive. For example, they relied on charts created by          , which according to them suggested that resellers absorbed 77% of rough diamond price increases.[7] This interpretation is inconsistent with the document's underlying assumption that margins and fixed costs were held constant. The Resellers also relied on a Bear Stearns report that suggested to them that the Resellers absorbed 68% of rough diamond price increases, simply because rough prices grew by as much as 25% over one year of the class period while polished prices were up only 8% at retail. However, the Resellers apparently compared a two-year period of rough price increases with a one-year period of polished price increases. When Dr. Pisarkiewicz corrected for this error, he found pass through to consumers based on this data was approximately 59%.[8]

### 4.    There Is No Persuasive Evidence Of A "Reseller Profit Squeeze."

The Resellers contended that they faced a "profit squeeze" during the class period, suggesting that price increases were being absorbed by them rather than being passed on to the Consumers. In support of this argument, the Resellers submitted the affidavit of Derek Parsons, the President of British Diamond Import Co., which is a plaintiff in a related case against De Beers. We understand that British Diamond made indirect as well as direct purchases of rough

---

[6] Report of Pisarkiewicz ¶¶ 42-46. "Multicollinearity" describes "the situation in which two or more predictors (or subsets of predictors) are strongly (but not perfectly) correlated to one other, making it difficult to interpret the strength of the effect of each predictor (or predictor subset)."
http://www.nature.com/nrg/journal/v4/n2/glossary/nrg996_glossary.html.

[7] Supp. Aff. of Pisarkiewciz ¶¶ 5-6.

[8] Supp. Aff. of Pisarkiewicz ¶¶9-10.

Material Redacted

diamonds, and therefore it could be entitled to claim a share of the Reseller Fund. Putting aside the self-interested basis for Mr. Parson's comments, neither he nor any other member of the Reseller subclass, which includes large retail chains, submitted any evidence concerning overall pass through or the lack thereof from Resellers to Consumers and particularly from Retailers to Consumers.[9] Presumably such an analysis would not have supported their position.

### 5. The Resellers' Contention That Consumer Demand Is Elastic Is Unpersuasive.

The Resellers speculated that consumer demand is elastic, because supposedly there are good substitutes for diamonds, which are expensive luxury items that consumers will buy less of if prices get too high. However, this speculation is inconsistent with internal De Beers documents showing that when diamond jewelry prices increased, consumers did not substitute by buying other types of jewelry, and that the diamond content of jewelry sold in the United States did not decrease when diamond prices increased.[10] The available data indicates that consumer demand is relatively inelastic. Moreover, common sense and experience, reinforced by the luxury image that De Beers has successfully marketed for diamonds over many years, indicate that most consumers would not find other gems to be adequate substitutes. "A diamond is forever" for many consumers, and particularly for sentimental occasions such as engagements and anniversaries, there are no effective substitutes.

### 6. Much Of The Commerce Within The Diamond Pipeline Is Foreign, And Therefore Is Not Within The Reseller Subclass.

The Resellers did not adequately account for the fact that much of the commerce in the diamond industry is foreign, and involves resellers who are not entitled to share in the settlement fund. Based on Dr. Pisarkiewicz's analysis of pipeline charts analyzing the amount of rough

---

[9] Dr. French's "absorption weighting" or claims weight analysis, described in his Fourth Affidavit, addresses how changes in rough prices are reflected in the prices of loose polished diamonds and diamond jewelry. It is useful only for the purpose of weighting claims based on the products reseller class members purchased, and says nothing about reseller margins or whether resellers faced a profit squeeze during the class period. Fourth Affidavit of Gary L. French, Ph.D.," ¶¶43-46.

[10] *See*, e.g., Second Supp. Aff. Of Pisarkiewicz, ¶¶ 47-51.

used in local (i.e., domestic production), most of the non-retail resellers are located outside of the United States. More importantly, because the United States accounts for no more than half of the world diamond jewelry commerce, the majority of the commerce affected by increases in rough diamond prices lies outside the United States. Unless this fact is taken into account in the allocation, the Resellers will be overcompensated.[11]

## B.     The Resellers Faced Greater Litigation Risks Than The Consumers.

The Resellers would have faced greater litigation risks had De Beers chosen to litigate the case on its merits—yet another reason why the allocation scale should not tip below 49.7% to the Consumers.

Certain risks of course would have been common to both subclasses, *e.g.*, establishing personal jurisdiction over De Beers, collecting on a default judgment in South Africa or other foreign countries, and proving liability and the total amount of overcharges. However, certain additional risks were unique to the Resellers and would have posed unique problems for them. These risks included relatively diminished standing under various state antitrust, unfair competition and consumer protection laws, and a greater hurdle of class certification.

## 1.     Standing Under State Laws Is Broader For Consumers.

Since the indirect purchaser class members could not have recovered damages under federal antitrust law because of the *Illinois Brick* rule, their damage claims in this litigation were based upon state antitrust, unfair competition, and consumer protection laws. Many states give standing to consumers to enforce such laws; some, however, do not extend the same standing to resellers. Accordingly, the *Sullivan* plaintiffs moved to certify subclasses in some states on behalf of consumers only, and not on behalf of resellers. Those states included Georgia, Hawaii, Louisiana, Montana, Oregon, Rhode Island, Utah, and Wyoming. The *Sullivan* class certification motion was pending at the time of settlement. In *Null v. DB Investments*, originally filed in the Illinois state court, and later removed by De Beers to federal court and transferred to

---

[11] *Id.*

this Court, plaintiffs alleged a nationwide consumer class under Illinois law, which was certified by the Illinois state court before removal. There was no corresponding nationwide claim for resellers.

### 2.    The Resellers Faced A Greater Risk On Class Certification.

The Consumers also had a much greater chance of getting a class certified than the Resellers. Indeed, a nationwide consumer class was certified by the Illinois state court in *Null v. D.B. Investments, Inc., et al.,*[12] and a California consumer class was certified by the California Superior Court in *Hopkins v. De Beers Centenary AG.*[13]  These decisions are consistent with a well-developed body of precedent for certification of indirect purchaser consumer/end user classes in cases like this one.[14]

Unlike consumers, who by definition do not pass on the overcharges they pay, and for whom applying a common measure of class-wide damages is relatively straightforward, the resellers would have confronted the argument on class certification that some or all of any overcharges they paid were passed on to the next level.  The reseller class includes multiple levels of the "diamond pipeline," not just retailers, compounding this pass through argument.  It is quite possible that consumer claims would have been certified in *Sullivan*, but that the Court would have reached the opposite result for the reseller claims.

In *Leider v. Ralfe*, 387 F.Supp.2d 283 (S.D.N.Y. 2005), Judge Baer held that class actions for damages cannot be brought under New York law.   Although the *Leider* case is on behalf of consumers only, the Resellers would have been disproportionately impacted by that decision, since much of the reseller commerce above the retail level in the United States takes place in

---

[12] Order of July 22, 2005, *Null v. D.B. Investments, Inc., et al.*, Madison Co. No. 05-L-209.

[13] Order of April 15, 2005, *Hopkins v. De Beers Centenary AG.et al.*, San Francisco Superior Court No. CGC-04-043954.

[14] *See*, e.g., *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 235 F.R.D. 137 (D. Me. 2006); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2002); *Rozack v. Volvo of Amer. Corp.*, 131 Cal. App. 3d 750 (Cal. Ct. App. 1982); *Microsoft I-V Cases*, J.C.C.P. No. 4106, 2000-2 Trade Cas. (CCH) ¶73,013 (Cal. Super Ct. San Francisco County Aug. 29, 2000).

New York, and many large resellers such as Tiffany are headquartered there and presumably purchased diamonds there for resale throughout the country.

## III.   THE PLAN OF DISTRIBUTION OF THE CONSUMER FUND.

### A.   The Relevant Legal Standard.

Approval of a plan of allocation for a settlement fund in a class action is governed by the same standard of review applicable to the settlement as a whole—namely, "the distribution plan must be fair, reasonable and adequate."[15]  It need not be perfect.[16]

An allocation formula should be approved as fair if it has a "reasonable, rational basis," particularly if "experienced and competent" class counsel support it.[17]  "The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable."[18]  Generally, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable.[19]  A plan of allocation was held to be fair and reasonable where claimants were

---

[15] *In re Ikon Office Solutions, Inc., Securities Litigation*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) (quoting *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 321 (D.N.J. 1998)). *See also In re Citric Acid Antitrust Litigation*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).

[16] *See*, e.g., *In re Lucent Tech. Inc. Sec. Litig.*, 307 F.Supp.2d 633, 649 (D.N.J. 2004); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp.2d 235, 272 (D.N.J. 2000).

[17] *In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429 (S.D. N.Y. 2001); *see also In re Chicken Antitrust Litigation American Poultry*, 669 F.2d 228, 241 (5th Cir. 1982); In re *WorldCom, Inc. Securities Litigation*, 388 F. Supp. 2d 319, 344 (S.D. N.Y. 2005); *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503, 518-19 (E.D. N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005); *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 529 (E.D. Mich. 2003), *appeal dismissed*, 391 F.3d 812 (6th Cir. 2004), *cert. denied*, 544 U.S. 1049 (2005); *In re PaineWebber Ltd. Partnerships Litigation*, 171 F.R.D. 104, 133 (S.D. N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

[18] *See Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d. 956, 964, 38 Fed. R. Serv. 2d 39 (3d Cir. 1983); *see also In re Worldcom, Inc. Securities Litigation*, 2005 WL 2319118, at *12 (S.D. N.Y. 2005) ("'An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'") (citation omitted).

[19] *In re Ikon Office Solutions, Inc., Securities Litigation*, 194 F.R.D. at 184. *See also In re Citric Acid Antitrust Litigation*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (citation omitted); *Kentucky Steel Elec. Inc. v. Mitsubishi Corp.*, 2003-2 Trade Cas. (CCH) P 74199, 2003 WL 22358491 (E.D. Pa. 2003); *accord In re Holocaust Victim Assets Litigation*, 413 F.3d 183, 186 (2d Cir. 2005) ("Any allocation of a settlement of this magnitude and comprising such different types of claims must be based, at least in part, on the comparative strengths and weaknesses of the asserted legal claims."); *In re Worldcom, Inc. Securities Litigation*, 2005 WL 2319118 (S.D. N.Y. 2005) ("settlement proceeds may be allocated with respect to the strengths and weaknesses of various claims"); *In re AremisSoft Corp. Securities Litigation*, 210 F.R.D. 109, 126 (D.N.J. 2002); *In re Aetna Inc., Fed. Sec. L. Rep.* (CCH) P 91322, 2001 WL 20928 (E.D. Pa. 2001) (approving as fair allocations among shareholders who purchased stock at different times in class period because "[t]he distinctions made [in allocation of settlement] are fair and

reimbursed at various percentages for their defined losses.[20]  A plan of allocation was also fair

and reasonable where claimants received a pro rata share of the settlement fund "based upon the

ratio of his or her claim to the total number of claims received."[21]

A district court has significant latitude to exercise its discretion in approving a plan of

distribution.[22]  The Second Circuit in the *Agent Orange* case set forth some useful guidelines

regarding court oversight of settlement implementation: (1) "[d]istrict courts enjoy 'broad

supervisory powers' over the administration of class-action settlements to allocate the proceeds

among the claiming class members . . . equitably"; (2) the district court must "exercise its

independent judgment to protect the interests of class absentees, regardless of their apparent

indifference, as well as protect the interests of more vocal members of the class"; and (3) the

court has "discretion to adopt whatever distribution plan he determine[s] to be in the best

interests of the class as a whole notwithstanding the objections of class counsel or of a large

number of class members." *Id.* at 182.  The district court also has the ability: (1) to flexibly

"alter the distribution plan in the future to simplify it more or clarify standards as concrete issues

arise"; (2) to determine an equitable allocation of the settlement fund without resolving issues of

causality; and (3) to "'provide broader relief [in an action that is before trial] than the court could

have awarded after a trial.'" *Id.* at 183-84.

---

accurately reflect the different risks and losses experienced by individuals who acquired Aetna stock at different times."); *Law v. National Collegiate Athletic Ass'n*, 108 F. Supp. 2d 1193, 1200 (D. Kan. 2000) (Approving as fair allocation, which "effectively matches each plaintiff's recovery to the strength of his or her claim. For practical purposes, the class-wide plan of allocation cannot account for every individual circumstance."); *In re Ann Taylor Stores Securities Litigation*, 1993 WL 183732, at *4 (S.D. N.Y. 1993) (approving allocation plan in securities fraud action where "[t]he allocation plan accounts for the rise in the AnnTaylor stock price after the end of the Class Period in that people who continued to hold their shares during the period after the Class Period when the stock price rose will recover less to reflect their mitigated out-of-pocket loss. Otherwise, class members recover pro rata according to the number of claims filed.").

[20] *In re Ikon Office Solutions*, 194 F.R.D. at 184-185.

[21] *Krangel v. Golden Rule Resources, Ltd.*, 194 F.R.D. 501, 509 (E.D. Pa. 2000).

[22] *See, e.g., Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3d Cir. 1988); *In re Agent Orange Product Liability Litigation*, 818 F.2d 179 (2d Cir. 1987).

Although the court must independently evaluate the proposed distribution plan, the professional judgment of class counsel involved in the litigation—who have made a determination that the settlement represents a fair allotment for their clients—is entitled to significant weight.[23]

**B.      Pro Rata Distribution Among All Consumer Claimants Is Reasonable.**

A pro rata distribution of the Consumer portion of the Fund, which is proposed here, is a reasonable approach and is commonly employed in antitrust class actions.[24] This will allow class members to be compensated in relation to the amount and value of their diamond purchases during the class period, which corresponds to the amount of their potential damages had the case been litigated on the merits.

Counsel considered whether it would be appropriate to weigh class members' claims against the Fund based on the relative strength of class members' differing state law claims. However, such a weighting would not be appropriate in this case because (1) De Beers demanded a release of potential damage claims in all 50 states; thus, the settlement amount likely would not have been as large had the claims of class members from all 50 states not been released; (2) a nationwide class of consumers was certified in the *Null* case; (3) all class members benefit from the additional value of the injunctive relief obtained; and (4) weighing class members' claims based on the relative strength of different state law claims would be

---

[23] *See Johnson v. Montgomery County Sheriff Dept.*, 604 F.Supp. 1346, 1348 (D.Ala. 1985) ("In assessing a proposed settlement of a class action, the trial court is entitled to take account of the judgment of the experienced counsel for the parties; if the attorney's decision in face of disagreement [among the class members] affects each class member more or less equally, and no allegation is made that the rights of a definable minority group with the class were sacrificed for the benefit of the majority, the attorney's views must be accorded great weight ... Even where there is a 'disparate distribution' favoring the named plaintiffs, '[t]he inference of unfairness may be rebutted by a factual showing that the higher allocation to certain parties are rationally based on legitimate considerations.'" (citation omitted)).

[24] *See, e.g., In Re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. Lexis 27013 (D.N.J. November 9, 2005). *In Re Warfarin Sodium Antitrust Litig.*, 391 F.2d 516 (3d Cir. 2003).

imprecise at best, and would greatly add to the cost and complexity of processing claims, diminishing the recovery for all consumers.[25]

**C.     Summary Of The Proposed Claims Process.**

As Dr. Pisarkiewicz explains, "[o]nly a portion of the retail price paid by consumers for jewelry or other diamond products is attributable to the diamond component of the jewelry." Fourth Supp. Pisarkiewicz Aff., ¶ 11.  Because this case concerns allegedly elevated prices for diamonds, and not gold or other gems which may be combined with diamonds in a piece of jewelry, Dr. Pisarkiewicz developed a methodology that allows class members' claims to be compared using a common metric—diamond content—based on the approximate value of diamonds as a proportion of the value of diamond jewelry and other diamond-containing products, such as watches and pens accessorized with diamonds. This common metric approach is consistent with the approach devised by the Reseller subclass.

In devising this plan of distribution, Consumer class counsel relied on their expert economist, Dr. John Pisarkiewicz, who in turn relied on information supplied by De Beers, data supplied by major resellers such as                    and             data from other resellers collected by Dr. Pisarkiewicz' staff and by counsel, and experienced economic and industry sources and consultants, including those retained by Dr. French and the Resellers.  Dr. Pisarkiewicz and his staff also shared data with Dr. French and his staff, and vice-versa.  The goals were to make this process as simple as possible for the consumers, to keep administrative costs down, and to put as much of the settlement proceeds as possible into the hands of the consumer claimants.

Consumers will have a reasonable period from the notice of the settlement to file a claim. Consumers will be asked to provide very basic information about their diamond product

---

[25] *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 260 (D.Del. 2002),  aff'd 391 F.3d 516 (3d Cir. 2004); *See also*, Decl. of Kenneth Feinberg at 9, (agreeing with reseller counsel's proposal to conduct a plan of allocation without regard to the differing laws of the various states because "if total piece is not achieved, the settlement may fail and all class members will disadvantaged," a sorting through such claims would increase administrative costs, disadvantaging class members).

11

Material Redacted

purchases, to enable the claims administrator to verify whether the consumer is entitled to assert a claim, and to estimate the diamond content value of the diamond product that is the basis for the consumer claim. The use of estimates will keep administrative costs and burden to a minimum. The diamond content value will be based upon the "Polished Wholesale Value" ("PWV") of the diamonds in the diamond product.

Consumers primarily purchase diamond products from retailers, and most of these purchases involve diamond jewelry. Therefore, we anticipate that the majority of consumer claims will be based on retail purchases of diamond jewelry. However, we also anticipate that some consumer claims will be based on retail purchases of other diamond products such as watches and other items accessorized with diamonds, and purchases of loose diamonds. While there are some additional diamond-containing products that consumers purchase, we do not anticipate many claims based on these items and they will be treated as special cases.

Consumers will be asked to describe the type(s) of diamond product(s) they purchased, date(s) of purchase, and prices paid. They will be allowed to aggregate their claims on one form. Depending upon the types of diamond products purchased, the claimants will be asked to supply information sufficient to enable the claims administrator to process pro rata distributions among the consumer class. We expect that most consumers will file their claims online, and the online features will minimize any deficiencies in the claim information. To the extent that consumers file claims by submitting a paper form, consumers will have an opportunity to correct any deficiencies.

The Claims Administrator will use the information provided by consumers to estimate the diamond content value of the diamond product and use these diamond content value estimates as the basis for the consumer's recognized claim. This process ensures that non-diamond elements of a diamond product such as metals are not the basis for a consumer claim, and avoids distortion of the recovery process.

Because there are millions of members of the consumer subclass who may have purchased many pieces of diamond jewelry, using estimated diamond content values is the most

reasonable approach under the circumstances. Calculating the diamond content value of every individual item would be completely impractical. The associated costs would consume a substantial portion of the consumer settlement fund, and would also require a significant amount of time, delaying the recovery. Furthermore, in order for the claims administrator to make these individual calculations, consumers would have to provide certain information about the diamonds in their diamond products that many are unlikely to have, and could not readily obtain without an expensive appraisal. Even if they had such information, it would not be reasonable to make the consumers expend the additional effort required to gather it, since this would diminish the number of claims filed. *See* Potter Decl., ¶¶ 17-28 (explaining why obtaining appraisals would not be feasible.) We expect that the use of estimates will result in a higher response rate for consumer claims, and will keep administrative costs down. Moreover, although consumer claimants will be informed that they may be subject to audit, they will not be required to submit proof of purchase with their claim forms. Class members will be allowed to submit their claims electronically using the settlement website, further simplifying the process.

###### D.   Feasibility Of The Proposed Claims Process.

Assuming a roughly equal division between Resellers and Consumers of the $272.5 million Indirect Purchaser Settlement Fund (to which will be added the interest which has been accruing since preliminary approval over a year ago), even after subtracting costs of administration and payment of class counsel's fees and costs, the portion of the Fund available for distribution to consumer class members should be at least $100 million. Mr. Potter's declaration addresses the feasibility of the proposed claims process given the approximate class size and the reasonably expected number of claimants. His opinion, supported by the experience of counsel, is that the proposed claims process is feasible and reasonable.

Although it is impossible to determine the size of the consumer subclass with precision, it is estimated to have between 67 and 117 million members. Potter Decl., ¶ 10. If most class members were expected to file a claim, obviously there would be a serious question whether a

pro rata distribution would be practical to administer.  Mr. Potter's declaration summarizes the

reasons why, despite the size of this class, the proposed claims process is reasonable:

> "12.     It is our opinion that a nationwide monetary claims process for the
> Consumer subclass in this case is feasible and should be implemented as
> proposed.  First, in our experience consumer claim filing rates rarely exceed seven
> percent, even with the most extensive notice campaigns.  There are no factors
> unique to the *Sullivan* settlement that suggest that a much higher claim filing rate
> is likely here.
>
> "13.     Second, we expect that over 90% of the claims that are submitted
> will be filed online.  This online claim filing rate estimate is based on Rust
> Consulting's experience in *CD MAP*,[26] where over 97% of the claims were
> submitted online.  The utilization of online claim filing in this case will provide
> substantial cost savings.  The cost of processing an online claim is approximately
> $0.30 ($0.50 where documentation is required), versus $0.90 ($1.10 with
> documentation) for a paper claim.  Costs are higher for processing paper claims
> and reviewing documentation because of the added labor costs of having
> individuals, as opposed to computers, review the information.  Because a proof of
> purchase is not required for the Consumer subclass, the claims analysis will not
> require the added expense of document verification (except for fraud prevention).
>
> "14.     Third, based on our experience in *CD MAP*, the amount of funds
> tentatively allocated for distribution to the Consumer subclass should be sufficient
> for the class size range estimated by the experts.  *CD MAP* involved a class size
> and settlement fund comparable to this case.  In *CD MAP*, a $67 million
> settlement fund was available for distribution to all purchasers of music compact
> discs, a class that was estimated to include at least 75 million people.  Here, the
> class size range (67 to 117 million) is somewhat larger, but the amount available
> for distribution is similarly larger....
>
> "16.     Based on expected claim filing rates and our experience in the *CD
> MAP* case, average award amounts to members of the Consumer subclass in this
> settlement should be more than sufficient to justify the costs of claims
> administration, assuming the settlement fund allocation to the Consumer subclass
> does not change.  Moreover, based on all of the factors listed herein—claim rate
> under 7%, over 90% of claims filed online, and at least $135.4 million available
> for distribution (less attorneys' fees, costs, plus interest)—it is our opinion that a
> consumer claims process is feasible regardless of whether the Consumer subclass
> size is at the low or high end of the expert estimates."  (Potter Decl., ¶¶ 12-14, 16)

---

[26] *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003).

Mr. Potter's opinion is consistent with the experiences of Consumer Subclass Counsel, who have been involved in numerous large consumer cases where claims processes were utilized successfully to distribute settlement proceeds, including the various *Microsoft* cases.

### E.   Claims Based On Purchases Of Diamond Jewelry.

#### 1.   Overview.

The goal of the proposed plan of distribution is to create a simple but reliable and accurate methodology for the claim administrator to value consumer claims for diamond jewelry and other diamond-containing products purchased during the class period. The recommended basis for paying consumer claims is the "diamond content" of jewelry and other diamond-containing products. Dr. Pisarkiewicz concludes that a handful of categories for diamond-only jewelry and two categories for mixed stone jewelry will reasonably compensate all purchases of diamond jewelry, with a few exceptions. Separate methodologies were developed for diamond watches and loose stones. Each of these categories can be reasonably applied throughout the class period, greatly simplifying claims administration. The collective diamond content value of each claimant's total claimed purchases will be the basis for the payment to that claimant.[27]

Dr. Pisarkiewicz has performed an extensive analysis of survey data and other information provided by De Beers, as well as publicly available data. A complete description of the data reviewed is contained in Dr. Pisarkiewicz's Fourth Supplemental Affidavit. As is shown in the Tables and Exhibits attached to and fully described in his Affidavit, Dr. Pisarkiewicz has assessed the diamond content and the distribution of that content in diamonds and diamond jewelry purchased by the consumer subclass during the class period, 1994-2005, and has determined that reasonable aggregate groupings or categories for diamond content can be identified, corresponding to different retail price levels. As a result, payments for claims as a percentage of retail prices paid will be higher for more expensive items. The average diamond content of different price levels of diamond and mixed stone jewelry tends to be stable, and only

---

[27] To the extent the consumer asserts claims based on purchases of other diamond products, the diamond content value of those products will be calculated as discussed below and added to the claimant's recognized claim amount.

a few such aggregate groupings are required to cover the vast majority of diamond jewelry.  The data are broken out for "diamond only" jewelry, *i.e.*, jewelry that does not include other precious gems such as a ruby (although it typically would contain other material such as a gold band), and "mixed stone" jewelry, which contains other precious gems in addition to diamonds.  The following table summarizes the results of Dr. Pisarkiewicz' analysis:

| "Diamond-Only" Jewelry | | |
|---|---|---|
| Retail Price Category Per Piece of Jewelry | | Average Diamond Content As A Percent Of Retail Price |
| Less than $200 | : | 10.5 percent |
| $200 to $999 | : | 27.5 percent |
| $1,000 to $9,999 | : | 32.0 percent |
| $10,000 or more | : | 45.0 percent |
| "Mixed Stone" Jewelry | | |
| Less than $200 | : | 6.0 percent |
| $200 or more | : | 14.5 percent |

With the exception of the $10,000 and above category, which is described below, these categories are based upon data that Dr. Pisarkiewicz analyzed from the "Diamond Content Model" (DCM), developed by a De Beers consultant, which estimates for diamond jewelry the polished wholesale value of diamonds in dollars and the polished diamond content in carats.  Dr. Pisarkiewicz also relied upon survey data taken from the De Beers Consumer Acquisition Survey (CAS), in particular, the Women's Diamond Jewelry Survey, the Bridal Survey, the Men's Diamond Jewelry Survey, and the Teens' Diamond Jewelry Survey.  The DCM and the CAS were prepared in the ordinary course of business by or for De Beers, and were generally

16

described in the Declaration of Howard Davies, a De Beers executive, dated March 16, 2006.
Finally, Dr. Pisarkiewicz also analyzed additional information supplied by De Beers, third
parties, and information from publicly-available sources. A complete description of his
methodology, sources, and results is contained in his accompanying Fourth Supplemental
Affidavit and corresponding exhibits.

> ### 2.      High-End Diamond Jewelry.

For "high-end" diamond jewelry priced at $10,000 or more, the above sources were
insufficient. Therefore, Dr. Pisarkiewicz and Dr. French obtained additional and more detailed
information from                          other sources, and their own store surveys for these more
expensive items. The wholesale prices were estimated using *The Guide to Wholesale Gem
Pricing* (*"The Guide"*), published by Gemworld International, Inc., and then divided by retail
prices to estimate the average diamond content. Based on all this information, Dr. Pisarkiewicz
estimates that 45% is a reasonable approximation of the diamond content of these expensive
items. Fourth Supp. Pisarkiewicz Aff., ¶¶ 57-63.

> ### 3.      Applying The Estimates To All Years Of The Class Period

The DCM, as well as the Women's Jewelry and Bridal Jewelry surveys, included
information for 2002-2004 only. Although similar model and survey data were not available for
the entire class period, Dr. Pisarkiewicz believes that it is nonetheless reasonable to apply the
above average diamond content percentages across the entire class period, 1994 to 2005. The
available data indicate that average diamond jewelry prices per price category during 1996-2001
were about the same as average prices during 2002-2004, average diamond content in jewelry
has been relatively constant over the entire class period, and average gold prices (a common
jewelry component) were relatively constant throughout the period. Fourth Supp. Pisarkiewicz.
Aff., ¶¶ 42-52.

> ### 4.      Intermediate Category Recommended By Counsel

The above table shows that the more expensive the item, the higher the diamond content.
However, there is a very large dollar range in the diamond-only category between $1,000 and

17

Material Redacted

$9,999, where the diamond content is 32%, and then at $10,000 the diamond content jumps to a much higher percentage, 45%. In class counsel's judgment, it is reasonable and appropriate to add an intermediate category within this range in order to smooth the results, and avoid the situation where a class member who purchased a piece for $10,000 receives a significantly higher award than a class member who purchased a piece for $9,500. Dr. Pisarkiewicz agrees that it would not be unreasonable to anticipate an intermediate breakpoint between $1,000 and $10,000, but found that the available data is inconclusive and does not yield an obvious breakpoint. Fourth Supp. Pisarkiewicz Aff., ¶ 14. Therefore, consistent with the law cited above that the court is justified in relying upon the judgment of experienced class counsel, counsel recommend that an additional intermediate category be added for diamond-only jewelry with a retail price between $5,500 and $9.999, at an assumed diamond content percentage of 38.5%. Dr. Pisarkiewicz believes that this "fairly reflects the relatively smooth progression one expects to see in diamond content values as higher and higher price categories are considered." Fourth Supp. Pisarkiewicz Aff., ¶ 67. Including this additional category results in the following recommended schedule of retail price categories and diamond content percentages to use as the basis for distributing settlement proceeds to the consumer class:

<u>Diamond-only Jewelry</u>

| Retail Price Category Per<br>Piece of Jewelry | Average Diamond Content<br>As a Percent of Retail Price |
|---|---|
| Less than $200 | 10.5 percent |
| $200 to $999 | 27.5 percent |
| $1,000 to $5,499 | 32.0 percent |
| $5,500 to $9,999 | 38.5 percent |
| $10,000 or more | 45.0 percent |

<u>Mixed Stone Jewelry</u>

| | |
|---|---|
| Less than $200 | 6.0 percent |
| $200 or more | 14.5 percent |

**5.      Treatment Of De Minimis Claims.**

Diamond jewelry costing less than $200 constitutes about 39 percent of all pieces purchased at retail, but has a mean diamond content which is substantially lower than that of higher price categories.  *Id.*, ¶¶ 19, 29.  Based on advice from Rust Consulting, counsel have concluded that it would be impractical to issue checks under $10, because they are too small to efficiently administer.  As Mr. Potter explains, "[b]y using a $10 minimum threshold, the amount is less than the $12.00 claim calculation for a 6% diamond content of the $200 [mixed stone] jewelry break point, the highest price of the lowest category.  This allows the possibility of paying such a claim, taking into account the *pro rata* distribution and other costs, but at the same time does not risk paying so many *de minimis* claims that the fund will be overwhelmed with substantial administrative costs."  Potter Decl., ¶ 30.  This is consistent with minimum thresholds which have been employed in other cases.  *Id.*, ¶ 31.  However, class members will be allowed to aggregate their own purchases in order to exceed the $200 threshold.  Therefore, there will be an incentive to aggregate claims, and we expect that the actual proportion of claims paid to those filed will be high.

As a general guideline, class members will be informed that if their total claimed purchases consist of mixed-stone jewelry with an aggregate purchase price of $165 or less, or diamond-only jewelry with an aggregate purchase price of $95 or less, their claims cannot result in a payment of $10 or greater, regardless of how few class members submit claims. This will reduce the number of claims filed which cannot be paid. Counsel propose that disposition of the money attributable to these de minimis claims, as well residual money from uncashed checks, interest earned after the distribution amounts were calculated, or unspent money previously reserved for distribution costs, be deferred until after those amounts can be quantified and an appropriate recommendation can be made to the Special Master.

### 6.    Treatment Of Claims In The Event Of A Low Claims Rate.

It is possible, though we think it unlikely, that the number of persons filing approved claims will be sufficiently low that an individual claimant's total share of the settlement fund would exceed the diamond content of all eligible purchases. In that event, we recommend that payment for individual claims be limited to the assumed diamond content of the corresponding purchases. For example, if a claim is filed for a diamond-only ring that cost $2,000, which has an assumed diamond content percentage of 32%, the total payment for the claim would be capped at $640. Disposition of any money left over by this limitation also should be deferred until the amount can be quantified and an appropriate recommendation can be made to the Special Master.

### F.    Claims Based On Purchases Of Diamond Watches.

We recommend that claims based on retail purchases of watches accessorized with diamonds also be administered on the basis of the value of the diamonds contained in the watch. However, diamond watches require somewhat different treatment than diamond jewelry, mainly because the non-diamond components of watches tend to be more valuable as a percentage of the total purchase price than the non-diamond components of jewelry. Fourth Supp. Pisarkiewicz Aff., ¶ 69. There are two types of watches accessorized with diamonds: pave watches and non-pave watches. Pave watches are those whose surface is set with a large number of very small

diamonds, which gives the appearance of being "paved" with diamonds.  Non-pave watches generally contain fewer but larger and more valuable diamonds.

The available data provided by De Beers and other sources was insufficient by itself to make a reasonable estimate of the diamond content of watches, although Howard Davies, a De Beers executive, provided valuable information about the special types of rough stones that De Beers sells to polishers of diamonds intended to be used in watches.  Therefore, Dr. Pisarkiewicz and his staff at Nathan Associates, assisted by staff provided by counsel, surveyed a number of retailers throughout the country in order to get a large enough sample to make reasonable estimates of diamond content based on price.  Dr. Pisarkiewicz' analysis of diamond content values for watches was based on this survey data, along with information provided by De Beers concerning the types of rough stones typically used for watches, and wholesale prices estimated from *The Guide*.   Fourth Supp. Pisarkiewicz Aff., ¶¶ 70-72.

For non-pave watches, where the number of diamonds can be easily counted, Dr. Pisarkiewicz recommends estimating the diamond content value by multiplying the number of diamonds contained in the watches by one of two values, based on the price of the watch.  The values are $2.01 for watches retailing below $2,600, and $6.57 for watches retailing at $2,600 or more.  Alternatively, in those cases where the consumer knows the total carat weight of the diamonds on the watch, Dr. Pisarkiewicz has developed a more precise equation that can be used by the claims administrator for calculating the diamond content value.  Fourth Supp. Pisarkiewicz Aff., ¶¶ 69-77 and Exhibit 36.

For pave watches, Dr. Pisarkiewicz recommends that claimants be asked to provide information concerning the total carat weight of the watch, and he has developed another equation to allow the administrator to calculate the diamond content.  Alternatively, if the consumer knows the total number of stones but not the caratage, Dr. Pisarkiewicz recommends that a diamond content value per stone of $3.62 be applied.  *Id.*, ¶¶ 78-80 and Exhibit 37.

21

### G.    Claims Based On Purchases Of Loose Diamonds

Loose diamonds by definition will have a higher diamond value than jewelry. Dr. Pisarkiewicz determined that retailers typically earn a lower margin for selling loose diamonds than jewelry, 41% as compared to 50%. A gross margin of 41% means that the retailers' cost, on average, is 59% of the retail purchase price. Thus, Dr. Pisarkiewicz recommends the diamond content of loose stones purchased by consumers be assumed to be 59% (*Id.*, ¶¶ 81-83), and we recommend that claims for loose diamonds be paid on that basis..

### H.    Claims Auditing

Consumer claimants should not be required to submit proof of purchase with their claim forms, but will be asked to sign them under penalty of perjury or affirm the same online. They also should be advised that their claims may be subject to audit, and that false claims may result in civil or criminal penalties. Mr. Potter and Rust believe that these steps will be sufficient to substantially deter fraudulent claims. However, the Claims Administrator will have the right to request that a claimant supply additional information or submit to an audit before approving a claim. Potter Decl., ¶ 41.

### I.    Claims Administration And Sufficiency of The Claim Form.

Mr. Potter's declaration describes the process by which claimants will be able to submit claims, either by filling out the form online with appropriate encryption, or by mailing a paper version. A settlement web page will supply additional information, answers to frequently asked questions, and links to downloadable documents. A toll-free number will be established to provide additional information and support. Potter Decl., ¶¶ 31-38. The claim form also has been carefully designed for ease of use and comprehension. *Id.*, ¶¶ 39-41.

### IV.    CONCLUSION

For all of the foregoing reasons, and those presented in the accompanying submissions, the Consumer Plaintiffs respectfully request that the Special Master formally recommend to the Court the preliminary allocation of the settlement fund as fair, reasonable, and adequate for both

the Reseller and the Consumer Subclasses, and recommend that the Court approve the proposed

Plan of Distribution to the Consumer Subclass.

Dated:  April 13, 2007

Respectfully Submitted,

By:   /s/ Craig C. Corbitt

Josef D. Cooper
Tracy R. Kirkham
COOPER & KIRKHAM, P.C.
655 Montgomery Street, 17th Floor
San Francisco, CA 94111
(415) 788-3030

Craig C. Corbitt
Christopher T. Micheletti
Qianwei Fu
ZELLE, HOFMANN, VOELBEL, MASON
& GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
(415) 693-0700

William Bernstein
Eric B. Fastiff
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000

Stephen Katz
Howard B. Becker
KOREIN TILLERY
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844

**Counsel for the Indirect Purchaser
Consumer Subclass Plaintiffs**

#3168332