UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHAWN SULLIVAN, et al., on behalf of themselves and all others similarly situated, | : | Civil Action Index No. |
| | : | |
| Plaintiffs, | : | 04-02819 (SRC) |
| | : | |
| -against- | : | *Electronically Filed* |
| | : | |
| DB INVESTMENTS, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**INDIRECT RESELLER PLAINTIFFS' MEMORANDUM ON THE DIVISION OF
THE INDIRECT PURCHASER SETTLEMENT FUND AND PLAN OF
DISTRIBUTION OF FUNDS TO SUBCLASS MEMBERS**

John A. Maher
LAW OFFICES OF JOHN A. MAHER
450 Springfield Avenue
Summit, New Jersey 07901-3626
(908) 277-2444

[Additional counsel listed on signature page]

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION .................................................................................1

II.     THE SPECIAL MASTER'S ALLOCATION OF 50.3% OF THE SETTLEMENT
        FUND TO THE INDIRECT RESELLER SUBCLASS IS SUPPORTED BY
        ECONOMIC ANALYSIS ..........................................................................3

        A.     The Indirect Resellers Previously Submitted Evidence and Argument
               Regarding Allocation............................................................................4

        B.     The Indirect Resellers' Proposed Plans for Distribution to Settlement
               Class Members Are Supported By Analysis of Their Expert Economist...............5

III.    THE ALLOCATION BETWEEN CONSUMERS AND INDIRECT
        RESELLERS SHOULD ALSO ACCOUNT FOR THE RELATIVE
        LITIGATION RISKS OF THE TWO SUBCLASSES .......................................6

        A.     Consumers May Have Difficulty Proving Pass Through Damages........................6

        B.     Consumer Demand For Gem Diamond Products Is Elastic, Creating
               Additional Risk To Consumers In Proving Pass Through Damages......................7

        C.     Heterogeneity and Multiplicity of Diamond Products Might Also Affect
               Consumers' Ability to Prove Damages......................................................7

        D.     Indirect Resellers May Have an Advantage Over Individual Consumers
               Under the Laws of Certain States ............................................................8

IV.     PROPOSED INDIRECT RESELLER DISTRIBUTION OF SETTLEMENT
        FUNDS TO SUBCLASS MEMBERS ..........................................................9

        A.     Conversion of Products to Polished Diamond Wholesale Prices .........................12

        B.     Absorption Weighting...........................................................................17

        C.     Claims Administrations Processes.............................................................18

V.      CONCLUSION....................................................................................20

i

## I.    INTRODUCTION

By Order entered November 30, 2005, the Court appointed Hon. Alfred Wolin (Ret.) as Special Master to hear and determine certain issues relating to the proposed settlement of these related antitrust cases, and to issue a report and recommendation to the Court. The Special Master was tasked, among other duties, with determining the allocation of the Indirect Purchaser settlement fund between the Indirect Reseller and Consumer subclasses, and recommending the method and entitlement for members of the Settlement Classes to file claims.

Submissions were made to the Special Master in the winter of 2006. A hearing on the allocation was held on March 3, 2006. After the hearing, the Special Master received additional submissions. The Special Master then issued a written submission on April 12, 2006 stating that the Indirect Class settlement fund should be allocated 50.3% to the Indirect Reseller subclass and 49.7% to the Consumer subclass. In the April 12, 2006 submission, the Special Master stated that the basis for the allocation would be set forth in a report and recommendation that would consider other issues referred to him by the Court.

Indirect Resellers respectfully submit this memorandum in further support of the Special Master's allocation. Section II of this memorandum summarizes the information previously submitted by the Indirect Resellers in which they relied on the economic analysis of Dr. Gary L. French ("Dr. French") to support an allocation that favors the Indirect Resellers. Section III presents further reasons why the Special Master's April 12, 2006 determination of a 50.3% versus 49.7% split is supported by the evidence.

In addition to the economic analysis underlying the allocation, an assessment of the litigation risks facing the subclasses demonstrates that the allocation as determined by the Special Master giving a slightly larger share of the Settlement Fund to the Indirect Resellers is

1

warranted.  Accordingly, Section III of this memorandum addresses some of the litigation risks unique to the Consumer subclass, risks which are additional reasons that support the Special Master's April 12, 2006 determination.  Other litigation risks described in this Section further support that decision.

In Section IV, the Indirect Resellers address the proposed plan of distribution to the members of the Indirect Reseller subclass.  Since the Indirect Reseller subclass members purchase different diamond products such as rough diamonds, polished diamonds, and wholesale diamond jewelry from other entities in the diamond pipeline, the Indirect Reseller claims will vary accordingly, to reflect the cost of rough diamonds as well as the added value of cutting and polishing, and of the metal and other gemstones in diamond jewelry.  *See Stipulated Facts* ¶41.[1] In addition, a rough diamond overcharge affects the prices of polished diamonds and diamond jewelry differently.  Consequently, Indirect Resellers developed methods to (1) compare the dollar value of claims for various diamond products (including rough diamonds, polished diamonds, and diamond jewelry) on an "apples to apples" basis, and (2) weight claims based on the way changes in the prices of rough diamonds are absorbed in the prices of polished diamonds and diamond jewelry.

---

[1]   The Indirect Purchaser Plaintiffs submit a Stipulated Industry Facts ("Stipulated Facts") containing uncontested background information regarding the subject matter at issue.  The Stipulated Facts address the following areas: (1) A procedural history of the litigation including a brief description of the cases in which the parties have reached a settlement and a summary of the Amended Settlement Agreement (Stipulated Facts at ¶¶ 1-13); (2) Background information on the diamond mining industry (Stipulated Facts at ¶¶ 14-18); (3) De Beers' rough diamond market share and distribution model (Stipulated Facts at ¶¶ 19-28); (4) A description of the "diamond pipeline" (Stipulated Facts at ¶¶ 29-47); (5) Background information on the reseller subclass members' purchases (Stipulated Facts at ¶¶ 48-54); (6) Background information on the consumer subclass members' purchases (Stipulated Facts at ¶¶ 55-62); and (7) Prices of diamond products (Stipulated Facts at ¶¶ 63-68).  The Indirect Purchaser Plaintiffs suggest the Special Master consider the Stipulated Facts in his deliberations and drafting of his Report and Recommendation.

2

Also submitted under separate cover is the Indirect and Direct Purchaser Plaintiffs' Joint Submission on Allocation of the Settlement Fund, Content and Dissemination of Notice and National Plan of Distribution ("Joint Brief"). The Joint Brief addresses the plan of notification, the legal standards for allocating settlement funds and other issues common to both Indirect Purchaser subclasses. Specifically, issues common to both subclasses include the design of the form and content of a notice, the plan of notification of purchasers nationwide, the propriety of a nationwide plan of distribution of net settlement proceeds and technical issues regarding the claims process. This memorandum, however, addresses the specifics of the distribution of settlement funds to Indirect Reseller subclass members.

## II.   THE SPECIAL MASTER'S ALLOCATION OF 50.3% OF THE SETTLEMENT FUND TO THE INDIRECT RESELLER SUBCLASS IS SUPPORTED BY ECONOMIC ANALYSIS

As discussed more fully in the Joint Brief, allocation plans are deemed reasonable when they are based on objective analytical methodologies developed by expert economists and recommended by experienced and competent class counsel. *See* Joint Brief at 5; 3 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 10:7 at 489 (4th ed. 2002) ("[c]lass proof of damages . . . by application of mechanical formulae or statistical methods . . . has received applause in several antitrust cases"); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL Docket No. 1500, -02 Civ. 5575, 2006 U.S. Dist. LEXIS 17588, at *58 (S.D.N.Y Apr. 6, 2006) ("allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel"). In antitrust cases, allocations of settlement funds to claimants in proportion to the overcharge they incurred are inherently reasonable. *In re Remeron*, 2005 WL 3008808, at *11; *see also In re Coordinated Pretrial Proceedings in Antibiotic*

3

*Antitrust Actions*, 410 F. Supp. 722, 726-29 (D. Minn. 1975) (approving allocation plan that accounted for different measures of damages for purchases of different products).

### A.   The Indirect Resellers Previously Submitted Evidence and Argument Regarding Allocation

In their prior submissions, the Indirect Resellers provided the Special Master with economic evidence supporting allocation of the settlement proceeds in favor of the Indirect Reseller subclass. *See generally Resellers' Memorandum* (dated February 8, 2006) *and Resellers' Reply Memorandum in Support of Proposed Plan of Allocation of Settlement Proceeds* (dated February 28, 2006).  Indirect Resellers argued that members of the Indirect Reseller subclass should receive a greater share of the allocation of settlement proceeds than consumers because (a) they disproportionately absorbed the overcharge in rough diamonds attributable to defendants' alleged violations of the antitrust laws because they were unable to pass along a significant portion of the overcharge to consumers, (b) industry information and analysis contained in several studies of the diamond industry and in De Beers' documents supported a greater share for Resellers, and (c) affidavits from members of the Indirect Reseller subclass provided additional support for their proposed allocation.

Dr. French, a senior vice president and consulting economist at Nathan Associates Inc., an economic and financial consulting firm that provides research and analysis to public and private clients in the United States and abroad, was retained by counsel for the Indirect Resellers. Dr. French has been a full-time economic consultant for over 25 years.  He specializes in antitrust economics, including market definition, measurement of market shares and assessment of market power and competitive impact of horizontal and vertical restraints.  Dr. French previously submitted three affidavits in this litigation, regarding the allocation of the settlement

4

funds.[2]  In each of these affidavits, Dr. French provided detailed research and analysis regarding

the division of the settlement funds between the Indirect Reseller and Consumer subclasses and

marshaled economic evidence in support of the Indirect Resellers' proposed allocation.  *See*

*generally French Affid. and French Suppl. Affid.*  This expert evidence, grounded in thorough

economic analysis, satisfies the standards in the case law and supports the Special Master's

decision.

Dr. French also provided the Special Master with a detailed economic analysis of the

elasticity of the demand for diamonds and diamond jewelry.  Based on his expertise and analysis

of the data, Dr. French determined that the demand for diamonds is highly elastic.  That is,

because diamonds and diamond jewelry are luxury items, consumers are sensitive to changes in

their price and will substitute other luxury goods as the prices of diamond products rise.  When

prices rise, resellers must absorb most or all of the price increases on the diamond products they

purchase and are unable to pass-on price increases to consumers.  Consequently, members of the

Indirect Reseller subclass at its various levels suffered significant financial damages.  *See*

*generally French Supp. Affid.*

**B.      The Indirect Resellers' Proposed Plans for Distribution to Settlement Class**
**Members Are Supported By Analysis of Their Expert Economist**

The Indirect Reseller Subclass submits additional analysis prepared by Dr. French to

support the methodology for distribution of settlement proceeds among the members of the

Indirect Reseller Subclass.  *See* Fourth Affidavit of Dr. Gary L. French, Ph.D. Regarding the

Allocation of Settlement Funds ("*Fourth French Affid.*") ¶1.  Dr. French concludes that the

---

[2]     Dr. French previously submitted an Affidavit in Support of Class Certification of the *Sullivan* plaintiffs on
April 22, 2005, an Affidavit Regarding The Allocation of Settlement Funds dated February 24, 2006 ("French
Affid.") and a Supplemental Affidavit dated March 20, 2006 ("French Suppl. Affid.").

Indirect Resellers' Plan of Distribution accurately applies the results of his econometric analysis of the diamond reseller industry and the pricing relationships between and among rough and polished diamonds and diamond jewelry. *See generally, Id.* at ¶¶8-9. See further discussion in Section IV, *infra.*

### III. THE ALLOCATION BETWEEN CONSUMERS AND INDIRECT RESELLERS SHOULD ALSO ACCOUNT FOR THE RELATIVE LITIGATION RISKS OF THE TWO SUBCLASSES

Although all indirect purchasers face the litigation risks set out in the Joint Submission, there are certain litigation risks unique to consumers which defendants would no doubt have raised had these cases not settled.

#### A.    Consumers May Have Difficulty Proving Pass Through Damages

To prove damages in an indirect purchaser case, a plaintiff must first establish an overcharge on the product sold by the defendant and then show the amount of the overcharge absorbed by indirect purchasers at the various stages in the chain of distribution. The difficulty in assessing damages increases with each step in the distribution chain. As the last in the chain of purchasers, consumers would need to prove the amount of the price increases absorbed by all of the resellers upstream from them in order to determine the amount consumers absorbed. *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1341 (9th Cir. 1982) (consumer oil purchasers would have to trace the "causal effects of each pricing decision" through the chain of distribution in order to prove damages). *See generally* II Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶395 (2d ed. 2000) (explaining problems in tracing an overcharge of the chemical Lysine to indirect purchases of end products).

6

**B.     Consumer Demand For Gem Diamond Products Is Elastic, Creating Additional Risk To Consumers In Proving Pass Through Damages**

If consumers were forced to prove the price overcharge passed on to them, they might have difficulty because of the elasticity of consumer demand.  Elasticity of demand is key to calculating indirect damages.  Dr. French previously concluded that consumer demand for diamond products is highly elastic.  *See French Suppl. Affid.* at ¶¶ 6, 12.  If the case were not settled, De Beers would have had the opportunity to minimize damages by proving that consumer demand is highly elastic.[3]  For example, there are multiple substitute goods, such as other gems or other luxury goods, which consumers might purchase instead of diamonds or diamond jewelry in response to increased diamond prices.  Consumers can only prove that they absorbed any amount of the alleged overcharge, and were damaged, if they can prove that the demand for diamond goods is relatively inelastic.  However, because consumer demand for diamonds is highly elastic, consumers would have great difficulty demonstrating that the illegal overcharge was passed on to them and that they suffered damages.

**C.     Heterogeneity and Multiplicity of Diamond Products Might Also Affect Consumers' Ability to Prove Damages**

Undoubtedly, De Beers would have argued that the heterogeneity of diamond products is a further problem to proving consumer damages.  Diamond jewelry includes rings, pendants, necklaces, and earrings with diamonds of different qualities and sizes and may also incorporate other gemstones.  *See* Stipulated Facts ¶47.  Where the consumer product can take multiple forms, and substantial value is added to the product as it proceeds down the chain of distribution,

---

[3]   The elasticity of demand measures how purchasers react to changes in price. *See* French Suppl. Affid. ¶6. "The extent to which a cost increase may be passed through to its customers in the form of a price increase depends on the elasticities of supply and demand." *Id.* ¶12 (footnote omitted).  When demand is relatively elastic, it is more difficult to pass along price increases.  On the other hand, when demand is relatively inelastic, price increases can be more easily passed onto customers.

7

consumers may be unable to isolate significant damages tied to their purchases of diamonds. II Areeda & Hovenkamp, *supra*, ¶346k3 at 383 ("computation of pass-on will be exceedingly complex, particularly when the cartelized good is one input into an intermediary's finished good, and even more when its proportions can be varied.")

**D.   Indirect Resellers May Have an Advantage Over Individual Consumers Under the Laws of Certain States**

Indirect Resellers have an advantage over consumers in states where it may be difficult or impossible to get a class certified under state procedures. Because members of the Indirect Reseller Subclass are businesses, some relatively large, they may have the financial wherewithal to join together to bring suits in states where a class action is not available. For example, New York City is not only a center of the world diamond trade, it is home to many diamond consumers and a place where consumers from other states go to purchase diamond products. The United States District Court for the Southern District of New York held in *Leider et al. v. Ralfe, et al.*, 387 F. Supp. 2d 283 (S.D.N.Y. 2005) (a case now transferred to the District of New Jersey and coordinated, but not consolidated, with this current proceeding) that New York State procedural law (N.Y.C.P.L.R. §901(b)) does not allow certification of state antitrust class actions under New York's antitrust statute, N.Y. Gen Bus. Law §340 (the "Donnelly Act"). 387 F. Supp. 2d at 291. Recently, the New York State Court of Appeals reiterated its confirmation of that interpretation of New York statutes. *Sperry v. Crompton Corp.*, 2007 W.L. 527726 (N.Y.) (Feb. 22, 2007). Individual damage actions, however, are still permitted, although the expense and effort to pursue claims must be factored into any decision to bring suit. This limitation on class litigation is borne heavily by consumers because, without a class action, it is unlikely that individual consumers would be able to sustain individual lawsuits against De Beers under New

8

York state law whereas larger reseller businesses might have that option because of the economics of much larger individual claims. In sum, the litigation risks the Consumer subclass might face without a settlement are another factor for consideration by the Special Master favoring the Indirect Reseller subclass in the allocation.

## IV.   PROPOSED INDIRECT RESELLER DISTRIBUTION OF SETTLEMENT FUNDS TO SUBCLASS MEMBERS

Indirect Resellers have designed a claims plan and process to distribute the settlement funds to subclass members that is both practicable and fair. As discussed more fully in the Joint Brief, damages in an indirect purchaser case are based upon the amount of the overcharge absorbed. *See* Joint Brief at 4-5. In this case, the damages alleged to have been caused by De Beers' anticompetitive behavior arise from an overcharge on rough diamonds; class members, however, purchased a variety of diamond products, including rough diamonds, polished diamonds, and jewelry containing polished diamonds. A plan of distribution that reasonably relates the recovery to the alleged damages incurred requires (1) a common metric for comparing claims based on purchases of these various products and (2) an analysis that allows claims to be valued in relation to how the alleged overcharge was reflected in the prices paid for rough and polished diamond and diamond jewelry. In addition, given the large class size and long class period, Indirect Resellers had to develop a plan that would be administratively feasible and not unduly burdensome to claimants.

After extensive analysis of these issues, Indirect Resellers propose that settlement funds be distributed *pro rata* based on two years of purchase information from each claimant. Each claimant's *pro rata* share of the fund will be determined by calculation of a "Recognized Claim." Recognized claims will be calculated in a two-step process. The first step is the conversion of all

9

purchase information to the polished wholesale value of the diamonds. Claimants will provide the dollar value of the price paid for rough and polished diamonds and diamond jewelry for any two years during the class period. Using methodologies developed by the Indirect Resellers' economic expert, certain formulas will be applied so that the purchase information is expressed in its polished diamond wholesale value. Second, the polished diamond wholesale value of the various products being claimed will be multiplied by "Claims Weights" derived from a fixed regression effects analysis designed to take into account likely differences in the damage incurred from purchases of rough and polished diamonds and diamond jewelry. The weighted purchase information will be totaled to calculate the claimant's Recognized Claim.

As noted, Indirect Reseller counsel enlisted the assistance of their economic expert, Dr. French. Dr. French reviewed data maintained by De Beers in the ordinary course of business and transaction data and other information provided by industry members. Additionally, Dr. French conducted his own research and supervised the collection of additional data. *See, Fourth French Affidavit* ¶10. The data that Dr. French reviewed, which included De Beers' own Bridal and Women's Jewelry Surveys, the "Rough To Polished Database," and the Diamond Content Model, provided comprehensive information on the prices paid by consumers and retailers for pieces of diamond jewelry, estimates of the polished wholesale value of rough diamonds, and estimates of the value of the diamond content of a broad array of diamond jewelry pieces.[4] Using this data, he was able to devise methodologies that can be applied by the claims administrator to estimate the polished diamond wholesale value of the diamond content of the

---

[4]   De Beers' business records, including the Bridal and Women's Jewelry Surveys, are particularly reliable because the data was collected over three years for use in the ordinary course of De Beers' business. As a result, there is no litigation bias. The data represents diamond jewelry purchases broadly and not specific to any particular retailer.

products purchased (*i.e.*, rough diamonds, polished diamonds, and diamond jewelry). Dr. French also had access to data provided under the Confidentiality Order by a vertically integrated polished diamond and jewelry manufacturer. Dr. French used this data to conduct econometric analyses to measure how changes in rough prices at the sightholder level were reflected in average prices of rough diamonds, polished diamonds and diamond jewelry. Based on this analysis, he derived the absorption weights described in more detail in Section B and in his Fourth Affidavit. *Id.* at ¶46.

Indirect Reseller counsel also consulted the Claims Administrator, Complete Claims Solutions ("CCS"), to ensure that the process they designed would encourage subclass members to make claims, keep administrative costs low, and have adequate protections against invalid and fraudulent claims. The Declaration of Thomas Glenn of CCS, detailing his opinion on administrative feasibility and reasonableness of certain aspects of Indirect Resellers' proposed process including the use of claims categories, the use of summary documentation, and the use of a two-year proxy period, is filed herewith.

Finally, Indirect Resellers' counsel "road tested" Dr. French's analysis. They consulted small, medium and large volume Indirect Reseller subclass members and major industry trade associations for feedback on whether the claim form and claims process would be manageable and reflected the commercial realities at different levels of Indirect Reseller trade. *See generally* April 16, 2007 Affidavit of Joseph J. Tabacco, Jr. ("Tabacco Affidavit") filed herewith. The plan detailed below was received positively by the trade. In fact, the Jewelers of America, the largest trade association of retail jewelers, wrote a letter supporting the proposed claim process. *See* Letter from Bruce Colbath to Joseph Tabacco, Jr. dated April 13, 2007 (Exhibit A to the Tabacco Affidavit). In addition, Indirect Resellers' counsel retained and consulted other industry

11

experts, including Paul Leonard, former President of Zales Jewelers, one of the largest retail jewelry chains in the country. Mr. Leonard, with decades of experience in the diamond jewelry trade, has submitted a declaration to the Special Master supporting the proposed claims process and the jewelry claim categories used by Indirect Resellers. *See generally, Declaration of Paul Leonard*, filed herewith. In sum, as a result of both substantial empirical and econometric analysis, substantial consultation with the claims administrator and members of the resale diamond trade, the Indirect Reseller plaintiffs submit that the proposed Plan of Distribution described below represents a fair and easily administered plan for distribution for the 50,000 to 60,000 members of the Indirect Reseller subclass.

### A.    Conversion of Products to Polished Diamond Wholesale Prices

The first step in determining a class member's Recognized Claim is to convert all purchase information to a common metric. Dr. French recommends the metric be the polished diamond wholesale value of the diamond content of any purchase. As detailed below, conversion to the common metric requires an understanding of the likely polished yield of rough stones, as well as a method for estimating the diamond content of jewelry sold in the United States over the class period.

**Loose Polished Gem Diamonds**

Because claims based on loose polished diamonds are already expressed in polished diamond wholesale value, no conversion is necessary. The polished wholesale value of loose polished diamond claims will be the wholesale prices paid by claimants which they will enter on the claim form. *See Fourth French Affid.* ¶15.

**Loose Rough Gem Diamonds**

In order to convert the value of rough diamond claims to their polished diamond wholesale value, Dr. French utilized the "rough to polished conversion" ("RTOP") database maintained and used by De Beers in the ordinary course of its business. The RTOP data consists of conversion factors showing the polished value of various quality categories of rough diamonds over time, derived from voluminous De Beers' business records. *See, Id.* ¶¶16-18. Based on this analysis, Dr. French concludes that the total dollar amount of indirect purchases of rough diamonds be multiplied by 1.22 to reach a polished diamond wholesale equivalent that can be compared with claims based on purchases of polished diamonds and other diamond products. *Id.*, ¶18.

### Diamond Jewelry

In order to estimate the value of the diamond content in the wide variety of jewelry purchased by Indirect Resellers, Dr. French analyzed databases derived from De Beers' periodic Bridal Survey, Women's Jewelry Survey and De Beers' own diamond content model. Over forty thousand data points were used and provided comprehensive information about the retail prices paid by consumers for pieces of jewelry. With one exception, namely jewelry with wholesale prices at $5000 and above, Dr. French was able use the survey information and De Beers' proprietary Diamond Content Model to estimate the contribution that the cost of the polished diamond made to the overall cost of the jewelry, in essence, estimating polished diamond content. *Id.*, ¶¶19-28. With respect to estimating diamond content for pieces priced at $5000 and above at wholesale, Dr. French relied on business record summaries and transaction data that Plaintiffs' counsel obtained on a confidential basis from certain large national retailers. These data sets were for a shorter period of time than the several years covered by the Bridal Survey and Women's Jewelry Survey. However, Dr. French determined that while the De Beers survey was

13

representative of the U.S. diamond jewelry market as a whole, this database had an insufficient number of observations at or above $5000 wholesale with which to draw conclusions about diamond content at these price points.[5]

As detailed in Dr. French's Fourth Affidavit, many different categories of jewelry were analyzed.  He determined that a few broad categories reflect different diamond content, namely jewelry with a mixture of diamonds and other gemstones and jewelry containing only diamonds.  *Id.,* ¶23.  Dr. French concluded that the average percentage of diamond value relative to the wholesale cost of a piece of jewelry rose as the wholesale price of jewelry rose.  Dr. French calculated price "breakpoints," where jewelry with a wholesale price above and below a certain amount had different average diamond content.  Using this information, he was able to group jewelry into categories of wholesale price ranges where average diamond contents were similar.  Additional price breakpoints (which might yield a more differentiated claims process) were not justified for two main reasons: (1) the diamond content did not vary widely within the price ranges ultimately selected so that, on average, the percentage of diamond content within the categories yielded fair and proportionate results, and (2) the risk of discouraging the filing of valid claims would be substantially increased by increasing the categories, either by price or jewelry type, making the claim form and claims process less manageable.  *See generally, Id.,* ¶¶24-25; *Declaration of Thomas Glenn.*

Based on this analysis, Dr. French recommends that the claim form contain only two categories of diamond jewelry, diamond only and mixed gem, and four price breakpoints for diamond only jewelry and two price breakpoints for mixed gem jewelry.  Claimants will enter

---

[5]   This is not surprising because the surveys were designed to be representative of the U.S. diamond jewelry market and there are relatively fewer pieces sold at these higher price points.

the total dollar amount paid per year for jewelry containing diamonds into claims categories based upon the wholesale price paid and the type of jewelry (mixed or diamond-only). Depending on the category, a percentage of the wholesale price, reflecting Dr. French's estimates of average diamond content for that category, will be applied by the claims administrator to the value of the purchases in that category. The categories and percentages to be applied are:[6]

| In Wholesale Prices of Jewelry | Diamond Content Percentage |
|---|---|
| 1. Mixed Piece: Less than $100 | 13.8% |
| 2. Mixed Piece: $100 and above | 30% |
| 3. Diamond Only: Less than $100 | 24.7% |
| 4. Diamond Only: $100 <= Price <$500 | 57.6% |
| 5. Diamond Only: $500 <= Price < $5,000 | 66.1% |
| 6. Diamond Only: Greater than or equal to $5,000 | 90% |

**Diamond Faced Watches**

With respect to diamond watches, the polished wholesale value of diamonds on watches will be estimated based on the total carat weight or the number of diamonds on the watch. Generally, there are two types of diamond watches, pavé and non-pavé. A pavé watch may be paved with diamonds such that the small diamond stones are set very close together on the face, case or band of the watch while a diamond decorated, non-pavé, watch generally contains

---

[6]   *Fourth French Affid.*, Tables 4 and 5.

diamond accents on the face or case of the watch. *See Fourth French Affid.* ¶32.  For purchases of pavé diamond watches, claimants must submit the number of stones or the total carat weight of the stones on a pavé diamond watch. *Id.* ¶¶40-41.  Then, the claims administrator will apply the $3.62 median diamond content per stone or $484.50 median price per carat from *The Guide* discounted at 24 percent to determine the polished wholesale value of the diamonds on a pavé watch.[7]  *Id.*  For purchases of non-pavé diamond watches, claimants must submit the retail price of the watch **and** either the number of diamond stones or the total carat weight of the diamonds on the watch. *Id.* ¶39.  Based on the retail price of the non-pavé diamond watch, the claims administrator will then apply the appropriate median diamond content per stone or the median price per carat from *The Guide* discounted at 24 percent to determine the polished wholesale value of the diamonds on a non pavé diamond watch.[8]  *Id.*

**Miscellaneous Diamond Products**

Indirect Reseller subclass members may make claims for purchases that do not fall within the product categories set out above.  Since it is difficult to anticipate what other types of diamond products may be the subject of a claim, the proposed procedure is to have claimants provide information on the value of the diamonds within the products.  This can be done, for example, by providing documentation showing the polished wholesale price of the diamonds

---

[7]   Guide to Wholesale Gem Pricing, Gem World International, Inc.  French Fourth Affidavit, ¶10, *et seq.*

[8]   For non-pavé watches **under** $1,500 wholesale, the appropriate median diamond content per stone is $2.01 and the median price from *The Guide* discounted at 24 percent per carat is $361.00. For non-pavé watches **at or above** $1,500, the appropriate median diamond content per stone is $6.57 and the median price from *The Guide* discounted at 24 percent per carat is $522.50, *See Fourth French Affid.* ¶38.

within the product or the "4Cs" of those diamonds.[9]  If claimants are able to provide only the

"4Cs," the wholesale value will be calculated using polished wholesale prices from *The Guide*.

**B.     Absorption Weighting**

Once all purchases are converted to the common metric of polished wholesale value, the

claims must be weighted to take into account likely differences in the damages incurred from

purchases of rough and polished diamonds and diamond jewelry.  To calculate such weights, the

Indirect Resellers obtained substantial additional data from a third party, a large, vertically

integrated polished diamond and diamond jewelry manufacturer with substantial sales to U.S.

customers.  (Tabacco Affidavit, ¶5.)  This company provided voluminous transactional data on a

confidential basis which plaintiffs believe is typical and representative of actual transactional

data in the whole market over several years of the nearly twelve year class period.  Using this

data, Dr. French was able to conduct a fixed effects econometric analysis to measure how

changes in the prices of rough diamonds were reflected in the prices of polished diamonds and

diamond jewelry, allowing him to derive claims weights.[10]

Based on the results from this econometric analysis, Dr. French concludes claims based

on purchases of rough diamonds should be weighted or multiplied by .338, claims based on

purchases of polished diamonds should be weighted or multiplied by .287, and claims based on

purchases of diamond jewelry should be weighted or multiplied by .375.[11]  These adjusted rough

---

[9]   The "4Cs" are cut, color, clarity and carat weight.

[10]  Although all data and information required to perform a "full blown" econometric model were not available to
Dr. French, he was able to utilize available data to undertake fixed effects regression models to approximate the
extent to which rough diamond price increases are reflected in the prices of polished diamonds and diamond
jewelry. *Fourth French Affid.*, ¶44.

[11]  *Id.*, ¶46.

diamond, polished diamond, and diamond jewelry claims will then be totaled to form an individual claimants' Recognized Claim, which will be the basis for the individual claimant's share of the *pro rata* distribution.

### C.   Claims Administrations Processes

To ensure that the above plan of distribution was designed in an administratively feasible manner, Reseller counsel had extensive discussions with the claims administrator, CCS. Based on these discussions, Indirect Resellers developed administrative processes for the claims process that are designed to reduce the burden on class members, encourage class members to submit claims, and reduce administrative costs. First, Indirect Resellers propose that eligible claimants will be asked to provide information relating to the purchases of diamond products for any two years of their choosing during the class period. Because certain class members may not have been in business throughout the entire class period, claims will be adjusted to reflect the number of years a claimant was in business.[12] Indirect Resellers recommend this approach because claimants may have difficulty providing purchase information for the entire class period. Claimants may not have retained information relating to their purchases throughout the class period and, even if they have, such information might be difficult to access because it may be stored at off-site warehouses or in antiquated electronic systems. According to Thomas Glenn, such an approach is reasonable because it provides an equal opportunity for class members to maximize their claims while reducing the burden on claimants and lowering administrative costs. *See, Declaration of Thomas Glenn* ¶13, 14.

---

[12]   For example, if a claimant was in business for only five of the <u>twelve year period</u>, its claim would be multiplied by a factor of 5/12.

Reseller counsel also propose, based on recommendations from CCS, that claimants be required to substantiate their claims by submitting summary documentation with their claim form. The summary documentation that Indirect Resellers propose requiring claimants to provide will contain summary listing by vendor and dollar amount of purchases in each of the categories and will enable the Claims Administrator to select claims for further audit and perform administrative tasks to facilitate the claims process. Neither the Indirect Resellers' counsel nor CCS believe that preparation of this summary documentation will result in additional burdens on claimants. Many companies have systems that prepare such reports in the normal course of their business and, in any event, subclass members will need to prepare a similar summary of purchases in order to complete the claim form. According to CCS, these documentation requirements will reduce the burden on class members, lower claims administration costs, increase claims rates, and be sufficient to deter and detect fraudulent claims. *See, Declaration of Thomas Glenn* ¶16. In addition to claimants being required to submit summary documentation, claims could be subject to a more thorough audit. In that regard, claimants will be selected at random and at the Claims Administrator's discretion. An audit would require the claimant to provide invoices, purchase orders or other written documentation of purchases to substantiate the claim form and the summary documentation the claimant has submitted.

Finally, the Indirect Resellers do not anticipate that there will be many claimants that file claims resulting in their *pro rata* share of the net settlement fund being too small to justify the costs of preparing and mailing checks. However, smaller single store retailers could fall within this category. We are advised by Mr. Glenn of CCS that the feasible administrative cutoff is twenty-five dollars. *Declaration of Thomas Glenn* ¶15. Subclass members are warned about

19

this possibility in bold type at Section V of the claim form just below the claimant's signature block.

## V.    CONCLUSION

Since the April 12, 2006 determination by the Special Master of the Indirect Reseller/Consumer allocation, Indirect Resellers' counsel, in consultation with the industry and various experts, have been engaged in a thorough process to create a plan for distribution and claims administration that meets the standards in antitrust and consumer class actions. Accordingly, the Indirect Resellers respectfully request the Special Master approve the proposed plan of distribution and proposed claim form as fair, reasonable and adequate for Indirect Reseller Subclass members.

Dated:  April 16, 2007                            By:    /s/ John A. Maher

                                                 John A. Maher (JM-6121)
                                                 LAW OFFICES OF JOHN A. MAHER
                                                 450 Springfield Avenue
                                                 Summit, NJ  07901-3626
                                                 (908) 277-2444

                                                 Joseph J. Tabacco, Jr.
                                                 BERMAN DeVALERIO PEASE
                                                 TABACCO BURT & PUCILLO
                                                 425 California Street, Suite 2100
                                                 San Francisco, CA  94104
                                                 (415) 433-3200

                                                 Susan G. Kupfer
                                                 GLANCY BINKOW & GOLDBERG LLP
                                                 455 Market Street, Suite 1810
                                                 San Francisco, CA  94105
                                                 (415) 972-8160

                                                 **Counsel for the Indirect Purchaser**
                                                 **  Indirect Reseller Subclass**

**EXHIBIT 1**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/27/07_

```
ANGELA TESE-MILNER as CHAPTER 7
TRUSTEE OF THE ESTATE OF W.B.
DAVID & CO., INC.,

              Plaintiff,                04 Civ. 5203 (KMW) (KNF)

      -against-                              ORDER

DE BEERS CENTENARY A.G., ET AL.,

              Defendants.

---------------------------------------X
```

WOOD, U.S.D.J.:

## I. Overview

By motion dated December 2, 2005, defendants De Beers Centenary A.G., De Beers Consolidated Mines Ltd., The Diamond Trading Company, and The Diamond Development Company (Proprietary) Ltd. (together "Defendants") move to vacate the Court's October 21, 2005 entry of default. For the reasons stated below, Defendants' motion is GRANTED.

## II. Background

On July 1, 2004, W.B. David & Co., Inc. ("Plaintiff") filed suit against over 100 defendants, claiming $200 million in damages in connection with Defendants' termination of Plaintiff as one of its preferred distributors, and the alleged theft of a company trade secret. On September 2, 2005, the Court granted

1

Plaintiff leave to file an amended complaint.  By letter dated
September 29, 2005, Plaintiff informed the Court that it no
longer planned to file an amended complaint, but instead would
dismiss its lawsuit against any defendants that had already
appeared, and pursue default remedies against the De Beers entity
defendants.  By order dated October 21, 2005, the Court entered a
default against Defendants and referred the case to Magistrate
Judge Kevin Fox for an inquest into damages.  Defendants then
moved to vacate the entry of default on the ground that there is
"good cause" under Federal Rule of Civil Procedure 55(c).[1]
Alternatively, Defendants argue that the Court should vacate the
entry of default because the Court lacks personal jurisdiction
over Defendants.

## III. Discussion

Pursuant to Federal Rule of Civil Procedure 55(c), the Court
may set aside an entry of default for "good cause shown."  Fed.
R. Civ. P. 55(c).  A court, in deciding whether to vacate an
entry of default, must "consider the willfulness of the default,
the existence of a meritorious defense, and the level of

---

[1] Following the completion of briefing on Defendants' motion
to vacate default, the Court stayed the proceedings in this
action to enable Trustee for Plaintiff to obtain counsel and
respond to Defendants' motion.  Trustee did not inform the Court
until September 7, 2006 that it did not intend to file additional
motion papers.

2

prejudice that the non-defaulting party may suffer should relief
be granted." <u>Pecarsky v. Galaziworld.com Ltd.</u>, 249 F.3d 167, 171
(2d Cir. 2001). "It is well established that default judgments
are disfavored. A clear preference exists for cases to be
adjudicated on the merits." <u>Id.</u> at 174. "[W]hen doubt exists as
to whether a default should be granted or vacated, the doubt
should be resolved in favor of the defaulting party." <u>Enron Oil
Corp. v. Diakuhara</u>, 10 F.3d 90, 96 (2d Cir. 1993); <u>see also</u> <u>Kumar
v. Ford</u>, 111 F.R.D. 34, 39 (S.D.N.Y. 1986) ("[I]n close cases,
courts favor disposition of a case on the merits.").

For the reasons discussed below, the Court holds that there
is "good cause" to vacate the October 21, 2005 entry of default
against Defendants.

A.   <u>Prejudice</u>

First, Plaintiff will not suffer prejudice if the Court
vacates the entry of default. Plaintiff argues that as a result
of Defendants' failure to appear, it can no longer afford to
prosecute its case. According to Plaintiff, if Defendants had
"made a timely appearance over a year ago when they were required
to and we were still in business, we would have made arrangements
to fund this litigation, including establishing a reserve."
Walter & Sheldon David Aff. ¶ 4. Plaintiff's argument is belied
by the fact that it waited almost fifteen months after filing the
Complaint to seek an entry of default. <u>See</u> <u>Enron</u>, 10 F.3d at 98

3

("The fact that plaintiff waited over a year before seeking such relief strongly suggests that some further delay will not unduly prejudice it."). Accordingly, the Court concludes that vacating the entry of default will not prejudice Defendants.

      B.   <u>Meritorious Defense</u>

"The test of [a meritorious] defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense." <u>Pecarsky</u>, 249 F.3d at 173 (quoting <u>Enron</u>, 10 F.3d at 98; <u>see also</u> <u>Grant v. City of N.Y.</u>, 145 F.R.D. 325, 326 (S.D.N.Y. 1992) ("[Defendant] must merely raise a serious question concerning [plaintiff's] allegations.") (internal quotations omitted). The defense need only meet a "low threshold of adequacy." <u>Meehan v. Snow</u>, 652 F.2d 274, 277 (2d Cir. 1981).

Defendants argue that Plaintiff's antitrust and state law claims are meritless, because, <u>inter alia</u>, there is still significant competition in the relevant diamond markets, Plaintiff cannot demonstrate monopoly power, and the Leading Jewelers of the World proprietary marketing program is not a trade secret. Plaintiff concedes that several of these issues raise relevant questions of fact. <u>See</u> Pl.'s Opp'n at 22 ("[W]hether monopoly power actually exists is a question of

fact."); id. at 23 ("Discovery may well show that De Beers began stealing the LJW plans, and began planning Diamond Masters of Japan, well before Las Vegas happened."); id. at 24 n.9 ("The evaluation of the relevant trade secret factors, which weigh in Plaintiff's favor, is a question of fact.").  The Court, therefore, concludes that Defendants present a meritorious defense.

C.  Willfulness

"[W]illfulness, in the context of a default, [is] conduct that is more than merely negligent or careless."  SEC v. McNulty, 137 F.3d 732, 738 (2d Cir. 1998).  It is sufficient, however, for a defendant to default deliberately; the defendant's conduct does not need to amount to bad faith.  Gucci Am., Inc. v. Gold Ctr. Jewelry, 158 F.3d 631, 635 (2d Cir. 1998).

Defendants argue that their default was not deliberate because they have "good faith reasons to believe that this Court lacks jurisdiction over them."  Defs.' Mem. at 15-16.[2] Defendants direct the Court to two fairly old district court decisions in which courts stated that an erroneous view of the law on jurisdiction negates willfulness.  In each of these instances, however, the defendant filed a motion to dismiss for

---

[2] Defendants also contend that service of process was defective. The Court, however, does not consider this argument because Defendants raise it for the first time in their reply memorandum. See Harris v. Albany County Office, 464 F.3d 263, 268 (2d Cir. 2006) ("We generally do not consider issues raised in a reply brief for the first time.").

lack of personal jurisdiction before the court entered default,
albeit after the deadline for filing such a motion had expired.
See Bartels v. Int'l Commodities Corp., 435 F. Supp. 865, 866 (D.
Conn. 1977); Latini v. R. M. Dubin Corp., 90 F. Supp. 212, 213
(N.D. Ill. 1950).  Defendants did not file such a motion here.
The only evidence of their supposed good faith belief is a 2001
Offering Circular in which Defendants state, with regard to a
prior indictment and two past lawsuits, "De Beers believes . . .
that the US courts lack jurisdiction over the company."  Sunshine
Aff. Exh. 1.  As a result, it is questionable whether Defendants'
default was or was not "willful."

Because, however, Defendants have presented meritorious
defenses and demonstrated a lack of prejudice to Plaintiff, the
Court finds that Defendants have shown "good cause" to vacate the
entry of default.[3]  See Akhtar v. Martin, No. 89 Civ. 5569, 1990
U.S. Dist. LEXIS 4369, at *3-6 (S.D.N.Y. Apr. 18, 1990) (granting
motion to vacate default despite defendant's willful conduct,
because defendant presented meritorious defenses and there would

---

[2] Because the Court finds good cause under Rule 55(c), and
Defendants seek only to vacate the entry of default and not to
dismiss the case, the Court does not reach Defendants' arguments
regarding personal jurisdiction.  See Defs.' Mem. at 3
("Defendants respectfully request that the Court vacate the
default entered on October 21, 2005, so that they may appear and
defend this action."); id. at 17 ("The default should . . . be
lifted to permit Defendants to contest Plaintiff's Complaint on
its merits."); id. at 24 ("Defendants respectfully request that
this Court grant Defendants' motion to vacate default and issue a
schedule setting forth the date by which Defendants need to file
an answer or move to dismiss Plaintiff's Complaint.").

6

be no apparent prejudice to plaintiff); <u>Grant</u>, 145 F.R.D. at 326-
27 ("[T]he 'good cause' test warrants that entry of default be
vacated.  Although the first factor, willfulness of default,
advises against the defendant, the other considerations support
her."); <u>McNulty</u>, 137 F.3d at 738 ("[T]he district court . . . has
discretion to deny the motion to vacate if it is persuaded that
the default was willful <u>and</u> is unpersuaded that the defaulting
party has a meritorious defense.") (emphasis added).

## IV.  Conclusion

In accordance with the above, the Court grants Defendants'
motion to vacate the entry of default (D.E. 97).  Defendants
shall answer or otherwise move with respect to the Complaint no
later than April 20, 2007.

SO ORDERED.

DATED:     New York, New York
           March 27, 2007

KIMBA M. WOOD
United States District Judge

7