NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHAWN SULLIVAN, ARRIGOTTI FINE JEWELRY and JAMES WALNUM, on behalf of themselves and all others similarly situated, | : : : : | **Civil Action No. 04-2819 (SRC)** |
| Plaintiffs, | : : : | **OPINION** |
| v. | : : | |
| DB INVESTMENTS, INC., DE BEERS S.A., DE BEERS CONSOLIDATED MINES, LTD., DE BEERS A.G., DIAMOND TRADING COMPANY, CSO VALUATIONS A.G., CENTRAL SELLING ORGANIZATION, and DE BEERS CENTENARY A.G., | : : : : : : : : | |
| Defendants. | : : | |

**CHESLER**, District Judge

This matter comes before the Court upon the motion for final class certification of the provisionally certified <u>Sullivan</u> nationwide settlement classes filed by Plaintiffs' representatives Shawn Sullivan, Arrigotti Fine Jewelry, and James Walnum [docket item #242]; the question of approval of the final settlement agreement and the adoption of the September 4, 2007 Report and Recommendation of Special Master Alfred M. Wolin ("R&R") [docket item #151]; and the question of approval of incentive awards, cost reimbursements, and attorneys' fees awards that are addressed in the February 15, 2008 Report and Recommendation of Special Master Alfred M. Wolin on Incentive Awards, Cost Reimbursement, and Attorneys' Fee Awards ("R&R on Awards & Reimbursement") [docket item #180].  The Court has considered the submissions by

the parties and objectors in connection with the motion and proposed adoptions.  The Court also

held a fairness hearing on April 14, 2008 during which all objectors and each of the parties had

the opportunity to speak.  For the reasons that follow, the Court grants the motion for class

certification, approves the class settlement, grants incentive awards totaling $220,000,

reimburses Plaintiffs' counsel for just over $2.8 million in expenses, and awards attorneys fees as

fixed at twenty-five percent with no interest.


## I.   BACKGROUND

### A.   Underlying Claims, Cases, & Parties

The procedural background of this case succinctly summarized by Special Master Wolin

in the R&R:

#### [1.]   Actions Included

This case began when several class action suits were filed against the Defendants in various federal and state courts alleging violations of federal and state antitrust laws, violations of consumer protection laws, deceptive trade practices, unfair competition, and similar claims.  In sum, the plaintiffs in the various class actions allege that the De Beers group of companies used its market dominance to wrongfully raise the prices of Rough Diamonds during the class period, and that reseller and consumer purchasers of diamonds and products containing diamonds paid more for such products than they otherwise would have.

The individual suits that are included in this action are:

On June 14, 2004, a class action complaint entitled Sullivan v. DB Investments, Inc., et al., D.N.J. Index No. 04-cv-02819 (SRC) ("Sullivan"), was filed alleging violations of both federal and state antitrust, consumer protection and deceptive trade practices laws, on behalf of a class of all persons and business entities located in the United States who, at any time during the class period, purchased polished diamonds indirectly from a defendant.  The Sullivan plaintiffs sought injunctive relief under federal antitrust law and damages under the laws of 41 states plus the District of Columbia.  A motion for class certification was filed on April 22,

2005.

On July 12, 2004, a class action complaint entitled Hopkins v. De Beers Centenary A.G., et al., San Francisco County No. CGC-04-432954 ("Hopkins"), was filed in the San Francisco Superior Court, California, alleging violations of California antitrust and unfair competition laws on behalf of California residents, and on April 15, 2005, the court certified a class of California residents who purchased diamonds in California during the class period January 1, 1994 to December 31, 2004, excluding, among others, diamond resellers and those who bought diamonds directly from defendants.

On February [28], 2005, a class action complaint entitled Cornwell v. DB Investments, Inc., et al., Maricopa Co. No. CV2005-2968 ("Cornwell"), was filed in Maricopa County Superior Court, Arizona, alleging violations of Arizona antitrust law on behalf of all people who purchased diamonds in Arizona during the class period and have not resold those diamonds, excluding, among others, sightholders and diamond manufacturers, wholesalers and retailers.

On February 17, 2005, a class action complaint entitled Null v. DB Investments, Inc., et al., Madison Co. No. 05-L-209 ("Null"), was filed in Madison County Circuit Court, Illinois, and subsequently amended on July 26, 2005, alleging violations of Illinois consumer protection laws and unjust enrichment or, in the alternative, violations of the consumer fraud and deceptive practice laws of the various states where purchases of diamonds occurred; on July 22, 2005 the state court certified a class of all persons residing in the United States who purchased diamonds not for resale during the class period, excluding, among others, sightholders and diamond manufacturers, wholesalers and retailers; on July 26, 2005, the action was removed to the United States District Court for the Southern District of Illinois; on October 3, 2005, the action was transferred to the United States District Court for the District of New Jersey, D.N.J. Index No. 05-cv-04849 (SRC).

On April 13, 2001, a class action complaint entitled Leider, et al. v. Ralfe, et al., Docket No. 01-CV-3137 (HB) ("Leider"), was filed in the United States District Court for the Southern District of New York alleging violations of federal and New York state antitrust and consumer protection laws; on October 10, 2003, the Court certified, under the federal antitrust laws, an injunctive class of consumers who purchased diamonds or diamond jewelry between April 14, 1995 to October 10, 2003; on February 15, 2006, the action was transferred to the United States District Court for the District of New Jersey, D.N.J. Index No. 06-cv-00908 (SRC).  It also sought injunctive relief and damages under New York state law.

On September 20, 2001, a class action complaint entitled Anco Industrial Diamond Corp. v. DB Investments, Inc., et al., D.N.J. Index No. 01-cv-04463 (SRC)

("Anco"), was filed in the United States District Court for the District of New Jersey alleging violations of federal antitrust laws; on September 23, 2003, the Court certified a class consisting of all persons who purchased rough diamonds directly from a defendant, a corporation or entity owned or controlled by a defendant, or a corporation or other person acting in combination with a defendant, or any of them, at any time beginning four years before September 20, 2001, and ending on September 23, 2003.

On August 25, 2004, a class action complaint entitled British Diamond Import Company v. Central Holdings Ltd., et al., D.N.J. Index No. 04-cv-04098 (SRC) ("British Diamond"), was filed in the United States District Court for the District of New Jersey alleging violations of federal antitrust laws on behalf of a class of direct purchasers of polished diamonds from a defendant, a corporation or entity owned or controlled by a defendant, or a corporation or other person acting in combination with a defendant (such as a Sightholder), or any of them, at any time beginning four years before August 25, 2004.

Plaintiffs in the Sullivan, Hopkins, Cornwell, Null, Leider, Anco and British Diamond actions (collectively "Plaintiffs") allege that the Defendants have acted unlawfully by, among other things, combining, conspiring or otherwise engaging in a common course of conduct to fix, raise, maintain or stabilize prices of diamonds in violation of both federal and state antitrust, unfair competition and/or consumer protection and fraud laws, and plaintiffs contend that they have suffered damages and other injuries as a result, including paying more for diamonds than they would have paid in a competitive market.

### [2.]    The Defendants

The Defendants are De Beers S.A. and various entities related to De Beers S.A., which are collectively referred to herein as "De Beers." Defendants deny each and every one of Plaintiffs' allegations of unlawful conduct, damages and other injuries. De Beers did not appear in any of the filed cases and defaults were entered against each of the Defendants with the exception of Cornwell.

Moreover, Defendants assert that they do not transact business directly in the United States, and that the Court does not have and cannot obtain personal jurisdiction over them. The Defendants further assert that any default judgment entered against them would have to be enforced in a jurisdiction outside the United States, and that such default judgment would likely be unenforceable for lack of jurisdiction.

(R&R 10-15.)

**B.    Class Period**

The class period for Direct Purchasers is September 20, 1997 to March 31, 2006.  The Indirect Purchaser class period runs from January 1, 1994 to March 31, 2006.

(R&R 15.)

**C.    Reference to the Special Master**

On December 2, 2005, the Court appointed the Honorable Alfred M. Wolin as Special Master pursuant to Rules 23, 53 and 54 of the Federal Rules of Civil Procedure, and referred the following issues for his consideration and recommendation to the Court:

(i)     Division of the Indirect Purchaser Settlement Fund as between the Indirect Purchaser Reseller Subclass and the Indirect Purchaser Consumer Subclass;

(ii)    The plan for dissemination of the Notice of Settlement (the "Notice Plan") and the proposed forms of Notice of Settlement;

(iii)   The method and entitlement, if any, for members of the Settlement Classes to file claims to share in the settlement proceeds and/or alternative proposals for disbursement of the settlement proceeds;

(iv)    The amount of incentive awards, if any, to be awarded to the named plaintiffs and the amount of attorneys' fees, expenses and costs to be awarded to Counsel for the Settlement Classes; and

(v)     Any other matter the Court refers to the Special Master.

. . .    After the Direct Purchaser Class was included in the Amended Settlement Agreement, the Court referred to the Special Master these additional issues related to the Direct Purchaser Class:  Notice Plan, Plan for Distribution, Counsel Fees and Incentive Awards.

. . .

The Plaintiffs have stipulated and agreed to the appointment of The Honorable Alfred M. Wolin as Special Master for determining the issues referred to him for his consideration and recommendation to the Court and have further agreed that the Special Master's fee shall be paid from the Aggregate Settlement Fund.

(R&R 15-17.)

5

**D.    The Proposed Settlements**

**1.    Settlement of <u>Sullivan</u>, <u>Hopkins</u>, <u>Null</u>, and <u>Cornwell</u> cases**

Counsel in the <u>Sullivan</u>, <u>Anco</u>, and <u>British Diamond</u> cases began holding settlement discussions in May 2005 and were joined by counsel for Plaintiffs in the state court cases. Several months of negotiations, mediated by Professor Eric Green, rendered an agreement to settle <u>Sullivan</u>, <u>Hopkins</u>, <u>Null</u>, and <u>Cornwell</u> for $250 million in cash and up to $7 million in notice costs to be paid by De Beers.  (Sept. 30, 2005 Settlement Agreement 4, 11, 17.)  The $250 million is the Indirect Purchaser Settlement Fund.  (<u>See</u> Mar. 30, 2006 Am. Settlement Agreement 4-5, 10, 15 [docket item #96].)  Further, De Beers agreed to the stipulated injunction that is described below, by which it agreed to not engage in certain conduct that would violate United States antitrust laws and to submit to the Court's jurisdiction for the limited purpose of enforcement of the injunction.  (Sept. 30, 2005 Settlement Agreement 11.)

By Order dated November 30, 2005, this Court conditionally certified this settlement class and granted preliminary approval of the class action settlement. (Nov. 30, 2005 Or. [docket item #33].)

**2.    Settlement of <u>Leider</u>, <u>Anco</u>, and <u>British Diamond</u> cases**

The parties to the initial <u>Sullivan</u> Settlement Agreement and Plaintiffs in the <u>Leider</u> case entered into the "First Addendum to the <u>Sullivan</u> Settlement Agreement" on February 7, 2006. (Mar. 30, 2006 Am. Settlement Agreement 5.)  By that Addendum, the <u>Leider</u> Plaintiffs agreed to resolve <u>Leider</u> in accordance with the terms of the initial settlement agreement.  (<u>Id.</u> at 5.)  The <u>Leider</u> Plaintiffs and De Beers also agreed to transfer that case to this Court from the Southern District of New York.  (<u>Id.</u> at 2-3.)

6

The parties to the Anco and British Diamond cases then held settlement discussions with mediator Judge Nicholas Politan (Ret.), and De Beers agreed to settle with the Anco and British Diamond Plaintiffs for $45 million.  (Id. at 6-7, 14.)  Reflective of this agreement, the parties agreed to amend the November 2005 settlement agreement to include and resolve the claims asserted in the Anco and British Diamond actions.  (Id. at 1-40.)  The Amended Settlement Agreement established the Direct Purchaser Class and a Direct Purchaser Settlement Fund of $22.5 million, which is half of the additional $45 million paid by De Beers to resolve Anco and British Diamond.  (Id. at 8.)  The remaining $22.5 million was added to the Indirect Purchaser Settlement Fund due to a substantial addition to indirect purchaser commerce from what was covered by the original September 2005 agreement, increasing the sum in that fund to $272.5 million.  (See id. at 10.)  As a result of the Amended Settlement Agreement, the total amount paid by De Beers is $295 million plus notice costs of up to $7 million.

On March 31, 2006, this Court entered an Order modifying its prior conditional certification of the settlement class and preliminary approval of the Settlement Agreement to reflect the changes detailed above.  In doing so, the Court conditionally certified the Direct Purchaser Class, composed of all natural persons and entities located in the United States who purchased any gem diamond directly from Defendants or their competitors from September 20, 1997 to March 31, 2006.  Sightholders, which are entities authorized to purchase rough diamonds directly from De Beers, are excluded for the period they held such status.

### 3.    Injunctive Relief for All Class Members

The proposed settlement provides for injunctive relief along with the $295 million payment.  The injunction, which lasts five years, requires that De Beers "comply with and abide

by the antitrust laws of the United States . . . as well as with the antitrust laws of each of the several states and territories within the United States." (Mar. 30, 2006 Am. Settlement Agreement, Ex. H at H-6, H-9.) The injunction also (1) limits the purchases De Beers is permitted to make from Third Party Producers; (2) prohibits De Beers from "set[ting] or fix[ing] the price of Rough Diamonds sold by the Third Party Producer other than those purchased by De Beers from any such Third Party Producer"; (3) bars De Beers from "[d]etermin[ing] the quality or quantity of . . . Third Party Producer[s'] Rough Diamond production or sales"; (4) prohibits De Beers from requiring that Sightholders resell or purchase diamonds at a fixed price; (5) prohibits De Beers from restricting the persons to whom a Sightholder or someone else may resell or purchase Gem Diamonds; and (6) prohibits De Beers from restricting the geographic regions in which a Sightholder may resell or purchase Gem Diamonds. (Id. at H-6-H-8.) It also bars De Beers from "purchas[ing] Rough Diamonds in the United States for the principal purpose of restraining supply." (Id. at H-9.)

The injunction further provides that the prohibitions above do not preclude certain specific behavior by De Beers including, but not limited to, "selecting Sightholders under a process approved by the European Commission" pursuant to certain criteria and "[c]onducting business with ALROSA pursuant to the terms of the agreement between De Beers and ALROSA and related undertakings reviewed by the European Commission[.]"

**4.      The Settlement's Effect on Jurisdiction Regarding De Beers**

All parties agree that the Amended Settlement Agreement does not constitute an admission as to the truth of Plaintiffs' allegations by De Beers, nor does it establish jurisdiction of the United States Courts over Defendants. De Beers does agree, however, to submit to this

Court's jurisdiction solely for purposes of the Settlement on its effective date.

    **E.**    **Settlement Classes**

As a means of effectuating the Settlement, Plaintiffs and De Beers seek the certification

of two nationwide Settlement Classes:

    (i)    The "Direct Purchaser Class."  All natural persons and legal entities located in the United States who purchased any Gem Diamond directly from a Defendant or Defendants' Competitors (including any entity controlled by or affiliated with any such party) from September 20, 1997 to the date of settlement class certification. The class shall exclude Defendants, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, Defendants' Competitors, any person or entity which is or was a Sightholder for the time period(s) during which such person or entity had Sightholder status, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff; and

    (ii)    The "Indirect Purchaser Class."  All natural persons and legal entities located in the United States who purchased any Diamond Product from January 1, 1994 to the date of settlement class certification, provided that any purchases of any Gem Diamond made directly from a Defendant (including any entity in which any Defendant has a controlling interest and any affiliate of any Defendant) or Defendants' competitors (including any entity controlled by or affiliated with any such party) shall be excluded.  The class shall also exclude Defendants, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff.

(R&R Ex. 4 (Am. Settlement Agreement) at 13-14.)

The "Indirect Purchaser Class" is divided into two subclasses solely for the purpose of

effectuating the Settlement Agreement.

    (1)    The "Indirect Purchaser Reseller Subclass," is a class consisting of all persons and entities in the Indirect Purchaser Class who purchased any Diamond Product for resale; and

    (2)    The "Indirect Purchaser Consumer Subclass," which consists of all persons

and entities in the Indirect Purchaser Class who purchased any Diamond Product for use and not for resale.

(R&R Ex. 4 at 14.)

### F.    Notice to Class Members

In its October 1, 2007 Order, this Court found that the Notice and Administration plans submitted by the Settlement Administrator and recommended by the Special Master "fully satisf[y] the requirements of Rule 23, Federal Rules of Civil Procedure, and due process, constitute[] the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons entitled thereto."  (Oct. 1, 2007 Order ¶6.)

### G.    Objections to the Settlement Agreement

The Court received 20 separate objections to the settlement agreement on behalf of 37 objectors.  (Objection of 13 Consumer Class Members (Rosaura Bagolie, Matthew De Long, Sandeep Gopalan, Manoj Kolel-Veetil, Matthew Metz, Peter Perera, Rangesh K. Shah, Ed McKenna, Thomas Vaughan, Anita Pal, Jay Pal, Deb K. Pal, & Frank Ascione), Mar. 4, 2008 [docket item #265]; Objection of Sherie Chrysler, Feb. 28, 2008; Objection of Timothy Cowles, Feb. 6, 2008; Objection of Kristen Dishman, Mar. 4, 2008 [docket item #202]; Objection of Neil Friedman & Kylie Luke, Mar. 4, 2008; Objection of Janet Giddings, Mar. 3, 2008 [docket item #191]; Objection of James Hicks, Mar. 4, 2008 [docket item #201]; Objection of Mason James, Feb. 26, 2008 [docket item #190]; Objection of Margaret Marasco, Mar. 4, 2008 [docket item #200]; Objection of Linda Mathews, Brad Boozer, & Maurice Kraiem, Mar. 4, 2008 [docket item #203]; Objection of Lee Miller, Feb. 24, 2008; Objection of Andrea Mount, Feb. 21, 2008; Objection of David Murray, Mar. 4, 2008 [docket item #196]; Objection of Aaron S. Petrus, Mar.

10

3, 2008 [docket item #199]; Objection of Kelly Puls, Mar. 4, 2008 [docket item #274]; Objection

of Susan M. Quinn, Mar. 4, 2008 [docket item #193]; Objection of Matin Rapaport, Mar. 4,

2008; Objection of Tracy A. Sturgeon, Feb. 5, 2008; Objection of Marvin L. Union, Tim

Henning, & William Benjamin Coffey, Jr., Feb. 28, 2008; Objection of Steven M. Wichmann,

Mar. 4, 2008 [docket item #204].)  Testimony on behalf of 19 objectors, representing six separate

objections, was given at the April 14, 2008 Fairness Hearing on this matter.

All objectors are members of the Indirect Purchaser Class, with four from the Indirect

Purchaser Reseller Subclass and 33 from the Indirect Purchaser Consumer Subclass.  Fifteen of

the 20 groups of objectors opposed the settlement itself, four objected to the provisions for

injunctive relief, six opposed the allocation and distribution methodology, and nine objected to

the provisions for attorneys' fees.  Although considered, all of the objections are not individually

addressed in this Opinion.


II.    LEGAL ANALYSIS

       A.    Standard of Review

       Federal Rule of Civil Procedure 53(f)(3) requires de novo review of "all objections to

findings of fact made or recommended by a master, unless the parties, with the court's approval,

stipulate that: (A) the findings will be reviewed for clear error; or (B) the findings of a master

appointed under Rule 53(a)(1)(A) or (C) will be final."  Fed. R. Civ. P. 53(f)(3).  In this case, the

parties stipulated that the Court shall review the Special Master's "findings of fact for clear

error."  Stipulation & Order of Reference to the Hon. Alfred M. Wolin as Special Master, Civil

Action No. 04-2819 (Dec. 2, 2005) [docket item #35].  However, objectors are not part of that

11

stipulation, so the Court will use the de novo standard articulated by Rule 53(f)(3) in reviewing objections to Special Master Wolin's factual findings.

B.    **Final Certification of Classes**

The first issue before this Court is the approval of the final certification of classes proposed by Plaintiffs and De Beers.  Two objections to class certification were filed, representing the objections of three members of the Indirect Purchaser Consumer Subclass. Those objections will be addressed in the course of the Court's discussion of class certification requirements.

The satisfaction of four threshold requirements enunciated in Federal Rule of Civil Procedure 23(a) is a prerequisite to class certification.  Those factors are

> (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

In re Warfarin Sodium Antitrust Litig. (Warfarin II), 391 F.3d 516, 527 (3d Cir. 2004).

After satisfying the Rule 23(a) threshold requirements, parties seeking class certification must make an additional showing.  They must demonstrate "that the action is maintainable under Rule 23(b)(1), (2), or (3)."  Id.  As in Warfarin II, Rule 23(b)(3) is at issue, because the case at hand is an "opt-out" class action.  See Warfarin II, 391 F.3d at 527 (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997)).

> Under Rule 23(b)(3), two additional requirements must be met in order for a class to be certified: (1) common questions must "predominate over any questions affecting only individual members" (the "predominance requirement"), and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy" (the "superiority requirement").

12

<u>Warfarin II</u>, 391 F.3d at 527; <u>Lenehan v. Sears, Roebuck, & Co.</u>, 2008 WL 466471 at *4 (3d Cir. Feb. 21, 2008).  Rule 23(b)(2) also applies to this case, since the settlement involves a non-opt-out class for injunctive relief and the injunctive relief is an important part of the overall relief sought.  Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

The Court will now address whether these requirements have been satisfied.

### 1.      Numerosity Pursuant to Rule 23(a)(1)

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all members is impracticable[.]"  Fed. R. Civ. P. 23(a)(1).  "To meet the numerosity requirement, class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members."  <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u> (<u>Prudential I</u>), 962 F. Supp. 450, 510 (D.N.J. 1997) (citing <u>Lerch v. Citizens First Bancorp, Inc.</u>, 144 F.R.D. 247, 250 (D.N.J. 1992)), <u>aff'd</u>, 148 F.3d 283 (3d Cir. 1998).  A showing of impossibility is not required.  <u>Cannon v. Cherry Hill Toyota, Inc.</u>, 184 F.R.D. 540, 543 (D.N.J. 1999).  "In determining whether the numerosity requirement is satisfied, the court should consider the estimated number of parties in the proposed class, the expediency of joinder, and the practicality of multiple lawsuits."  <u>Cannon v. Cherry Hill Toyota, Inc.</u>, 184 F.R.D. 540, 543 (D.N.J. 1999).

"No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir.

2001), cert. denied, 536 U.S. 958 (2002).   In this case, the class period for Direct Purchasers is

over eight years in length, and the class period for Indirect Purchasers is over twelve years in

length.  The underlying claims allege wrongs with nationwide impact, and the proposed classes

consist of over 67 million members.[1]  The classes are therefore sufficiently numerous that joinder

is impracticable, satisfying Rule 23(a)(1).

> **2.      Commonality Pursuant to Rule 23(a)(2) and Predominance Pursuant to Rule 23(b)(3)**

Rule 23(a)(2) requires there be "questions of law or fact common to the class[.]"  Fed. R.

Civ. P. 23(a)(2).  Rule 23(b)(3) requires that these common issues of law or fact "predominate

over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The

commonality requirement of Rule 23(a)(2) is satisfied when "the named plaintiffs share at least

one question of law or fact with the grievances of the prospective class."  In re Baby Neal, 43

F.3d 48, 56 (3d Cir. 1994); Gutierrez v. Johnson & Johnson, 467 F.Supp.2d 403, 406 (D.N.J.

2006).  The predominance requirement of Rule 23(b)(3) is a more exacting standard; because of

this, it "incorporates the Rule 23(a) commonality requirement."  Warfarin II, 391 F.3d at 528.

The two factors are therefore analyzed together, "with particular focus on the predominance

requirement."  Id. (citing In re LifeUSA Holding, Inc., 242 F.3d 136, 144 (3d. Cir. 2001)).

---

[1] Within the Indirect Purchaser Class, the Indirect Purchaser Consumer Subclass is estimated as containing between 67 and 117 million members (Decl. of Matthew Potter on the Distribution of Settlement Funds to the Consumer Subclass Members ¶10 (Apr. 20, 2008) ("Potter Decl. on Distribution") [docket item #139-9]), and 38,152 members of the Indirect Purchaser Reseller Subclass have been identified (Joint Decl. of Joseph J. Tabacco, Jr. and Josef D. Cooper Regarding Class Notice & Claim Form Procedures, Ex. 1 (Feb. 1, 2008) ("Tabacco & Cooper Feb. 2008 Decl.") [docket item #174]).  The Direct Purchaser Class is significantly smaller, with notice being directly sent to 130 direct purchasers.  (Decl. of Jared Stamell on Publication Notice to Direct Purchasers ¶¶5-8 (Feb. 22, 2008) ("Stamell Feb. 2008 Decl.") [docket item #182].)

Here, the commonality requirement of Rule 23(a) is met, because the federal and state

claims asserted regarding the Direct Purchaser Class and the Indirect Purchaser Class present the

following common operative facts and common questions of law:

(a)     Whether [D]efendants combined or conspired with others to fix, raise, stabilize and maintain the prices of polished diamonds;

(b)     Whether [D]efendants monopolized or combined or conspired with others to monopolize the supply of polished diamonds;

(c)     Whether [D]efendants' conduct caused the prices of polished diamonds to be maintained at higher levels than would exist in a competitive market;

(d)     Whether [P]laintiffs and the Class[es] are entitled to injunctive relief; and

(e)     Whether [D]efendants' conduct caused injury to the business or property of [P]laintiffs and the other [Class and] Subclass Members and, if so, the appropriate class-wide measure of damages.

(Compl. ¶¶20(a)-(e).)  Another question raised is whether Defendants are subject to the

jurisdiction of the courts of the United States.

As stated above, satisfying the commonality requirement alone is not sufficient where

classes, such as those presently at issue, seek to be certified under Rule 23(b)(3); the common

questions must be found to predominate over individual issues.  Fed. R. Civ. P. 23(b)(3).  To

ascertain if Rule 23(b)(3) predominance exists, "the Court must determine whether the

efficiencies gained by class resolution of the common issues are outweighed by individual issues

presented for adjudication."  Prudential I, 962 F. Supp. at 510.  The United States Supreme Court

noted that "predominance is a test readily met in certain cases alleging consumer or securities

fraud or violations of the antitrust laws."  Amchem, 521 U.S. at 625; Warfarin II, 391 F.3d at

528.  Further, "[w]hen the party opposing the class has engaged in some course of conduct that

affects a group of persons and gives rise to a cause of action, one or more of the elements of that

cause of action will be common to all of the persons affected."  Prudential I, 962 F. Supp. at 510

(quoting 1 Newberg § 3.10, at 3-51).  To determine whether common issues of impact

15

predominate over other issues for the purposes of class certification, the Third Circuit explained that,

> at the class certification stage, the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law. Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class.

In re Linerboard Antitrust Litigation (Linerboard), 305 F.3d 145, 152 (3d Cir. 2002) (citations omitted). Resultantly, to obtain class certification, a plaintiff must either satisfy a presumption of impact or prove antitrust impact that is supported by class-wide common evidence. See id. at 151-52. The presumption of impact, known as the "Bogosian shortcut" is

> [i]f, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "[The] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . . proof of some damage flowing from the unlawful conspiracy. . . ." Under these circumstances, proof on a common basis would be appropriate.

Id. (citing Bogosian, 561 F.2d 434, 455 (3d Cir.1977)) (citations omitted). In the alternative, a plaintiff may also show direct evidence of injury.

Plaintiffs have offered the Affidavit of Gary L. French, Ph.D. Regarding Class Certification, filed on June 19, 2003, to explain that the antitrust impact of De Beers' alleged actions on all Classes and Subclasses can by proven on a class-wide basis. (Aff. of Gary L. French, Ph.D. Regarding Class Certification ¶¶41-45 (April 22, 2005) (discussing impact on all

Classes and Subclasses) [docket item #19-4] ("Apr. 2005 French Aff."); see also Supplemental

Aff. of Gary L. French, Ph.D. Regarding Class Certification Issues (Apr. 4, 2008) ("Supp. French

Aff.").)  Dr. French's explanation of the diamond industry as a whole further buttresses his

conclusions regarding class impact.  (Apr. 2005 French Aff. ¶¶9-40; Supp. French Aff.)  The

explanation in Dr. French's Affidavit and Plaintiffs' arguments explained above support the use

of the Bogosian shortcut.  As such, based on the nature of the diamond industry, it is appropriate

to presume potential injury to all class members and allow them to prove injury on a common

basis.  See Linerboard, 305 F.3d at 151-52.

Direct evidence of injury is also shown by Plaintiffs, although it will only be addressed

briefly here, as Plaintiffs have presented sufficient evidence for this Court to rely on the

Bogosian shortcut for purposes of proving impact.  The core of this settlement is the nature of De

Beers role in the diamond industry and whether De Beers engaged in behavior that caused an

artificial inflation of diamond prices nationwide.  Plaintiffs have shown that each class member

shares a similar legal question arising from whether De Beers engaged in a broad conspiracy that

was aimed to and did affect diamond prices in the United States.  (See generally, Apr. 2005

French Aff.)  Plaintiffs and all Class members would be required to prove the implementation of

De Beers' conspiracy, the form of the conspiracy, and the duration and extent of the conspiracy.

Plaintiffs have offered evidence that the proof required to demonstrate these allegations raises

factual issues that are common to Plaintiffs and all members of the Classes and Subclasses.

Specifically, they would all be required to prove that Defendants acted in concert to artificially

fix, maintain, and stabilize prices and to monopolize trade and commerce in the market for

polished diamonds sold to consumers in the United States resulting in an inflation in the prices of

diamonds sold to consumers. Further, all class members are confronted with the difficulty of De Beers' refusal to submit to the jurisdiction of any court in the United States and the resulting burden of establishing that De Beers' nationwide contacts satisfy the constitutional requirements of due process. Plaintiffs' allegations of conspiracy arise from a single course of conduct by De Beers and raise a jurisdictional issue common to all class members, so the allegation of conspiracy falls within the category of cases described in Amchem and satisfies the predominance test.

However, members of the Indirect Purchaser Consumer class have objected to that class's being nationwide. (See e.g., Freedman Objection.) Although variations exist between the antitrust and consumer protection laws of different states, those variations do not defeat commonality and predominance. Weighing claims, particularly Consumer claims, by different state laws would not be appropriate in this case for the following reasons:

a)   De Beers, in the pursuit of a global settlement, demanded a release of potential damage claims in all 50 states; without class member releases from all 50 states, the settlement amount likely would have been less.

b)   A nationwide class of consumers had been certified in the Null case.

c)   All class members benefit from the additional value of the injunctive relief obtained.

d)   Weighting class member claims based on the relative strength of different state law claims would be imprecise at best, would greatly add to the cost and complexity of processing claims, and would diminish the funds available for claimant recovery.

e)   A nationwide antitrust class action is an expedient vehicle to resolve the disparate claims of the Direct Purchasers and the Indirect Purchaser Subclasses.

Notwithstanding the Court's conditional certification of a settlement class and the grant of preliminary approval of the class settlement, at the suggestion of counsel for De Beers, and

18

with the concurrence of the Special Master, notification of the Settlement was sent to the

Attorney General of the United States and the Attorneys General of all 50 states pursuant to the

Class Action Fairness Act of 2005; 28 U.S.C. §§ 1332(d), 1453, and 1711-1715 ("CAFA").  No

Attorney General sought to participate.  This lack of response confirms the propriety of counsels'

decision to allocate the Aggregate Settlement Fund without reference to differing state laws.

Further, as the certification at issue is for a settlement class as opposed to a litigation

class, case manageability problems caused by differences in law that would hinder a litigation

class do not exist.  Warfarin II, 391 F.3d at 529.  Second, as in Warfarin II, although differences

exist between the various state laws, none are sufficient to defeat commonality and

predominance.  Id. at 530 ("the fact that there may be variations in the rights and remedies

available to injured class members under the various laws of the fifty states in this matter does

not defeat commonality and predominance").

### 3.    Typicality Pursuant to Rule 23(a)(3)

Rule 23 also requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class[.]"  Fed. R. Civ. P. 23(a)(3).  "Typicality lies where there is

a strong similarity of legal theories or where the claims of the class representatives and the class

members arise from the same alleged course of conduct by the defendant."  Prudential I, 962 F.

Supp. at 518 (citations omitted).  Identical claims are not required; "[f]actual differences among

the claims of the putative class members do not defeat certification."  In re Prudential Ins. Co.

Am. Sales Practice Litig. Agent Actions ("Prudential II"), 148 F.3d 283, 311 (3d Cir. 1998)

(quoting Baby Neal, 43 F.3d at 58).

In this case, claims of the representatives of the proposed Classes and Subclasses are

based on the same conduct by Defendants and substantially similar legal theories.  The claims demonstrate factual typicality, as all members of the Direct Purchaser Class and the Indirect Purchaser Class, as well as the latter's two subclasses, seek recovery of the alleged overcharge resulting from Defendants' allegedly illegal conspiracy. (Compl. ¶17(a), (b); Amended Settlement Agreement 1-4, 13-14.)   Typicality of legal theories also exists.  In order to recover on behalf of themselves and each member of the Classes, Plaintiffs must prove that Defendants violated federal antitrust laws, state antitrust laws, state consumer protection laws, and state common law and that Defendants' actions resulted in Plaintiffs and all class members paying higher prices than they would have paid absent the violations.  Accordingly, this Court finds that the typicality requirement of Rule 23(a)(3) is satisfied.

### 4.      Adequacy of Representation Pursuant to Rule 23(a)(4)

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The determination of whether a class is adequately represented requires a court's finding two factors: "(1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class."  Prudential I, 962 F. Supp. at 519; Prudential II, 148 F.3d at 312.  Both factors are met in this case.

As to the first factor, named Plaintiffs and their counsel have prosecuted this action vigorously on behalf of the class.  (See R&R on Awards & Reimbursement 19-23.)  Plaintiffs' counsel also have extensive experience in federal antitrust and class action litigation. (Compendium of Decls. in Supp. of Application for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards, Exs. 1-15 (Jan. 11, 2008) [docket item #169].)  Additionally,

the individual classes were represented by separate counsel during settlement negotiations and

allocation proceedings, allowing for "adequate 'structural protections to assure that differently

situated plaintiffs negotiate for their own unique interests.'"  Warfarin II, 391 F.3d at 533

(quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 631 (3d Cir. 1996)).

The second factor is also met, as Plaintiffs and all class members do not have conflicting

interests.  All classes claim that they have been and presently are adversely impacted by

Defendants' alleged conspiracy, because their ability to purchase polished diamonds has been

restricted by Defendants' actions and they have paid artificially inflated prices for polished

diamonds.  As a result, they all seek monetary damages for overpayment and share a common

interest in establishing an appropriate measure of damages and determining whether injunctive

relief is proper.  Further, they uniformly seek to demonstrate that De Beers is subject to the

jurisdiction of United States courts.  As such, all Plaintiffs and all proposed class members share

an interest in proving the existence of Defendants' alleged price-fixing conspiracy and monopoly

and in establishing the appropriateness of injunctive relief.  Accordingly, the Court is satisfied

that the Rule 23(a)(4) requirement of adequate representation is met.

Various objectors argue that actual conflicts exist among members of the proposed

Indirect Purchasers Class making fair and adequate representation by Plaintiffs impossible, but

the objections do not alter the Court's determination that Rule 23(a)(4)'s adequacy requirement is

satisfied.  Of particular note, three objectors argue that inherent conflicts of interest exist within

the class, since only a portion of the class have causes of action for damages under their states'

antitrust laws due to Illinois Brick repealer statutes, yet the entire class collects damages under

the settlement.  (Quinn Objection 26; Freedman Objection 2-8.)  This objection is without merit,

21

as all members of each class have valid claims under state law, albeit not identical claims in all situations, that they are ceding in exchange for the settlement fund and injunction. Furthermore, all class members allege that they were overcharged for diamonds due to De Beers' conduct; no state-by-state disparity in overcharging is claimed. Another objector stated that an internal conflict exists within the Indirect Purchaser Class, and sufficient steps were not taken to protect the subclasses. (Petrus Objection 3.) As explained above, however, each subclass was represented by its own attorney throughout the settlement process. (See R&R on Awards & Reimbursement 20-21.) The Special Master further ensured and monitored the integrity of the settlement process. Accordingly, this objection is also without merit.

### 5. Superiority Pursuant to Rule 23(b)(3)

Rule 23(b)(3) requires that, for a class action to be maintained, a court must find that the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule then provides courts with four factors that are "pertinent" to determining if superiority exists: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

In this case, the first factor weighs in support of a class action, as the same underlying allegations underpin each of class and subclass members' claims, creating little reason for class members to individually control separate actions. The second factor also demonstrates the superiority of a class action, as the settlement classes at issue encompass numerous class

members from across the nation in agreement over the proposed settlement.  The third factor, whether the District of New Jersey is the proper forum, is less clear, although it is unquestioned that a single class action in one court benefits all class members by spreading litigation costs among Plaintiffs.  See Prudential II, 148 F.3d at 316.  The fourth factor need not be addressed by this Court, as class certification is being sought for settlement purposes only and the Supreme Court explained that "a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."  Amchem, 521 U.S. at 620.  Additionally, the size and scope of the class support class certification: "as a class increases in size, there become fewer methods to adjudicate the controversy.  As the case becomes larger and more geographically dispersed, the traditional alternatives of joinder, consolidation, and intervention will be impracticable."  Prudential I, 962 F. Supp. at 523.  Based on this combination of factors, the Court finds a settlement class action to be the superior method for litigation of these claims.

### 6.      Rule 23(b)(2) Requirements

Rule 23(b)(2) "applies when the putative class seeks injunctive or declaratory relief, and 'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.'" Beck v. Maximus, Inc., 457 F.3d 291, 301 (3d Cir. 2006) (quoting advisory committee note to Fed. R. Civ. P. 23(b)(2)).  As stated above, Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

In this case, Plaintiffs seek relief under Section 16 of the Clayton Act, which reads in

part,

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . .

15 U.S.C. § 26.  Plaintiffs allege that De Beers' conduct, specifically its alleged violations of antitrust laws, caused the entire membership of all classes to pay artificially inflated prices. Further, Plaintiffs allege that, absent this Court ordering injunctive relief, all class members will continue to suffer this harm.  (Sullivan Compl. ¶¶34, 35, 39, 41, 43, 45 [docket item #1]; British Diamond Compl. ¶¶41- 43, 47-50 [docket item #239-27]; Anco Compl. ¶¶35-39, 41-44 [docket item #239-26].)  Plaintiffs' allegations, if proven, would show that injunctive relief that affects the class as a whole is appropriate.

Objector Susan Quinn argues that injunctive relief is inappropriate for a number of reasons.  First, she asserts that all class members have adequate remedies at law, the absence of which is a requirement for a court's ordering an injunction.  (Quinn Objection 9-10; see also eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 390 (2006) (stating the four-factors that a plaintiff must show before a court will grant a permanent injunction: "(1) that [plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction").)  This argument lacks merit, because the injunction at hand is part of a compromise that De Beers entered into willfully; as such, De Beers has waived the right to demand proof of substantive elements of the claims.  Furthermore,

24

injunctions and damages are not mutually exclusive remedies. See, e.g., Danny Kresky Enters. Corp. v. Magid, 716 F.2d 206 (3d Cir. 1983). Quinn next asserts that the injunction will not benefit all class members, as they may not purchase "a De Beers' diamond (or any diamond) between now and March 31, 2011" and will therefore not be wronged again by De Beers. (Quinn Objection 11.) However, by nature of their business, members of the Direct Purchaser Class and members of the Indirect Purchaser Reseller Subclass will purchase diamonds during the period covered by the injunction, and the goal of their purchases is for final sale to consumers. This demonstrates benefit to all classes and subclasses. Quinn also asserts that the class is overly broad, because many members did not purchase De Beers' diamonds. However, this argument fails due to Plaintiff's allegation that DeBeers' conduct increased the price of all diamonds on the market, not just De Beers' diamonds. (Quinn Objection 14.) Quinn's additionally objections regarding certification under Rule 23(b)(2) are equally without merit.

In short, Plaintiffs have shown that class certification under Rule 23(b)(2) is appropriate.

### 7.     Conclusion Regarding Final Class Certification

In sum, this Court grants final class certification under Rules 23(a), 23(b)(2), and 23(b)(3) to the Direct Purchaser Class and the Indirect Purchaser Class along with the latter's two subclasses, the Indirect Purchaser Reseller Subclass and the Indirect Purchaser Consumer Subclass. All persons who satisfy the Class definition, except those who properly requested exclusion from the Class in accordance with the November 30, 2005 Order Conditionally Certifying the Settlement Class, are members of the Class and are bound by the terms of the Settlement and the Final Judgment.

C.      **Fairness of the Final Settlement**

All class action settlements must receive court approval pursuant to Federal Rule of Civil Procedure 23(e).  A prerequisite to settlement approval is "a determination by the district court that the proposed settlement is 'fair, reasonable and adequate." Warfarin II, 391 F.3d at 534 (quoting In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig. (General Motors), 55 F.3d 768, 785 (3d Cir. 1995)).  In its inquiry regarding approval, "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." Id. Further, "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, . . . district courts [must] be even 'more scrupulous than usual' when examining the fairness of the proposed settlement." Id.

The Third Circuit set forth factors in Girsh v. Jepson, 521 F.2d 153 (3d Cir.1975), to guide district courts' review of proposed class action settlements ("Girsh factors").  The "nine-factor [Girsh] test requires this Court to conduct both 'a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation' and 'a procedural inquiry into the negotiation process.'" Prudential I, 962 F. Supp. at 534 (quoting General Motors, 55 F.3d at 796).  The Girsh factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through the trial; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

In re AT&T Corp. Sec. Litig., 455 F.3d 160, 164-65 (3d Cir. 2006); Girsh, 521 F.2d at 157.  This list is not exhaustive.  The Third Circuit explained that, "since Girsh was decided in 1975, there

has been a sea-change in the nature of class actions, especially with respect to mass torts."

Prudential II, 148 F.3d at 323. As such, it charged "district courts [to] consider other potentially

relevant and appropriate factors. In re AT&T, 455 F.3d at 165. The following factors were given

as a non-limiting list of examples:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Prudential II, 148 F.3d at 323; In re AT&T, 455 F.3d at 165.[2]

Additionally, as noted by the Third Circuit in Warfarin II, settlement of class actions is

preferred to protracted litigation:

> there is an overriding public interest in settling class action litigation, and it should therefore be encouraged. See General Motors, 55 F.3d at 784 ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re Sch. Asbestos Litig., 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years").

Warfarin II, 391 F.3d at 535.

For the reasons discussed below, after carefully weighing the Girsh factors along with the

relevant additional factors discussed in Prudential II, considering the objections, and being

---

[2] To the extent that the factors stated in In re AT&T & Prudential II apply, they have been discussed with the Girsh factors due to the close nature of the inquiries under the facts of this case.

mindful of the heightened standard of review in place for a settlement-only class that has not yet been entirely certified, the Court determines that the proposed Final Settlement Agreement is fair, reasonable, and adequate.  The Court will now address each Girsh factor in turn.

        **1.**     **The Girsh Factors**

                **a.**     **The Complexity, Expense and Likely Duration of the Litigation**

Under the first Girsh factor, courts must analyze "the probable costs, in both time and money, of continued litigation." General Motors, 55 F.3d at 812 (quoting Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir. 1974)).  Where the Court finds, after balancing the Proposed Settlement against the anticipated expense, complexity, and time of possibly achieving a more favorable result through litigation, that the litigation would likely be expensive, complex, and time-consuming, this factor is found to weigh in favor of settlement.  Prudential I, 962 F. Supp. at 536.

Litigation in this case would have been difficult, as multiple parties, multiple claims, extensive jurisdictional problems, and complicated discovery would be involved.  For example, the plaintiffs in the Hopkins litigation named nine defendants along with many unnamed co-conspirators, totaling a potential 200 defendants.  (Hopkins Compl. ¶¶ 14-19 [docket item 239-21].)  Further, as noted by the Special Master, "proprietary data of the diamond industry is difficult to obtain."  (R&R 33 (noting that the Special Master only had access to sufficient information to support the R&R due to "the Herculean efforts of class counsel").)  Additionally, but for settlement, extensive motion practice would have been likely on a variety of issues including determining whether personal jurisdiction existed over each defendant, whether service of process was sufficient, whether the Hague Evidence Convention applied, whether the

complaints sufficiently state claims, and whether the yet-certified proposed classes should be certified and the certified classes should be decertified.  Motions would also be likely relating to lifting the defaults and determining the appropriate statute of limitations period.  (See, e.g., R&R 19 (discussing underlying conflicts regarding jurisdiction and culpability).)  Adding to these difficulties is the charge by the Supreme Court to protect foreign litigants from excessive discovery: "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the Dist. of Iowa, 482 U.S. 522, 536, 546 (1987); Astrazeneca v. Ranbaxy Pharms., Inc., 2008 WL 314627 at *3 (D.N.J. 2008) (Bongiovanni, M.J.).

The proposed settlement provides substantial and immediate benefits to the Classes, undiminished by further expenses and without the risk and uncertainty of continued litigation. The first Girsh factor, therefore, supports approving the proposed settlement agreement.

### b.    The Reaction of the Class to the Settlement

The second Girsh factor "attempts to gauge whether members of the class support the settlement." Prudential II, 148 F.3d at 318; Warfarin II, 391 F.3d at 536.  In gauging support, courts look at the number of objectors as well as opt-outs.  See Prudential II, 148 F.3d at 318; Warfarin II, 391 F.3d at 536.  Courts also look to objectors' "vociferousness" and other factors to determine whether "class members possessed adequate interest and information to voice objections[.]" General Motors, 55 F.3d at 813.

In this case, all objections were related to the Indirect Purchaser Class.  The Consumer Subclass alone, which accounts for all but four of the objections, is estimated by Plaintiffs as

containing between 67 and 117 million members.  (Potter Decl. on Distribution ¶10.)  38, 152

members of the Reseller Subclass have been identified.  (Tabacco & Cooper Feb. 2008 Decl., Ex.

1.)  The Direct Purchaser Class is much smaller, with notice being sent to 130 direct purchasers

along with general published notice in trade publications and the internet.  (Stamell Feb. 2008

Decl. ¶¶5-8.)  As of March 31, 2008, 433,891 claim forms were received for all classes.  (Decl.

of Matthew Potter re: Claim Statistics and Claim Processing Costs (Apr. 4, 2008) ¶4 ("Potter

Decl. on Claims") [docket item #234].)  Nine were from members of the Direct Purchaser Class

and 433,882 were from the Indirect Purchaser Class with 431,380 from the Consumer Subclass

and 2,502 from the Reseller Subclass.  (Id.)

    Requests for exclusion from the settlement, which were ordered to be submitted by

March 4, 2008, were received from members of all classes.  (Decl. of Thomas R. Glenn re:

Requests For Exclusion Received from the Settlement Classes (Mar. 18, 2008 ) [docket item

#208].)  Five requests for exclusion were received from the Direct Purchaser Class, and 139 were

received from the Indirect Purchaser Class, with 66 coming from the Reseller Subclass and 69

from the Consumer Subclass.  (Id. at ¶3.)

    The numbers of objections and requests for exclusion are consistent with those in classes

that have been approved within the Third Circuit.  See, e.g., Warfarin II, 391 F.3d at 536 (146

class members opted out and 13 objected out of a class of 1.8 million members); Prudential II,

148 F.3d at 318 (19,000 class members opted out and 300 objected out of a class of 8 million

members).  Of additional significance are the class members and other entities that have not

objected to the proposed settlement.  In particular, class counsel made significant outreach efforts

to solicit input from Class and Subclass members during the crafting of the settlement agreement

(Joint Declaration of Joseph J. Tabacco, Jr. and Josef D. Cooper In Support of Final Settlement

Approval (Apr. 4, 2008) ¶¶56-58 ("Tabacco & Cooper Apr. 4, 2008 Decl.") [docket item #238].),

and afterwards, few objections were received.  Further, as stated above, although fifty states'

Attorney Generals were notified of the terms of the settlement, none objected.  (R&R 36-37.)  In

sum, the number of objections received, the number of requests to opt-out, and the low number

of objections with a complete absence thereof from certain entities demonstrate that an

overwhelming majority of both the Direct Purchaser Class and the Indirect Purchaser Class

support the settlement.

### c.    The Stage of the Proceedings and the Amount of Discovery Completed

The third Girsh factor "captures the degree of case development that class counsel have

accomplished prior to settlement.  Through this lens, courts can determine whether counsel had

an adequate appreciation of the merits of the case before negotiating."  In re Cendant Corp.

Litig., 264 F.3d 201, 235 (3d Cir. 2001) (quoting General Motors, 55 F.3d at 813).  In the case at

hand, class counsel engaged in extensive factual discovery including interviewing a broad base of

affected individuals and groups that included industry participants, consumers, and experts in the

field; retaining economic experts; gathering pertinent publicly available information; drawing

upon the experiences of Plaintiffs' counsel who had previously brought suit against De Beers for

price-fixing in the market for industrial diamonds; and reviewing proceedings related to De

Beers' joint venture with Louis Vuitton, the Supplier of Choice program, and the trading

agreement with ALROSA before the European Commission for information on competition in

the diamond industry and De Beers' role in that industry.  (Tabacco & Cooper Apr. 4, 2008 Decl.

¶¶11-15, 18.)  Each of the underlying cases also proceeded on its own track, independent of one

another.  (Tabacco & Cooper Apr. 4, 2008 Decl. ¶¶16-17.)   Classes were separately certified in Anco, Leider, Hopkins, and Null, and experts were retained in all cases.  (Tabacco & Cooper Apr. 4, 2008 Decl. ¶¶16-17.)

The Bagolie objectors assert that the underlying Sullivan case was insufficiently developed prior to settlement negotiations, stating that settlement negotiations began immediately after default was entered on September 23, 2004.  (Bagolie Objection 19-20.)  However, at the time of the initial settlement on November 30, 2005, over four years had passed since the complaints were filed in Anco (Sept. 20, 2001) and Leider (Apr. 13, 2001), over a year passed since the filing of Hopkins (July 12, 2004), Sullivan (June 14, 2004), and British Diamond (Sept. 8, 2004), and almost nine months had passed since the filing of Cornwell (Feb. 28, 2005) and Null (Feb. 17, 2005).  Further, as stated above, prior to settlement, classes were certified in Anco, Leider, Hopkins, and Null and significant factual investigation took place.  (Tabacco & Cooper Apr. 4, 2008 Decl. ¶¶11-17.)  The early stage in the proceedings at which settlement was reached does not undermine the settlement where class counsel demonstrates its significant development of the case.  See Davies v. Cont'l Bank, 122 F.R.D. 475, 479-80 (E.D.Pa. 1988).  Moreover, given the fact that De Beers had given every indication that it intended to continue to be in default and force Plaintiffs to seek enforcement of default judgments in foreign jurisdictions, absent settlement, it is hard to see how much more developed the case could have been.

Based on the understanding of the underlying cases obtained through pre-filing investigation, third party discovery and interviews, and informal discovery from Defendants, the Court is satisfied that class counsel adequately appreciated the merits of the case prior to

negotiating the settlement.

        **d.**    **The Risks of Establishing Liability**

The fourth <u>Girsh</u> factor requires this Court to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." <u>Cendant</u>, 264 F.3d at 237 (quoting <u>General Motors</u>, 55 F.3d at 814). The risks involved in litigating the case at hand would be numerous. Special Master Wolin encapsulates many of these difficulties in his Report and Recommendation:

> Although the risks of litigation are not identical for each Class or Subclass, there exist some risks that the Plaintiffs share in common. Potential lack of jurisdiction over the De Beers entities, potential defenses interposed by De Beers, collectability of a judgment in a foreign jurisdiction and the inherent difficulty encountered with proof of damages are emblematic of the litigation risks shared in common. Moreover, without the Settlement, the impetus for De Beers and its key personnel to assist Class Counsel and their econometric experts would have been non-existent.

(R&R 34.)

The Bagolie objectors assert that it would be simple to collect on a default judgment in a foreign jurisdiction (Bagolie Objection 11), however, that assertion is incorrect. Plaintiffs determined that De Beers lacked assets in the United States and identified nations in which the companies had assets. In the <u>Sullivan</u> Complaint, it is asserted that DB Investments, Inc. and De Beers S.A. are Luxembourg corporations with offices in Luxembourg, De Beers Consolidated Mines, Ltd. is a South African corporation with offices in the United Kingdom, De Beers Centenary is a Swiss corporation with offices in Switzerland, Diamond Trading Co. is an English and Welsh corporation with offices in the United Kingdom, and the Central Selling Organization and CSO Valuations, A.G. are Swiss corporations that had offices in the United Kingdom. (Sullivan Compl. ¶¶7-13.) Two De Beers subsidiaries not named in the Complaint do business

in Canada (Decl. of Barry L. Glaspell ¶2(b) [docket item 230-2]), and De Beers has "substantial

assets" in South Africa (Decl. of Roger Wakefield re: Enforcement in South Africa of Judgments

Granted by Various United States Courts 6 [docket item 230-2]).  Plaintiffs offer the Court a

compendium of declarations from individuals with expertise in the law of enforcing foreign

money judgments regarding the enforcement of such judgments in the United Kingdom,

Switzerland, Luxembourg, Canada, and South Africa.  (Compendium of Declarations by Experts

on Law of Enforcing Foreign Money Judgments in the United Kingdom Switzerland,

Luxembourg, Canada, and South Africa (Apr. 4, 2008) [docket item #230].)  The conclusion in

all declarations was that foreign enforcement of the judgments would be problematic at best,

based on Defendants being served outside the United States, their denying doing business in the

United States, their lack of substantial assets in the country, and their refusal to submit to United

States jurisdiction beyond for the limited purpose of settlement.  (Id.)  The effect of the

information put forth in the above declarations is to show that the monetary judgments by this

Court would quite possibly be viewed as beyond its authority in the eyes of the foreign

jurisdictions and be effectively void.  Vallely v. N. Fire and Marine Ins. Co., 254 U.S. 348, 353-

54 (1920) ("Courts are constituted by authority and they cannot [act] beyond the power delegated

to them.  If they act beyond that authority, and certainly in contravention of it, their judgments

and orders are regarded as nullities. They are not voidable, but simply void, and this even prior to

reversal.")  The Bagolie objection does not effectively refute these nation-specific declarations

with its citation to general academic studies nor with its late submission of an expert report on

the enforcement of foreign judgements under English law.  (Bagolie Objection 11; Decl. of Dr.

Martha-Marie Kleinhans [docket item #296].)  The paucity of similar suits brought against De

Beers based upon antitrust claims given the allegations of long-standing violations stands as compelling evidence of the daunting nature of these defenses.

In short, Plaintiffs demonstrate that substantial hurdles would exist if this case proceeded to litigation, posing significant risks if class counsel decided to litigate the claims.

###        e.        The Risks of Establishing Damages

Inquiry under the fifth Girsh factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." Cendant, 264 F.3d at 238-39 (quoting General Motors, 55 F.3d at 816).  In this case, the issue of damages has yet to be fully addressed by the parties.  Although Defendants are in default, no default judgment has been entered against them.  A default judgment only establishes "that the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."  Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1992) (citations omitted).  Therefore, once default judgment is entered, where there are no damages for a "sum certain[,]" a  "court may conduct such hearings or order such references as it deems necessary and proper." Fed. R. Civ. P. 55(b).  In such a hearing, antitrust plaintiffs must make a showing regarding the amount of damages, although the standard for demonstrating those damages is  "somewhat relaxed[.]" Rossi v. Standard Roofing, Inc., 156 F.3d 452, 484 (3d Cir. 1998).  Therefore, although "speculation and guesswork" is not permitted in calculating damages, damages may be calculated based on "inferential as well as (upon) direct and positive proof." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946).  However, adequate data must support the analysis used to assess damages.  See Lehrman v. Gulf Oil Corp., 464 F.2d 26, 46 (5th Cir. 1972).

In this case, Plaintiffs offer proposals on how to determine and estimate damages, but as

demonstrated by the analysis conducted by De Beers' economic consultant Mary T. Coleman, De

Beers has substantial grounds to present defenses to each of Plaintiffs' proposals.  (Aff. of Mary

T. Coleman, Ph.D. ¶¶96-120 (Apr. 4, 2008) [docket item #240].)  Dr. Coleman's affidavit, the

complexity of assessing damages, and the need for sufficient data on which to base damages

determinations demonstrate that a "battle of the experts" would likely result regarding damages.

The uncertainty attendant to such a battle is a factor that weighs in support of approving the

Settlement.  See, e.g., Cendant, 264 F.3d at 239 (explaining "[w]ere a jury confronted with

competing expert opinions of corresponding complexity, there is no compelling reason to think

that it would accept Lead Plaintiff's determination rather than Cendant's, which would posit a

much lower figure for the Class's damages").

### f. The Risks of Maintaining a Class Action Through the Trial

"'Because the prospects for obtaining certification have a great impact on the range of

recovery one can expect to reap from the [class] action,' [the sixth Girsh factor] measures the

likelihood of obtaining and keeping a class certification if the action were to proceed to trial.

Warfarin II, 391 F.3d at 537 (quoting General Motors, 55 F.3d at 817).  A class action's value is

heavily dependant on the class certification, "because, not only does the aggregation of the claims

enlarge the value of the suit, but often the combination of the individual cases also pools

litigation resources and may facilitate proof on the merits."  General Motors, 55 F.3d at 817.

Class certification is not an unalterable state, as a "district court always possesses the authority to

decertify or modify a class that proves unmanageable."  Prudential II, 148 F.3d at 321.

The size of the nationwide classes in this action did not pose a problem for class

certification purposes, as the classes were certified for settlement, not litigation.  However, if this

36

Court were to certify the classes for litigation purposes, a significant risk exists that intractable management problems would result due to the size and scope of the classes. As in Warfarin II, "the significant risk that the class would be decertified if litigation proceeded weighs in favor of settlement." Warfarin II, 391 F.3d 537.

### g.    The Ability of Defendants to Withstand a Greater Judgment

The seventh Girsh factor asks "whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." Cendant, 264 F.3d at 240. A defendant's having the ability to withstand a higher judgment than what is required of it by the settlement agreement does not mean that it must pay more than what class members are reasonable entitled to based on the theories of liability at the time of the settlement. Warfarin II, 391 F.3d at 538. Objections were filed to the amount of monetary relief provided for in the settlement agreement. (See, e.g., Wichmann Objection.)

In this case, the parties do not dispute that De Beers has the ability to withstand greater judgment. However, little fact-finding has been done on this issue. This limited record development is similar to that in Cendant, where the Third Circuit explained that it was unquestionable that Cendant could withstand a higher judgment, but that the company would be pushed into bankruptcy at some unknown point between the settlement payment and the potential judgment. The court explained,

> [t]here is inevitably a measure of speculation involved in [weighing Girsh factor seven], especially given the lack of record development on this issue, so even though we think that it is likely that both Cendant and E&Y could have paid substantially more than they did under the Settlement, we must remain cognizant that the possibility of bankruptcy is quite real when the settlement or judgment numbers sufficiently increase. At the same time, the proponents of a settlement bear the burden of proving that the Girsh factors weigh in favor of approval.

> Given these observations, . . . we think that this factor cuts against approval
> of the Settlement, albeit only moderately, because of the built-in limitations of this
> kind of analysis and the lurking possibility of bankruptcy for Cendant (and perhaps
> E&Y as well) if faced with a judgment near $8.8 billion.

Cendant, 264 F.3d at 241 (citations omitted).  In this case, the question of De Beers bankruptcy

has not been addressed.  However, a prime consideration here is the high unlikelihood that a

judgment could be collected against De Beers for the reasons discussed above.  Unlike the

possibility of bankruptcy, which was unproved by the settlement's proponents in Cendant, there

is little question, based on the information provided by the parties, that it would be extremely

difficult, if not impossible, to collect a judgment from De Beers.  As such, based entirely on the

risks of collecting a judgment from DeBeers, this Court concludes that, this factor does not favor

nor disfavor the Proposed Settlement.  See Warfarin II, 391 F.3d at 538.

> ### h.      The Range of Reasonableness of the Settlement Fund in Light of the
> Best Recovery & The Range of Reasonableness of the Settlement
> Fund to a Possible Recovery in Light of All the Attendant Risks of
> Litigation

The final two Girsh factors are often analyzed together, as they are viewed as testing "two

sides of the same coin: reasonableness in light of the best possible recovery and reasonableness

in light of the risks the parties would face if the case went to trial."  Warfarin II, 391 F.3d at 538

(quoting Prudential II, 148 F.3d at 322).  The factors ask "whether the settlement represents a

good value for a weak case or a poor value for a strong case."  Id.  "In order to evaluate the

propriety of an antitrust class action settlement's monetary component, a court should compare

the settlement recovery to the estimated single damages."  In re Remeron End-Payor Antitrust

Litig., 2005 WL 2230314 at *24 (citing In re Ampicillin Antitrust Litig., 82 F.R.D. 652, 654

(D.D.C.1979)) (emphasis added).  In evaluating  this comparison, "an antitrust class action

settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors, such as the risk of no recovery." Id. (citing Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974), abrogated on other grounds, Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2000)); General Motors, 55 F.3d at 806 (citations omitted).  Where monetary relief is the primary remedy, a court's comparison should focus on

> the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.  This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside.  The evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.  The primary touchstone of this inquiry is the economic valuation of the proposed settlement.

General Motors, 55 F.3d at 806 (citations omitted).

In this case, the documents supporting the settlement demonstrate that it is "reasonable[] in light of the best possible recovery and reasonable[] in light of the risks the parties would face if the case went to trial." Warfarin II, 391 F.3d at 538.  Dr. John Pisarkiewicz, an economist retained by counsel representing the Indirect Purchaser Consumer Subclass, theorized that the average overcharge was 4.85 percent, making the total worldwide overcharge $4.99 billion.  (Aff. of John Pisarkiewicz, Ph.D. on Damages and Current Market Conditions ¶3, 64 [docket item #245].)  From this, Dr. Pisarkiewicz explained that, "[s]ince the U.S. consumes approximately 50 percent of diamonds and diamond jewelry worldwide, the overcharge to the U.S. market is $2.49 billion[,] [t]he proposed settlement by De Beers to the Indirect Purchaser Settlement Fund of $272.5 million represents 10.93 percent of the overcharge." (Id. at ¶63.)  The recovery for Direct

Purchasers is impossible to quantify based on the available information, since the exact amount of non-De Beers sales to the Direct Purchaser Class is unknown.  Using the value of the total United States imports of rough diamonds, which Plaintiffs posit as over $4.3 billion during the Direct Purchaser Class Period of September 20, 1997 to March 31, 2006 (Indirect Purchaser Stipulation of Industry Facts, App. 1 [docket item #139]), Dr. Pisarkiewicz's 4.85 weighted overcharge percentage, and an estimation that at least 46 percent of the total rough diamond sales were excluded sales, estimated at $2 billion, Plaintiffs' attorneys theorize that the overcharge percentage on that $2 billion was near $100 million.  From this, they reason that the allotted $22.5 million recovery under the settlement is more than 20 percent of the single damages.

The Bagolie objectors argue that the settlement is insufficient, because the fund only represents between 1 and 2 percent of Plaintiffs' estimated damages.  (Bagolie Objection 24-26.) However, the objectors improperly compare the settlement amount to treble damages and subtract both expenses and attorneys' fees.  In evaluating whether an antitrust class action settlement's monetary component is proper, the settlement recovery should be compared to single damages, see Remeron, 2005 WL 2230314 at 24; the Bagolie objectors cite no law to the contrary.  Further, objectors offer no support for their subtracting expenses and attorneys fees in their comparison with estimated damgages.  (Bagolie Objection 24-26; see In re Cendant Corp. Litigation, 264 F.3d 201, 241-42 (3d Cir. 2001); Warfarin II, 391 F.3d at 538-39.)

Although calculations as to the Direct Purchaser Class are inexact at this point, the monetary settlements to each class, when accounting for the additional relief provided by the injunction, are a reasonable percentage of the overcharges.  This is particularly so due to the magnitude of the potential risks in litigation, including likely profound difficulties enforcing

40

United States default judgments in the relevant foreign countries, establishing personal jurisdiction, and establishing liability.  (See discussion above.)  As such, the Proposed Settlement offers a reasonable recovery and weighs in favor of settlement.

Given the analysis above, the Court concludes that the nine-factor Girsh test utilized by the Third Circuit is satisfied.  The proposed settlement is fair, adequate, and reasonable under Federal Rule of Civil Procedure 23(e).

### 2.     Additional Objections to Settlement

The Court will now address a variety of objections that were filed but have yet to be discussed.  The objections are organized by topic.

### a.     Injunctive Relief

A number of objections were filed regarding the injunctive relief portion of the Proposed Settlement Agreement, finding the relief insufficient.  As an example, Martin Rapaport argues that the exemptions in the injunction should be eliminated, reasoning that the exemptions "appear to enable illegal or borderline illegal activity instead of setting up guidelines that will protect the diamond community and public."  (Rapaport Objection ¶¶4-11)  In lieu of the proposed injunctive relief, Rapaport presents the Court with "policy guidelines" that he finds acceptable and in the best interests of the diamond trade and consumers; these include requiring De Beers to make public an "Economic Impact Study" prior to purchasing diamonds from third parties and prohibiting De Beers from imposing any resale restrictions on its customers. (Rapaport Objection ¶12.)  Objector Susan Quinn also disagrees with the terms of the injunction, arguing that the provision allowing De Beers to enter into agreements that are approved by foreign or domestic antitrust authorities is a "loophole[,]" the injunction has been ineffective to

date as diamond prices have yet to decrease, and the injunction is of insufficient duration, although Objector Quinn incorrectly states that the injunction will expire in 2011, when expiration will occur in 2013 (five years from the date of entry of the Order that corresponds with this Opinion).   The Bagolie objectors argue that the relief is mostly precatory, because it only requires De Beers to "follow the law[,]" and the relief is meaningless to class members "since their claims relate to conduct between 1994 and 2006 and the proposed injunctive relief takes effect only *after* the Court's approval, i.e., no earlier than 2008."  (Bagolie Objection 30.) Objector Kelly Puls makes the identical argument that the injunctive relief is "meaningless" because it only requires Defendants "to follow the law."  (Puls Objection ¶6.)

        In addressing these objections, the Court first notes that the injunction is the result of a settlement, and therefore, by its nature, it is a negotiated compromise.  Like any compromise, the best recovery possible is ceded for other considerations.  See General Motors, 55 F.3d at 806 ("settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution").  Because of this, the injunctive relief being weaker or shorter in duration than absolutely possible does not render the injunction "inadequate."  As discussed above, the cumulative result of settlement must only be fair and reasonable.  Addressing specific objections, the sole factor of lower prices is not an indicator of an injunction's effectiveness, as the injunction is aimed at eliminating anti-competitive conduct; numerous other factors including advertising, input costs, and demand also affect resale prices.  See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 127 S.Ct. 2705, 2719 (2007).  Further, the injunction's exemption for activities approved by antitrust authorities is reasonable, as it prevents Defendants from being subject to potentially inconsistent legal requirements of multiple jurisdictions.  See In re Agent

Orange Prod. Liab. Litig., 373 F.Supp.2d 7, 45 (E.D.N.Y. 2005), aff'd sub nom., Vietnam Ass'n

for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 124 (2d Cir. 2008).  The

objectors ignore what the injunction does do – it, for the first time, subjects De Beers to the

jurisdiction of a United States Court with the undisputed power to sanction De Beers if it engages

in conduct that allegedly had been at the heart of its prior anti-competitive activities.  In short,

despite the objections filed, the injunctive relief is reasonable.

        **b.**      **Scope of Release**

Objections were filed asserting that the settlement's scope of release is over-broad,

alleging that it "extinguish[es] future claims that are not at stake in the present litigation"

(Bagolie Objection 31), it "releases claims that were neither investigated nor prosecuted" (Petrus

Objection 3), and it "releases persons and entities never sued and that are paying no consideration

in exchange for the release" (Petrus Objection 3).

The proposed release discharges De Beers from claims arising from existing business

practices, including the Supplier of Choice Program and the ALROSA agreement, as long as it

does not materially change the marketing agreement agreed with and approved by the European

Commission.  (Amended Settlement Agreement 29-32.)  The injunction explicitly provides that

> [t]he parties expressly agree that the release applies to Claims arising from certain
> business practices or conduct in existence on the date of settlement class certification
> or continuing after such date, namely (I) the Supplier of Choice Program, so long as
> there is no material change in the European Commission's approval, no material
> change in the Supplier of Choice Program or no material change to the United States
> federal antitrust laws that are applicable to the Supplier of Choice Program; (ii) the
> ALROSA Agreement, so long as there is no material change in the European
> Commission's position, no material change in the ALROSA Agreement or no
> material change to the United States federal antitrust laws that are applicable to the
> ALROSA Agreement; and (iii) any advertising programs substantially similar to
> those used during the two years prior to the date of settlement class certification.

(Am. Settlement Agreement, Ex. H at 30.)  The release does not extend to unrelated claims.  (<u>Id.</u> at 30-31.)  It only encompasses claims "arising from or relating to facts alleged in any of the Class Actions . . . whether known or unknown, asserted or unasserted . . . ." by members of the Settlement Classes who did not timely exclude themselves based on conduct up to the date of settlement class certification.  (<u>Id.</u> at 29.)

Claims arising from the same facts but not asserted in a class action may be released by a class action settlement.  <u>Prudential II</u>, 148 F.3d at 326 n.82 ("[I]t is widely recognized that courts without jurisdiction to hear certain claims have the power to release those claims as part of a judgment.").  Additionally, as demonstrated by the quoted text above, despite objectors' assertion to the contrary, the proposed settlement's release only applies to the class period and to claims arising out of or relating to the underlying Class Actions.  Finally, a settlement release can include non-parties.  <u>See, e.g.</u>, <u>Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96 (2d Cir. 2005); 4 Alba Conte & Herbert B. Newberg, <u>Newberg on Class Actions</u> §12:16 (4th ed. 2007).  Objectors, therefore, fail to demonstrate that the proposed settlement's scope of release is overly broad.

### c.  Sufficiency of Information Available to Assess the Settlement

Additional objections were raised by two groups asserting that insufficient information was available to them to assess the settlement.  As a result, they seek discovery and unsuccessfully sought to delay the fairness hearing in order to obtain such discovery.

The Court recognizes its fiduciary obligation "as the guardian of the rights of the absentee class members in approving the settlement[,]" <u>Girsh</u>, 521 F.2d at 157, and, as demonstrated above, finds that absentee class members' rights are represented in the proposed settlement.

First, the facts of this case differ from those in <u>Girsh</u>, which the Bagolie Objectors rely on to support their argument regarding insufficiency of available information. In <u>Girsh</u>, the Third Circuit determined that an objector was denied a meaningful opportunity to object where class counsel and other involved parties failed to respond to interrogatories and the objector did not receive late-filed affidavits until the day before the settlement hearing despite the objector's extensive involvement in the case.  <u>Girsh</u>, 521 F.2d at 157-58.  In this case, at the April 14, 2008 proof hearing, Plaintiffs' attorneys explained that the objectors had never requested this information prior to their objection, but the information will be provided.  The Bagolie objectors made no efforts to obtain additional information prior to the filing of their March 4, 2008 objection and had access to the entire public record in this case.  The Mathews objectors do not make direct requests for discovery; in objecting to attorneys' fees provisions, they only state that they do not have Class Counsel's time records for the case.  (Mathews Objection 5.)  However, they make no assertion that they ever requested these records, so they do not assert that their attempts at discovery have been hindered.  (<u>Id.</u>)  As such, sufficient information was available for all parties to assess the fairness of the Proposed Settlement.

### d.    Notice Requirements Regarding Class Numbers and Estimated Recovery

Objectors Mount, Bagolie, and Wichmann also state that the class notice should have contained the number of class members and/or their estimated recovery.  (Mount Objection 1; Bagolie Objection 8; Wichmann Objection 1.)  However, class notice is not required to inform class members of such information.  <u>See</u> Fed. R. Civ. P. 23(c)(2); <u>see also, e.g.</u> <u>Newberg on Class Actions</u> §8:32 ("It is unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover.  It should be recognized that

the ultimate recovery may often depend on the number of valid claims filed.").

In short, the Court is satisfied that none of the objectors have provided a sufficient basis for this Court to refrain from approving the settlement.

### D.    Attorneys' Fees, Cost Reimbursement, and Incentive Awards

In his February 15, 2008 Report and Recommendation on Incentive Awards, Cost Reimbursement, and Attorneys' Fee Awards, the Special Master made the following recommendations:

> 1.    That the Court award to class counsel an aggregate attorneys' fee in the amount of 25% of the net settlement fund (minus expenses) as a fair and reasonable attorneys' fee.
>
> 2.    That the Court determine class counsel's request for an award of 25% of the interest incurred on the settlement fund (approximately $28 million as of submission of the fee application). The Special Master recommends that the Court adopt the intermediate approach[, which the Special Master describes in detail and is discussed below].
>
> 3.    That the Court award to class counsel $2,368,802.26 for fair and reasonable expenses incurred as of the date of the application, plus such other fair and reasonable expenses that were incurred subsequent thereto.
>
> 4.    That the Court approve incentive awards to the following persons/entities who performed services for the benefit of the public and the settlement classes:
>
> Direct Purchasers – total $175,000
>    $85,000 for British Diamond Import Co.
>    $85,000 for Anco Industrial Diamond Corp.
>    $ 5,000 for American Diamond Tool & Gauge
>
> Indirect Purchasers – total $45,000
>    $ 5,000 for seven Consumer class representatives for a total of $35,000: Shawn Sullivan, Thomas G. Hopkins, Emert A. and Katie E. Null (one award), George Vuoso, Robert Hallowell, James Walnum and Estate of Pamela Sue Cornwell.
>    $10,000 for Reseller representative, Arrigotti Fine Jewelry.

(R&R on Awards & Reimbursement 46-47.)  The Court will address each of the Special Master's recommendations individually by topic.

### 1.    Attorneys' Fees

Special Master Wolin succinctly summarized Plaintiff's counsel's request for attorneys' fees:

> Plaintiffs' counsel request an aggregate award of attorneys' fees of 25% of the $295 million Settlement Fund, as well as 25% of the net interest actually earned on the Settlement Fund since its establishment in 2005.  Twenty-five percent of the Settlement Fund, not including interest, is $73.75 million.  Plaintiffs state that more than $28 million in interest has been earned on the Settlement Fund through January 7, 2008.

> The Settlement Fund will be allocated among the two classes (Direct and Indirect Purchasers) and subclasses (Consumers and Resellers).  Plaintiffs' counsel seeks one award from the total Settlement Fund for all counsel involved in representing the various plaintiff classes and subclasses. This is a reasonable approach because there is essentially one settlement which has been obtained by the efforts of counsel for all classes and subclasses.

> Plaintiffs' counsel are applying for an aggregate award of counsel fees and cost reimbursements to be paid from the Settlement Fund.  By agreement, the aggregate awards will be allocated and distributed among the various firms representing plaintiffs through a separate out-of-court procedure.  Thus, the Court need not address the difficult task of assessing counsels' relative contributions.  A total of 18 law firms and many more attorneys within those firms are represented in the application.

(R&R on Awards & Reimbursement 3-4.)  In requesting these fees, all counsel have sworn or averred to a number of relevant general facts.  First, Plaintiffs' firms were all retained on contingency fee bases and have not been compensated for their work or reimbursed for costs incurred in this matter.  Second, the hourly rates reflected in each firm's lodestar amount are the 2007 rates that the firms customarily charge to non-contingent fee clients.  Third, all litigation costs were also billed at the rates that the firms customarily charge to non-contingent fee clients.

Finally, the time spent preparing the application for attorneys' fees, cost reimbursement, and incentive awards was not included by the firms in calculating their lodestars.

### a.      Applicable Law

Federal Courts have consistently "recognized that . . . a lawyer who recovers a common fund for the benefit of persons other than . . . his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980); see Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 392 (1970); In re Cendant Corp. PRIDES Litig. (Cendant PRIDES), 243 F.3d 722, 732 n.12 (3d Cir. 2001). The standard is not dependent on the legal merits of the claim; it derives from the equitable fund doctrine, which mandates that counsel who have performed services beneficial to a class of litigants receive compensation for their efforts. See Trustees v. Greenough, 105 U.S. 527, 536 (1882). When reviewing a request for an award of attorneys' fees charged to a common fund in a class action, a court focuses on whether the work performed resulted in a benefit to the class. In re AT&T, 455 F.3d at 165.

"[A] thorough judicial review of fee applications is required in all class action settlements." Id.; In re Rite Aid Corp. Sec. Litig. (Rite Aid), 396 F.3d 294, 299 (3d Cir. 2005). "When parties are negotiating settlements, the court must always be mindful of the 'danger . . . that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees.'" Prudential II, 148 F. 3d at 333 (citation omitted). As such, District Courts must "engage in robust assessments of the fee award reasonableness factors when evaluating a fee request." Rite Aid, 396 F.3d at 302. "'[T]he amount of a fee award . . . is within the district court's discretion so long as it employs correct legal standards and procedures and makes findings of fact not clearly erroneous." Rite Aid, 396 F.3d at 299 (quoting

48

<u>Pub. Interest Research Group of N.J., Inc. v. Windall</u>, 51 F.3d 1179, 1184 (3d Cir. 1995)).

Within the Third Circuit, two methods exist for determining an award of attorneys' fees: the

percentage of recovery approach ("POF") and the lodestar approach.  <u>Prudential II</u>, 148 F.3d at

333.  The Third Circuit has determined that "[t]he percentage of recovery method is generally

favored in common fund cases because it allows courts to award fees from the fund 'in a manner

that rewards counsel for success and penalizes it for failure.'"  <u>Rite Aid</u>, 396 F.3d at 300 (quoting

<u>Prudential II</u>, 148 F.3d at 333).  In contrast, the loadstar method is preferred "in statutory

fee-shifting cases because it allows courts to 'reward counsel for undertaking socially beneficial

litigation in cases where the expected relief has a small enough monetary value that a

percentage-of-recovery method would provide inadequate compensation' or in cases where the

nature of the recovery does not allow the determination of the settlement's value required for

application of the percentage-of-recovery method."  <u>Id.</u>  Regardless of the method used by a

court, the Third Circuit encourages the use of "a second method of fee approval to cross-check its

initial fee calculation."  <u>Id.</u>

  As the case at hand involves a common fund, the Court will apply the POF method and

use a lodestar cross-check.  In determining an award of attorneys' fees using the POF method, a

court must consider seven factors:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence
> or absence of substantial objections by members of the class to the settlement terms
> and/or fees requested by counsel; (3) the skill and efficiency of the attorneys
> involved; (4) the complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and
> (7) the awards in similar cases.

<u>Gunter v. Ridgewood Energy Corp.</u>, 223 F.3d 190, 195 n.1 (3d Cir. 2000); <u>Rite Aid</u>, 396 F.3d at

301.  The following additional factors, referred to as <u>Prudential II</u> factors, may also be

49

considered:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, [Prudential II], 148 F.3d at 338; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained, id. at 340; and (3) any "innovative" terms of settlement, id. at 339.

In re AT&T, 455 F.3d at 165.

A court is not required to apply the Gunter and Prudential II factors formulaically; in certain cases, some factors may outweigh others. Rite Aid, 396 F.3d at 301. The court must, however, "engage in robust assessment of the fee award reasonableness[,]" which is done through a thorough analysis of the particular facts and circumstances of each application. See id. at 301-02; In re AT&T, 455 F.3d at 166.

### b.    Application of the POF Factors

### (1)    The size of the fund created and the number of persons benefitted

The settlement fund is not the sole benefit conferred to the classes in this case; the injunctive relief must also be considered. Quantifying benefit to a class is difficult when relief is not solely monetary, but such a non-monetary award should not detract from an attorneys' fee award where the class has received a substantial benefit. See, e.g., Merola v. Atl. Richfield Co., 515 F.3d 165, 169-70 (3d Cir. 1975). In class action resolutions that include non-monetary benefits, the Third Circuit guides district courts to

> bring an informed economic judgment to bear in assessing its value. If probative evidence of the monetary value of such a benefit is available, it should of course be used. If the benefit is not susceptible of being rationally reduced to monetary terms, the court must compare the value of the legal services and the benefit obtained on the basis of its best economic judgment.

Id. at 172.

The Court will first address the settlement fund.  The total Settlement Fund is $295 million; this figure does not include interest or notice costs.  (Am. Settlement Agreement 7.) However, the Court will only apply the POF analysis to the net settlement fund, after deduction of expenses.  See In re Ikon Office Solutions, Inc., 194 F.R.D. 166, 193 (E.D. Pa. 2000) (explaining that "this approach increases the incentives for cautious expenditure and, again, helps align the interests of the class more closely with those of counsel"); In re Aetna Inc. Sec. Litig., 2001 WL 20928 at *14.  In this case, that amount is $292,192,189.06, reflecting expenses totaling $2,807,810.94 through April 15, 2008.  (Decl. of Eric B. Fastiff on Class Counsel's Litig. Expenses From Dec. 1, 2007 Through Apr. 15, 2008 ¶4 ("Fastiff Decl.") [docket item #300-4].)

Additionally, Plaintiffs' counsel seek an award of 25 percent of the interest earned on the Settlement Fund since its creation, which, as of January 2008, was approximately $28 million. The Third Circuit does not have a consistent rule on whether courts should award Plaintiffs' counsel a percentage of interest earned on a settlement fund.  See, e.g., In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389, 413 (D.N.J. 2006) (awarding 26 percent of the common fund plus a proportionate amount of interest earned on the common fund); but see, In re AT&T, 455 F.3d 160 (affirming an award of 21.25 percent of the settlement fund without referring to interest); In re Warfarin Sodium Antitrust Litig. (Warfarin I), 212 F.R.D. 231, 264-65 (D. Del. 2002) (awarding 22.5 percent of the settlement fund plus interest accruing only from the date of entry of the judgment to the date of payment from the settlement fund), aff'd, 391 F.3d 516 (3d Cir. 2004).  Special Master Wolin recommended one possible solution to the question of interest, namely that the Court deny the fee application on interest at the present time and preserve the

request for the fee on the net interest, after taxes and costs, in the event that the interest is not

exhausted by the initial payment of the claim.  However, the Court is satisfied that attorneys' fees

of 25 percent of the settlement fund without any interest are fair, reasonable, and adequate.  To

that extent, the Court will reject Special Master Wolin's recommendation regarding potentially

adding a percentage of the interested earned on the total settlement fund to the total attorneys' fee

award.

In addition to the settlement agreement's monetary benefits, the injunction against De

Beers provided for in the settlement agreement will benefit the classes by protecting competition

in the diamond industry for five years after entry of the Final Approval.  (Am. Settlement

Agreement, App. H.)  The terms of the injunction are described above at section I(G)(3) of this

Opinion.  In short, it requires De Beers to abide by state and federal antitrust laws, prohibits

specific conduct that Plaintiffs' believe has been anti-competitive in the past, limits De Beers'

purchase of rough diamonds from a third party to 40 percent of that third party's production

unless a regulatory agency gives express approval otherwise, prohibits stockpiling of rough

diamonds, and prohibits resale price maintenance agreements by De Beers.  (Am. Settlement

Agreement, App. H.)  De Beers has never before agreed to comply with federal or state antitrust

laws, nor has it agreed, relating to gem diamonds, to be subject to the jurisdiction of a United

States court.  See, e.g., De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212 (1945)

(reversing the grant of a preliminary injunction against De Beers);  In re Indus. Diamonds

Antitrust Litig., 119 F. Supp. 2d 418 (S.D.N.Y. 2000) (avoiding a judgment after defaulting

when plaintiffs' damages analysis was rejected); but see, United States v. De Beers Indus.

Diamond Div. (Ireland) Ltd.,  1976 U.S. Dist. LEXIS 11948, 1978-1 Trade Cas. (CCH) ¶ 62,056

(S.D.N.Y. 1976) (limited consent to jurisdiction by one De Beers division for purposes of consent judgment related to diamond grit). These factors demonstrate that the injunction provides a substantial benefit to the general public and the members of the settlement classes although the exact benefit is not presently quantifiable.

The second element of this Gunter factor addresses the number of people who benefit from settlement. As stated above, the Consumer Subclass consists of between 67 and 117 million members (Potter Decl. on Distribution ¶10), the Reseller Subclass consists of 38,152 identified members (Tabacco & Cooper Feb. 2008 Decl., Ex. 1), and the Direct Purchaser Class is significantly smaller, with notice being directly sent to 130 direct purchasers. (Stamell Feb. 2008 Decl., ¶¶5-8.)

The Court must also ask whether a percentage reduction is appropriate due to the large size of the classes. In Prudential II, the Third Circuit suggested that percentage reductions are appropriate in cases where "the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." Prudential II, 148 F.3d at 339 (quoting In re First Fidelity Bancorporation Sec. Litig., 750 F.Supp. 160, 164 n. 1 (D.N.J. 1990). However, the Third Circuit has also explained that its statement in Prudential is not a mandate: "there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund. Put simply, the declining percentage concept does not trump the fact-intensive Prudential/Gunter analysis." Rite Aid, 396 F.3d at 303. In this case, the large size of the Settlement Fund is unquestionably tied to the size of the settlement classes, a factor that weighs in support of decreasing the percentage of recovery due to class size. The value of the injunction not being added into the Settlement Fund amount, however, weighs against

decreasing the percentage of recovery.  Additionally, the recovery sought by Plaintiffs' counsel as a percentage of the Settlement Fund is smaller than the entire benefit conferred on the classes. The Court finds that the latter fact, when viewed in concert with the Court's analysis of fees as a whole, demonstrates that a declining percentage reduction is inappropriate in this case.

### (2) The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel

As noted above, a total of twenty objections were filed in this case, all by Indirect Purchasers.  Two objections, representing four objectors, were filed by Resellers, and 16, representing 33 objectors, were filed by Consumers.  No objections were received from state Attorneys General or the Justice Department despite notice being given.   As discussed above, only fifteen Class members objected to the Proposed Settlement as a whole.  Ten of the Objections related to attorneys' fees; however, based on the analysis herein, those objections are without merit.  In sum, given the enormous size of the settlement class and the discussion of objections above, the lack of significant objections from the Class supports the reasonableness of the fee request.  See, e.g., In re Lucent Tech. Inc. Sec. Litig., 327 F. Supp. 2d 435, 435 (D.N.J. 2004).

### (3) The skill and efficiency of the attorneys involved

The skill and efficiency of the attorneys involved in a class action settlement is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." In re Ikon, 194 F.R.D. at 194 (citation omitted); Lenahan v. Sears, Roebuck & Co., 2006 WL 2085282 at *20 (D.N.J. July 24, 2006), aff'd, 2008 WL 466471 (3d Cir. Feb. 21, 2008).

In this case, the quality of the result achieved and the difficulties faced favor a high percentage award.  See Warfarin I, 212 F.R.D. at 261 (class counsel "showed their effectiveness through the favorable cash settlement they were able to obtain").  Class counsel's efforts resulted in the recovery of an extremely large settlement.  The large size of the settlement is particularly noteworthy, because Plaintiffs' counsel litigated the case without the assistance of a governmental investigation or prosecution, a factor that distinguishes this case from others, such as securities class actions.  Class counsel also faced significant difficulties in this case, including their expending almost 39,000 hours (R&R on Awards and Reimbursement 21), paying out over $2 million in expenses without a guarantee of recovery (id.), and having to rely on diverse state law causes of action for Indirect Purchaser Class damages claims due to Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) (indirect purchasers cannot bring federal antitrust damage claims). Furthermore, Plaintiffs' counsel includes attorneys with significant class action experience, and counsel's expertise is demonstrated by the organized, efficient manner in which they managed this complicated case, which began in different jurisdictions and was pursued by separate counsel.  (See Joint Decl. of Tabacco & Cooper in Supp. of Application for an Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representatives' Incentive Awards (Jan. 11, 2008) ¶¶ 11-43 ("Tabacco & Cooper Jan. 11, 2008 Decl.") [docket item #169-20]; R&R on Awards and Reimbursement 21.)  Defense counsel is of similar high standing within the legal profession, and the Court takes note of the Special Master's statement that Defense Counsel "has been vocal and vigilant throughout the post-settlement process within the limited confines of De Beers's participation[,]" along with the Special Master's commendation to all counsel for their professionalism.  (R&R on Awards and Reimbursement 23.)  In short, the skill and efficiency of

55

the attorneys involved is a factor in support of the reasonableness of a 25 percent attorneys' fee award.

### (4)     The complexity and duration of the litigation

As explained above, this case involved numerous complex factual and legal issues. The litigation began over seven years ago, and Plaintiffs' counsel has expended nearly 39,000 hours.

Pre-settlement, class counsel faced complex legal issues including applying differing laws of 50 states for the Indirect Purchaser Class claims, determining whether United States courts have jurisdiction over De Beers, attempting to serve process on De Beers, and applying for class certification. The factual issues of anti-competitive conduct and damages and causation were equally complex pre-settlement caused primarily by the secrecy surrounding the diamond industry and Plaintiffs' inability to obtain formal discovery from De Beers due to its having defaulted, both of which made the gathering of necessary information difficult. (R&R 49.) Furthermore, despite De Beers default, Plaintiffs' counsel faced opposition from intervenors or *amici* in a number of cases. See, e.g., Hopkins (two De Beers sightholders sought to appear as *amicus*); Lieder (six *amici* parties with separate counsel and submissions).

Settlement took over a year to complete, even with the assistance of two nationally recognized mediators. The settlement process included numerous complex issues such as crafting injunctive relief in light of the number of competition-regulating bodies that have jurisdiction over De Beers and defining the different classes.

The post-settlement process also raised complex issues, which were described by Special Master Wolin, who had first-hand experience with this stage of the process.

Those issues included:

- Allocating the Indirect Purchaser settlement monies between the Reseller and Consumer subclasses by determining the amount of overcharges that each subclass paid or absorbed
- Identifying the impact of a diamond overcharge on a piece of jewelry when the diamond is only one constituent (e.g., gold)
- Determining how a diamond overcharge was reflected in the price of diverse types of jewelry and other diamond products (e.g., watches)
- Designing claims processes that were complex enough to encompass claims for the many different pieces of jewelry and diamond products, yet simple enough to encourage submission of claims by thousands of consumers
- Designing an effective notice plan for a huge consumer class whose members could not be individually identified

Class counsel confronted and resolved these issues despite these two overarching difficulties presented by the diamond industry: i) diamonds are not fungible and they vary greatly in value depending on the 4 C's (caratage, cut, clarity and color), and ii) the scarcity of information about the diamond industry.

Although there was no formal discovery against De Beers, the informal discovery process that occurred post-settlement was substantial. Counsel was permitted to review and take notes on, but not copy, approximately 100,000 pages of documents produced by De Beers in London. Instead of depositions, there were informal interviews of De Beers employees and third-parties in Europe.

Counsel also selected companies to administer the settlement and implement the claims process with great care. Class counsel prepared a Request for Proposals ("RFP") that was circulated to firms in the claims administration business. The claims administrators were selected after a review of written submissions and interviews. The Special Master is aware of the diligence of class counsel in the selection process because he was invited to participate and did participate in that process.

(R&R on Costs and Awards 27-28.)

The complexity of the issues involved at all stages of settlement supports the requested fee.

### (5)    The risk of nonpayment

Class counsel undertook a substantial risk of non-payment in this case. It is generally recognized that "[t]he risk of non-payment in complex cases, such as this, is very real and is

heightened when Plaintiffs' Counsel press to achieve the very best result for their clients." In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 134 (D.N.J. 2002). This case is no different. De Beers has few assets in the United States against which a judgment could be enforced, which would force class counsel to enforce a United States judgment in foreign jurisdictions where De Beers does have assets. As discussed above, that would be a challenging, and likely unsuccessful, venture. (See Compendium of Decls. by Experts on Law of Enforcing Foreign Money J. (Apr. 8, 2008) [docket item #258].) This factor weights in support of the requested 25 percent award.

### (6)    The amount of time devoted to the case by plaintiffs' counsel

As stated above, approximately 38,835 hours of counsel and paralegal time have been expended by Plaintiffs' counsel on this case. This time was spent on a variety of tasks including legal research, drafting pleadings, motion practice, mediations and settlement negotiations, substantial informal discovery, and crafting notice and distribution plans for the classes and subclasses. The amount of time and effort Class Counsel spent on this litigation supports the fee request.

### (7)    The awards in similar cases

The final Gunter factor involves a comparison of the fee request with attorneys' fees awarded in similar cases. Attorneys' fees of approximately 25 percent not uncommon, as noted by the Third Circuit in Rite Aid:

> one study of securities class action settlements over $10 million that found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period that found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million that found recoveries in the 25-30% range were "fairly standard."

Rite Aid, 396 F.3d at 303; see also General Motors, 55 F.3d at 822 ("One court has noted that the fee awards have ranged from nineteen percent to forty-five percent of the settlement fund.").  A further exploration of fee awards was conducted by the Third Circuit in Cendant PRIDES, where the Court listed fee awards in cases with settlements exceeding $100 million where the percentage recovery method was used.  Cendant PRIDES, 243 F.3d at 737.  The cases listed showed attorneys' fee awards ranging from 2.8 percent to 36 percent.  Id.  The Third Circuit explained that the list was not comprehensive but that the listed awards were "representative of the range of cases relevant to" analysis of the fee award from the $341,500,000 settlement in Cendant PRIDES.  Id. at 737 n.22.  The Third Circuit concluded that the breadth of the range in fee award size confirms "that a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case."  Id. at 736.  Instead, the Court identified factors that justify more substantial fee awards, namely, "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel."  Id. at 741.

The case at hand differs from many others that could be used for comparison based on a number of factors discussed above, including the denial of jurisdiction by De Beers, the secrecy of the diamond industry, the unavailability of ordinary discovery methods, the substantial risk of non-collection of a United States judgment in foreign countries, and the injunction obtained as part of the settlement agreement.  The 25 percent fee requested by counsel is at the high end of the range of approved awards, but it remains within that range.  This case also has all of the factors that the Third Circuit recognized in Cendant PRIDES as supporting a higher award, specifically "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and

tens of thousands of hours spent on the case by class counsel." Cendant PRIDES, 243 F.3d at
741. As such, a comparison of awards in similar cases supports the requested award of 25
percent.

### (8)    Prudential II Additional Factors

The first additional factor set forth in Prudential II asks "the value of benefits accruing to
class members attributable to the efforts of class counsel as opposed to the efforts of other
groups, such as government agencies conducting investigations[.]" In re AT&T, 455 F.3d at 165.
This factor supports class counsels' fee request, since, as noted above, the settlement in this case
was achieved without the benefit of governmental agency investigation or prosecution or a
defendants' admission of liability.

The second Prudential II factor inquires as to "the percentage fee that would have been
negotiated had the case been subject to a private contingent fee agreement at the time counsel
was retained[.]" In re AT&T, 455 F.3d at 165.   Although the Court in Prudential II noted that
this factor may be less helpful in analyzing large settlements, case law demonstrates that the 25
percent range is within, if not below, what is agreed upon in most private contingent fee
agreements.  As explained by the Eastern District of Pennsylvania,

> in private contingency fee cases, particularly in tort matters, plaintiffs' counsel
> routinely negotiate agreements providing for between thirty and forty percent of any
> recovery.  See, e.g., In re U.S. Bioscience, 155 F.R.D. [116, 119 (E.D. Pa. 1994)]
> (adopting Special Master's conclusion that thirty percent would likely have been
> negotiated in securities action); In re U.S. Bioscience, Civ. A. No. 92-0678, 1994 WL
> 485935, at *9-10 (E.D.Pa. 1994) (Special Master's report examining practice by
> attorneys in this district who reported negotiating agreements between 30-40%); see
> also In re Merry-Go-Round Enter., Inc., 244 B.R. 327 (D.Md. 2000) (holding that
> forty percent negotiated contingency fee on $185 million settlement was appropriate
> in bankruptcy context); . . . but see In re Prudential Ins. Co., 962 F.Supp. 572, 586-87
> (D.N.J. 1997), rev'd, 148 F.3d 283 (stating that Fee Examiner concluded that
> contingency would be between 10-15% if negotiated privately).

In re Ikon, 194 F.R.D. at 194.  A fee of 30 to 40 percent is also supported by a supplemental

declaration of Craig Corbett, Esq. of  Zelle, Hofman, Voelbel, Mason & Gette LLP, one of

Plaintiffs' counsel, in which he explains his ordinary contingent fee arrangements:

> My firm and I have represented a number of Fortune 500 and other sophisticated
> companies in contingent antitrust matters.   We customarily have fee agreements
> providing for a contingent fee of one-third of recovery, which is well in excess of
> the 25% fee that my co-counsel and I seek in this case.

(Supp. Decl. of Craig C. Corbett in Supp. of Pls.' Application for Att'ys Fees & Reimbursement

of Expenses ¶5 in Supp. Decl. of Joseph J. Tabacco, Jr. in Supp. of Application for Att'ys Fees,

Reimbursement of Expenses, & Incentive Awards (Feb. 6, 2008), Ex 17 [docket item #176-2].)

This comparison supports the reasonableness of a 25 percent attorneys' fee award in this case.

The third factor is if there were "any 'innovative' terms of settlement[.]"  In re AT&T,

455 F.3d at 165.  The injunction within the Settlement Agreement is unquestionably innovative,

and it adds value to the overall settlement, although, as discussed above, that value cannot be

quantified.  As such, the third Prudential II factor also supports a 25 percent attorneys' fee award.

### c.    Lodestar Cross-Check

The Third Circuit instructs courts to use a second method to cross-check their initial fee

calculations.  Rite Aid, 396 F.3d at 300.  However, "the lodestar cross-check does not trump the

primary reliance on the percentage of common fund method."  Id. at 307.

> The lodestar award is calculated by multiplying the number of hours reasonably
> worked on a client's case by a reasonable hourly billing rate for such services
> based on the given geographical area, the nature of the services provided, and the
> experience of the attorneys.  The multiplier is a device that attempts to account for
> the contingent nature or risk involved in a particular case and the quality of the
> attorneys' work.  The lodestar cross-check serves the purpose of alerting the trial
> judge that when the multiplier is too great, the court should reconsider its
> calculation under the percentage-of-recovery method, with an eye toward reducing

the award.

Id. at 305-06 (footnote & citation omitted).  In calculating the lodestar, courts are permitted to

rely on summaries submitted by counsel that approximate the fee structure of the attorneys and

others who worked on the matter; the Court has done that here.  Id. at 306-07; see R&R on

Awards & Reimbursement, App. 5.  Here, the Court was provided with actual hourly rates of the

attorneys and paralegals involved.

     In calculating the loadstar in this case, the Court relies on the second loadstar report

submitted to the Special Master, which was calculated using a 50 percent reduction of travel time

for all counsel.  (R&R on Awards & Reimbursement 36, App. 7.)  The Court agrees with Special

Master Wolin's calculation that the lodestar multiplier is approximately 3.3.  (R&R on Awards &

Reimbursement 36.)  The loadstar is $22,123,712.45 and is based on 38,829.50 hours.  (Id.)

These figures reveal an average hourly rate of approximately $569.77.  In comparison with other

cases, this hourly rate is on the high end, but, when viewed through the prism of the lodestar

devoted to the injunction, it is sustainable.  See, e.g., In re Ins. Brokerage Antitrust Litig., 2007

WL 2916472 at *8 (D.N.J. Oct. 7, 2007) (the average hourly rate was $363.76).  This

mathematical hourly rate calculation is of questionable significance in this situation, however, as

Plaintiffs' counsel have supplied the actual hourly rates of the attorneys and paralegals involved,

which range from $800 to $185 per hour.  "The Third Circuit, as well as other courts, have held

that an attorney's customary billing rate is the proper starting point for calculating fees."  Id. at

*7 (citing Cunningham v. City of McKeesport, 753 F.2d 262, 268 (3d Cir. 1985)).

     A single consistent range of lodestar multiplier recoveries does not exist.  For example, in

Prudential II, it was explained that "multiples ranging from one to four are frequently awarded in

common fund cases when the lodestar method is applied[.]" Prudential II, 148 F.3d at 341.

However, in the list of relevant fee award cases in Cendant PRIDES that is discussed above, the

lodestar multipliers ranged from 1.35 to 2.99, suggesting a ceiling of 3.  Cendant PRIDES, 243

F.3d at 737.  More recently, in In re AT&T, the Third Circuit noted that a lodestar of 2.99 may be

reasonable even "in a short and 'relatively simple' case. . . ."  In re AT&T, 455 F.3d at 173.  This

suggests that 2.99 is not a ceiling on multipliers in complex and lengthy cases.

The loadstar multiplier in this case is within the range in Prudential II.  Further, the

multiplier cannot be calculated against the full value of the settlement, since the injunction's

value cannot be quantified, so the true multiplier is certainly less than 3.3.  The lodestar

submitted by counsel also does not include the additional work that will be needed to fully

implement the settlement and bring the case to closure, and it is unquestioned that additional

work will be required.  Allowing for these variables, the actual multiplier will likely be closer to

2.99 than 3.3 once work on this case is complete.  As such, the lodestar cross-check supports the

reasonableness of a 25% fee award to class counsel.

## 2.   Cost Reimbursement

In addition to their request for attorneys' fees, Plaintiffs' counsel seek an additional

aggregate award of $2,807,810.94 in reimbursement of litigation expenses, representing just

under 1 percent of the Settlement Fund.  (R&R on Awards & Reimbursement, Ex. 8; Fastiff

Decl. ¶4, Exs. A-C.)  In common fund cases, counsel is "entitled to reimbursement of expenses

that were adequately documented and reasonably and appropriately incurred in the prosecution of

the case."  In re Cendant Corp., Derivative Action Litig., 232 F. Supp 2d 327, 343 (D.N.J. 2002).

Upon review of the declarations in this case, the Court finds the requested amounts to be fair and

reasonable.  Class Counsel's expenses reflect costs that were reasonably incurred in expert fees,

court filings, service of process, travel costs, court reporters and transcripts, mediation fees,

notice costs, postal and other delivery charges, computerized research, telephone and facsimile

charges, photocopying and reproduction charges, secretarial and word processing fees, witness

fees, camera and film expenses, supplies, fees for *pro hac vice* admission and other

miscellaneous items.  (Fastiff Decl. Exs. A-D.)  Courts in this Circuit have found these types of

expenses to be reasonable and compensable.  See, e.g., In re Elec. Carbon Prods. Antitrust Litig.,

447 F.Supp 2d 389, 411-12 (D.N.J. 2006); Oh v. AT&T Corp., 225 F.R.D. 142, 154 (D.N.J.

2004).  In short, this Court is satisfied that the request for $2,807,810.94 in expenses is

reasonable and sufficiently documented; it will therefore grant class counsel's request for

reimbursement of litigation expenses.

### 3.        Incentive Awards

Class counsel also seek a total of $220,000 in incentive awards, an amount that represents

.0007% of the Settlement Fund.  (R&R on Awards & Reimbursement 5.)  Specifically, Plaintiffs'

counsel seek the following incentive awards for class representatives.  First, they propose a total

of $175,000 for the Direct Purchaser Class, with $85,000 for British Diamond Import Co.,

$85,000 for Anco Industrial Diamond Corp., and $ 5,000 for American Diamond Tool & Gauge.

(Id.)  Second, they propose a total of $45,000 in incentive awards for the Indirect Purchaser

Class, with $5,000 for seven Consumer class representatives totaling $35,000 and $10,000 for

Reseller representative Arrigotti Fine Jewelry.  (Id.)

Incentive awards are common in class action litigation that creates a common fund for the

benefit of a class.  See, e.g., In re Cardizem CD Antitrust Litig.,  218 F.R.D. 508, 535 (E.D.

Mich. 2003);  In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 40729 at *8-*9

(D.N.J. Oct. 5, 2007).  As Special Master Wolin explained, a number of reasons support granting

incentive awards to class representatives: "(1) just as with class counsel, the class representatives

have conferred a benefit on all class members by their willingness to bring the litigation; (2) class

representatives should be rewarded for taking action that is in the public interest; and (3) public

policy favors compensation for class representatives for taking on risks of litigation on behalf of

absent class members."  (R&R on Awards & Reimbursement 43.)  The class representatives that

receive incentive awards tend to be those who devoted substantial time and resources to the case.

See, e.g., In re Elec. Carbon Prods., 447 F.Supp.2d 389 (D.N.J. 2006) (approving $72,000 in

incentive awards to plaintiffs, explaining that "extensive discovery efforts were required of the

class representatives and a benefit was conferred by those efforts upon the class as a whole, such

incentive awards commensurate with the representatives' time and effort are appropriate"); In re

Cardizem CD Antitrust Litig., 218 F.R.D. at 535-36 (awarding incentive fees of $75,000 each to

two companies that dedicated "hundreds of hours" to the case).

　　　Class counsel seeks the largest incentive awards of $85,000 each for Direct Purchasers

British Diamond and Anco for two reasons.  First, the two purchasers faced a significant risk of

losing their supply of diamonds.  That risk was greater for them than for retailers in a similar

situation, because few suppliers exist for Direct Purchasers, with De Beers being the largest

supplier.  Second, Anco and British Diamond principals invested substantial time and resources

in initiating, prosecuting, and settling the Direct Purchaser cases.  (See Decl. of Thomas M.

Corcoran (Jan. 25, 2008) (describing Anco's efforts) [docket item #187] ; Decl. of Derek M.

Parsons (Jan. 25, 2008) (describing British Diamond's efforts) [docket item #188].  These

contributions of substantial time and resources were of benefit to the Direct Purchasers.  (Decl. of

Jared Stamell (Jan. 8, 2008) [docket item #169-21].)  The incentive of $85,000 is therefore

appropriate for Anco and British Diamond.

The modest awards of $5,000 to each Consumer representative are justified by the public

policy reasons stated above.  The incentive is appropriate because the Consumer representatives

were willing to serve and thereby conferred a benefit on the Consumer subclass.

The same public policy reasons, along with the business risks it undertook in serving as

Reseller subclass representative, warrant the higher award of $10,000 to Reseller representative

Arrigotti Fine Jewelry.  Given the tight-knit diamond supplier community that is described in the

initial R&R, retailer Arrigotti likely faced a real risk of losing its supply of diamond gem

products by taking a position adverse to the world's largest supplier of rough diamonds.  The

incentive award of $5,000 to Direct Purchaser American Diamond Tool & Gauge is supported by

the same reasoning.


**III.   CONCLUSION**

For the foregoing reasons, this Court grants final certification to the Direct Purchaser

Class and the Indirect Purchaser Class, including its two subclasses, the Indirect Purchaser

Reseller Class and the Indirect Purchaser Consumer Class; approves the Final Settlement

Agreement and adopts the Report and Recommendation of the Special Master; approves

attorneys' fees of 25% of the settlement fund, exclusive of interest, $2,807,810.94 in expenses,

and $220,000 in incentive awards and adopts in part the Report and Recommendation of Special

Master on Incentive Awards, Cost Reimbursement, and Attorneys' Fees.  Appropriate forms of

orders will be filed together with this Opinion.


                                                   s/ Stanley R. Chesler
                                                STANLEY R. CHESLER
                                        United States District Judge


DATED: May 22, 2008