1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
2                    CIVIL ACTION NO. 04-2819-SRC-MAS

3

      SHAWN SULLIVAN, et al.,              MOTIONS
4
             Plaintiffs,
5
             vs.
6
      D.B. INVESTMENTS, et al.,
7
             Defendants.
8      _____

9                              June 29, 2010
                               Newark, New Jersey
10

11    B E F O R E:   HONORABLE STANLEY R. CHESLER, USDJ

12


13
      Pursuant to Section 753 Title 28 United States Code, the
14    following transcript is certified to be an accurate record
      as taken stenographically in the above-entitled
15    proceedings.

16
      S/Jacqueline Kashmer
17    JACQUELINE KASHMER
      Official Court Reporter
18

19

20                    JACQUELINE KASHMER, C.S.R.
                        OFFICIAL COURT REPORTER
21                          P. O. Box 12
                         Pittstown, NJ 08867
22                         (908) 229-6496
23

24

25

```
 1     A P P E A R A N C E S:

 2


 3          ARENT FOX, LLP
            1675 Broadway
 4          New York, NY 10019
            BY:   JOSHUA A. FOWKES, ESQ.
 5          For Dr. Gary L. French and Nathan Associates

 6

            D'ARCY JOHNSON & DAY, PC
 7          3120 Fire Road
            Suite 100
 8          Egg Harbor Township, NJ 08234
            BY:   ANDREW J. D'ARCY, ESQ.
 9          For Proposed Intervenor Michelle Fairhurst

10


11          SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
            1440 New York Avenue, N.W.
12          Washington, DC 20005
            BY:   STEVEN C. SUNSHINE, ESQ.
13

14                    and

15          LOWENSTEIN SANDLER, PC
            65 Livingston Avenue
16          Roseland, NJ 07068
            BY:   THOMAS E. REDBURN, JR., ESQ.
17

18                    and

19

            STIKEMAN ELLIOTT, LLP
20          5300 Commerce Court West
            199 Bay Street
21          Toronto, Canada M5L 1B9
            BY:   KATHERINE L. KAY, ESQ.
22          For DeBeers, S.A.

23

24

25
```

1        THE COURT:  All right.  First I will hear the

2   application of DeBeers to enforce the protective order.

3   Can I have appearances by counsel please.

4        MR. SUNSHINE:  Good morning, your Honor.  Steve

5   Sunshine for DeBeers.  With me, a face recognized by this

6   Court, of course, Mr. Redburn.

7        May I also introduce to the Court Katherine Kay.

8   She's a qualified lawyer in Ontario and also in British

9   Columbia.  She's here appearing before your Honor this

10   morning.

11        MS. KAY: Good morning, your Honor.

12        THE COURT:  Good morning.  And I'll hear from

13   respondents.

14        MR. FOWKES:  Joshua Fowkes on behalf of Dr. Gary

15   French and Nathan Associates.

16        THE COURT:  Good morning to you.  All right.  Who's

17   arguing for DeBeers?

18        MR. SUNSHINE:  That will be me, your Honor.

19        THE COURT:  Mr. Sunshine, go ahead.

20        MR. SUNSHINE:  Good morning, your Honor.  Steve

21   Sunshine again.  Your Honor, we're before you this morning

22   for one simple reason, and that reason is that DeBeers gave

23   Dr. French its confidential data.  It selected that data.

24   It gave him models.  It gave him an illustrative model.  It

25   taught him how to use that data, and it did so under the

1    promises that Dr. French would never use that material in

2    any other context.

3         And what he did is he turned -- after signing the

4    confidentiality agreement and after agreeing to be bound by

5    an order that your Honor signed, he's now turned around and

6    he's using that data against DeBeers in an adversarial

7    proceeding in the same cause of action against the same

8    defendants.

9         So, now what we have here are really two questions

10   and they're related to this basic blatant breach of the

11   protective order.  The first question is whether -- is the

12   relief around Dr. French's violation of the protective

13   order, and the second question is relating to Canadian

14   plaintiff Michelle Fairhurst.  She's attempting to inject

15   herself into this private dispute and --

16        THE COURT:  We'll deal with the intervention

17   afterwards.  All right.  Do we have counsel for the

18   Fairhurst plaintiff here?

19        MR. D'ARCY:  Yes, your Honor.

20        THE COURT:  Who is it?

21        MR. D'ARCY:  Andrew D'Arcy.

22        THE COURT:  Okay.  I'm going to deal with the

23   intervention separately.  First let's deal with the motion

24   to enforce the protective order.

25        Let me ask you this, Mr. Sunshine.  All right.  I've

1   got really two components of the protective order that you

2   are asserting.

3        MR. SUNSHINE:  Correct.

4        THE COURT:  One is essentially a one-year bar on

5   performing any expert or consultant's services, I think was

6   the word which was referred to, in connection with this

7   type of proceeding, and the other is that he would not

8   utilize or use any information which he obtained pursuant

9   to the protective order, period.

10       MR. SUNSHINE:  Correct.

11       THE COURT:  Now, let's take the first.  All right.

12   My recollection is -- but please refresh it if I'm wrong --

13   that the order doesn't explicitly state when the one-year

14   ban starts, does it?

15       MR. SUNSHINE:  That's correct, your Honor.  Let me

16   say two things and acknowledge, first I think there are two

17   provisions.  There's the use provision and there's the one-

18   year ban.

19       To DeBeers, the much more important provision is the

20   use provision.

21       THE COURT:  Okay.  Fine.  Then let's dispose of the

22   one-year thing first --

23       MR. SUNSHINE:  Okay.

24       THE COURT:  -- now, because I take a look and I take

25   a look at your argument and your argument on the one year

1    tends -- essentially is the one year starts, in your view,

2    would be when any cert petition and approval of the

3    settlement by the Third Circuit was denied by the Supreme

4    Court.

5          MR. SUNSHINE:  Your Honor, with respect, that's not

6    our argument.

7          THE COURT:  Okay.  It seems like it's a logical

8    extension of the argument you're making, however.

9          MR. SUNSHINE:  No.  Our argument, your Honor, is as

10    follows:  Our argument is the one year starts from the

11    termination of Dr. French's representation in the Sullivan

12    matter, and the reason why that goes in, if you look at the

13    paragraph, we'll agree with you that the actual drafting of

14    that provision in the protective order, I think it's

15    paragraph 17, is not a model of clarity.  I think that was

16    hard and negotiated between the sides, but the intent of

17    that was the idea that as long as Dr. French is working on

18    the Sullivan matter, that he should not be working on other

19    engagements.  And I think if you think about it for a

20    moment, of the hornets' nest of problems that would occur,

21    that as long as Dr. French is working on Sullivan, the

22    problems that happen if he's getting confidential data and

23    then using it on other matters, and I think if you look at

24    the affidavit of Mr. Tabacco, obviously, Mr. Tabacco is

25    well known to this Court.

1          The affidavit of Mr. Tabacco is probably the most

2     striking piece of evidence as to whether the representation

3     and the retention of Dr. French has been terminated.

4          And what is striking about that affidavit, Mr.

5     Tabacco is a very capable lawyer, as your Honor knows from

6     personal experience, nowhere in that affidavit does Mr.

7     Tabacco say the retention is terminated.  All that

8     affidavit says is that he hasn't asked Dr. French to

9     perform work and that he asked him to do an invoice.

10    Because Mr. Tabacco well knows that this case is up on

11    appeal in front of the Third Circuit, that class cert is a

12    big issue, that there is certainly some greater-than-zero

13    probability and perhaps significant probability that this

14    will be turned around.

15         Our point, your Honor, is that nowhere has the

16    retention been terminated, and how else do we know that?

17    Because Dr. French is still holding on to confidential

18    documents.  Not only is Dr. French still holding on to

19    confidential documents, your Honor, even Dr. French admits

20    he reviewed one of these confidential documents to prepare

21    his affidavit in Fairhurst.

22         THE COURT:  We'll deal with that.  Would it be your

23    argument then that the retention continues until the Third

24    Circuit has in fact decided this?

25         MR. SUNSHINE:  My argument, your Honor, is the

1   retention continues until the parties to the retention say

2   it's terminated.  They may terminate it when the Third

3   Circuit decides it.  They may terminate it, you know, at

4   another time period, but certainly Mr. Tabacco could have

5   well said in his affidavit in response -- because this

6   affidavit was asked of Mr. Tabacco knowing full well what

7   the issues in front of this Court were -- Mr. Tabacco could

8   have said, look, the retention is terminated.  What's the

9   question.

10          He very carefully chose not to say that.  And I would

11   suggest further, your Honor, that if this is even a

12   question at all in doubt, we've asked for some discovery

13   because there's been some questionable excerpts of e-mail

14   chains where, if that is really the issue, we can get to

15   the bottom of this question in terms of what the status of

16   the retention truly is, what the status of this destruction

17   of the documents and the record truly are.

18          THE COURT:  Okay.  Now, I'm just curious.  All right.

19   Dr. French sends Mr. Tabacco a letter dated April 18 of

20   2008 essentially saying my work is done, here's the final

21   invoice.

22          Now, do we have in the record when he went to work on

23   this other case?

24          MR. SUNSHINE:  Well, your Honor, there's a formal

25   retention that happens not until December.  Our suspicion

1    is -- and excuse me, your Honor -- our suspicion is that

2    there was a fair amount of discussion before that.  But the

3    reason that -- and pardon counsel handing me something

4    up -- but I think that there is some record before the

5    April 18 letter that you're referring to.  Dr. French

6    didn't write that letter out of whole cloth.

7        In the plaintiffs' materials -- I'm sorry, not the

8    plaintiffs' -- Dr. French's materials, the first sort of

9    time that there's been a ping here is Mr. Tabacco writes an

10    e-mail to Dr. French on April 17th, where he says, Gary,

11    any chance you can send me your final bill in the next few

12    days?  This is the e-mail exhibit that Dr. French attaches

13    on April 20.

14        THE COURT:  Is Mr. Tabacco involved in the Canadian

15    litigation?

16        MR. SUNSHINE:  No, sir.  Well, not to my knowledge, I

17    should say.  And so, my point here is Mr. Tabacco -- and

18    this is argument, your Honor, not fact, I suspect he's

19    worried about objectors getting access to materials.  This

20    isn't the conclusion of the retention and this is brought

21    on by Mr. Tabacco's e-mail here on April 17.

22        THE COURT:  All right.  So, your argument would be

23    that he is retained until you folks discharge him.

24        MR. SUNSHINE:  No, your Honor.  With respect, he's

25    retained until the people who hired him discharge him.

1           THE COURT:  Okay.

2           MR. SUNSHINE:  And Mr. Tabacco, who has got a case

3      going, Mr. Tabacco, who I know from my personal discussions

4      with him, is worried about the case continuing to proceed

5      and would like to use Dr. French if the case ends up back

6      before your Honor.  And Mr. Tabacco could have well said in

7      his affidavit, I've discharged Dr. French.

8           It doesn't say that.  It doesn't come anywhere close

9      to saying that, despite knowing that that's the key issue.

10          THE COURT:  Okay.

11          MR. SUNSHINE:  I do think, your Honor, I mean, that

12     is my position, your Honor, but I do think that's not the

13     key issue.

14          THE COURT:  Fine.  Then I'll tell you what.  Let me

15     hear from opposing counsel on another issue.  Who's arguing

16     for Dr. French?

17          MR. FOWKES:  I am, your Honor.

18          THE COURT:  All right.  Okay.  That's Mr. Fowler?

19          MR. FOWKES:  Mr. Fowkes.

20          THE COURT:  I'm sorry?

21          MR. FOWKES:  Mr. Fowkes.

22          THE COURT:  I'm sorry.  You've got to write clearer.

23     Mr. Fowkes, I will tell you quite clearly what my concern

24     is here.  All right.  I read your brief.  You say that Mr.

25     French only utilized public portions of the affidavits

1    which were filed in this case in connection with the

2    Canadian litigation.  Correct?

3          MR. FOWKES:  Correct, your Honor.

4          THE COURT:  Now, those public portions contain

5    conclusions, do they not?

6          MR. FOWKES:  Yes, your Honor.

7          THE COURT:  They contain conclusions about the manner

8    in which the alleged anti-competitive activity of DeBeers

9    affected various participants in the distribution system of

10   diamonds.  Correct?

11         MR. FOWKES:  Conclusions about whether claimants at

12   different points in the diamond distribution chains were

13   affected.

14         THE COURT:  Fine.  Now, when Dr. French voiced those

15   opinions, to reach those opinions and to reach those

16   conclusions, are you telling me that he did not utilize

17   material which DeBeers had provided to him under this

18   protective order?

19         MR. FOWKES:  What I'm telling you, your Honor, is

20   that the Fairhurst report which is at issue contains

21   opinions that are so basic, so innocuous and so -- so much

22   removed from literally economic textbooks, that they can in

23   no way depend on or rely on or be based on any quantitative

24   data that DeBeers produced, any regression model that

25   DeBeers may have shared or anything of the kind.

1        THE COURT:  Okay.  So let me ask you this.  If I put

2    Dr. French on the stand right now and I go through his

3    affidavit, he will be able to demonstrate to me that within

4    the public knowledge, without any reference at all to the

5    material which he analyzed in this case, he could, would

6    and would have in the past made the same conclusion?

7        MR. FOWKES:  What I can tell you with complete

8    confidence, your Honor, is that if Dr. French were on the

9    stand and you asked him about the Fairhurst report in

10   Canada, in particular, even if you grilled him on the

11   particular paragraphs that DeBeers has compared

12   side-by-side, Dr. French could again with confidence

13   testify that that is innocuous, fundamental economics that

14   reaches one conclusion, your Honor, and that is whether the

15   class members in Canada were affected, not how much, not

16   the proportion to which a price increase was absorbed at

17   different points in the chain, just that they were

18   affected.  He can do that.

19       THE COURT:  Had he ever voiced such an opinion as

20   part of an expert report or an expert analysis in any

21   proceeding which he has had before this lawsuit?

22       MR. FOWKES:  I'm sorry.  Can you repeat the question,

23   your Honor?

24       THE COURT:  Has he ever voiced those opinions in any

25   lawsuit which he participated in before participating in

1      DeBeers?

2            MR. FOWKES:  Your Honor, he helped with and authored

3      class certification affidavits in three lawsuits; one of

4      which is Industrial Diamonds in the Southern District of

5      New York, long before this case; another one is Anco, while

6      he drafted that, the class certification affidavit, he had

7      never received any confidential information from DeBeers.

8            THE COURT:  Did he voice the same opinions that

9      DeBeers is pointing to in the Canadian litigation?

10           MR. FOWKES:  Yes, your Honor.

11           THE COURT:  Before reviewing this material?

12           MR. FOWKES:  Before reviewing DeBeers material?

13           THE COURT:  Yes.

14           MR. FOWKES:  I think the class certification issues

15     in the three cases that Dr. French served as an expert on

16     before this one involved the same class certification

17     issues, your Honor.

18           THE COURT:  That's not my question.  Did he ever

19     voice the same opinions as an expert before having reviewed

20     the DeBeers material?

21           MR. FOWKES:  I think that the answer to that question

22     is, your Honor, is yes.

23           THE COURT:  Good.  Where is Dr. French?

24           MR. FOWKES:  Dr. French is in Virginia.

25           THE COURT:  Fine.  We are going to set up an

1    evidentiary hearing.  You are going to have Dr. French

2    demonstrate to me that every contested paragraph in his

3    affidavit in connection with the Canadian litigation was

4    based upon information which was not provided by DeBeers,

5    which was either publicly available to him or which he had

6    before.

7        In short, and I will put it bluntly, the fact that

8    the affidavit which he submitted in the Canadian litigation

9    does not disclose confidential information is of no moment.

10   Indeed, there are redacted and unredacted versions of the

11   affidavit.  Correct?

12       MR. FOWKES:  Not of the Fairhurst affidavit, your

13   Honor.

14       THE COURT:  No.  But of the DeBeers affidavits.

15   Correct?

16       MR. FOWKES:  Correct, your Honor.

17       THE COURT:  And each one of those affidavits was

18   prepared after Dr. French reviewed substantial amounts of

19   material provided by DeBeers voluntarily after Dr. French

20   agreed to be bound by a protective order.  Correct?

21       MR. FOWKES:  I believe that many of the affidavits,

22   your Honor, were submitted after DeBeers supplied

23   confidential information.

24       THE COURT:  The key ones that are at stake here are

25   the class certification one?

1    MR. FOWKES:  He submitted several class certification

2    affidavits, your Honor.

3    THE COURT:  Okay.  The point is this -- okay -- I

4    don't expect that Dr. French, after having reviewed

5    material, can put ink back in the bottle.  Generalized

6    knowledge which he may have is certainly something which

7    cannot be put back, but when I'm presented with affidavits

8    which are virtually verbatim in some respects when I

9    compare the two affidavits, and the Canadian affidavit is

10   prepared specifically in connection with this lawsuit --

11   I'm sorry -- the DeBeers, Shawn -- what's the caption of

12   this thing?

13   MR. FOWKES:  Sullivan, your Honor.

14   THE COURT:  The Sullivan affidavit is prepared

15   specifically after reviewing this material, and it's

16   reviewed for a particular purpose, so that the parties can

17   jointly demonstrate to this Court that this settlement is

18   reasonable and that this class can be certified and then,

19   lo and behold, identical paragraphs are appearing in the

20   Canadian litigation.

21   I am totally unpersuaded that the mere fact that the

22   paragraphs reflect qualitative information as opposed to

23   quantitative information demonstrates that he could have

24   reached those conclusions without having significantly and

25   carefully digested that DeBeers material, and nothing which

1    is presented to me persuades me otherwise.

2         I will tell you bluntly, Dr. French's affidavit or

3    certification in this case is a model of what is not said.

4    I want to know how he was able to reach those conclusions,

5    even generalized conclusions, without having utilized the

6    information which was contained in the DeBeers

7    certifications.

8         And let me also make this perfectly clear.  Dr.

9    French is a professional.  He was paid money, I would

10   presume thousands upon thousands of dollars in connection

11   with this lawsuit, and I have every reason to assume that

12   he knew exactly what he was signing.

13        As far as the Court's concerned, his ability to use

14   that information is essentially a matter of contract which

15   this Court, by signing it, agreed to enforce, and he

16   doesn't get to walk away from it simply because it doesn't

17   suit his convenience right now.

18        MR. FOWKES:  Your Honor, may I respond?

19        THE COURT:  You've got one minute and then we'll set

20   this down for a hearing.

21        MR. FOWKES:  Your Honor, if you take a look at the

22   Fairhurst report that's at issue, you'll see that the

23   conclusions are not merely general, your Honor.  They are

24   as if Dr. French is teaching an economics 101 class.  He

25   defines in Fairhurst supply curves, demand curves,

 1   equilibrium point.  He cites microeconomics textbooks.

 2        The conclusions that he reaches are as if he's spoon

 3   feeding it to a student in class, and there's no plausible

 4   explanation that confidential information he received for

 5   totally other purposes to quantify damages and to divvy up

 6   settlement allocations can be used when the Fairhurst

 7   report only is concerning --

 8        THE COURT:  Let me stop you.  He received

 9   confidential information in connection with class

10   certification submissions in this case, did he not?

11        MR. FOWKES:  In connection with some of them, yes,

12   your Honor, particularly the supplemental class

13   certification affidavit.  And Dr. French does not use that

14   information until 16 pages later in the supplemental

15   Sullivan class certification affidavit, 16 pages after the

16   portion that you contend is virtually identical, and I'll

17   agree with you, your Honor, they're very similar, but he

18   doesn't use DeBeers' information until he was divvying up

19   and allocating the settlement money.  He did not need it to

20   merely conclude class members were harmed.

21        THE COURT:  And you know something, that's what he's

22   going to explain to me in exquisite detail.

23        Miss Trivino, a date for the hearing.

24        THE CLERK:  You can either do it July 1st or July

25   13th.

1          THE COURT:  July 13.

2          THE CLERK:   10:00?

3          THE COURT:  Yes.

4          MR. SUNSHINE:  Your Honor, just to make that hearing

5     more efficient, we ask for the right to take Dr. French's

6     deposition in advance of that hearing.

7          THE COURT:  No.  We'll do it here now.

8          MR. SUNSHINE:  Thank you.

9          MR. FOWKES:  Your Honor, could you clarify again the

10    goals of the hearing just so that I'm clear?

11         THE COURT:  Yes.  I want the doctor to demonstrate to

12    me convincingly that the certification which he gave in the

13    Canadian litigation did not use or require the use of

14    information which was obtained by him in connection with

15    his role in Sullivan vs. DeBeers.

16         MR. FOWKES:  Thank you.

17         THE COURT:  All right.  Now, the intervention motion,

18    this is a motion to intervene, if I recall correctly,

19    permissive intervention.  Correct?

20         MR. D'ARCY:  Yes, your Honor.

21         THE COURT:  Why should I permit it?

22         MR. D'ARCY:  Your Honor, for the record, Andrew

23    D'Arcy from D'Arcy, Johnson & Day, and with me is Canadian

24    counsel, Reidar Mogerman.

25         Your Honor, as was just detailed, Dr. French is now

1   an expert that is put before the Canadian court with an

2   affidavit for a class certification.  We, of course,

3   believe that this is simply an alternative position because

4   we believe that now, following your most recent ruling,

5   that Dr. French will confirm at the hearing on July 13 that

6   his information was something that could be taught to an

7   economics 101 class.

8        In the event that that is not the case, we, given the

9   right to intervention that is detailed in the brief, we

10  feel that this is a timely application with obviously

11  common elements of law and fact and that the prejudice to

12  DeBeers has not been established, and the only prejudice

13  that we can see is that it would give them -- it would

14  actually be a prejudice to the plaintiff, Canadian

15  plaintiffs giving DeBeers tactical advantage.

16       Throughout the motion opposition brief, we could not

17  identify any direct prejudice other than an argument that

18  there was reliance on the agreement that was put into place

19  and, your Honor, simply put, we believe that that argument

20  must fail in fact since the affidavit that is at issue was

21  put into the public system, the public process.  There is

22  nothing confidential or confidential information which is

23  being sought from Dr. French at this time.

24       THE COURT:  I have two questions.  First of all,

25  courts generally don't permit a party to intervene when

1      their interests are already adequately and fully

2      represented by one of the parties to the action.  Correct?

3            MR. D'ARCY:  Yes, your Honor.

4            THE COURT:  What is there about Dr. French's role in

5      this that does not adequately protect your interests?

6            MR. D'ARCY:  Well, your Honor, I believe that the

7      plaintiffs in Canada, and Michelle Fairhurst as the

8      representative of that class, has a direct interest that

9      Dr. French is obviously putting forth his position here

10     that he has not violated the protective order.

11           However, for purposes of those Canadian plaintiffs, I

12     think they have a direct interest in having Dr. French

13     involved in this litigation that may not be exactly similar

14     to Dr. French, who may be willing to just accept the fact

15     that there is a protective order issue and if, in fact, the

16     protective order is found to be violated, we're then coming

17     in on behalf of the plaintiffs to say, your Honor, we

18     should have our chance to use Dr. French.

19           THE COURT:  So, your argument is that the protective

20     order should be modified to the extent that Dr. French may

21     have relied upon information which he obtained as a result

22     of his examination of the material which DeBeers provided,

23     even if that happens to in fact be violative of the

24     protective order which he agreed to.  Correct?

25           MR. D'ARCY:  Yes, except that we do not believe that

1    it was violative.

2         THE COURT:  I understand that.  But if per chance it

3    happens to be violative of the protective order which he

4    agreed to, you should nevertheless be able to use Dr.

5    French and the information which he proposes to use in

6    violation of the order.  Right?

7         MR. D'ARCY:  Yes, your Honor.

8         THE COURT:  Okay.  Now, would you say that that might

9    be viewed as essentially an effort to do an end run around

10   an agreement which Dr. French voluntarily and freely

11   entered into?

12        MR. D'ARCY:  I would not, your Honor, and the simple

13   reason is because when you break this down, what I am

14   trying to relay to the Court is that we don't see the

15   prejudice at this juncture and, your Honor, keeping in mind

16   that we are just talking about the class certification

17   stage, we just don't see the prejudice as to what we're

18   submitting to the Canadian courts.

19        THE COURT:  Let me ask you something.  All right.  I

20   assume that you are fully familiar with the history of

21   Sullivan vs. DeBeers -- okay -- so Then you know that as a

22   practical matter, until the moment this case settled,

23   DeBeers was in default.

24        I had, in fact, granted a default against DeBeers

25   probably years before the settlement was reached.  You are

1    aware of that, are you not?

2         MR. D'ARCY:  Yes, I am, your Honor.

3         THE COURT:  And you are aware that that was largely

4    because, at least my understanding is that DeBeers'

5    position was that we are not subject to in personam

6    jurisdiction in the United States.  If you get a judgment

7    against us, good luck trying to enforce it around the

8    world, and by not even participating in litigation here, we

9    preserve our position to the extent that any plaintiff

10   tries to enforce that judgment.

11        You are aware of that, are you not?

12        MR. D'ARCY:  Yes, your Honor.

13        THE COURT:  Okay.  Lo and behold, it appears that

14   after mediation with Judge Politan, which, by the way, the

15   Court was not involved in, they rounded up Judge Politan on

16   their own, if I recall correctly, and decided one day to

17   inform the Court that they had reached a settlement and

18   were asking the Court to consider preliminary approval, if

19   I recall correctly.  Right?  And voluntarily those parties

20   agreed that they were going to exchange material which

21   would be relevant to determining damages, class

22   certification issues, and having the Court ultimately rule

23   on whether or not the settlement could be approved as fair

24   as reasonable and whether or not a class in fact could be

25   certified.

1       As a result of that, they negotiated an agreement

2  concerning this material, material which was not obtained

3  through the use of court process, not obtained through

4  notices to produce or depositions or subpoenas, but through

5  an agreement between the parties in that lawsuit in which

6  every expert agreed that the material which they were

7  exposed to was going to be limited.  Correct?

8       MR. D'ARCY:  Yes.

9       THE COURT:  And in support of your position, you're

10  citing cases like Pansy vs. Stroudsburg, is it, which deal

11  with umbrella protective orders in the context of Rule 26

12  through 37 discovery.  Correct?

13       MR. D'ARCY:  Correct.

14       THE COURT:  And by the way, I have between you folks

15  a vast dispute about whether or not Canadian courts would

16  ever authorize this material to be produced by DeBeers.

17  Correct?

18       MR. D'ARCY:  There is a dispute, yes.

19       THE COURT:  Have you sought that information in the

20  Canadian courts?

21       MR. D'ARCY:  It would not be permissible at this

22  juncture in the Canadian litigation.

23       THE COURT:  Now, if I recall correctly, there is,

24  first of all, a U.S. statute which permits a party to seek

25  discovery in the United States for use in a foreign court.

1      Have you used those provisions?

2             MR. D'ARCY:  I do not believe so, your Honor.

3             THE COURT:  Do you know whether or not Canada is a

4      party to the Hague Convention?

5             MR. D'ARCY:  I believe they are, your Honor.

6             THE COURT:  Okay.  I will tell you bluntly, as far as

7      I'm concerned, my characterization of your intervention

8      motion is accurate.  You've only sought relief from the

9      protective order to the extent that Dr. French used

10     material that was obtained pursuant to the protective

11     order.  You have not sought generalized discovery.  You

12     said it's very limited.  That tells me this is simply an

13     alternate way of trying to achieve the use of Dr. French

14     and, as far as I'm concerned, to that extent permissive

15     intervention should be denied because your interests, to

16     the extent that they in fact should validly be considered

17     by this Court, are fully represented by Dr. French.

18            Now, I can tell you right now that if a Canadian

19     court were to order DeBeers to provide information and

20     their response to the Canadian court was we can't because

21     there's a protective order in Sullivan vs. DeBeers which

22     bars us providing this information, you're welcome here any

23     time to litigate whether or not that protective order

24     should be modified under the Pansy standard.  But that's

25     not what you're asking me to do.  The application to

1    intervene is denied.

2         MR. D'ARCY:  Thank you, your Honor.

3         THE COURT:  Oh, yes.  Finally, just so we clarify,

4    Mr. Sunshine, I agree with you that your real argument is

5    whether or not Dr. French utilized and had to utilize

6    information which DeBeers provided to him in connection

7    with material which he is submitting to the Canadian court

8    and in connection with preparing it.

9         In short, if it's purely textbook economics, you

10   lose.  If it's not purely textbook economics but in fact it

11   is material, it could only have been reached on the basis

12   of review of your material, you win.

13        As far as your argument about the one year, I wish

14   you luck in another court, but as far as I'm concerned,

15   that one year ran when he finished making his reports and

16   he asked for his bill.

17        Is it conceivable?  Hey, of course it's conceivable.

18   You folks were at the Third Circuit.  The Third Circuit --

19   I'm not infallible.  All right.  And as superb a job as

20   Judge Wolin did in giving his special master's report, he's

21   not infallible.  The Third Circuit might send this back,

22   might totally reject it.  All right.  That's understood.

23   But that's a bridge which you cross when you come to it.

24        Dr. French doesn't get held on the book indefinitely

25   for a potential remand by the Third Circuit, so, that

1    aspect of your argument is rejected.

2         MR. SUNSHINE:  Okay.

3         THE COURT:  Just so you know where you stand right

4    now when we get to our hearing.  All right.

5         MR. SUNSHINE:  I understand, your Honor.  I

6    understand.

7         On the first point, your Honor, we understand there's

8    an evidentiary hearing coming, but I do want to say we do

9    disagree very strongly with counsel's characterization and

10   we'll come prepared.

11        THE COURT:  And I appreciate that but, you know

12   something, that's why I'm going to have a hearing and, you

13   know something, I'm not going to have a deposition for a

14   very good reason, which is you folks are trial lawyers.  Do

15   what trial lawyers do, examination and cross examination --

16        MR. SUNSHINE:  We'll look forward to it, your Honor.

17        THE COURT:  -- as opposed to interminable depositions

18   upon depositions upon depositions.  Thank you very much,

19   counsel.

20        MR. SUNSHINE:  Thank you, your Honor.

21        (Whereupon the proceedings are adjourned.)

22

23

24

25