**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHAWN SULLIVAN, *et al.,* on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>DB INVESTMENTS, INC., *et al.,*<br><br>　　　　　　　　　　Defendants. | Civil Action Index Nos.<br>04-CV-2819 (SRC) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR AN ORDER APPROVING DISTRIBUTION OF SETTLEMENT FUNDS**
**TO THE INDIRECT PURCHASER CONSUMER SUBCLASS**

Plaintiffs submit this memorandum of law in support of Plaintiffs' motion for an order approving distribution of settlement funds to the Indirect Purchaser Consumer Subclass. A separate motion was previously filed seeking Court approval to distribute to the Indirect Purchaser Reseller Subclass.

## PRELIMINARY STATEMENT

Plaintiffs achieved an historic settlement with Defendant De Beers S.A. and certain of its affiliates (together, "De Beers"). The settlement established a $295 million fund to compensate class members for their injuries caused by De Beers's alleged monopoly of the worldwide supply of gem diamonds, provided for a stipulated injunction restraining De Beers from engaging in specified anticompetitive conduct, and subjected De Beers for the first time to the jurisdiction of a court in the United States to enforce the settlement terms and to obtain relief in the event of any future anticompetitive conduct. On May 22, 2008, after holding a fairness hearing on the settlement and considering objections, and with the aid of the extensive report and recommendation of the Special Master, the Honorable Alfred M. Wolin (Ret.), this Court granted final approval to the settlement.

A lengthy appellate process followed final approval of the settlement. In December 2011, the Third Circuit Court of Appeals affirmed in its entirety this Court's May 2008 judgment. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011). The Supreme Court subsequently denied a petition for certiorari. *Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

Counsel for the Consumers request the Court authorize distribution to Consumer claimants immediately under the terms of the accompanying [Proposed] Order Approving Distribution of the Indirect Consumer Subclass Net Settlement Fund ("Distribution Order").

-2-

### THE PROPOSED DISTRIBUTION ORDER ALLOWS PAYMENTS TO AUTHORIZED CONSUMER CLAIMANTS AND TO THE COURT-APPOINTED CLAIMS ADMINISTRATOR

1. As explained in more detail in the accompanying Declaration of Amy Lake ("Lake Decl."), 606,044 consumer claims were filed. Of those, 574,860 were deemed eligible, and 551,909 exceeded the $10.00 minimum payment threshold. The average payment amount, after removing outliers, is 180.75.

2. Pursuant to the accounting and reconciliation performed by Damasco & Associates ("Damasco") (the Settlement Fund's accountancy firm) the cash balance of the Consumer Subclass Settlement Fund as of February 28, 2013 was $108,727,148.77, after receipt of interest earned and the payment of charges for attorneys' fees and costs, incentive awards to plaintiffs, taxes, and bank, administrative, accounting, claims processing and other costs. *See* Lake Decl. Ex. B ("Damasco Accounting").

3. Plaintiffs respectfully request distribution of the net balance of the Consumer Subclass Settlement Fund – $107,929,082.45 – which was calculated by deducting requested claims administration payment amounts and requested reservations of future claims administration payment amounts and amounts for future unanticipated contingencies (*see infra* Section E) from the cash balance ($108,727,148.77) of the Consumer Subclass Settlement Fund.

B. **The Court Should Approve The Administrative Recommendations Of The Claims Administrator Concerning Acceptance Or Rejection Of Claims**

During the approval process and appellate proceedings, the Court-appointed claims administrator, Rust Consulting, Inc. ("Rust"), diligently collected and processed claims. Rust received 606,044 claims from potential Consumer Subclass members. As described below and in the accompanying Lake Declaration, following Rust's claims administration, deficiency processing, and auditing procedures, Rust recommends, and Class Counsel agree, that 551,909

claims should be accepted as valid and 54,135 claims should be rejected as ineligible for payment (which includes 22,951 claims that were eligible but fell below the $10 *de minimis* payment requirement).

Rust collected and processed the 606,044 claims it received from Consumer Subclass members. Lake Decl. ¶ 6 & Ex. A. Rust entered the claimants' information into a database and assigned each claim a unique claim number. *Id*.

Upon careful review of the claims, Rust determined that a number of claims were deficient in some respect. Such deficiencies included claims that, *inter alia*: (i) contained incomplete transactions; (ii) were not completed on the correct claim form; (iii) only provided one year of purchase information; or (iv) were missing signatures. *Id*. ¶ 9. Rust provided written notice to claimants of deficiencies and afforded claimants a reasonable opportunity to cure their deficient claims. *Id*. ¶ 10. Upon receiving necessary information to cure a claim, Rust recognized the claim as valid. *Id*.

Some claims, however, remained uncured or were inherently deficient. *See id*. ¶¶ 19-20. Rust sent these claimants letters notifying them that their claims were deficient. *Id*. ¶ 10.

As part of its claims administration procedures, Rust required valid proof of purchase for claims made for a single purchase of $10,000 or higher; claims submitted without valid proof of purchase were sent a letter requesting such proof. *Id*. ¶ 11. Upon receipt of proof of purchase documents, either with the original claim form submission or as a response to the deficiency notification letter, Rust completed a review of the proof to ensure validity. *Id*. Prior to finalizing the validation of claim forms, Rust completed an additional review of the top 100 claims based on their total purchase amounts. *Id*.

Finally, Rust received 172 letters from claimants seeking to withdraw their claims. *Id*. ¶ 10.

### C. The Court Should Approve Payment Of Late Claims

Of the 606,044 Consumer claims filed, the Claims Administrator received 5,820 claims that were filed after the May 19, 2008 filing deadline but which, except for their tardiness, are valid in all other respects. *Id*. ¶ 17. The late claims represent approximately $22,054,053.89 in Recognized Claim Amounts compared to the approximately $1,994,206,295.38 in Recognized Claim Amounts attributable to timely claims. *See id*. ¶¶ 16-17. Due to the modest number of late claims, Plaintiffs recommend that the Court approve treating the late claims as valid and timely and permit the late claimants to share in the settlement recovery.

In the Third Circuit, late claimants may share in a settlement's monetary consideration if they can show excusable neglect. *See In re Elec. Carbon Prods. Antitrust Litig.*, 622 F. Supp. 2d 144, 152-53 (D.N.J. 2007) (citing *In re Orthopedic Bone Screw Prods. Liability Litig.*, 246 F.3d 315, 323 (3d Cir. 2001)). To determine whether there was excusable neglect, the Court must examine "(1) the danger of prejudice to the other class members or to the defendants, (2) the length of delay and its effect on judicial proceedings, (3) the reason for the delay, including whether it was [within] the reasonable control of the late claimant, and (4) whether the late claimant acted in good faith." *Elec. Carbon Prods*. 622 F. Supp. 2d at 153. Here, each of these factors weighs in favor of permitting late claimants to share in the settlement.

*First*, paying the late claims would not prejudice the claimants who filed timely claims because "[a]ll legitimate members of the class are normally presumed equally entitled to share in recovery." *Id*. at 154. Indeed, "courts have generally said the mere reduction of money available to timely registrants is not considered prejudice for purposes of this inquiry." *Id*. Even if the effect on the recoveries of the timely claims is significant, this does not mean the timely

-4-

claimants are prejudiced by inclusion of late claims. In *Electrical Carbon Products*, the court permitted late claimants to share in the settlement proceeds even though doing so reduced the recovery of another claimant by 16.6%, or over $1.6 million. *Id*. at 155.[1] Here, the late claims comprise only 1% of the total Recognized Claim Amounts for all valid claims, so the effect on other recoveries will not be significant. *See* Lake Decl. ¶ 17.

*Second*, the vast majority of late claims—5,718 out of the 606,044 claims, representing Recognized Claim Amounts of approximately $22 million—were filed prior to November 2008 (*Id.* ¶ 17), shortly after the May 2008 deadline passed, which represents a very short delay. Further, processing the late claims did not delay or affect any of the judicial proceedings.

*Finally*, there is no indication that the late claimants acted in anything other than good faith. Thus, it is equitable to permit these claimants to share in this historic settlement. Indeed, district courts within the Third Circuit have permitted payment of late claims in similar circumstances. *See, e.g.*, *Weber v. Gov't Emps. Ins. Co.*, 262 F.R.D. 431 (D.N.J. 2009) (approving payment of late claims); *see also Orthopedic Bone Screw*, 246 F.3d at 323 (finding that the district court abused its discretion in excluding a late claimant from sharing in the settlement recovery). Further, late claims are routinely included in settlement distributions in other district courts. *See, e.g.*, *In re Am. Tower Corp. Secs. Litig.*, 648 F. Supp. 2d 223, 225 (D. Mass. 2009) (approving payment of late claims).

To facilitate the efficient distribution of the Indirect Consumer Subclass Net Settlement Fund, however, there must be a final cut-off date after which no other claims may be accepted.

---

[1] *See also id*. at 156 ("[T]he Court has an obligation not to elevate the claims of any class member over the claims of other class members, no matter how large a class member's stake in the case might be.").

Thus, Plaintiffs respectfully request that no claim submitted after March 1, 2013 be accepted for any reason. Rust has not received any claims after this proposed cut-off date. Lake Decl. ¶ 17.

Upon treating the late claims as valid, there are a total of 551,909 claimants that will receive payments ("Authorized Consumer Claimants"). *Id*. ¶ 16.

### D. The Court Should Authorize Distribution Of The Consumer Subclass Net Settlement Fund To Authorized Claimants

Plaintiffs submit that the administration of the settlement has complied with the terms of the Settlement Agreement and the Orders of this Court. Accordingly, Plaintiffs respectfully request that Rust be authorized to mail checks to the Authorized Consumer Claimants.

The Notice informed Consumers that payments falling under the minimum $10.00 will not be paid. *See* Notice at 10. There are 22,951 claimants whose calculated payment falls below the minimum check amount. *Id.* ¶ 18. Consistent with the Notice and the Court-approved Plan of Allocation, these claims will not be paid.

### E. The Court Should Authorize Payment Of Outstanding Claims Administration Expenses, Reserve Of Estimated Expenses, and Reserve of Expenses for Previously Rejected Claimants

Rust has provided Class Counsel with an invoice detailing the fees and expenses it has incurred to date to administer the claims of the Consumer Subclass. *See Id.* ¶ 24 & Ex. C. Class Counsel have reviewed the invoice and believe the fees and expenses are reasonable. Plaintiffs respectfully request that the Court authorize the following payments from the Consumer Subclass Settlement Fund to Rust and Damasco for accrued fees and expenses incurred as of February 28, 2013:

      (i)     $73,022.88 to Rust;

      (ii)    $9,181.86 to Damasco.

*See Id.* ¶ 25 & Exs. B & C.

Plaintiffs further request the Court to authorize Plaintiffs to reserve the following amounts from the Consumer Subclass Settlement Fund for estimated future claims administration expenses that Rust, Damasco, and Class Counsel reasonably expect will be incurred in connection with administering and distributing checks to Consumer Subclass members. These expenses include, among other things, costs for postage, claims processing, and the management of a call center:

(i) $829,799 to Rust;

(ii) $3,672.75 to Damasco.

*See Id.*

Plaintiffs also request the Court to authorize Plaintiffs to reserve from the Consumer Subclass Settlement Fund, the sum of $18,075.00 for future unanticipated contingencies, including for purposes of considering payment to claimants who come forward and provide good cause as to why their previously rejected claim should be paid. *See Id. ¶* 23

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the distributions and enter the proposed Distribution Order.

Dated: April 9, 2013           Respectfully submitted,

By:     /s/ John A. Maher

John A. Maher
450 Springfield Avenue
Summit, NJ  07901-2611
Telephone:  (908) 277-2444

1069575.6

-8-

William Bernstein
Eric B. Fastiff
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000

Josef D. Cooper
Tracy R. Kirkham
COOPER & KIRKHAM, PC
357 Tehama St Unit #2
San Francisco, CA  94103-4169
Telephone:  (415) 788-3030

Craig C. Corbitt
Christopher T. Micheletti
ZELLE, HOFMANN, VOELBEL & MASON, LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:  (415) 693-0770

Stephen Katz
KOREIN TILLERY, LLC
Gateway One on the Mall
701 Market Street, Suite 300
St. Louis, MO  63101-1820
Telephone:  (314) 241-4844

*Indirect Purchaser Consumer Class Counsel*