UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAWN SULLIVAN, *et al.,* on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DB INVESTMENTS, INC., *et al.*,<br><br>Defendants. | Civil Action Index Nos.<br>04-CV-2819 (SRC) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR SUPPLEMENTAL DISTRIBUTION TO CONSUMER SUBCLASS AND
<u>DISPOSITION OF RESIDUAL SETTLEMENT FUNDS</u>**

1272925.7

## **TABLE OF CONTENTS**

|      |                                                                                                                                                         | **Page** |
|------|---------------------------------------------------------------------------------------------------------------------------------------------------------|---------|
| I.   | BACKGROUND ……………………………………………………..…                                                                                                                      | 1       |
| II.  | PLAINTIFFS' REQUESTED DISTRIBUTION TO CLAIMANTS AND DISPOSITION OF ANY REMAINING FUNDS …………………..                                                        | 4       |
|      | A. Supplemental Distribution to Subclass Members …………….....…                                                                                            | 4       |
|      | B. Payment of Fees and Expenses ……………….……………....…….                                                                                                     | 4       |
|      | C. Disposition of Any Funds Remaining After the Supplemental Distribution Through *Cy Pres* Awards ……………………………………………..                                 | 6       |
|      |     1. The Jewelers Vigilance Committee Will Use Any Funds It Receives for Trade Education and Jewelry Consumer Assistance ……………………………….. | 9       |
|      |     2. Common Sense Education's Digital Media Media Education Programs Reach Everyone in the U.S. Making It an Appropriate *Cy Pres* Recipient …………………. | 11      |
| III. | CONCLUSION ……………………………….……………………                                                                                                                        | 14      |

Plaintiffs submit this memorandum in support of their motion for an order approving final distribution of residual settlement funds from the Indirect Purchaser Consumer Subclass Net Settlement Fund ("Consumer Settlement Fund").  Approximately 96% of the Consumer Subclass Net Settlement Fund has been distributed to class members.  As of October 31, 2017, $4,130,467.30 remains in the Consumer Settlement Fund.[1]  This residual is composed of checks not cashed and interest earned.

Counsel for the Consumer Subclass request the Court enter an Order: (A) authorizing that a distribution ("Supplemental Distribution") of these residual funds, less Court-approved fees and expenses, be made to certain of the Consumer Subclass Members who filed timely claims; and (B) directing that out of any funds remaining after the stale date of the Supplemental Distribution checks, Class Counsel be awarded a supplemental fee, and the balance be divided equally between two *cy pres* recipients.  This will allow this matter to proceed to conclusion and be removed from the Court's docket without the necessity of further motions.  The proposed *cy pres* recipients are the Jewelers Vigilance Committee and Common Sense Education.  A "[Proposed] Disbursement Order For Supplemental Distribution To Indirect Purchaser Consumer Subclass and Disposition of Residual Funds" is being lodged concurrently with this motion.

I.      BACKGROUND

Plaintiffs achieved a settlement with Defendant De Beers S.A. and certain of its affiliates (together, "De Beers") which created a $295 million fund to compensate direct and indirect purchasers for their injuries caused by De Beers's alleged monopoly of the worldwide supply of

---

[1] All of the statistics and statements of fact in this memorandum regarding claims processing, payments and the money remaining in the Consumer Settlement Fund are taken from the "Declaration of Jason M. Stinehart Regarding  Supplemental Distribution of Indirect Purchaser Consumer Settlement Fund," ("Stinehart Declaration") filed concurrently herewith.  Since the declaration is relatively short, individual sentence citations will not be given.

gem diamonds. It also provided for a stipulated injunction restraining De Beers from engaging in specified anticompetitive conduct, and subjecting De Beers for the first time to the jurisdiction of a United States Court to enforce the settlement terms and to obtain relief in the event of future anticompetitive conduct. This Court evaluated the settlement and objections thereto with the aid of the extensive Report and Recommendation ("R&R") of the Special Master, the Honorable Alfred M. Wolin (Ret.), and on May 22, 2008, granted final approval to the settlement. Various novel issues regarding antitrust class action settlements engendered a lengthy appellate process that followed final approval. In December 2011, the Third Circuit Court of Appeals *en banc* affirmed this Court's May 2008 judgment. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011). The Supreme Court subsequently denied a petition for certiorari. *Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

The reference to Judge Wolin covered "the method and entitlement for class members to file claims to share in the distribution of the settlement proceeds, or alternative proposals for disbursement of the funds. . . ." *See* ECF No. 306 at 2.[2] During the course of granting final approval of the settlement on May 22, 2008, this Court "adopt[ed] and affirm[ed] the September 6, 2007 'Report and Recommendation of the Special Master' . . . and adopt[ed] as the plan of distribution of the settlement proceeds to members of each of the respective Settlement Classes, the procedures and formulae for said distributions" set out in the R&R. *Id.* at ¶ 12. On May 20, 2013, this Court entered an order approving distribution of the Indirect Purchaser Consumer Subclass Settlement Fund to Authorized Consumer Claimants ("First Distribution Order"). ECF No. 448. The First Distribution Order authorized the payment of $107,929,082.45, the net

---

[2] "Stipulation and Order of Reference to the Honorable Alfred M. Wolin as Special Master," entered December 2, 2005. By the "Order Modifying the Order Dated November 30, 2005 Granting Preliminary Approval of Class Action Settlement" entered March 31, 2006, the Court amended the Order of Reference to include the Direct Purchaser Class. *See* Dkt. No. 306 at 2.

balance of the Consumer Subclass Settlement Fund, "to eligible Consumer Subclass claimants according to the Plan of Allocation approved by this Court and consistent with [the First] Distribution Order." ECF No. 448 at ¶ 7.  The Court also "retain[ed] continuing jurisdiction over the administration and distribution of the settlement proceeds." *Id.* at ¶ 8.

The projected *pro rata* recovery for each Authorized Consumer Claimant was based on the ratio of the Authorized Consumer Claimant's Total Recognized Claim Amount to the sum of all Authorized Consumer Claimants' Total Recognized Claim Amounts.  The consumer distribution procedure adopted by this Court provided that any claim that did not yield a reimbursement check of $10.00 would be disallowed as *de minimis*.  After notice and claim collection, processing and auditing, 551,906 checks totaling $107,929,082.45 were issued to class members whose recovery exceeded the $10 minimum payment.  The *pro rata* share of 22,951 claimants was below the $10 *de minimis* threshold, and these claimants were informed that they would not receive a payment.

Of the checks that remain uncashed at this time, a total of 4,334 were returned undeliverable, and the Claims Administrator has not been able to be reissued to a new address. A total of 39,158 checks have not been returned undeliverable, and remain unaccounted for despite diligent searches to locate their recipients.  These checks carry a stale date of no later than July 9, 2015.  After the payment of taxes, and bank, administrative, accounting, claims processing, fees incurred by the Special Master and other costs from the amount remaining after the last check stale date, and adding interest earned, the cash balance of the Consumer Settlement Fund as of October 31, 2017, is $4,130,467.30.

II. **PLAINTIFFS' REQUESTED DISTRIBUTION TO CLAIMANTS AND DISPOSITION OF ANY REMAINING FUNDS**

In his R&R, Special Master Wolin anticipated that after implementation of the distribution plan, there would likely be residual funds remaining in the Settlement Fund as a result of checks not cashed, interest earned and possibly money set aside for administrative expenses that was not used.  R&R at 166.  Because the Special Master determined that there was "no reasonable way to estimate the amount of residual funds that may be left after distribution," he recommended that this Court defer the determination of the disposition of residual funds until the amount left over could be determined.  *Id.*  Class Counsel are now providing such accounting and recommended disposition of the residual balance remaining in the Consumer Subclass Settlement Fund.

A. **Supplemental Distribution to Subclass Members**

Class Counsel propose that the Court authorize the payment of the fees and expenses described below, and then order a Supplemental Distribution of the balance in the Consumer Settlement Fund to Class Members who filed timely claims, as follows:

(A) $10 payments to each of the 22,881 claimants who were excluded from the original distribution because their *pro rata* calculated recovery was less than $10, and thus, they did not meet the *de minimis* threshold to receive a payment; and

(B) $10 payments to each of the claimants who cashed the original payment check, starting with those who received the smallest initial recovery of $10 in the first distribution and continuing until the fund is depleted down to the last whole $10.00 amount.

Under this plan, the largest approximately 135,000 claimants will not get a supplemental $10.00 check, and the entire residual will go to the claimants who received either no share or the smallest shares of the initial recovery.

### B. Payment of Fees and Expenses

Rust Consulting, the claims administrator, estimates that its fees and expenses to administer the proposed Supplemental Distribution will total approximately $245,113. Stinehart Decl. ¶ 8. Class Counsel request that this Court order that a reserve in that amount be established to pay Rust prior to calculating the amount available for the Supplemental Distribution. Any unused portion of this amount will be contributed to the residual for disposition pursuant to Court's order. Conversely, in the event that this sum is insufficient to cover Rust's actual fees and expenses, it will look solely to any residual remaining from uncashed Supplemental Distribution checks to make up the deficit. *Id*. at ¶ 9..

The Special Master has and will continue to devote time to considering Class Counsel's proposals for the final disposition of the residual remaining in the Consumer Settlement Fund, and preparing a Report and Recommendation to the Court. Class Counsel therefore respectfully request this Court to authorize the payment of fees and expenses to the Special Master in the amount of the invoice submitted by him in connection with this motion.

In addition, Class Counsel, Cooper & Kirkham, P.C., and Lieff Cabraser Heimann & Bernstein, LLP, have expended time and incurred expenses administering the Settlement Fund and supervising the previous distribution, and will continue to expend time and incur expenses in connection with the disposition of the residual and closing of the Consumer Settlement Fund. As set forth in the Declarations of Josef D. Cooper[3] and Eric B. Fastiff,[4] the combined settlement fund administration fees and expenses of these firms to date total approximately $264,000. Class Counsel respectfully request this Court to award them a supplemental fee of $150,000 (to be

---

[3] "Declaration of Josef D. Cooper In Support of Supplemental Distribution and Disposition of Consumer Settlement Fund," filed concurrently herewith, at ¶¶4-5.

[4] "Declaration of Eric B. Fastiff In Support of Attorneys' Fees and Reimbursement of Expenses," filed concurrently herewith, at ¶¶3-5.

divided equally) in consideration of these efforts, and costs reimbursement of $5,580.61 to Cooper & Kirkham and $ 2,966.80 to Lieff Cabraser.  However, unlike the requested fees and expenses for Rust and the Special Master which Class Counsel request be paid before the calculation of the amount available for the Supplemental Distribution, Class Counsel's fee and expense awards should be made contingent and payable only in the event that there is a residual remaining in the Consumer Settlement Fund after any uncashed Supplemental Distribution checks pass their stale date.

      **C.**      **Disposition of Any Funds Remaining After the Supplemental Distribution Through *Cy Pres* Awards**

It can reasonably be anticipated that not all checks issued in the Supplemental Distribution will be cashed, and most likely there will be residual money in the Consumer Settlement Fund.  Accordingly, Class Counsel request that this Court designate the following two *cy pres* recipients to receive any such funds (after payment of the supplemental award of attorneys fees and expenses) in equal shares so that the Consumer Settlement Fund accounting can be closed, and a final order submitted to conclude the matter and remove it from the Court's docket.  The proposed *cy pres* recipients are:

      1. The Jewelers Vigilance Committee ("JVC"), a non-profit organization whose mission is to "promote ethics and integrity in the best interests of consumers and the jewelry industry by ensuring legal compliance with all relevant laws and standards," primarily "focus[ing on] helping companies understand consumer protection laws, and working with them to meet fair advertising standards."[5]

---

[5] A description of the JVC and the JVC's proposed use of any *cy pres* funds it might receive is set out in a letter from Sara E. Yood, Esq., dated September 28, 2017, attached as Exhibit A to the Cooper Declaration.

2. Common Sense Education ("CSE"), a division of Common Sense Media, "the nation's leading nonprofit [organization] dedicated to improving the lives of kids and families by providing the trustworthy information, education, and independent voice they need to thrive in the 21st century."[6]

"*[C]y pres* awards should generally represent a small percentage of total settlement funds." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013). That condition is met here. The total funds available for the Supplemental Distribution are only approximately 4% of the total funds disbursed to the Consumer Subclass, and the residual remaining after that distribution will to be substantially less. Courts have authorized *cy pres* distributions involving far higher percentages of settlement funds. *In re Ins. Brokerage Antitrust Litig.,* 282 F.R.D. 92, 116-17 (D.N.J. 2012) (approving settlement with 15% of the settlement funds in the form of a *cy pres* award); *In re Metlife Demutualization Litig.,* 689 F. Supp. 2d 297, 341 (E.D.N.Y. 2010) ($2.5 million of $36.0 million settlement allocation to the class approved for *cy pres* beneficiaries (7%)); *Parker v. Time Warner Entm't Co., L.P.,* 631 F. Supp. 2d 242, 277 (E.D.N.Y. 2009) ($500,000 of $4.2 million settlement allocation for *cy pres* (12%)); *accord Baby Prods.,* 708 F.3d at 169-170 (vacated settlement approval where *cy pres* component represented 86% of the total funds available for class claimants).

Courts have repeatedly held that *cy pres* distributions are appropriate vehicles for dissemination of residual settlement funds. "*Cy pres* principles have most commonly been used where unclaimed funds remain following distribution of the class fund to individual class members. In such circumstances, the court, analogizing to *cy pres* principles, may distribute the

---

[6] A description of the CSE and Common Sense Media and CSR's proposed use of any *cy pres* funds it might receive is set out in a letter from Jim Steyer. dated October 30, 2017, attached as Exhibit B to the Cooper Declaration.

unclaimed portion for the indirect benefit of the class." *In re Matzo Food Prods. Litig.*, 156 F.R.D. 600, 605 (D.N.J. 1994).[7] Although direct distributions to class members are preferred, "*cy pres* distributions are most appropriate where further individual distributions are economically infeasible . . . ." *Baby Prods.*, 708 F.3d at 173 (citing American Law Institute ("ALI"), Principles of the Law of Aggregate Litig. § 3.07 (2010).[8] Approximately 96% of the cash deposited into the Consumer Subclass Settlement Fund has already been directly distributed to individual class members, as will be a substantial portion of the remaining 4%. It will be economically infeasible to attempt a further distribution of any uncashed check funds remaining after the Supplemental Distribution proposed in this motion.

The Third Circuit has specifically authorized a *cy pres* distribution "of excess settlement funds to a third party to be used for a purpose related to the class injury." *Baby Prods.*, 708 F.3d at 172. "Courts generally require the parties to identify 'a recipient whose interests reasonably approximate those being pursued by the class.'" *Id.* at 180 n.16 (quoting ALI, Principles of the

---

[7] *See also Rosenau v. Unifund Corp.*, 646 F. Supp. 2d 743, 755-756 (E.D. Pa. 2009) (in Fair Debt Collection Practices Act action, approving *cy pres* distribution of "unclaimed, undistributed or undistributable monies" to the Senior Law Center and Legal Aid of Southeastern Pennsylvania).

[8] The pertinent text from § 3.07 reads:

"A court may approve a settlement that proposes a *cy pres* remedy . . . . The court must apply the following criteria in determining whether a *cy pres* award is appropriate:

"(a) If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.

"(b) If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.

"(c) If the court finds that individual distributions are not viable based upon the criteria set forth in subsections (a) and (b), the settlement may utilize a cy pres approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interest reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class."

Law of Aggregate Litig. § 3.07).  In applying *cy pres* principles to specific recipients, it is appropriate for a court to be further guided by "(1) the objectives of the underlying statute(s), (2) the nature of the underlying suit, (3) the interests of the class members, and (4) the geographic scope of the case."  *Schwartz v. Dallas Cowboys Football Club*, *Ltd.*, 362 F. Supp. 2d 574, 576 (E.D. Pa. 2005) (citing *In re Airline Ticket Comm'n Antitrust Litig. Travel Network*, 307 F.3d 679, 682 (8th Cir. 2002).  *See also Ripley v. Sunoco, Inc.,* 287 F.R.D. 300, 316 (E.D. Pa. 2012) (determining after review of background, mission statement and agreement of parties that a Philadelphia non-profit organization focused on health and safety concerns of workers and unions was appropriate *cy pres* beneficiary in overtime employment class action concerning Philadelphia refinery workers).

### 1. The Jewelers Vigilance Committee Will Use Any Funds It Receives for Trade Education and Jewelry Consumer Assistance

The Jewelers Vigilance Committee ("JVC") is a non-profit nationwide trade association that engages in "legal compliance education, monitoring of industry practices, [and] the development of comprehensive compliance tools," and conducts nearly 400 mediations per year of disputes "between consumers and retailers, and within the industry." [9]  The JVC also represents the jewelry trade before federal and state government agencies that regulate the industry, advising on industry practices and consumer concerns, as well as addressing risks for money laundering and terrorist financing in the jewelry supply chain.

JVC has traditionally undertaken specific monitoring programs to study the occurance of products sold with inaccurate representations of quality or content, such as representations of the karat quality of precious metals or carat weight of diamonds, or the amount of synthetic products sold as natural.  JVC selects products based on an increase in the number of consumer

---

[9] The following is a brief summary of certain of the content of Exhibit A to the Cooper Declaration.

complaints, allegations provided by government or investigative agencies, or simply because a product is the subject of increased consumer attention in the marketplace. JVC then regularly acts as an "undercover" shopper, often engaging a forensic investigation firm, and purchases jewelry from retail outlets, documents representations made by the seller, and establishes a chain of custody to determine the source of the particular product.

  The jewelry sellers – including members of JVC - are selected on a random basis and/or because they are the subject of complaints. *Id.* If a misrepresentation is established, JVC contacts the seller of the product, seeks information about the supplier or manufacturer of the goods, and in appropriate cases, will refer cases to prosecuting authorities. In order to greatly enhance its diamond quality monitoring efforts, the JVC seeks to acquire three items of screening technology: the Diamond Sure, the Diamond Sure Mount and the Automated Melee Screening System for an estimated cost to become fully functional of approximately $222,500.00 Funds from the *cy pres* distribution, which will go towards this endeavor, would benefit consumers by enhancing and facilitating the JVC's monitoring activities to investigate allegations pertaining to quality, substitution of imitation or man-made diamonds, and monitoring the third-party reports that often accompany the sale of diamonds. Since purchasers of limited amounts and smaller diamonds are the least able to detect substandard quality or outright fraud, and are also the most likely to fall into the group of smaller claimants that the monetary distribution is intended to reach, facilitating these activities by sending part of the residual of uncashed checks to the JVC is particularly appropriate here.

  The JVC also has taken a leading role in assisting the U.S. jewelry industry in developing responsible supply chains. In order to comply with U.S. law and international standards, the JVC works with its members and its industry partners to educate all members of the supply chain

in ways to avoid conflict diamonds, which are diamonds mined or sold and assist African civil wars. The JVC previously organized two meetings designed to address reducing the risks to consumers associated with deceptive trade practices and the sourcing of conflict diamonds. These meetings, as part of a comprehensive summit and industry dialogue, have "delivered specific initiatives and a set of guiding principles to which our industry can conform to demonstrate to the consumer that the challenges are being met, and that the industry is working towards eliminating any conduct that leads to human rights violations, supports conflict or promotes deceptive trade practices." Funds from the *cy pres* distribution would benefit consumers by allowing the JVC to develop an additional summit and the Responsible Sourcing Toolkit, which would benefit consumers by protecting them from unknowingly contributing to African civil wars and being defrauded by harmful trade practices.

### 2. Common Sense Education's Digital Media Education Programs Reach Everyone in the U.S. Making It an Appropriate *Cy Pres* Recipient

Unlike the JVC, Common Sense Education's ("CSE") activities are not associated with the product that was the subject of this litigation. However, CSE provides direct benefit to members of the Consumer Subclass. Digital media and technology are transforming education from kindergarten through high school, and whether or not Class members are educators, and/or have children or grandchildren, their lives and communities are affected by the quality of the education afforded to their fellow citizens. The use of digital media in politics, government, healthcare and the delivery of virtually all goods and services in this country has exploded in recent years, and the evidence is that this trend will both continue and escalate. Accordingly,

there is no citizen, including those who are members of the Consumer Subclass, whose interests will not be directly benefitted by efforts to foster an educated and media-aware populace.[10]

Digital curricula, apps, on-line videos, and even games are increasing their presence in classrooms. The use of internet-based technology creates both huge opportunities and major challenges. The presence of digital media has the potential to expand students' horizons almost indefinitely by transporting them to the exhibition galleries at the Louve or the furthest reaches of our solar system. It also has the potential to expose them to irresponsible and inappropriate content, from advertising and hate-mongering dressed up as "news," to personal exploitation. Behavioral and ethical issues related to students' use of technology, including cyber bulling, sexting, digital cheating, privacy violations, and plagiarism, all present significant challenges to schools, to families and to the community at large. Virtually all schools recognize the need to both harness the good and protect against the bad in the digital world, but few, especially those serving low-income communities, possess the expertise to capitalize on the opportunity or address the pitfalls of digital media content.

The abundance of digital learning products that claim educational value challenge teachers to make correct choices. Teachers need help in understanding how to integrate internet-based technology with their curricula and teaching techniques. CSE's Student Curricular Resources programs and in-school work help ensure that teachers and students, regardless of a school's zip code, are prepared to harness the power of technology for learning and for life. In addition, CSE's K-12 Digital Citizenship program, designed in conjunction with Dr. Howard Gardner at the Harvard Graduate School of Education, provides students with tools to teach them

---

[10] The following is a brief summary of certain of the content of Exhibit B to the Cooper Declaration.

to critically approach digital media and content, behave safely, and participate responsibly online.

CSE will use any money received in a *cy pres* award for the continued development and national outreach and implementation of its groundbreaking media/digital literacy programs that are currently used in over 102,000 schools, more than 60% of which are Title 1 schools serving predominantly low-income students. CSE's focus on providing assistance to schools in underserved communities will mean that a significant portion of the benefit from its share of a *cy pres* distribution will go directly to the children of families who made small purchases of diamonds, and who are specifically targeted in the supplemental distribution.

CSE's resources, including the K-12 Digital Citizenship program and various curricular programs, are made available to educators for free. Common Sense Graphite is a free platform that helps teachers find the best educational technology tools and learn best practices for teaching with technology. Lesson plans include privacy, cyber bullying, on-line identity and reputation, and respect and creative work. Its student interactive suites such as Digital Passport, a free learning experience for 3rd-5th grade students featuring game modules that teach digital citizenship knowledge and skills, Digital Compass for 6th-9th graders, and Digital Bytes, digital literacy and citizenship program designed for upper-middle and high school students, address media literacy at each level of child development and sophistication of use. Common Sense's education division is a worthy recipient for a portion of the residual funds left over in this litigation, and Class Counsel believe that using funds from a *cy pres* distribution to enhance its programs will both directly and indirectly benefit all Consumer Subclass members.

**III.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the Supplemental Distribution, payments of fees and expenses to Rust and the Special Master from the Consumer Settlement Fund, award a supplemental fee and expenses to Class Counsel from any residual funds remaining after the Supplemental Distribution, and designate the Jewelers Vigilance Committee and Common Sense Education to receive all remaining residual monies in equal shares.

Upon the final disposition of the Consumer Settlement Fund (*i.e.,* upon payment of all cashed distribution checks, all approved and awarded fees and expenses, and the *cy pres* awards, and the closing the Consumer Settlement Fund bank account and submission of final tax returns), Class Counsel will submit a report and form of order to the Court that releases and discharges Rust and Class Counsel from any further responsibility or liability with regard to administration of the Consumer Settlement Fund.

Dated:  November 1, 2017            Respectfully submitted,

  /s/ John A. Maher
John A. Maher
LAW OFFICES OF JOHN A. MAHER
11 Euclid Avenue, No. 7B
Summit, NJ  07901-2611
Telephone:  (908) 591-9683

William Bernstein
Eric B. Fastiff
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: (415) 956-1000

Josef D. Cooper
Tracy R. Kirkham
COOPER & KIRKHAM, PC
357 Tehama St Unit #2
San Francisco, CA 94103-4169
Telephone: (415) 788-3030

**Indirect Purchaser Class Counsel**